JUDGE BRODERICK

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

19 CV 9681

Case No. _____

**<u>VERIFIED COMPLAINT</u>**

**Jury Trial Demanded**

RONALD A. BERGRIN,

*Plaintiff,*

-v-

UNITED STATES OF AMERICA

and

UNITED STATES DEPARTMENT OF JUSTICE
Washington, DC 20535,

and

FEDERAL BUREAU OF INVESTIGATION,
Washington, DC 20535,

and

JAMES COMEY, JR.,
individually and in his
capacity as former Director of the
Federal Bureau of Investigation,
Washington, DC 20505,

and

AARON T. FORD,
individually and in his
capacity as former Director of the
Federal Bureau of Investigation
Newark, NJ 07102,

and

1

SHAWN BROKOS,
individually and in her
capacity as Special Agent,
Federal Bureau of Investigation
Pittsburgh, PA 15203,

and

STEVEN CLINE,
individually and in his
capacity as IRS/Special Agent,
Federal Bureau of Investigation,
Newark New Jersey 07102,

and

"JOHN/JANE DOE",
individually and in his/her
capacity as Special Agents,
Federal Bureau of Investigation,
Newark, New Jersey 07102,

and

PAUL FISHMAN,
individually and in his
capacity as former United States Attorney,
United States Department of Justice,
Newark, New Jersey 07102,

and

OFFICE OF THE INSPECTOR GENERAL
U.S. Department of Justice
Washington, DC 20505,

and

OFFICE OF THE ATTORNEY GENERAL
Washington, DC 20505,

and

UNITED STATES MARSHALS SERVICE
Cleveland, Ohio

and

PETER ELLIOTT,
individually and in his
capacity as United States Marshal,
United States Marshals Service
Cleveland, Ohio

and

"JOHN DOE",
United States Marshals Service,
Cleveland, Ohio,

and

"JOHN DOE",
United States Marshals Service,
Butner, North Carolina,

and

CORECIVIC, INC.
(Formerly known as Corrections Corporation of America)
Brentwood, TN 37027

and

DAMON HININGER,
individually and in his
capacity as Chief Executive Officer, CoreCivic, Inc.
(Formerly known as Corrections Corporation of America)
Brentwood, TN 37027

and

STEVEN GROOMS
individually and in his
capacity as former General Counsel, CoreCivic, Inc.
(Formerly known as Corrections Corporation of America)
Brentwood, TN 37027

and

NORTHEAST OHIO CORRECTIONAL CENTER
Youngstown, Ohio

and

3

LAURA BEDARD
individually and in her capacity as Warden,
Northeast Ohio Correctional Center
Youngstown, Ohio

and

DANA HIVNER,
individually and in her
capacity as Health Services Administrator,
Northeast Ohio Correctional Center
Youngstown, Ohio

and

JASON RUPEKA, STEVEN SENICH, RENEE SFERRA,
KURT KAMPFER, DEBORAH JOHNSON, ARLENE GLASS,
individually and in his/her capacity as
members of the medical staff,
Northeast Ohio Correctional Center
Youngstown, Ohio

and

FEDERAL BUREAU OF PRISONS
Butner, North Carolina

and

J.C. HOLLAND,
individually and in his capacity as Warden,
Federal Medical Center
Butner, North Carolina

and

OFFICE OF THE UNITED STATES ATTORNEY
Cleveland, Ohio

and

STEVEN DETTLEBACH,
individually and in his capacity as
former United States Attorney
Cleveland, Ohio

and

4

BRIAN MCDONOUGH,
individually and in his capacity as
Assistant United States Attorney
Cleveland, Ohio

and

MATTHEW SHEPHERD
individually and in his capacity as
Assistant United States Attorney
Cleveland, Ohio

and

OFFICE OF THE FEDERAL PUBLIC DEFENDER
Cleveland, Ohio

and

DENNIS TEREZ,
individually and in his capacity as
former Federal Public Defender,
Cleveland, Ohio

and

EDWARD BRYAN,
individually and in his capacity as
Assistant Federal Public Defender,
Cleveland, Ohio

and

CLAIRE CURTIS,
individually and in her capacity as
Assistant Federal Public Defender,
Cleveland, Ohio

and

CAROLYN KUCHARSKI,
individually and in her capacity as
Assistant Federal Public Defender,
Cleveland, Ohio

and

5

STEVEN R. JAEGER,
individually and in his capacity as
court-appointed CJA Counsel,
Erlanger, Kentucky 41018

and

GARY W. CRIM,
individually and in his capacity as
court-appointed CJA Counsel,
Dayton, Ohio 45406

and

GEORGE W. SCHMEDLEN,
individually and in his capacity as
court-appointed expert witness,
Shaker Heights, Ohio 44120

and

DAN POLSTER
individually and in his capacity as
District Court Judge individually
Cleveland, Ohio

and

R. GUY COLE
individually and in his capacity as
Chief Judge, United States Court of Appeals for the Sixth Circuit
Cincinnati, Ohio

and

ERIC L. CLAY,
DAMON J. KEITH,
DEBORAH L. COOK,
JEFFREY S. SUTTON,
BERNICE B. DONALD,
RONALD LEE GILMAN,
KAREN NELSON MOORE,
RICHARD ALLEN GRIFFIN,
RICHARD F. SUHRHEINRICH,
JANE BRANSTETTER STRANCH,
individually and in his/her capacity as Judge,
United States Court of Appeals for the Sixth Circuit
Cincinnati, Ohio

6

and

SOLOMON OLIVER, JR.
individually and in his capacity as
Chief United States District Judge,
Cleveland, Ohio

and

ROBERT R. REED
individually and in his capacity as Judge,
Supreme Court of the State of New York
New York, New York

*Defendants.*

---

# COMPLAINT

(Civil Rights Violations; Constitutional Violations; Constitutional Torts;)

---

**COMES NOW** Plaintiff, RONALD BERGRIN, by and through as a pro-se litigant, hereby files his Complaint against all Defendants referenced above:

## INTRODUCTION

1. Plaintiff Ronald Bergrin believes that the United States government remains "a government of laws, and not of men," *Marbury v. Madison*, 5 U.S. 137, 163 (1803), and has brought this civil suit primarily for three (3) reasons: First, to obtain the Justice that Mr. Bergrin is entitled to receive under the Constitution of the United States of America. Second, to prevent other citizens of the United States from suffering the same or similar victimization that Mr. Bergrin suffered by members of the Judiciary and by members of the United States Department of Justice, and by America's privately-owned prison systems, and Lastly, to hopefully bring change to the Judiciary and to the United States Department of Justice. Mr. Bergrin believes that the United States of America has the best judicial system in the world, and that it can be improved upon, and that it should be improved upon, and that it must be improved upon. Plaintiff, Ronald Bergrin, regrets having to file this lawsuit against the United States of America because Mr. Bergrin did not want to embarrass the United States of America by revealing to its citizens the misdeeds of those at the highest levels of government who repeatedly and blatantly violated Mr. Bergrin's constitutional rights and committed numerous crimes against Mr. Bergrin in the herein case.

2. Plaintiff Ronald Bergrin did not bring the above-named Judges into the herein case as Defendants. The Judges who engaged in criminal behavior in this case are solely responsible for bringing themselves into this case. District Court Judge Dan Polster brought Judge R. Guy Cole into the herein case in an effort to conceal the numerous *crimes* that District Court Judge Dan Poster and others had engaged in. Judge R. Guy Cole, Chief Judge, United States Court of Appeals for the Sixth Circuit, then brought his Associate Judges into the criminal conspiracy, specifically to violate Mr. Bergrin's constitutional rights, in an effort to protect Judge Dan Polster from being removed from the bench, disbarred, and possibly charged criminally. Throughout the pendency of this case, and as recently as August 26, 2019, there were more than three hundred (300) violations of Mr. Bergrin's constitutional rights and *crimes* that were committed against Mr. Bergrin by the above Defendants. There are in excess of two thousand (2,000) pieces of documentary evidence supporting the more than 300 crimes and violations of Mr. Bergrin's constitutional rights that were

committed against Mr. Bergrin by the above defendants, and there are in excess of one hundred and thirty (130) witnesses that will testify in the herein case.

## PLAINTIFF PRO-SE

Plaintiff Ronald Bergrin is prosecuting the herein civil suit *pro-se* for three reasons:

3.  **First**, Mr. Bergrin had already retained several civil litigation attorneys from several different law firms to represent Mr. Bergrin in the herein case, but the Assistant U.S. Attorneys who had wrongly indicted Mr. Bergrin and engaged in numerous crimes, do not want to be sued by Mr. Bergrin, so they arranged for members of the FBI to engage in Obstruction of Justice, Witness Tampering, and a host of other crimes, by contacting, coercing, intimidating, and threatening Mr. Bergrin's numerous civil litigation attorneys (in addition to his experts, his doctors, and his witnesses), which attorneys then threw Mr. Bergrin under the proverbial bus prior to abandoning the herein case, and such attorneys (experts, doctors, and witnesses), will be subpoenaed to testify at pre-trial hearings in order for the Court to confirm that the herein allegations are truthful.

4.  As a result of the FBI's Special Agents and other members of the United States Department of Justice conspiring together to engage in Obstruction of Justice, Witness Tampering, and numerous other crimes and numerous other violations of Mr. Bergrin's constitutional rights, the Statute of Limitations *might* have been compromised on *a very limited number* of Mr. Bergrin's herein claims. However, the Statute of Limitations must be tolled from the time that the members of the United States Department of Justice engaged in such Obstruction of Justice and Witness Tampering so that Mr. Bergrin can proceed with *all* of the herein Causes of Action, and therefore, at the end of this complaint, Mr. Bergrin will be requesting *an immediate hearing* in which Mr. Bergrin would subpoena at least five (5) attorneys from at least five (5) different law firms who were contacted, pressured, coerced, intimidated, and threatened by members of the FBI, and Mr. Bergrin would prove that the Statute of Limitations would not have expired on *any* of the herein Causes of Action had it not been for the Obstruction of Justice and the Witness Tampering that members of the FBI engaged in.

5. Crimes constituting Obstruction of Justice are defined primarily in Chapter 73 of Title 18 of the United States Code as follows.

> "Anyone who corruptly endeavors to influence, obstruct, or impede, the due administration of justice in connection with a pending court proceeding is subject to punishment."

6. If so permitted, Mr. Bergrin would *also* subpoena numerous Experts, Doctors, Witnesses, and Defendants, who would also testify that the FBI agents and several Defendants conspired together to violate Mr. Bergrin's constitutional rights and they committed numerous *crimes* against Mr. Bergrin, including, but in no way limited to, Obstruction of Justice, Witness Tampering, Intentional Interference, numerous Due Process of Law violations, and numerous other crimes and violations of Mr. Bergrin's constitutional rights.

> The crime of Witness Tampering is defined by statute at 18 U.S.C. § 1512, which defines it as:
>
> "Tampering with a witness, victim, or an informant"
>
> The punishment for Witness Tampering is up to 20 years in prison if physical force was used, attempted, or threatened. In the herein case, physical force was in-fact *threatened* against Mr. Bergrin's numerous witnesses, expert witnesses, and his attorneys.

7. **Second**, Mr. Bergrin is also prosecuting the herein case *pro-se* because he wants to prove to the jury and to the Court that Mr. Bergrin is extremely *competent*. As a result of Mr. Bergrin being arrested, indicted, and imprisoned for crimes that never occurred, the government was unable to take Mr. Bergrin to trial, and in an effort to protect the members of the FBI who wrongly harassed and arrested Mr. Bergrin, and in an effort to protect members of the Office of the United States Attorney who wrongly indicted Mr. Bergrin, and in order to protect numerous other people that are employed by the United States Department of Justice, Judge Dan Polster then violated *all* of Mr. Bergrin's due process rights, prior to wrongly, maliciously, and sadistically declaring Mr. Bergrin *Incompetent to Stand Trial* prior to dismissing the bogus criminal case that was brought against Mr. Bergrin.

8.    By wrongly declaring Mr. Bergrin *Incompetent to Stand Trial,* Judge Dan Polster was also attempting to prevent Mr. Bergrin from exposing Judge Polster's numerous *crimes* and from suing the above Defendants. Mr. Bergrin believes that it is of paramount importance for the Jury and for the Court to know that Mr. Bergrin is extremely competent, and has never been incompetent. Mr. Bergrin is not an attorney and has no legal training/education, and although Mr. Bergrin is not an attorney, and his legal papers have much to be improved upon, Mr. Bergrin is able to prove all of the herein allegations at trial as a *pro-se* litigant, because the evidence in the herein case is voluminous and incontrovertible. Mr. Bergrin would like to apologize to the Court in advance for the format and numbering of this complaint being imperfect, as this is the first time that Mr. Bergrin has prepared a *pro-se* complaint for submission to the United States District Court, and

9.    **Third**, Mr. Bergrin is also representing himself pro-se because he prefers not to retain more attorneys who would only be contacted, pressured, coerced, intimidated, and threatened by members of the FBI, as the FBI had done to five (5) of Mr. Bergrin's prior attorneys whom Mr. Bergrin paid to represent him in the herein case, and Mr. Bergrin does not want to waste nor spend any more money than is absolutely necessary.

10.    Consistent with the past and present actions of those whom are named as Defendants, this Court will most likely be contacted by the Judges in the Sixth Circuit or by members of the United States Department of Justice, who are going to attempt to "Corrupt the Court" by requesting that the Court enter into its "Criminal Conspiracy" by denying Mr. Bergrin his constitutional right to receive justice in the herein case. The wrongdoing and the corruption that Plaintiff suffered by those members of the United States has plagued this case for the past ten (10) years. If Mr. Bergrin's constitutional rights are not violated by the Judiciary in the Southern District of New York after being contacted by the Judges in the Sixth Circuit or after being contacted by members of the United States Department of Justice, then Mr. Bergrin would annihilate the government's best defense attorneys at trial.

11.    After the FBI wrongly arrested Mr. Bergrin, and after the Office of the U.S. Attorney wrongly indicted Mr. Bergrin, the Assistant U.S. Attorneys realized that Mr. Bergrin had not committed a crime. The Assistant U.S. Attorneys then offered Mr. Bergrin a Plea-Deal in which to send the bogus criminal case down to the *state level* and to sentence Mr. Bergrin to *time-served,* but only if Mr. Bergrin were willing to plead guilty to a *misdemeanor.* Mr. Bergrin rejected the Assistant U.S.

11

Attorneys Plea-Deal, and in response, the Assistant U.S. Attorneys, conspired with Judge Dan Polster, with the Office of the Federal Public Defender, with Judge R. Guy Cole of the United States Court of Appeals for the Sixth Circuit, and with numerous others to keep Mr. Bergrin incarcerated until he pleads guilty to a misdemeanor, but when Mr. Bergrin refused to plead guilty to a crime that never occurred, the Assistant U.S. Attorneys conspired with others at the United States Department of Justice to cause Mr. Bergrin's death via homicide.

## THE DEFENDANTS

12. Each of the above Defendants are a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. Each of the above Defendants are being sued individually and in his/her official capacity as an employee of the United States of America, of the United States Department of Justice, of the Federal Medical Center in Butner, NC, of the Federal Bureau of Prisons, of the State of New York, of the Northeast Ohio Correctional Center, and of CoreCivic, Inc.

## PLAINTIFF

13. Plaintiff Ronald Bergrin was born in New York, New York in April 1958. Mr. Bergrin's paternal great-grandparents came to the United States from Austria in the mid 1800s and his maternal grandparents came to the United States from Poland in 1926. Mr. Bergrin's Father and his Father's Brother grew-up in Brooklyn, New York and they both served in the Korean War. Mr. Bergrin grew-up in Rockland County, and when he was 13 years old he started a neighborhood lawn maintenance business. Mr. Bergrin joined the local volunteer ambulance corps when he was 16 years old and he became certified in Standard and Advanced First Aid, and he rode the ambulance weekly for approximately 5 years. When Mr. Bergrin was 17 years old he decided to forego college and to continue operating his lawn maintenance business in which Mr. Bergrin employed 10 full-time employees. Mr. Bergrin sold his lawn maintenance business in 1980, four years after graduating from high school.

14. After selling his lawn maintenance business, Mr. Bergrin became a licensed real estate broker and he relocated to Manhattan in 1981. Mr. Bergrin worked as a commercial real estate broker and he taught himself the investment banking business and become a Licensed Investment Advisor. For the following twenty-eight years, Mr. Bergrin was in the business of putting together commercial real estate transactions and investment banking transactions. Mr. Bergrin was also a partner in

12

several small businesses and Mr. Bergrin also owned several restaurants with numerous partners. Prior to being arrested in December of 2014, and charged with crimes that never occurred, and incarcerated for a period of 22+ months prior to the bogus criminal case being dismissed, Mr. Bergrin was active in several charitable organizations, including those that support individuals that suffer from Mesothelioma, Autism, and organizations that help people with intellectual and developmental disabilities.

15. Mr. Bergrin was appointed Special Advisor to the late Prime Minister of Israel, Yitzhak Shamir, from 1990-1992. Mr. Bergrin also headed a small organization which sent tens of thousands of New Testament Bibles and Christmas CDs annually to United States service men and women who are stationed overseas. Although Mr. Bergrin has only a high school education, Mr. Bergrin has had several civil litigations that he handled *pro-se*, including one case in the United States District Court in which Mr. Bergrin appeared before the so very Honorable Shira A. Scheindlin, which case lasted in excess of 3 years. Mr. Bergrin won all of his *pro-se* cases as both Plaintiff and Defendant.

16. Plaintiff has complied with all requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e (a) in that Plaintiff has exhausted his administrative remedies and all appeals that were available.

## STATEMENT OF FACTS

17. On or about March 19, 2009, Ronald Bergrin's cousin, a high-profile criminal defense attorney in Newark, New Jersey (formerly, a very well-respected federal prosecutor who worked under both Michael Chertoff and the Honorable Samuel Alito) was arrested and charged with committing numerous crimes (hereinafter referred to as "Mr. Bergrin's Cousin" or "his Cousin"). Mr. Bergrin had no idea why his cousin was arrested, nor did Mr. Bergrin know anything about his cousin's business. Days after his cousin's arrest, Mr. Bergrin had traveled to Florida to take care of his Mother who had been diagnosed with Mesothelioma, a terminal cancer. Mr. Bergrin was in Florida overseeing his Mother's cancer treatment and aiding his Mother from April 1, 2009 through late June 2009, and then Mr. Bergrin traveled to Washington, DC to attend a Mesothelioma Medical Symposium from late June 2009 thru early July 2009. Mr. Bergrin attended the Mesothelioma Medical Symposium in order to learn about his Mother's disease and to find out who are best doctors to treat the disease.

18. Mr. Bergrin later learned that the government had alleged that Mr. Bergrin's cousin had gone into business with several of his criminal clients who are in the drug trade, in an effort to earn millions of dollars from illegal activities. When Mr. Bergrin's cousin was arrested by the FBI, his cousin's assets were seized and his cousin was denied bail. Mr. Bergrin learned that one of the crimes that his cousin was accused of being involved in was "a conspiracy to cause the death of a drug dealer in Newark, New Jersey who had been working for the FBI as a Confidential Informant". Mr. Bergrin's cousin was being held at the Metropolitan Detention Center in Brooklyn, New York.

19. In July of 2009, the cousin contacted Mr. Bergrin, and he requested that Mr. Bergrin visit with him. When Mr. Bergrin visited with his cousin, the cousin assured Mr. Bergrin that he was "innocent of the charges", and the cousin requested that Mr. Bergrin retain a defense team consisting of competent counsel, experts, and private investigators to assist in the cousin's defense of the criminal charges. Mr. Bergrin agreed to support his cousin and to retain the defense team. Several weeks after visiting with his cousin, Mr. Bergrin started interviewing criminal defense attorneys in New York and in New Jersey.

20. In or about August 2009, Mr. Bergrin was interviewing criminal defense attorneys when his cousin asked Mr. Bergrin to visit with him once again at the prison, and at that meeting, the cousin dictated a letter to Mr. Bergrin, and he asked that Mr. Bergrin forward the letter to the Office of the U.S. Attorney in Newark, New Jersey. Mr. Bergrin's recollection is that the letter was "a 54-month plea-deal". At the time, Mr. Bergrin's cousin assured Mr. Bergrin once again that he was "innocent of the charges". Mr. Bergrin printed the letter that his cousin had dictated to him and Mr. Bergrin sent the letter to the Office of the U.S. Attorney in Newark, New Jersey as his cousin had requested.

21. Several days later, Mr. Bergrin received a telephone call from one of the Assistant U.S. Attorneys in New Jersey. The gentleman told Mr. Bergrin that they had reviewed his letter and the gentleman told Mr. Bergrin: "We are very interested in meeting with you to discuss the plea deal". The Assistant U.S. Attorney set up a meeting with Mr. Bergrin for the following day, and he gave Mr. Bergrin the address in Newark, New Jersey where the meeting was to be held. At the time, Mr. Bergrin had never been arrested or accused of a crime, and Mr. Bergrin knew nothing about the criminal justice system.

22. Upon Mr. Bergrin's arrival in Newark, New Jersey, Mr. Bergrin learned that the meeting was taking place at the office of the Federal Bureau of Investigation. Special Agent Shawn Brokos and Special Agent Steven Cline greeted Mr. Bergrin, and the three of them went into a conference room. Mr. Bergrin learned shortly thereafter that Steven Cline was the FBI's Internal Revenue Service Agent and that Shawn Brokos was the FBI Agent that investigated and arrested Mr. Bergrin's cousin.

23. The two FBI agents asked Mr. Bergrin many questions about his cousin's past and about Mr. Bergrin's own background as well. Mr. Bergrin answered all of the questions openly and truthfully, and it was a relatively pleasant meeting. The two FBI agents pretended that the proposal that Mr. Bergrin had sent to the Office of the U.S. Attorney was going to be accepted, but after a couple of hours, Ms. Brokos' demeanor changed, and Ms. Brokos surprised Mr. Bergrin by stating: "We are not going to consider the proposal that you sent to us. If you and your cousin would like to offer us a 20-year plea deal, we would consider it, but we would not consider anything less than 20 years." Ms. Brokos' statement was very surprising to Mr. Bergrin, because the impression that had been given to Mr. Bergrin throughout the prior 2 hours is that the 54-month plea deal was going to be accepted. Mr. Bergrin remembers feeling disappointed that he would have to tell his cousin that the government would not consider anything less than a 20 year sentence.

24. Approximately one week after the meeting at the office of the FBI, Ms. Brokos contacted Mr. Bergrin by telephone and she asked Mr. Bergrin if he would help the FBI in their prosecution of his cousin, by working as an *informant* for the FBI, but Mr. Bergrin explained to Ms. Brokos that he could not do that because he did not want to be disloyal to his cousin. The conversation was short, but very cordial.

25. Mr. Bergrin did not know it at that time, but in an effort to prevent Mr. Bergrin from helping his cousin financially, Ms. Brokos was planning to destroy Mr. Bergrin's business. Mr. Bergrin was extremely naive at the time, but has since learned that sometimes overzealous FBI agents attempt to cut-off the defendant's or the defendant's family's *cash-flow* in order to prevent the defendant from being able to defend himself or herself against the criminal charges.

26.     Within a couple of weeks, the FBI started *harassing* Mr. Bergrin by arranging for FBI agents to wait outside of Mr. Bergrin's residence in New York City and they would say obnoxious things to Mr. Bergrin when he walked out of his residence. The FBI agents were sitting in cars that had New Jersey license plates, and when Mr. Bergrin would walk out of the building in which he resides, the FBI agents would get out of their cars and they would accuse Mr. Bergrin of being "A Traitor To Your Country!", and they would make numerous other obnoxious remarks.

27.     Within a month, the FBI agents had downloaded the names of everyone on Mr. Bergrin's FaceBook account and on Mr. Bergrin's LinkedIn account, and the FBI started contacting all of Mr. Bergrin's friends, relatives, business associates, partners, investors, and his clients. The FBI agents contacted in excess of 200 people that Mr. Bergrin had relationships with, and the FBI agents told these people: "Mr. Bergrin was involved in crimes with his cousin, and the FBI needs people to work as *informants* so that the FBI could charge Mr. Bergrin with crimes".

28.     Numerous people who were contacted by the FBI told Mr. Bergrin what the FBI agents had told them about Mr. Bergrin, which was not truthful, and many of these people were intimidated and threatened by the FBI. More than sixty (60) of the people that were contacted by the FBI had *agreed* to work as Confidential Informants for the FBI after being coerced, intimidated, pressured, misled, and threatened, and those people will be called to testify as witnesses to the FBI's illicit behavior and to the slandering of Mr. Bergrin's reputation by the FBI and to the severe, persistent, and pervasive *harassment* by the FBI and by the FBI's Confidential Informants who repeatedly attempted to set-up and entrap Mr. Bergrin in numerous crimes throughout a period of five (5) years. Such Slander by the members of the FBI was an Intentional Tort which caused severe damage to Mr. Bergrin's reputation, and also caused severe damage to Mr. Bergrin's business, which resulted in a substantial loss of business and substantial financial damages.

29.     After only a few months, the people that Mr. Bergrin had done business with for the prior 28 years would no longer take Mr. Bergrin's calls and many of Mr. Bergrin's business associates, clients, investors, partners, and friends told Mr. Bergrin that they are being contacted, coerced, pressured, intimidated, and threatened by the FBI agents. Mr. Bergrin was extremely stressed-out, and his business was destroyed in a matter of only a few months. Every sixty (60) days, the FBI agents

arranged for its *informants* to attempt to set-up and entrap Mr. Bergrin in criminal schemes, which attempts were unsuccessful, because Mr. Bergrin refused to engage in any criminal behavior.

30. After only a few months of being harassed by the FBI, Mr. Bergrin contacted James Comey, the Director of the FBI in Washington, DC, and Aaron Ford, the Director of the FBI's field office in Newark, New Jersey, by telephone and in writing, but neither of these people would accept Mr. Bergrin's telephone calls nor would they do anything to put an end to the FBI's severe, persistent, and pervasive *harassment.*

31. Mr. Bergrin learned that the FBI had arranged for his neighbor in Manhattan to work as a Confidential Informant for the FBI, who then stole highly confidential information from Mr. Bergrin's computer. The neighbor had rented-out a room in the neighbor's apartment to a young man who knocked on Mr. Bergrin's front door and brought Mr. Bergrin into the neighbor's apartment in order to show Mr. Bergrin all of Mr. Bergrin's personal files that had been downloaded to the desktop of the neighbor's computer. The young man explained to Mr. Bergrin that the neighbor had gone up to the roof of the brownstone in which Mr. Bergrin and his neighbor resides, and the neighbor spliced into Mr. Bergrin's cable-wire and the neighbor was then able to run a wire into his own apartment in order to download all of Mr. Bergrin's personal files from the hard-drive of Mr. Bergrin's personal computer, and the neighbor would then share such information with the FBI agents.

32. Mr. Bergrin then confronted the neighbor and the FBI agent together outside of Mr. Bergrin's home, and a verbal altercation ensued. Mr. Bergrin then contacted the 20th Precinct to file a police report, and he contacted Time Warner Cable, and the following day Time Warner went to the roof of the building and ran all new cable wires. These wrongful acts caused property injury, financial injury, and numerous intangible injuries to Mr. Bergrin, which consisted of Intentional Torts and violations of Mr. Bergrin's Fourth Amendment rights to protect against unlawful search and seizure, and it was a violation of Mr. Bergrin's Fourteenth Amendment right to Due Process by the FBI agents who conspired with the neighbor. Despite the FBI embarking on a campaign to arrange for people that Mr. Bergrin had known to set-up and entrap Mr. Bergrin in numerous crimes throughout a period of 5 years, the FBI was unable to achieve its goals.

17

33.    The FBI agents repeatedly attempted to set-up and entrap Mr. Bergrin in murder-for-hire schemes, extortion schemes, prostitution schemes, schemes in which the informants for the FBI attempted to set-up Mr. Bergrin with underage girls for sex, money laundering schemes, tax evasion schemes, extortion schemes, fraud schemes, insurance fraud schemes, etc., etc., etc. In-fact, the FBI agents are still *today* attempting to set-up and entrap Mr. Bergrin in crimes because they are angry that Mr. Bergrin is suing them, and they are hoping to charge Mr. Bergrin *legitimately* with a crime in order to prevent Mr. Bergrin from being able to sue them.

34.    In an effort to further harass Mr. Bergrin, in early 2011 the FBI put "near-lockstep surveillance" on Mr. Bergrin, and Mr. Bergrin could not leave his home without FBI agents following him around his neighborhood and harassing him. Unless Mr. Bergrin had something very important to attend to outside of his home, Mr. Bergrin only left his home after 12:00 a.m. because Mr. Bergrin did not want anyone to see him in the streets with FBI agents walking in lockstep with him because it was extremely annoying and embarrassing. Despite the FBI's repeated attempts to entrap Mr. Bergrin in crimes, the FBI was unable to entrap Mr. Bergrin, because Mr. Bergrin did not have any desire or any motivation to do anything improper. When Mr. Bergrin would visit frequently with his Mother in Florida (now deceased), the FBI would arrange for local Palm Beach County Police to sit in police cars outside of his Mother's home 24/7 for the sole purpose of harassing Mr. Bergrin. The injuries and damages to Mr. Bergrin's reputation, to his personal life, and to his business, were a directly foreseeable result of the FBI's intentional bad faith, and their willful, wanton, reckless, and deliberately indifferent acts and omissions.

35.    In mid 2011, Mr. Bergrin was under a tremendous amount of stress as a result of the FBI harassing Mr. Bergrin and putting *near lockstep surveillance* on him, and despite having normal blood pressure, low cholesterol, low body fat, and no history of heart-related illness, in June of 2011, Mr. Bergrin suffered a severe heart attack, which left Mr. Bergrin with a permanently damaged heart, and throughout the following period of 7+ months, Mr. Bergrin underwent several surgical procedures. Mr. Bergrin was prescribed numerous *prescription heart-related medications* that Mr. Bergrin must take each and every day for the remainder of his life. Through a "process of elimination", Mr. Bergrin's doctors, who will testify in the herein case, determined that the cause of Mr. Bergrin's heart attack was "stress related".

36.     The FBI was well aware that Mr. Bergrin had a heart attack, because they would say obnoxious things to Mr. Bergrin about his heart attack when he would walk out of his residence, but instead of backing off of Mr. Bergrin, the FBI agents continued to harass him, and they became even more aggressive. Although Mr. Bergrin was hoping that his cousin would not be convicted at trial, Mr. Bergrin's thinking at the time was that if his cousin were convicted, then the FBI would most likely end its campaign of harassment against him.

37.     Mr. Bergrin once again left several telephone messages and wrote numerous letters to Aaron Ford, to James Comey, and to the United States Attorney in New Jersey, Paul Fishman, complaining about the *extreme harassment* that was being perpetrated against Mr. Bergrin by the FBI, but Mr. Ford, Mr. Comey, and Mr. Fishman would not do anything to put an end to the harassment. Mr. Bergrin also contacted the Office of the Inspector General in Washington, DC, but they also refused to intervene.

38.     In February of 2012, Mr. Bergrin had a second heart-attack, which was substantially milder than the first, but it caused Mr. Bergrin to have another surgical procedure and a set-back in his recovery from his prior heart attack in June of 2011.

39.     By late 2011, the investigators who Mr. Bergrin had retained to investigate the allegations against his cousin had uncovered the reason that FBI Special Agent Shawn Brokos had severely, persistently, and pervasively *harassed* Mr. Bergrin and attempted to set-up and entrap Mr. Bergrin in crimes. Several years prior to arresting Mr. Bergrin's cousin, FBI Special Agent Shawn Brokos had arrested a young man from Newark, New Jersey who was purchasing cocaine from a street gang in Newark, and the young man was then selling the cocaine on a street corner. After arresting the young man, Ms. Brokos was able to convince the young man to become a Confidential Informant for the FBI in an effort to set-up the members of the drug gang that had been supplying the young man with his drugs. Ms. Brokos was in a vehicle with the young man, and she took a cell phone out of her pocketbook and she instructed the young man to contact his drug supplier at the street gang in order to purchase "One Kilo of Cocaine", which at the time cost $20,000.00.

19

40.    The young man made the call and he agreed to meet the drug supplier in approximately 30 minutes. However, Ms. Brokos forgot to block-out the telephone number of her cell phone, and when the young man contacted his drug supplier, Ms. Brokos telephone number appeared on the drug supplier's caller ID. Several minutes later, the drug supplier realized that he could not meet the young man in 30 minutes, because the drug supplier needed additional time, because he had to travel to another location to pick-up the Kilo of Cocaine. The drug supplier then attempted to call back the young man at the telephone number that had lit-up on his Caller-ID, but the telephone call had gone into Ms. Brokos' voice-mail, and the voice-mail message stated: "This is Special Agent Brokos of the FBI. Please leave a message and I will get back to you shortly". Within 10 minutes of hearing that recording, approximately 120 gang-members on the street learned that the young man was working as a Confidential Informant for the FBI, and the gang then put a contract out on the young man's life. Ms. Brokos destroyed Mr. Bergrin's business and was attempting to set-up and entrap Mr. Bergrin in crimes in order to prevent the numerous investigators that Mr. Bergrin had retained for his cousin from finding-out the details of Ms. Brokos negligence, which led to the young man's death, but what happened next is an even more compelling reason that Ms. Brokos was frantic about concealing her negligence.

41.    Minutes after the drug supplier had called Ms. Brokos' cell phone, Ms. Brokos and the young man realized that the telephone call had gone into *voice-mail*, and the young man begged Ms. Brokos to hide him in another state or in another city, because the young man knew that the street-gang was going to murder him, but in an effort to conceal her own negligence, Ms. Brokos refused to hide the young man who was then murdered by the street-gang. This was the reason that Ms. Brokos became *obsessed* with Plaintiff Ronald Bergrin and was attempting to prevent Mr. Bergrin from financing the defense team who were ultimately able to uncover Ms. Brokos' negligence, and this was the reason that the FBI repeatedly attempted to set-up and entrap Mr. Bergrin in crimes. Ms. Brokos is extremely angry that the cousin's defense team called Ms. Brokos to testify on the witness stand and made her confess that she was responsible for the death of her Confidential Informant.

42.    Ms. Brokos had alleged that Mr. Bergrin's cousin (who represented one of the members of the street gang that was charged in the conspiracy to murder the Confidential Informant), had suggested that the street-gang get rid of the Confidential Informant. Mr. Bergrin's cousin had gone

to trial in late 2012, and the first trial ended with a "hung jury". Mr. Bergrin attended the first trial in which ten (10) jurors voted *not guilty* and two (2) jurors voted *guilty*.

43. In early 2013, Mr. Bergrin wrote a letter to the District Court Judge that presided over his cousin's first criminal trial, the Honorable William J. Martini. Mr. Bergrin asked Judge Martini to issue a Restraining Order against the FBI in order to put an end to the severe, persistent, pervasive, and unwarranted *harassment* by the FBI, but Judge Martini advised Mr. Bergrin that he was unable to do so, and at that time, Judge Martini suggested that Mr. Bergrin file a lawsuit against the FBI for *harassment* in order for the FBI to end its abuse. Mr. Bergrin did not file a lawsuit at that time because he did not want to sue the FBI.

44. The second trial of Mr. Bergrin's cousin was to take place in late 2013, and approximately one month prior to commencement of the second trial, Mr. Bergrin was crossing the street on West 72nd Street between Broadway and West End Avenue in order to stop into Kinko's/Federal Express, and one of the FBI agents who was sitting in his car in front of Mr. Bergrin's residence pushed on his accelerator and tried to hit Mr. Bergrin with his car as Mr. Bergrin was crossing the street. Had Mr. Bergrin not heard the roar of the engine, and had Mr. Bergrin not run across the street as fast as he could, he would have been killed by the car that swerved towards him. The car actually clipped the tail end of Mr. Bergrin's long coat which was open (unbuttoned), and the tail of the coat sort-of slapped Mr. Bergrin on the side of his body. Mr. Bergrin then turned around and went back into his apartment and he packed his bags and drove out to Kennedy airport without telling anyone where he was going. Mr. Bergrin flew to Central America, where he spent approximately one month, prior to flying into Miami to visit with his Mother for a few days, and then Mr. Bergrin spent several months in Las Vegas traveling from hotel to hotel, without ever using his credit cards or his cell phone or his computer, so that the FBI would not know where Mr. Bergrin was located. Mr. Bergrin returned to New York a couple of months after the conclusion of his cousin's second trial.

45. The second trial of Mr. Bergrin's cousin took place in late 2013, and Mr. Bergrin's cousin was convicted on all counts. After Mr. Bergrin's cousin was convicted, Mr. Bergrin assumed that the FBI would end its *harassment* of Mr. Bergrin, but they didn't.

46. In late 2013, the daughter of Mr. Bergrin's cousin, called Mr. Bergrin to tell him that she had received a call from the FBI in which the FBI asked her to stop by the FBI's field office in Red

Bank, New Jersey in order to pick-up her father's watch and his jewelry, which had been seized by the FBI in 2009 when her father was arrested. However, when she walked into the FBI's office she noticed that a large photo of "Ronald Bergrin" was hanging on the wall of the FBI's reception area. She then asked the FBI agent that brought her the jewelry: "Why is my cousin's photo on your wall?" To which the FBI agent responded: "We need to know what he looks like in case he comes to our office". It seems that as a result of the FBI's severe, persistent, and pervasive harassment of Mr. Bergrin, and as a result of the FBI destroying Mr. Bergrin's business and his life throughout the prior 4-year period of time, the FBI agents had become "paranoid", and they thought that Mr. Bergrin might "retaliate against them with violence". Mr. Bergrin was in-fact planning to retaliate at some point by suing them, as the Honorable William J. Martini had suggested, but the concept of doing something violent never entered Mr. Bergrin's mind.

47.    Several weeks later, the FBI issued a BOLO that was circulated throughout the tri-state area. A BOLO is a document that was sent to all of the FBI agents throughout the tri-state area that stated: "Be On The Lookout For Ronald Bergrin". This BOLO was issued as a result of the FBI agents becoming "paranoid" that Mr. Bergrin might retaliate and do something violent to them as a result of the severe, pervasive, and persistent harassment that victimized Mr. Bergrin throughout the prior 4 year period of time.

48.    In late 2013, Mr. Bergrin contacted his cousin's second Judge who presided over the cousin's second trial, the Honorable Dennis Cavanaugh of the United States District Court of New Jersey. Mr. Bergrin also asked Judge Cavanaugh to issue a Restraining Order against the FBI, but Judge Cavanaugh also declined Mr. Bergrin's request, and he strongly advised Mr. Bergrin to sue the FBI for *harassment*, and Judge Cavanaugh advised Mr. Bergrin that: "The FBI would not stop harassing you if you do not sue them".

49.    The following are 2 actual examples of the FBI attempting to set-up and entrap Mr. Bergrin in crimes, and 1 example of the FBI harassing Mr. Bergrin and violating Mr. Bergrin's constitutional rights by slandering Mr. Bergrin. Mr. Bergrin is not revealing the last names of the Confidential Informants who worked for the FBI, but all of the more than sixty (60) Confidential Informants that Mr. Bergrin was able to identify will be subpoenaed to testify at trial.

22

**Entrapment Scheme**

50.    **Abdul J:** Abdul J was one of the first people to work as a Confidential Informant for the FBI whose mission it was to set-up and entrap Mr. Bergrin in a crime. Abdul did a great job as a Confidential Informant, but because Mr. Bergrin had no interest in committing a crime, Abdul was not able to achieve his ultimate goal of having Mr. Bergrin arrested by the FBI and charged with "conspiracy to commit murder". The following is what took place when Abdul J contacted Mr. Bergrin:

51.    Mr. Bergrin received a telephone call from a man whose name is Abdul J. Abdul told Mr. Bergrin that he's a friend and a former client of Mr. Bergrin's cousin, and he heard about Mr. Bergrin's cousin's arrest, and that he feels terrible about it. Abdul told Mr. Bergrin that Mr. Bergrin's cousin saved-his-life and the lives of several of his family members and friends who were charged with crimes. Abdul told Mr. Bergrin that he believes that he could help his cousin with his defense case, because he was getting information that could potentially be extremely helpful to the defense, and he asked to meet with Mr. Bergrin. Mr. Bergrin told Abdul that Mr. Bergrin would be speaking with his cousin on Monday, and if Mr. Bergrin's cousin advises Mr. Bergrin to meet with Abdul, then Mr. Bergrin will call Abdul back on Monday after Mr. Bergrin speaks with his cousin.

52.    Mr. Bergrin went to visit with his cousin at the Metropolitan Detention Center in Brooklyn, New York on Monday, and Mr. Bergrin told his cousin that Abdul J called and that Abdul said he might be able to help Mr. Bergrin's cousin with his case. Mr. Bergrin's cousin responded by telling Mr. Bergrin that he strongly recommends that Mr. Bergrin meet with Abdul, and he told Mr. Bergrin that Abdul is a really great guy and he's highly intelligent. Mr. Bergrin called Abdul later that afternoon and Abdul asked if he could meet with Mr. Bergrin the following day. Mr. Bergrin agreed to meet with Abdul the following day in Mr. Bergrin's neighborhood on the Upper West Side of Manhattan at Francesco's Pizzeria on Columbus Avenue and 68th Street at 1:00 p.m. The following day, Mr. Bergrin walked into the pizza place, and Abdul introduced himself. Abdul had been waiting for Mr. Bergrin at a table. Mr. Bergrin was about to sit down, but Abdul told Mr. Bergrin that he did not want to talk in the pizza place because he doesn't want anyone to overhear what they are discussing. Abdul then suggested that they take a walk around the block and then

come back to the pizza place and have lunch. Mr. Bergrin sort of liked the fact that Abdul was being careful and that he didn't want anyone to overhear their conversation.

53.   Abdul and Mr. Bergrin then walked around the block, and Abdul asked Mr. Bergrin how is your cousin doing? Mr. Bergrin said he's doing okay, but he doesn't like being in Solitary Confinement. Abdul then asked Mr. Bergrin if Mr. Bergrin likes the Yankees or the Mets. Then he asked Mr. Bergrin if Mr. Bergrin likes the Knicks or the Nets? Then he asked Mr. Bergrin if Mr. Bergrin likes the Giants or the Jets. It was mostly just light conversation, and Abdul didn't talk about Mr. Bergrin's cousin's case other than to say "I'm working on something for your cousin, and I will let you know about it soon". Abdul seemed like a very sharp and a well-spoken guy from the streets. Mr. Bergrin treated Abdul to lunch and they said goodbye.

54.   The following week Mr. Bergrin received another call from Abdul, and Abdul asked if Mr. Bergrin could meet with him again the following day. Mr. Bergrin responded that he would meet with Abdul at the same pizza place at 1:00 p.m. The following day Mr. Bergrin arrived at the pizza place, and Abdul was sitting at a table, and at the next table was Abdul's 2 children. Abdul had ordered pizza for the kids, and when Mr. Bergrin walked into the restaurant, Abdul said: "C'mon let's take a walk around the block so that we could talk". They then walked around the block, and Mr. Bergrin was expecting Abdul to tell Mr. Bergrin something important, but instead, Abdul asked Mr. Bergrin "How's your cousin doing?" Then he talked about the New York Mets, the New York Jets, and the New York Knicks. Then Abdul told Mr. Bergrin that he's working on something "very big", and he might know something in a week or two. Abdul didn't have anything to say that could not have been discussed in the restaurant, but Mr. Bergrin remembers thinking that Abdul is a smart street guy, and he's just being cautious. It was basically just uneventful discussion. Then they walked back to the pizza place and they had lunch, and Mr. Bergrin treated Abdul and his kids to lunch. When Mr. Bergrin saw his cousin a few days later, Mr. Bergrin told is cousin that Abdul said he was working on something "very big", and Mr. Bergrin's cousin assured Mr. Bergrin that "Abdul is a really great guy!"

55.   The following week, Mr. Bergrin received a call from Abdul who told Mr. Bergrin that he needed to meet with him, and he asked Mr. Bergrin if Mr. Bergrin could meet with him in Newark, New Jersey the following day. Abdul told Mr. Bergrin that he doesn't have any gasoline in his car

because of "financial issues", and he therefore cannot meet with Mr. Bergrin in New York City. Mr. Bergrin told Abdul that he would meet with him in Newark and that he would take Abdul to lunch. Mr. Bergrin met with Abdul the following day at a park in Newark, which was located across the street from where Mr. Bergrin's cousin's law office used to be located. Mr. Bergrin handed Abdul an envelope with $500 cash in it, and Mr. Bergrin told Abdul: "This $500 is for you because you're helping my cousin and so that you would be able to put gasoline in your car and so that you would be able to meet with me in New York City". Abdul seemed pleasantly surprised and was very grateful that Mr. Bergrin had given him the $500.

56.    Abdul started off by telling Mr. Bergrin that the information that he was waiting to receive was going to be "coming down any day" and he wants to meet with Mr. Bergrin as soon as he receives the information. He told Mr. Bergrin that he knows the information is "very big" but doesn't know what it is yet. They also discussed that Mr. Bergrin's cousin was supposed to have a hearing in the courthouse in Philadelphia in approximately 10 days at the U.S. Court of Appeals for the Third Circuit, and Abdul asked Mr. Bergrin if he was going to be attending the hearing. Mr. Bergrin told Abdul that Mr. Bergrin was in-fact planning to attend the hearing, and Abdul then asked Mr. Bergrin "How are you going to be traveling to Philadelphia?" Mr. Bergrin told Abdul that he was driving his car to the hearing and that Mr. Bergrin would be glad to pick Abdul up and to give him a ride to Philadelphia to attend the hearing, which offer Abdul gladly accepted. Abdul was very appreciative that Mr. Bergrin was going to be picking him up in Newark to attend the hearing in Philadelphia, and that it wasn't going to cost him any money to travel to Philadelphia. The court hearing was scheduled for 10:00 a.m. and they agreed that Mr. Bergrin would pick Abdul up at his home at 8:00 a.m., and Abdul once again told Mr. Bergrin that he appreciated the money and the ride to Philadelphia. Everything else that they discussed was the same uneventful chatter. They then had lunch and Mr. Bergrin then traveled back to Manhattan.

57.    One week later, Mr. Bergrin received a call from Abdul who told Mr. Bergrin that he received the information that he was waiting for, and Abdul asked Mr. Bergrin if they could meet the following day at 3:00 p.m. at Francesco's Pizzeria, which Mr. Bergrin agreed to do. The following day, Mr. Bergrin walked to the pizza place, but just before Mr. Bergrin was about to enter the restaurant, Mr. Bergrin noticed that there was a red car sitting in front of the pizza place with two men sitting in the front seat, but the car was parked at a fire hydrant. Mr. Bergrin knows that the police and the meter-maids do not permit people to park or sit in front of fire hydrants, and Mr. Bergrin was going

to tell the driver that he might get a ticket from the meter maid, but then Mr. Bergrin realized that the two men were probably just waiting for their pizza to be ready, so instead of saying something to the men, Mr. Bergrin just entered into the pizza place. When Mr. Bergrin walked into the pizza place, Abdul was sitting at a table waiting for Mr. Bergrin. Mr. Bergrin walked over to Abdul and they shook hands, and Mr. Bergrin sat down. It was Tuesday, and Abdul and Mr. Bergrin had made plans for Mr. Bergrin to pick Abdul up on Thursday (in 2 days) to travel to Philadelphia for Mr. Bergrin's cousin's hearing. Mr. Bergrin immediately confirmed with Abdul that Mr. Bergrin would be picking Abdul up at 8:00 a.m. on Thursday to go to Philadelphia to attend the cousin's hearing. A waitress then came over to their table and Abdul and Mr. Bergrin ordered lunch. After the waitress walked away, Abdul leaned towards Mr. Bergrin and he told Mr. Bergrin the following:

> **"I have the information that I've been waiting for. Tommy Moran is a lawyer that was arrested with your cousin. Tommy worked for your cousin. I found out that Tommy made a deal to testify against your cousin in exchange for a very substantial reduction in his prison sentence. I have a guy on the inside at the prison where Tommy Moran is being held, and I could arrange to have Tommy killed in prison if you give me the go ahead"**

58.     Upon hearing those words, Mr. Bergrin realized that Abdul had just asked Mr. Bergrin if he wanted to cause the murder of Tommy Moran. Mr. Bergrin immediately responded to Abdul: "I would never get involved in anything like that!" Mr. Bergrin then remembered that at the prior two meetings that Mr. Bergrin had with Abdul at the pizza place, Abdul wouldn't even discuss the Mets and the Yankees in the pizza place for fear that someone might overhear their conversation, but now, Abdul is asking Mr. Bergrin to sanction a hit on Tommy Moran in the same pizza place. Something didn't seem right. A few minutes later the waitress brought over their lunch. Mr. Bergrin remembers feeling extremely uncomfortable. Mr. Bergrin ate his lunch very quickly and Mr. Bergrin then asked the waitress for a check. Mr. Bergrin paid the check and then Mr. Bergrin told Abdul that Mr. Bergrin had to go.

59.     However, when Mr. Bergrin walked out of the pizza place, Mr. Bergrin noticed that the red car was still sitting in the same location in front of the fire hydrant, and both of the men who were sitting in the front seat of the car were staring at Mr. Bergrin as Mr. Bergrin exited the restaurant. At that time, Mr. Bergrin realized that Abdul had just attempted to set-up and entrap Mr. Bergrin in a

26

"murder-for-hire scheme", and those two guys in the red car are most likely FBI agents. Mr. Bergrin remembers thinking that Abdul was probably wearing a wire, and that he probably wanted to meet with Mr. Bergrin a little later in the day (at 3:00 p.m. instead of at 1:00 p.m.) so that it wasn't noisy in the pizza place so that if Mr. Bergrin were to agree to cause the murder of Tommy Moran, the conversation would be clearly heard on the recording device.

60.    Mr. Bergrin got back to his apartment and Mr. Bergrin was very upset. Mr. Bergrin then realized that he had to tell his cousin that Abdul was working as a Confidential Informant for the FBI, but Mr. Bergrin did not think that his cousin would believe him, so Mr. Bergrin devised a strategy that would permit Mr. Bergrin the opportunity to confirm his belief "that Abdul was working with the FBI to set-up and entrap Mr. Bergrin in a crime". Mr. Bergrin decided to send an email to his cousin (Federal prisons have an email system for the inmates to use) telling his cousin that: "I am positive that Abdul is working for the FBI as a Confidential Informant, and that Abdul had just attempted to set-me-up and entrap-me in a scheme in which to murder Tommy Moran". Mr. Bergrin wanted to send this email to his cousin because Mr. Bergrin knew that *FBI Special Agent Shawn Brokos* receives copies of all of Mr. Bergrin's cousin's *correspondence*, and Mr. Bergrin knew that if Ms. Brokos read Mr. Bergrin's email, that she would not permit one of her Confidential Informant's to travel with Mr. Bergrin to Philadelphia on Thursday, because the FBI agent would fear that Mr. Bergrin would cause injury to Abdul if Mr. Bergrin knew that Abdul was working for the FBI as a Confidential Informant. Mr. Bergrin also realized that if Abdul were to back-out of their plans for Mr. Bergrin to pick Abdul up on Thursday to travel with Mr. Bergrin to Philadelphia, it was because the FBI told Abdul that he could no longer meet with Mr. Bergrin. Mr. Bergrin then sent an email to his cousin, which stated the following:

> **"Abdul J is working for the FBI as a Confidential Informant and he attempted to set-me-up and entrap-me by asking me if I wanted him to arrange for Tommy Moran to be murdered in prison.....Ron".**

By the end of the day on Tuesday Mr. Bergrin received an email response from his cousin that stated the following:

**"Ron.....Abdul would never work against me as a Confidential Informant. He loves me. I saved his life and the lives of several of his family members. I think you're just being overly cautious"**

61. However, the following day (Wednesday), Mr. Bergrin called Abdul's cell phone number numerous times throughout the day to confirm that Mr. Bergrin would be picking Abdul up on Thursday morning at 8:00 a.m. to travel to Philadelphia, but Abdul would not answer Mr. Bergrin's telephone calls, which had never happened before. Mr. Bergrin then called Abdul from a telephone number that Abdul was not familiar with, and Abdul then answered his telephone. Mr. Bergrin said "Hi Abdul, its Ron! I was just calling to confirm that I will be picking you up tomorrow morning at 8:00 a.m. to go to Philadelphia", but Abdul then responded: "No. Don't pick me up. I'll get a ride there myself". Mr. Bergrin then asked Abdul: "Why don't you want me to pick you up?" To which Abdul responded: "I got another ride" and he hung up the telephone.

62. The following morning, Mr. Bergrin arrived at the courthouse in Philadelphia at least an hour and a half before the hearing was to begin, because Mr. Bergrin wanted to see if Abdul was going to walk into the lobby by himself or with someone else. Approximately 30 minutes after Mr. Bergrin arrived at the courthouse, Abdul walked into the lobby of the courthouse with Special Agent Shawn Brokos and with several other FBI agents. The next time that Mr. Bergrin saw Abdul was at Mr. Bergrin's cousin's first trial, and Abdul was sitting directly next to Special Agent Shawn Brokos of the FBI in the courtroom, despite that side of the courtroom being reserved for people that were supportive of the prosecution. It was Shawn Brokos who attempted to set-up and entrap Mr. Bergrin in the murder-for-hire scheme, and Shawn Brokos was Abdul's handler.

63. Days after this incident, Mr. Bergrin arranged for an investigator to look into Abdul's background, and Mr. Bergrin's investigator learned that Abdul had gotten arrested by Shawn Brokos several months earlier, and he retained an attorney by the name of Robert Pierce, Esq. to represent him in his defense of the criminal charges. However, weeks after retaining Mr. Pierce to defend him, Abdul contacted Mr. Pierce and told him that the FBI had dropped the charges against him and that Mr. Pierce's services were no longer needed. However, Mr. Pierce did not believe Abdul, and Mr. Pierce was sure that Abdul had become a Confidential Informant for the FBI, and this was the reason that Abdul had attempted to set-up and entrap Mr. Bergrin in a murder-for-hire scheme. Mr. Bergrin will be subpoenaing Abdul to testify in any upcoming trial.

**Next Entrapment Scheme**

64.   **Sex with a Minor: Another scheme developed by the FBI to set-up and entrap Mr. Bergrin in a crime.**

Mr. Bergrin was working on his laptop computer, and for the first time ever, Mr. Bergrin received a "pop-up". It was a message from someone named Lisa. The following dialogue is what took place:

**Alleged Female:** Hi Ron. It's Lisa.

**Ron Bergrin:** Lisa who?

**Alleged Female:** You just met me a few days ago; did you already forget who I am?

**Ron Bergrin:** Where did I meet you?

**Alleged Female:** What are you doing tonight? Wanna come over?

**Ron Bergrin:** Where did I meet you?

**Alleged Female:** I don't know the name of the place it was a bar/restaurant. So, do you want to come over tonight?

**Ron Bergrin:** Where do you live?

**Alleged Female:** Fort Lee, New Jersey. Just over the GW Bridge.

**Ron Bergrin:** Whom do you live with?

**Alleged Female:** Nobody's going to be home except me. Can you bring something to drink?

**Ron Bergrin:** Do you live alone?

**Alleged Female:** No. But nobody's going to be home except me. We have the house to ourselves. Can you bring with you some Vodka and some Red Bull?

**Ron Bergrin:** Whom do you live with?

**Alleged Female:** My parents, but they're away.

**Ron Bergrin:** How old are you?

**Alleged Female:** I'm old enough!

**Ron Bergrin:** I want to know how old you are!

**Alleged Female:** I told you I'm old enough.

**Ron Bergrin:** I want to know exactly how old you are!

**Alleged Female:** I'm 16 years old, but I have lots of experience.

**Ron Bergrin then logged off of the computer.**

65. Mr. Bergrin did not know it at the time, but after Mr. Bergrin told the investigators that Mr. Bergrin retained for his cousin about this experience, the investigators told Mr. Bergrin that the FBI often sets-up-men and entraps them in these types of schemes with allegedly underage girls.

66. **The following is only one example of FBI's Severe, Persistent, and Pervasive *Harassment* and *Slandering* of Mr. Bergrin.**

67. David Parks, Esq. of Mautner Glick Corp. is the Managing Agent of the building in which Mr. Bergrin resides at 218 West 72nd Street, New York, NY 10023 and Marc Wigder, Esq. is the Landlord/Owner of the building located at 218 West 72nd Street:

68.   In early 2014, Mr. Bergrin stopped by the office of the Managing Agent of the residential building in which Mr. Bergrin resides on the Upper West Side in order to pay his monthly apartment rent, which Mr. Bergrin generally pays several months in advance for convenience purposes. Mr. Bergrin met with the managing agent, David Parks, Esq., of Mautner Glick Corp, and after paying his rent, Mr. Parks asked Mr. Bergrin to step into the conference room with him for a few minutes. Mr. Parks informed Mr. Bergrin that the FBI had contacted Mr. Bergrin's landlord, Marc Wigder. The FBI agents told Mr. Wigder that Mr. Bergrin committed numerous crimes with Mr. Bergrin's cousin, and that Mr. Bergrin also might have committed *income tax evasion, money laundering, and other crimes*, and the Managing Agent told Mr. Bergrin that the FBI told Mr. Wigder that: "It is illegal to accept *dirty money* once you know that the money's dirty". Mr. Parks also volunteered that the FBI asked Mr. Wigder numerous questions about Mr. Bergrin, and Mr. Parks also told Mr. Bergrin that Marc Wigder would like Mr. Bergrin to leave the building when his lease expires. However, Mr. Bergrin's apartment is Rent Stabilized and Mr. Bergrin has a legal right to renew his apartment lease. Mr. Bergrin then explained to Mr. Parks that Mr. Bergrin never committed a crime, but the FBI has been harassing Mr. Bergrin on a daily basis because Mr. Bergrin supported his cousin when his cousin had gotten arrested.

69.   A few weeks later, Mr. Bergrin received a bill from the Managing Agent of the residential building that Mr. Bergrin resides for approximately $1,800.00 for "legal fees". Mr. Bergrin then contacted Mr. Parks, and Mr. Bergrin asked Mr. Parks what the bill for legal fees was for? To which Mr. Parks responded: "You were late in paying your rent and we had to retain counsel". Mr. Bergrin then responded: "What are you talking about? I always pay my rent prior to it being due!" Mr. Bergrin did not pay the invoice for the legal fees, and months later Mr. Bergrin threatened to bring the landlord and the managing agent to court to settle the matter, but after threatening to sue the landlord and the managing agent, Mr. Parks removed the legal fees from Mr. Bergrin's monthly invoice.

70.   However, as you will learn later on in this complaint, this was not the end of the FBI's interference with Mr. Bergrin's relationship with his landlord and with Mr. Bergrin's apartment, because during the period of time that Mr. Bergrin was falsely arrested and incarcerated for a period of 22+ months for a crime that never occurred, the FBI instructed Mr. Bergrin's landlord to *clean-out* Mr. Bergrin's apartment and to remove all of Mr. Bergrin's personal belongings, including his furniture, clothing, and all of his *valuables* (which included valuable artwork and antiques), and

31

after the bogus criminal case was dismissed, Mr. Bergrin returned home to an empty apartment. However, as you will also learn later on in this complaint, Judge R. Guy Cole, Chief Judge, United States Court of Appeals for the Sixth Circuit, then engaged in Intentional Interference and Obstruction of Justice, and Judge Cole prevented Mr. Bergrin from recovering the moneys that the landlord's insurance company was to pay to Mr. Bergrin for the loss of Mr. Bergrin's personal property. There is no end to the corruption that had been and is still being perpetrated by members of the United States Department of Justice and by the corrupt Judges in the Sixth Circuit.

71.    Attached hereto is a list of *exhibits*, which form a part of this complaint. Such exhibits include a *partial list* of the Confidential Informants who worked for the FBI in which to set-up and entrap Mr. Bergrin in crimes, and a list of the criminal schemes in which the CI's attempted to entrap Mr. Bergrin.

72.    In or about 2013, Special Agent Shawn Brokos was transferred from New Jersey to Pittsburgh, PA. However, despite Ms. Brokos' relocation, the *baton-of-harassment* was then passed from Ms. Brokos to other FBI agents who continued to harass Mr. Bergrin on a daily basis, and continued to attempt to set-up and entrap Mr. Bergrin in crimes. Mr. Bergrin did not want to sue the FBI as the Honorable William J. Martini and the Honorable Dennis Cavanaugh had suggested. However, in an attempt to get the FBI off of his back, Mr. Bergrin did the following:

73.    A). In or about 2013, Mr. Bergrin Googled Ms. Brokos' name and he found her *home address* on-line, and Mr. Bergrin then sent "Easter Cards" to Shawn Brokos' home. Mr. Bergrin simply added her name and address to the computerized list of the more than 200 people that Mr. Bergrin had been sending Easter Cards to each year. Mr. Bergrin's thinking at the time was that if Ms. Brokos was aware that Mr. Bergrin knew where she lived in Pennsylvania, that *she might put an end to the severe, persistent, and pervasive harassment* by pulling the other FBI agents off of Mr. Bergrin, and

74.    B). In early and mid 2014, Mr. Bergrin had written several letters to the FBI threatening to contact the television news media, the radio news media, the online news media, and the news print media, in order to expose the *harassment* and the *wrongdoing* by the members of the FBI, and

75.    C). Mr. Bergrin was considering "stopping by the home of Shawn Brokos" in Pennsylvania to "say hello", in order to once again let Ms. Brokos know that Mr. Bergrin *knows where she lives*, in hopes of convincing her to pull the FBI agents off of him.

76.    In mid November 2014, Mr. Bergrin had enough evidence of wrongdoing by the FBI, and numerous witnesses that would testify on Mr. Bergrin's behalf in order to initiate a lawsuit against the FBI for *harassment* and for the destruction of Mr. Bergrin's reputation and his business, which lawsuit Mr. Bergrin had repeatedly threatened to file against the FBI. In mid November 2014, Mr. Bergrin forwarded a letter to Aaron Ford of the FBI (with copies to James Comey), informing them that Mr. Bergrin would be serving Mr. Ford, Mr. Comey, Shawn Brokos, Paul Fishman, and others with a civil suit for *harassment* within the next sixty (60) days.

77.    Days after sending that letter to the FBI, Mr. Bergrin received a telephone call from a friend of Mr. Bergrin's who had traveled from New York to Cleveland, Ohio with his wife. The friend's wife needed an outpatient medical procedure that she wanted to be administered at the Cleveland Clinic (similar to a colonoscopy). However, there was a *complication* in the surgical room, in that the woman's bowel was accidentally punctured by the doctor, and the woman's body went into Septic Shock, the woman's lungs collapsed, and the friend's wife was in *severely critical condition*. Mr. Bergrin's friend asked Mr. Bergrin if he would to come out to Cleveland to assist his friend and to support the family, and the following day, Mr. Bergrin traveled to Cleveland. Mr. Bergrin did not retain counsel to prepare the lawsuit against the FBI as he had written in his letter to the FBI, because he was attending to his friend's medical emergency in Cleveland.

78.    On or about December 19, 2014, which was towards the end of the 30 day period that Mr. Bergrin had been in Cleveland, Mr. Bergrin was walking into the Hilton Garden Inn hotel, when he was arrested in the lobby of the hotel by the FBI. Mr. Bergrin was initially charged with 2 counts of "threatening an FBI agent via email", which Mr. Bergrin did *not* do.

79.     The FBI agents who arrested Mr. Bergrin told Mr. Bergrin:

**"The FBI agents in New York said that you sent an email to Special Agent Shawn Brokos of the FBI from the state of Minnesota, threatening to murder her".**

But Mr. Bergrin responded:

**"I did not send Ms. Brokos an email. I don't know her email address, and I have never been in the state of Minnesota".**

80.     Mr. Bergrin then asked the FBI agents if he could *see* the email, but the FBI agents told Mr. Bergrin that they did not have it, and that it was in New York or New Jersey. Mr. Bergrin knew instantly that he was being arrested by the FBI in retaliation for Mr. Bergrin threatening to sue the FBI for five (5) long-years of severe, persistent, and pervasive *harassment*, which caused the destruction of Mr. Bergrin's health, his reputation, his many relationships, and his business.

81.     This was a "Retaliatory Arrest" as a result of Mr. Bergrin threatening to sue the FBI agents that were harassing him. There was no "probable cause" to arrest Mr. Bergrin, but probable cause doesn't matter because probable cause is always in the eye of the beholder.

82.     The FBI agents then walked with Mr. Bergrin to his hotel room so that they could seize Mr. Bergrin's laptop computer, from which Mr. Bergrin *allegedly* communicated the threat to Ms. Brokos. When the FBI agents were in Mr. Bergrin's hotel room, Mr. Bergrin asked them to take along a bag that contained Mr. Bergrin's *prescription heart-related medications* and his *medical records*, so that Mr. Bergrin would be assured to receive his prescription heart-related medications. The FBI agents took with them the laptop computer and the plastic bag containing Mr. Bergrin's medical records and his prescription heart medications.

83.     Unbeknownst to Mr. Bergrin, his laptop computer was forwarded overnight to the FBI's headquarters in Quantico, Virginia, and 3 days later, Mr. Bergrin was brought to the courthouse to be arraigned.

84.    On or about December 22, 2014 (which was approximately 3 days after Mr. Bergrin was arrested in Cleveland), Mr. Bergrin was brought to the courthouse for an *arraignment*. An attorney from the Office of the Federal Public Defender, Charles Fleming, Esq., sat-in-on-the-arraignment on Mr. Bergrin's behalf. Mr. Fleming explained to Mr. Bergrin that he would not be representing Mr. Bergrin in the defense of the criminal charges, but that there were two other attorneys from the Office of the Federal Public Defender who would be representing Mr. Bergrin. Mr. Bergrin was not very concerned about being arrested because Mr. Bergrin hadn't committed a crime, and Mr. Bergrin knew that the FBI agents in New York were aware that Mr. Bergrin hadn't committed a crime.

85.    Mr. Fleming then shared with Mr. Bergrin that he spoke with the Assistant U.S. Attorney, Brian McDonough, Esq., and Mr. McDonough offered Mr. Bergrin a "Plea Deal" in which Mr. McDonough offered to send the case down to the *state level* and he would recommend a sentence of *time-served* (after arresting Mr. Bergrin only 3 days earlier), but only if Mr. Bergrin would agree to plead guilty to *one misdemeanor*. Mr. Fleming also told Mr. Bergrin that Mr. McDonough said that Mr. Bergrin could plead guilty to "any misdemeanor of Mr. Bergrin's choice". However, Mr. Bergrin *rejected* the Misdemeanor Plea-Deal because Mr. Bergrin did not want to plead guilty to a crime that he did not commit, and to a crime that never occurred.

86.    After the arraignment, Mr. Bergrin was transferred from the Cuyahoga County Prison in Cleveland to the Northeast Ohio Correctional Center in Youngstown, Ohio. The Northeast Ohio Correctional Center is a private prison that is owned and managed by CoreCivic, Inc. (formerly known as "Corrections Corporation of America"). Pre-trial inmates at the Northeast Ohio Correctional Center are under the custody of the United States Marshals Service, and Peter Elliott is the United States Marshal in Cleveland, Ohio.

87.    On or about December 30, 2014, which was approximately eleven (11) days after being arrested, Mr. Bergrin was brought back to the courthouse for the indictment to be read and for a bail hearing. Prior to the hearing, Mr. Bergrin was brought to the attorney-client meeting room where Mr. Bergrin met with Carolyn Kucharski, Esq. of the Office of the Federal Public Defender. Carolyn Kucharski told Mr. Bergrin that she and her colleague, Edward Bryan, Esq., were appointed to represent Mr. Bergrin. Ms. Kucharski told Mr. Bergrin the following: "The Office of the U.S.

Attorney offered you a *plea-deal* in which they would send the case down to the *state level* and to sentence you to *time-served*", but only if you would agree to plead guilty to *one misdemeanor*". However, Mr. Bergrin once again refused to accept the misdemeanor plea deal, because Mr. Bergrin hadn't threatened anyone, nor had Mr. Bergrin committed a crime. At the time, Mr. Bergrin knew very little about the "criminal justice system", but subsequently, as a result of being incarcerated for a period of more than twenty-two (22) months for a crime that never occurred, Mr. Bergrin learned in retrospect that in a federal case, defendants are not offered to be sentenced to "time-served" after being arrested only three days earlier, unless the defendant either agreed to work as a Confidential Informant for the FBI or if the prosecutor is convinced that the Defendant did not commit a crime.

88.    Mr. Bergrin then told Ms. Kucharski that he wanted a meeting with the FBI agents that arrested Mr. Bergrin and with the Assistant U.S. Attorneys (Brian McDonough, Esq. and Matthew Shepherd, Esq.), and 30 minutes later, Mr. Bergrin found himself in a meeting with the 2 Assistant U.S. Attorneys and with the 2 FBI agents that arrested Mr. Bergrin. Mr. Bergrin requested the meeting because Mr. Bergrin wanted to be "released on bail", and Mr. Bergrin believed that he needed the support of the Office of the U.S. Attorney in order to be offered bail by the Magistrate Judge.

89.    However, during that meeting, Ms. Kucharski surprised Mr. Bergrin and betrayed Mr. Bergrin by arguing vociferously against Mr. Bergrin receiving bail. Mr. Bergrin could not believe that the attorney that was appointed to represent him was arguing against Mr. Bergrin receiving bail, because it didn't make any sense to Mr. Bergrin. Ms. Kucharski was saying that because Mr. Bergrin was arrested in Cleveland, and because he lives in New York City, he is a *flight risk*. But Mr. Bergrin argued that the Assistant U.S. Attorneys repeatedly offered Mr. Bergrin a *misdemeanor* plea deal with *time-served*, and that Mr. Bergrin has no reason to flee, because if he were to flee, he would then be charged with a *felony* for *fleeing*. The argument between Mr. Bergrin and Ms. Kucharski became heated, and the 2 FBI agents and the 2 Assistant U.S. Attorneys were laughing at Mr. Bergrin. The meeting ended shortly thereafter, without the result that Mr. Bergrin was hoping for. After the meeting ended, Mr. Bergrin was furious that Ms. Kucharski argued against Mr. Bergrin receiving bail, and Mr. Bergrin was planning to terminate Ms. Kucharski at Mr. Bergrin's earliest opportunity.

90.  Approximately a half-hour later, Mr. Bergrin was brought into the attorney-client meeting room and Ms. Kucharski was sitting on the other side of the glass. As soon as the U.S. Marshal closed the door behind Mr. Bergrin, Ms. Kucharski started crying profusely, and with tears in her eyes, Ms. Kucharski apologized to Mr. Bergrin for betraying Mr. Bergrin in the meeting, and she explained to Mr. Bergrin that she betrayed Mr. Bergrin because she and her colleague, Edward Bryan, Esq. are *"under FBI criminal investigation"* and they are *"about to be indicted"*, and Ms. Kucharski explained that the FBI is destroying their careers, their marriages, and their lives.

91.  Mr. Bergrin then asked Ms. Kucharski why she and her colleague were "under FBI criminal investigation and why they were about to be indicted", and Ms. Kucharski responded that a Judge in another case had issued a "No-Contact Order" against Ms. Kucharski and her colleague, Edward Bryan, Esq., contacting the witness in that case, but the two of them violated the Judges No-Contact-Order and they contacted the witness. The FBI found out about the illicit contact, and they were planning to charge Ms. Kucharski and Mr. Bryan "criminally", but a deal was reached in which Mr. Bryan and Ms. Kucharski would betray Mr. Bergrin in the herein case in order to prevent the Office of the U.S. Attorney from charging Mr. Bryan and Ms. Kucharski with a crime. Ms. Kucharski explained to Mr. Bergrin that the Assistant U.S. Attorney asked Ms. Kucharski and Mr. Bryan to keep Mr. Bergrin incarcerated until he pleads guilty to a misdemeanor, which the defense attorneys agreed to do.

92.  Mr. Bergrin then told Ms. Kucharski that Mr. Bergrin wanted the Office of the Federal Public Defender off of Mr. Bergrin's case immediately, and Mr. Bergrin requested a meeting with the Magistrate Judge, the Honorable Nancy Vecchiarelli. An hour later, they entered the courtroom, and the 2 Assistant U.S. Attorneys, Ms. Kucharski, and Mr. Bergrin approached the bench, and Mr. Bergrin explained to Judge Vecchiarelli that Ms. Kucharski argued against Mr. Bergrin receiving bail in the meeting with the Assistant U.S. Attorneys and with the FBI agents, and then Mr. Bergrin told Judge Vecchiarelli what Ms. Kucharski subsequently told to Mr. Bergrin in the attorney-client meeting room, and Judge Vecchiarelli then turned to the court-reporter and stated: "Seal This!" Judge Vecchiarelli then asked Ms. Kucharski: "Is what Mr. Bergrin just stated truthful and accurate?" Ms. Kucharski then responded "Yes Your Honor", and Judge Vecchiarelli then stated:

**"I am disqualifying the Office of the Federal Public Defender from the herein case. The Office of the Federal Public Defender has engaged in an Actual Conflict of Interest, and the Office of the Federal Public Defender has the Appearance of a Conflict of Interest and can no longer represent Mr. Bergrin in the herein case".**

93. Ms. Kucharski later thanked Judge Vecchiarelli for removing such damaging testimony from the transcript.

94. A CJA attorney, named Michael O'Shea was then appointed to represent Mr. Bergrin at his bail hearing, but throughout Mr. Bergrin's bail hearing, Assistant U.S. Attorney, Brian McDonough, attempted to convince Judge Vecchiarelli that Mr. Bergrin was *obsessed* with Special Agent Shawn Brokos of the FBI, and Mr. McDonough inferred that Mr. Bergrin had Googled her name "twenty-three-thousand-times" (23,000 times), which was not truthful. Mr. Bergrin did Google Ms. Brokos' name once or twice *annually* throughout the five (5) year period that Ms. Brokos and other FBI agents were harassing Mr. Bergrin, and the Google search might have registered approximately 23,000 hits or articles (including numerous articles about "the FBI", which had nothing to do with Shawn Brokos), but Mr. Bergrin only Googled her name once or twice annually, and the only reason that Mr. Bergrin Googled her name was to find out where she lived because Mr. Bergrin wanted to send her Easter Cards in an attempt to persuade Ms. Brokos to put an end to the harassment that had destroyed Mr. Bergrin's business and his life.

95. In reality, it was Shawn Brokos who was obsessed with Mr. Bergrin, and Mr. Bergrin had learned in his cousin's first trial that the FBI had penalized Ms. Brokos in the past for disobeying the FBI's rules and for violating the FBI's own mandate, and Ms. Brokos testified under oath that she was penalized by the FBI for disobedience and for numerous other infractions. Mr. Bergrin does not need to fabricate nor exaggerate nor embellish anything in the herein complaint because there is documentary evidence of every allegation, and witnesses will testify to any and all allegations in which the documentary evidence is not available.

96.    Despite knowing that Mr. Bergrin did not commit a crime, the Assistant U.S. Attorneys then indicted Mr. Bergrin on:

COUNT I: Cyber-stalking;

COUNT II: Threatening a Federal Law Enforcement Officer in Retaliation for Performing Official Duties; and

COUNT III: Threatening Interstate Communications.

97.    The "cyber-stalking" allegation was not in the original arrest warrant, but Assistant U.S. Attorney, Brian McDonough, threw the cyber-stalking charge into the mix in an attempt to force Mr. Bergrin to plead guilty to the lesser charge of a *Misdemeanor*.

98.    The FBI in Cleveland had arrested Mr. Bergrin in order to prevent Mr. Bergrin from filing a civil suit against the FBI agents in "New York" who had been harassing Mr. Bergrin for 5 long years (from September 2009 – November 2014), and the Assistant U.S. Attorneys then indicted Mr. Bergrin under false pretenses in order to prevent Mr. Bergrin from suing the FBI agents in "Cleveland" who falsely arrested Mr. Bergrin.

99.    Throughout Mr. Bergrin's bail hearing, Assistant U.S. Attorney, Brian McDonough, fabricated information about Mr. Bergrin by inferring that Mr. Bergrin was involved with his cousin's alleged crimes, and Mr. McDonough argued vociferously that Mr. Bergrin was both a *flight risk* and a *danger to society*, despite the fact that Mr. Bergrin had never committed a crime in his life, and despite the fact that Mr. Bergrin had no reason whatsoever to *flee*.

100.    The Assistant U.S. Attorneys violated Mr. Bergrin's constitutional rights by indicting Mr. Bergrin based upon the same *fabricated hearsay information and the same blatant lies* that the Assistant U.S. Attorney, Brian McDonough, used to argue against Mr. Bergrin receiving bail, and despite Mr. Bergrin *not* having sent an email to Shawn Brokos, as the FBI agents had wrongly alleged, and despite it being *impossible* for Mr. Bergrin to have "cyber-stalked" the FBI agent when Mr. Bergrin did not have the FBI agent's email address, Mr. Bergrin was wrongly indicted and he was denied bail. The former head of the Gambino Organized Crime Family, Paul Castellano, who murdered numerous people, was given bail, but Mr. Bergrin, who never committed a crime in his

life, was denied bail. There is no end to the corruption that is so pervasive and systemic throughout the *cesspool* known as the Sixth Circuit.

101. Mr. Bergrin repeatedly responded to Mr. McDonough's plea-deal by telling his attorneys that Mr. McDonough can either dismiss the bogus criminal case or Mr. McDonough can hold a jury trial. However, the Assistant U.S. Attorneys were unable to take Mr. Bergrin to trial because no crime had been committed. The Assistant U.S. Attorneys then produced an email that Mr. Bergrin had forwarded to his cousin's daughter, but even if Mr. Bergrin had forwarded that email directly to FBI Special Agent Shawn Brokos, it still would not have been a threat or a crime, because that email clearly falls under "First Amendment Free Speech".

102. Had Mr. Bergrin actually committed a crime, Mr. Bergrin would have accepted the Assistant U.S. Attorney's Misdemeanor Plea-Deal in *light-speed*, but if Mr. Bergrin had committed a crime, the Assistant U.S. Attorneys would *not* have offered Mr. Bergrin the Misdemeanor Plea-Deal.

103. As a result of the blatant lies that the Assistant U.S. Attorney, Brian McDonough, argued at the bail hearing, Mr. Bergrin was denied bail by the Honorable Nancy Vecchiarelli, despite the following:

    a. Mr. Bergrin was a 56-year-old man at the time of his arrest.

    b. Mr. Bergrin did not commit a crime.

    c. Mr. Bergrin had never been accused of a crime, prior to being falsely accused in the bogus criminal case.

    d. Mr. Bergrin never did anything violent to anyone in his life, and Mr. Bergrin never attempted to cause physical injury to anyone in his life.

    e. Mr. Bergrin maintained his residence in New York City, where he resided at that time for the prior 35 years.

    f. Prior to the bail hearing, there was overwhelming and incontrovertible evidence that Mr. Bergrin was innocent of the bogus criminal charges that were brought against him.

    g. The Assistant U.S. Attorney could not make a legitimate argument as to why Mr. Bergrin would *flee* or would not attend his hearings and/or his trial had Mr. Bergrin been offered bail.

h. Mr. Bergrin rejected numerous *Misdemeanor* plea-deals on the *State Level* with a sentence of *Time Served*. Had Mr. Bergrin *fled*, then he would have been *legitimately* charged with a *felony* for *fleeing*, and therefore, it made absolutely no sense whatsoever when Mr. McDonough argued that Mr. Bergrin was a *flight risk*.

i. Mr. Bergrin traveled to Cleveland solely because his friend's wife was in *severely critical condition* at the Cleveland Clinic, and Mr. Bergrin had been staying at the Hilton Garden Inn hotel in Cleveland for the 30-day period prior to Mr. Bergrin being falsely arrested by the FBI and charged with crimes that never occurred.

j. Mr. Bergrin offered to wear an ankle bracelet and offered not to leave the State of Ohio until after the *speedy trial* is concluded.

k. Mr. Bergrin has memberships in two synagogues in New York City, and although Mr. Bergrin does not attend the synagogues, he supports the synagogues via his memberships.

l. Prior to Mr. Bergrin being arrested in the bogus criminal case, Mr. Bergrin was the primary fundraiser for an Evangelical Church in New York City.

m. Prior to being falsely arrested, Mr. Bergrin raised money each year in order to send tens of thousands of New Testament Bibles and Christmas CD's to United States service men and women operating overseas.

n. Mr. Bergrin was involved in numerous charitable organizations, raising funds and attending numerous charitable events annually on behalf of several Autism organizations and numerous other organizations that help people with intellectual and developmental disabilities, and numerous organizations that raise money for Mesothelioma Cancer Research (Mr. Bergrin's Mother died of Mesothelioma).

o. In his younger days, Mr. Bergrin joined a volunteer ambulance corps in New York and became certified in Standard and Advanced First Aid and he rode an ambulance for several years, without ever receiving compensation of any kind, and Mr. Bergrin raised funds for the ambulance corps to purchase new ambulances and equipment.

104. Mr. Bergrin then appeared before District Court Judge Dan Polster. Judge Polster is a former Assistant U.S. Attorney who worked for 20+ years in the same office as the Assistant U.S. Attorneys who were prosecuting the bogus criminal case against Mr. Bergrin.

105.    During one of the first hearings, Judge Dan Polster told Mr. Bergrin that the CJA attorney, Michael O'Shea, Esq. (whom Mr. Bergrin only spoke with for 5 minutes) *allegedly* requested via telephone that Mr. Bergrin undergo a *psychological evaluation*, because Mr. Bergrin had insisted on representing himself *pro-se* at trial, and Judge Polster stated that he needed to confirm that Mr. Bergrin is *competent to represent himself at trial*. Mr. Bergrin insisted on representing himself *pro-se* at trial because the attorneys from the Office of the Federal Public Defender had thrown Mr. Bergrin under the proverbial bus by arguing against Mr. Bergrin receiving bail, and Mr. Bergrin's CJA attorney, Michael O'Shea, did not argue effectively that Mr. Bergrin should be given bail. At that time, Mr. Bergrin naively believed that it is common-place for a criminal defendant to undergo a "competency evaluation" if the defendant chooses to represent himself/herself *pro-se*, because this is what had been explained to Mr. Bergrin by Judge Dan Polster.

106.    Judge Polster stated: "Mr. Bergrin, if you want to represent yourself, we need to insure that you're *Competent to Stand Trial*, because if you are convicted, your attorneys could later argue that you *weren't competent*". After the bogus criminal charges were dismissed 22 months later, Mr. Bergrin learned that Judge Polster had arranged for all of the hearing transcripts to be altered by the Court Reporters, and anything that could be later used against Judge Polster was removed from the transcripts. Judge Polster blatantly violated Mr. Bergrin's constitutional rights in every court hearing that took place throughout the criminal case, and there was not even one hearing in which Judge Polster did not *blatantly* violate Mr. Bergrin's constitutional rights.

107.    In March 2015, Judge Dan Polster violated Mr. Bergrin's constitutional rights by refusing Mr. Bergrin a *speedy trial*, and instead, Judge Polster sent Mr. Bergrin to the Metropolitan Correctional Center in Chicago, Illinois for a period of three (3) months to undergo a *psychological evaluation* as part of an *illicit scheme* in which to fraudulently declare Mr. Bergrin *Incompetent to Stand Trial*, because the Assistant U.S. Attorneys could not take the frivolous criminal case against Mr. Bergrin to trial.

108.    The Assistant U.S. Attorneys, who did not want to be sued by Mr. Bergrin for false indictment, prosecutorial misconduct, selective prosecution, and a host of other violations, colluded with Judge Dan Polster in an attempt to declare Mr. Bergrin *Incompetent to Stand Trial* because Mr. Bergrin hadn't committed a crime, and the Assistant U.S. Attorneys could therefore not take Mr. Bergrin to trial. Mr. Bergrin also wanted to represent himself *pro-se* at trial because Mr. Bergrin was told by

Ms. Kucharski that she and Edward Bryan "were working hand-in-hand with the Assistant U.S. Attorneys and with Judge Dan Polster in order to keep Mr. Bergrin incarcerated until Mr. Bergrin agrees to plead guilty to a misdemeanor".

109. During the period of time that Mr. Bergrin was incarcerated at the Metropolitan Correctional Center in Chicago, undergoing a 10 week psychological evaluation, Judge Dan Polster contacted the doctors at the Metropolitan Correctional Center whom are employed by the Federal Bureau of Prisons, and Judge Polster repeatedly attempted to pressure the doctors to declare Mr. Bergrin *Incompetent to Stand Trial*, which the government's own doctors refused to do. After undergoing a 10-week psychological evaluation at the Metropolitan Correctional Center in Chicago, the doctors determined that "Mr. Bergrin is Competent to Stand Trial", and they sent Mr. Bergrin back to Ohio to stand trial.

110. Mr. Bergrin returned to Ohio from Chicago in June 2015 to stand trial, and Mr. Bergrin once again requested a *speedy trial*, but Judge Polster refused to set a trial date, and instead, Judge Polster forced Mr. Bergrin to suffer in prison cells for the following sixteen (16) months, but that was the least of Judge Polster's wrongdoing, and the false arrest and false imprisonment was the least of the wrongdoing by the Assistant U.S. Attorneys and by other law enforcement officers of the United States Department of Justice.

111. Upon Mr. Bergrin's return to the Northeast Ohio Correctional Center from Chicago, Judge Dan Polster disregarded Judge Nancy Vecchiarelli's Order in which Judge Vecchiarelli disqualified the Office of the Federal Public Defender from representing Mr. Bergrin, and Judge Polster then re-appointed Carolyn Kucharski, Edward Bryan, and Claire Curtis of the Office of the Federal Public Defender to represent Mr. Bergrin, and when Mr. Bergrin objected, Judge Polster responded: "I am not going to remove the Office of the Federal Public Defender from the case under any circumstances". For the following 16 months, the defense attorneys from the Office of the Federal Public Defender worked hand-in-hand with Judge Polster and with the Assistant U.S. Attorneys to keep Mr. Bergrin incarcerated until he pleads guilty or is murdered by members of the government, whichever were to occur first.

112. Judge Dan Polster made it his mission to prevent Mr. Bergrin from being able to sue the FBI in New York for the 5 years of severe, persistent, and pervasive *harassment*, and to prevent Mr.

43

Bergrin from suing the FBI in Cleveland for falsely arresting Mr. Bergrin, and to prevent Mr. Bergrin from suing the Assistant U.S. Attorneys who wrongly indicted Mr. Bergrin. Judge Polster blatantly violated Mr. Bergrin's constitutional rights during every single hearing that took place in the bogus criminal case throughout the 22 months that Mr. Bergrin was incarcerated for a crime that never occurred.

113.  Upon Mr. Bergrin's return to the Northeast Ohio Correctional Center from Chicago, the medical staff at the Northeast Ohio Correctional Center refused to administer to Mr. Bergrin one of Mr. Bergrin's *prescription heart-related medications*, which Mr. Bergrin needed to take every day. The withdrawal of that *prescription heart-related medication* was done in an effort to force Mr. Bergrin to plead guilty to a crime or to cause Mr. Bergrin's death, but Mr. Bergrin had decided that because he was the *victim*, and not the *perpetrator*, that he would not plead guilty to a misdemeanor or to any other charges, under any circumstances.

114.  The government did not simply *permit* the medical staff at the Northeast Ohio Correctional Center to withhold Mr. Bergrin's prescription medication, but rather, the Assistant U.S. Attorneys colluded with the United States Marshal, Peter Elliott, who then ***instructed*** the Warden (Laura Bedard) to instruct the medical staff at the Northeast Ohio Correctional Center to withhold one of Mr. Bergrin's *prescription heart-related medications* that Mr. Bergrin needed to take every day. The government was well aware that the withholding of that particular medication would cause Mr. Bergrin to become extremely ill within a short period of time, because the prison had possession Mr. Bergrin's medical records which clearly state that "Mr. Bergrin has an Aneurysm in the Aortic Root of his Heart", and the medical staff at the Northeast Ohio Correctional Center were well aware that the withdrawal of that particular medication could eventually cause Mr. Bergrin's death.

115.  Throughout a period of six (6) months, Mr. Bergrin had written in excess of 36 letters and filled-out other documents that were forwarded to the medical staff, with copies to the Warden, to the United States Marshal - Peter Elliott, to Judge Dan Polster, to the Inspector General in Washington, DC, to Mr. Bergrin's attorneys, and to the Senior Executives of Corrections Corporation of America (Damon Hininger and Steve Grooms), but the medical staff at the Northeast Ohio Correctional Center continued to withhold the *prescription heart-related medication*. Had the medical staff administered to Mr. Bergrin his *prescription heart-related medication,* the United States Marshal might have terminated the government's contract with Corrections Corporation of

America, so the withholding of Mr. Bergrin's *prescription heart-related medication* benefitted Corrections Corporation of America *financially*. Numerous employees of the medical staff at the Northeast Ohio Correctional Center told Mr. Bergrin that they did not want to withhold his *prescription heart-related medication*, but that the Warden and the United States Marshal had insisted it be withheld, and those members of the medical staff will be called to testify at trial.

116.    As a result of Mr. Bergrin not receiving his *prescription heart-related medication*, Mr. Bergrin's heart malfunctioned within days, and throughout the following six months, Mr. Bergrin suffered severe and permanent damage to his heart, which damage could have been foreseen, and it was in-fact foreseen, but Corrections Corporation of America and the Assistant U.S. Attorneys, and the United States Marshal, chose to violate Mr. Bergrin's constitutional rights in an effort to force Mr. Bergrin to plead guilty to a crime that never occurred.

117.    If the medical staff at the Northeast Ohio Correctional Center or if the Senior Executives of Corrections Corporation of America were to argue that such damage to Mr. Bergrin's heart was not "foreseen", then the medical staff at the Northeast Ohio Correctional Center and the Senior Executives of Corrections Corporation of America were certainly aware that Mr. Bergrin's heart was severely malfunctioning within only a few days after denying Mr. Bergrin his prescription heart medication, because Mr. Bergrin's body filled-up with fluid, which made Mr. Bergrin appear somewhat deformed, and Mr. Bergrin immediately sought medical treatment from the medical staff at the Northeast Ohio Correctional Center, but the medical staff refused Mr. Bergrin any meaningful medical treatment.

118.    As a result of the Northeast Ohio Correctional Center withholding Mr. Bergrin's *prescription heart-related medication*, Mr. Bergrin's heart malfunctioned, and his entire body filled-up with "fluid", and over a period of six (6) months, Mr. Bergrin's shoe size went from a size 13 to a size 15 to a size 17 to a size 19, and the corrections officers were unable to shackle Mr. Bergrin's ankles with standard leg irons when he was being transported. Mr. Bergrin was severely ill, and the medical staff at the Northeast Ohio Correctional Center refused to permit Mr. Bergrin to see a doctor, and they refused to send Mr. Bergrin to a hospital.

119. The medical staff ignored the numerous letters and documents that Mr. Bergrin had forwarded to all of those who were responsible for Mr. Bergrin's health, safety, and security, and they refused Mr. Bergrin any meaningful medical treatment. However, the icing on the proverbial cake by the medical staff of the Northeast Ohio Correctional Center was "the falsifying of Mr. Bergrin's medical records". The evidence that members of the medical staff at the Northeast Ohio Correctional Center were instructed to falsify Mr. Bergrin's medical records is voluminous and undeniable.

120. The only reason that a doctor or a hospital or an institution falsifies a person's medical records is to "conceal something", which is exactly what the medical staff was attempting to do. The Assistant U.S. Attorney (Brian McDonough), conspired with the U.S. Marshal (Peter Elliott), who conspired with the Warden (Laura Bedard), who conspired with the Medical Staff at the Northeast Ohio Correctional Center and with the Senior Executives of Corrections Corporation of America (now known as "CoreCivic, Inc."), to withhold one of Mr. Bergrin's *prescription heart-related medications* until Mr. Bergrin either pleads guilty or dies, whichever were to have occurred first. This was done to Mr. Bergrin as Judge Polster and the Assistant U.S. Attorneys conspired with the Office of the Federal Public Defender to keep Mr. Bergrin incarcerated.

121. The withholding of Mr. Bergrin's *prescription heart-related medication* and the denial of any meaningful medical treatment was an Intentional Tort and falls under "Cruel and Unusual Punishment" and it was a violation of Mr. Bergrin's Eighth Amendment rights and Fourteenth Amendment rights.

122. The withholding of Mr. Bergrin's *prescription heart-related medication* and the denial of any meaningful medical treatment also falls under the Federal Tort Claims Act (August 2, 1946, ch.646, Title IV, 60 Stat. 812, "28 U.S.C. Pt.VI Ch.171" and 28 U.S.C. § 1346) ("FTCA"). A Federal Tort would cover Negligence, Fraud, Intentional Infliction of Emotional Distress, and numerous other violations of Mr. Bergrin's constitutional rights.

123. The withholding of Mr. Bergrin's *prescription heart-related medication* and the denial of any meaningful medical treatment also falls under Title 18, U.S.C., Section 241 - Conspiracy Against Rights. This statute makes it unlawful for two or more persons to conspire to injure, oppress, threaten, or intimidate any person of any state, territory or district in the free exercise or enjoyment

of any right or privilege secured to him/her by the Constitution or the laws of the United States, (or because of his/her having exercised the same).

124. The withholding of Mr. Bergrin's *prescription heart-related medication* and the denial of any meaningful medical treatment also falls under Title 18, U.S.C., Section 242 - Deprivation of Rights Under Color of Law. This statute makes it a crime for any person acting under color of law, statute, ordinance, regulation, or custom to willfully deprive or cause to be deprived from any person those rights, privileges, or immunities secured or protected by the Constitution and laws of the United States. The withholding of Mr. Bergrin's prescription heart-related medication is also a violation of Mr. Bergrin's Eighth and Fourteenth Amendment rights under the constitution of the United States.

125. In addition to his negligence claims, plaintiff also seeks to recover against CoreCivic and its officers under § 1983 for alleged Eighth Amendment violations. Prison officials can be held liable for an Eighth Amendment violation when an inmate shows: (1) "that he is incarcerated under conditions posing a substantial risk of serious harm," and (2) that the prison official had "the state of mind ... of `deliberate indifference' to inmate health or safety." (*Farmer v. Brennan,* 511 U.S. 825, 842, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994)) (citations omitted). The Supreme Court has held that "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer,* 114 S.Ct. at 1981.

126. The U.S. Supreme Court has also held that subjecting individuals to a substantial risk of future harm can be cruel and unusual punishment if the conditions presenting the risk are "sure or very likely to cause serious illness and needless suffering" and give rise to "sufficiently imminent dangers." *Helling v. McKinney,* 509 U.S. 25, 33-35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Significantly, the Supreme Court has held that an isolated mishap alone does not violate the Eighth Amendment, *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 463-464, 67 S.Ct. 374, 91 L.Ed. 422, because such an event, while regrettable, does not suggest cruelty or a "substantial risk of serious harm."

127. For the following sixteen (16) months, the defense attorneys from the Office of the Federal Public Defender kept Mr. Bergrin incarcerated and they worked hand-in-hand with the Assistant U.S.

Attorneys in exchange for the Office of the U.S. Attorney agreeing not to file criminal charges against the defense attorneys.

128. Mr. Bergrin filed at least nine (9) *pro-se* motions for the Office of the Federal Public Defender to be removed from the case (Please see attached Exhibits), but Judge Polster denied every motion and refused to issue *final orders* in violation of Mr. Bergrin's Due Process rights so that Mr. Bergrin was unable to appeal Judge Polster's wrongful and malicious decisions and orders.

129. In violation of Mr. Bergrin's constitutional rights, Judge Dan Polster contacted Judge R. Guy Cole, Chief Judge, United States Court of Appeals for the Sixth Circuit, and Judge Polster requested that Judge Cole arrange for *all* of Mr. Bergrin's, Motions, Appeals, and Petitions for Writs of Mandamus be denied, and sadly, Judge R. Guy Cole agreed to Judge Polster's illicit request. Judge R. Guy Cole joined in the *criminal conspiracy* that plagued the bogus criminal case. Judge Cole then instructed his Associate Judges to enter into the criminal conspiracy as well, and Judge Cole's Associate Judges then violated Mr. Bergrin's constitutional rights by denying each and every Appeal, Motion, and Petition for Writ of Mandamus that Mr. Bergrin filed in the bogus criminal case.

130. Mr. Bergrin also filed several motions for Judge Polster to be disqualified for violating Mr. Bergrin's constitutional right to *conflict-free counsel* (and for numerous other violations of Mr. Bergrin's Due Process rights), but Judge Polster refused to rule on Mr. Bergrin's motions, and because Judge Polster refused to issue any *final orders*, Mr. Bergrin was *technically* unable to appeal Judge Polster's wrongful and malicious Decisions and Orders. However, Mr. Bergrin filed numerous appeals of Judge Polster's silent denials of Mr. Bergrin's *pro-se* motions with the United States Court of Appeals for the Sixth Circuit, but the United States Court of Appeals for the Sixth Circuit repeatedly violated Mr. Bergrin's constitutional rights by refusing to rule on Mr. Bergrin's Appeals, Motions, and Petitions for Writs of Mandamus, and when the United States Court of Appeals for the Sixth Circuit did in-fact issue Decisions, they would either rubber-stamp such motions and appeals DENIED, or they would write something that was blatantly untruthful and did not make any sense, or they would state that Mr. Bergrin has counsel and can therefore not file any *pro-se* documents. The Judges at the United States Court of Appeals for the Sixth Circuit were well aware that Mr. Bergrin's counsel had refused to file any legal documents that could have benefitted

Mr. Bergrin in any way, and the Judges were well aware the Mr. Bergrin's appointed counsel was *under FBI criminal investigation* and that they had previously been disqualified by the Honorable Nancy Vecchiarelli, but the Judges refused to grant any of Mr. Bergrin's Appeals, Motions, and Petitions for Writs of Mandamus.

131. Judge Dan Polster had entered into a "criminal conspiracy" with the Assistant U.S. Attorneys, with the Office of the Federal Public Defender and with Judge R. Guy Cole, in an effort to protect Judge Polster and the members of the United States Department of Justice, who repeatedly and blatantly violated Mr. Bergrin's constitutional rights.

132. Mr. Bergrin filed a motion with the United States Court of Appeals for the Sixth Circuit to either move the venue of the criminal case to the Southern District of New York (which is where the case originated) or to disqualify Judge Polster for his repeated violations of Mr. Bergrin's constitutional rights. However, the United States Court of Appeals for the Sixth Circuit refused to issue a ruling, because they were in bed with Judge Polster. Mr. Bergrin sent a second Motion for the venue to be transferred to the Southern District of New York, but the corrupt Judges at the United States Court of Appeals for the Sixth Circuit accused Mr. Bergrin of "Judge Shopping", because that is what corrupt Judges do when they want to protect a fellow crony who's violating a litigant's constitutional rights.

133. In accordance with Strickland v. Washington, 466 U.S. 668 (1984), in order for a case to remain in the same office as an attorney that was disqualified from representing a defendant, the "defendant" must *request* to keep the office of the disqualified attorney on the case, and only in very rare circumstances can a Judge permit an attorney to remain on the case if the attorney's colleague had been disqualified, and *only* if the lawyers are "walled off", and in those rare circumstances, "such a wall must be as imposing as the Great Wall of China", thus referred to as a "Chinese Wall". But not only was there not a Chinese Wall installed at the Office of the Federal Public Defender in order to preserve Mr. Bergrin's constitutional right to *conflict-free counsel*, but there wasn't even a flimsy partition installed in the Office of the Federal Public Defender, and there was ongoing communications regarding Mr. Bergrin's case between Carolyn Kucharski, Edward Bryan, and Claire Curtis, and they had constant ongoing communications with their *handlers* from the Office of the U.S. Attorney (Brian McDonough, Esq. and Matthew Shepherd, Esq.).

134.    In June of 2015, the Office of the U.S. Attorney produced numerous emails that Mr. Bergrin had sent to his cousin's daughter, which clearly were <u>not</u> a threat to anyone, but the Assistant U.S. Attorneys and Judge Dan Polster had pretended that the emails were a threat. Had there been any question whatsoever as to whether or not Mr. Bergrin had communicated a threat, on June 1, 2015 (which was approximately six (6) months after Mr. Bergrin's arrest, and approximately sixteen (16) months prior to the dismissal of the bogus criminal case), the Supreme Court of the United States issued what is most likely the single most important Decision ever on the subject of "threats" in _Anthony Elonis v. United States_. The Supreme Court's Decision (which decision the United States Court of Appeals for the Sixth Circuit supported by overturning _United States v. Houston_) clearly confirmed that Mr. Bergrin could not possibly have committed a crime, and there were six (6) different reasons that each of the emails that Mr. Bergrin had sent to his cousin's daughter were not crimes, and the government was well-aware that any one (1) of those six (6) reasons meant that the government had to dismiss the bogus criminal charges, but the government only arrested Mr. Bergrin for _retaliatory purposes_ and in order to prevent Mr. Bergrin from suing the FBI agents in New York City, and the government was well aware that Mr. Bergrin had not committed a crime.

135.    On or about June 15, 2015, Mr. Bergrin's sent numerous copies of the _Anthony Elonis Decision_ to Judge Dan Polster, to the Office of the U.S. Attorney, and to the Office of the Federal Public Defender, but Judge Polster and the Office of the U.S. Attorney violated Mr. Bergrin's constitutional rights by refusing to dismiss the frivolous criminal charges that were brought against Mr. Bergrin, and they conspired together with the Assistant Federal Public Defenders to keep Mr. Bergrin incarcerated for another sixteen (16) months in an attempt to force Mr. Bergrin to plead guilty to a crime that never occurred.

136.    After Mr. Bergrin returned to the Northeast Ohio Correctional Center from Chicago, in addition to withholding one of Mr. Bergrin's prescription medications, the Government then attempted to force Mr. Bergrin to plead guilty by arranging for the United States Marshal in Cleveland, Peter Elliott, to arrange for Mr. Bergrin to be tortured on two (2) occasions during the following 6 month period, which almost cost Mr. Bergrin his life, but despite being tortured, Mr. Bergrin still refused to plead guilty to a crime.

137. On or about July 21, 2015, Mr. Bergrin was taken out of his prison cell and brought to the courthouse in Cleveland. When Mr. Bergrin arrived at the courthouse, members of the United States Marshals Service brought Mr. Bergrin and another inmate named Kevin Slater (a healthy 61-year-old man) to the basement of the courthouse, and Mr. Bergrin and Mr. Slater were put into a *freezer* (an Ice-Cold Holding-Cell that had freezing-cold-air being pumped into the cell, which environment was designed to cause a person's death, because no man or woman could survive the frigid temperatures of that environment without having access to coats, hats, gloves, and blankets). The temperature in the freezer was Below Zero, and there was ice in the toilet bowl. Upon entering the freezer, Mr. Slater and Mr. Bergrin knew instantly that the U.S. Marshals Service was attempting to cause Mr. Bergrin's death, because a person with a severe heart-condition cannot withstand such freezing temperatures for an extended period of time without causing severe damage to one's heart.

138. Within a couple of hours, Mr. Slater and Mr. Bergrin began to get Hypothermia. Their lips were purple and they were shivering, and it was difficult for them to breathe. No matter how much they yelled for the U.S. Marshals to lower the air-conditioning or to give them blankets, or begged the U.S. Marshals to take them out of the freezer, the U.S. Marshals ignored their pleas. After a couple of hours, Mr. Bergrin looked at Mr. Slater and thought that Mr. Slater looked as if he would die. Mr. Bergrin then looked in the scratched mirror that was on the wall, and Mr. Bergrin also looked as if he were going to die as well. They were not able to sit on the stainless steel bench in the freezer because the stainless steel bench was freezing-cold and it was like sitting on a block of ice, and they had to keep moving around in order not to freeze, so they had to stand the entire time that they were in the freezer.

139. Within approximately 3 hours, Kevin Slater's eyes rolled to the back of his head, and Mr. Slater blacked-out from Hypothermia, and Mr. Slater fell-face-first onto the concrete floor of the freezer. Mr. Slater was unable to brace his fall with his hands because Mr. Slater had lost consciousness prior to hitting the floor *face-first*. Mr. Bergrin immediately started kicking the freezer door and Mr. Bergrin was screaming for the U.S. Marshals to get a doctor, but the response was "laughter" and what sounded like "clapping". The U.S. Marshals seemed to be "celebrating", and minutes later, one of the U.S. Marshals peeked through the glass in the door and he went from having a smiley-face to a look of "devastation", and he yelled: "It's Not Bergrin. It's the Other Guy! Get a Gurney and a Medic!" The clapping that Mr. Bergrin had heard earlier was the U.S. Marshals high-

fiving each other because they had thought that it was "Mr. Bergrin" who had lost consciousness and fell face-first onto the concrete floor. Mr. Slater was unconscious and he suffered severe head trauma. Minutes later, a couple of first-aid medics arrived with a gurney and they loaded Mr. Slater onto the gurney and removed him from the freezer.

140. Mr. Bergrin later learned that Mr. Slater was taken to a "normal temperature cell" for the remainder of the day. The U.S. Marshals made sure that Mr. Slater "thawed-out" prior to Mr. Slater attending his court hearing, but Mr. Slater had a severe face and head injury, which everyone in the courtroom wrongly assumed was the result of a severe beating that Mr. Slater had sustained at the prison. Mr. Slater suffered a severe concussion and was incoherent days after the incident. Mr. Slater will be testifying on Mr. Bergrin's behalf, and unlike the government's witnesses, Mr. Slater will not be paid in any way, shape, or form for his testimony. Despite Mr. Bergrin having a severe heart condition, the U.S. Marshals Service kept Mr. Bergrin locked up in that torture chamber for approximately seven (7) hours, and Mr. Bergrin could not understand how he had survived the frigid temperatures of the freezer that was meant to cause his death.

141. Days later, Mr. Bergrin was physically able to contact his cardiologists in New York City to tell them that the Northeast Ohio Correctional Center had taken away his prescription medication ("Polyethylene Glycol 3350 Powder"), and Mr. Bergrin explained to his doctors that the United States Marshal and his henchmen had put Mr. Bergrin and Mr. Slater in a freezer, and Mr. Bergrin explained to his doctors that he was experiencing severe shortness of breath, weakness throughout his body, and severe chest pain, and a host of other symptoms related to what Mr. Bergrin later learned was "Heart-Related Hypothermia".

142. Mr. Bergrin's cardiologists then explained to Mr. Bergrin that had the Medical Staff at the Northeast Ohio Correctional Center not attempted to cause Mr. Bergrin's death by depriving Mr. Bergrin of his *prescription heart-related medication* ("Polyethylene Glycol 3350 Powder"), Mr. Bergrin would have died in that freezer. Mr. Bergrin's cardiologists further explained to Mr. Bergrin that as a result the U.S. Marshals Service instructing the Medical Staff at the Northeast Ohio Correctional Center to withhold that particular *prescription heart-related medication* from Mr. Bergrin, his body filled-up with fluid as a result of his heart malfunctioning, and the fluid actually insulated Mr. Bergrin's heart against the frigid temperatures of the freezer which were

meant to cause Mr. Bergrin's death, and the fluid actually protected Mr. Bergrin from what otherwise would have been *certain death.*

143. The U.S. Marshal, Peter Elliott, engineered the attempt to cause Mr. Bergrin's death, which almost cost Kevin Slater and Mr. Bergrin their lives, but Mr. Bergrin and his cardiologists are still surprised that Mr. Bergrin survived that torturous experience. Mr. Bergrin's cardiologists will be testifying to the severe and permanent injuries that Mr. Bergrin sustained as a result of Mr. Bergrin being denied his *prescription heart-related medication* and getting *heart-related hypothermia* as a result of being put into a freezer for 7 hours.

144. The withholding of Mr. Bergrin's *prescription heart-related medication* was a crime, and placing Mr. Bergrin in the freezer was a crime under 18 U.S. Code § 1117. If two or more persons *conspire* to violate section 1111, 1114, 1116, or 1119 of this title, and one or more of such persons do any overt act to effect the object of the *conspiracy*, each shall be punished by imprisonment for any term of years or for life.

145. The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v.Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

146. In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir.

2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

147.    One of Mr. Bergrin's doctors in New York City contacted the Northeast Ohio Correctional Center and spoke with a senior member of the medical staff, Renee Sferra, and Mr. Bergrin's doctor requested that the medical staff at the Northeast Ohio Correctional Center immediately administer to Mr. Bergrin his *prescription heart-related medication* ("Polyethylene Glycol 3350 Powder"), but Ms. Sferra refused the doctor's request, and that doctor will also be testifying at trial to his discussion with Ms. Sferra. Such deprivation of Mr. Bergrin's *prescription heart-related medication* and the refusal to provide any meaningful medical treatment were violations of Mr. Bergrin's Eighth and Fourteenth Amendment rights of the United States constitution.

148.    During the time of Mr. Bergrin's incarceration, the FBI violated Mr. Bergrin's constitutional rights by engaging in *Witness Tampering* and *Obstruction of Justice* by contacting and coercing several of Mr. Bergrin's witnesses to work as a Confidential Informants for the FBI. These witnesses will be called to testify on behalf of Mr. Bergrin. Several witnesses admitted to Mr. Bergrin their roles in working as Confidential Informants for the FBI, and several of them will testify that they were intimidated and threatened by members of the FBI.

149.    For a period of six months (from June 2015 through early January 2016), Mr. Bergrin made numerous requests both verbally and in writing for Judge Polster to issue an Order instructing the Northeast Ohio Correctional Center to administer to Mr. Bergrin his *prescription heart-related medication*, but Judge Polster repeatedly violated Mr. Bergrin's constitutional rights by verbally denying Mr. Bergrin's numerous requests and motions, despite Judge Polster knowing that Mr. Bergrin had a prescription for the medication, and despite knowing that Mr. Bergrin had been receiving the medication at the Northeast Ohio Correctional Center prior to the government's doctors in Chicago opining that "Mr. Bergrin is Competent to Stand Trial", and despite Judge Polster knowing that Mr. Bergrin was prescribed that medication since his heart attack in June of 2011. Judge Polster also arranged for Mr. Bergrin's numerous verbal requests to have his prescription medication administered to him - removed from the hearing transcripts by the Court

Reporters, and Judge Polster also refused to issue *final orders* in order to prevent Mr. Bergrin from appealing Judge Polster's malicious and wrongful decisions.

150. Mr. Bergrin repeatedly requested that Edward Bryan and Claire Curtis file a *Motion for a Bill of Particulars* for the bogus criminal charges that were brought against Mr. Bergrin, because such Bill of Particulars would have forced the government to explain how Mr. Bergrin committed a crime, but the attorneys refused to file it. Mr. Bergrin then filed a *pro-se* Motion for a Bill of Particulars, but Judge Polster verbally denied the motion by saying "Mr. Bergrin has counsel and he is therefore not permitted to file any *pro-se* documents". Mr. Bergrin then threatened to file a complaint against the attorneys with the Bar Association, and Claire Curtis and Edward Bryan finally filed a Motion for a Bill of Particulars, but Judge Polster violated Mr. Bergrin's constitutional rights by *denying* the Motion, as he denied every motion that could have benefited Mr. Bergrin in any way.

151. In October 2015, Mr. Bergrin filed a Motion for the Northeast Ohio Correctional Center to cease using *Jailhouse Informants* who had been harassing Mr. Bergrin, threatening Mr. Bergrin's life, and stealing Mr. Bergrin's legal file from his prison cell when Mr. Bergrin was at the cafeteria, but Judge Polster verbally denied the motion and he refused to issue a *final order*, which technically prevented Mr. Bergrin's from being able to appeal Judge Polster's wrongful and malicious denial of Mr. Bergrin's motion.

152. Throughout Mr. Bergrin's incarceration, Mr. Bergrin wrote numerous letters to the Chief United States District Judge, Solomon Oliver, Jr., informing Judge Oliver that Mr. Bergrin's constitutional rights were being repeatedly violated by Judge Dan Polster and by other members of the United States Department of Justice, but Judge Oliver violated Mr. Bergrin's constitutional rights by refusing to intervene.

153. In November 2015, Mr. Bergrin wrote a 5-page letter to the United States Attorney, Steven Dettlebach and to the Federal Public Defender, Dennis Terez, in order to share with them how Mr. Bergrin's constitutional rights were being repeatedly violated by Judge Polster, by the Assistant U.S. Attorneys, by Carolyn Kucharski, by Edward Bryan, and by Claire Curtis of the Office of the Federal Public Defender, and by the United States Marshal, Peter Elliott. Mr. Bergrin asked Mr.

Dettlebach and Mr. Terez to intervene, but Mr. Dettlebach and Mr. Terez chose to support their corrupt colleagues, and neither Mr. Dettlebach nor Mr. Terez would intervene nor respond to Mr. Bergrin's letter.

154. On or about December 9, 2015, which was approximately six months after the government's own doctor in Chicago, Ron Nieberding, PhD, found Mr. Bergrin "Competent to Stand Trial", Mr. Bergrin was taken to the courthouse for what turned out to be a *"surprise competency hearing"*, in which Edward Bryan and Claire Curtis retained a man by the name of George Schmedlen, PhD (a Liar-for-Hire who is **NOT** a Government employed doctor), and George Schmedlen took the witness stand and committed perjury, fraud, and medical malpractice, by testifying falsely that in his opinion "Mr. Bergrin is Incompetent to Stand Trial", but worse, Mr. Bergrin was not permitted to question Dr. Schmedlen, nor was Mr. Bergrin permitted to testify at the hearing, nor was Mr. Bergrin permitted to subpoena witnesses to testify at the hearing, nor was Mr. Bergrin permitted to subpoena or present evidence at the hearing, despite Mr. Bergrin having a constitutional right to do all of those things. The entire hearing was a "sham" and a violation of Mr. Bergrin's constitutional rights.

155. In accordance with "United States Federal Code", under 18 USCS 4241 ("The Competency Statute"), at a Competency Hearing, the Defendant has the constitutional right to be made aware there will be a Competency Hearing *prior* to the Competency Hearing date, and the defendant is entitled to subpoena witnesses and evidence, to question witnesses, to present evidence, and to testify at the hearing, but Judge Polster violated all of Mr. Bergrin's constitutional rights and would not permit Mr. Bergrin to participate at the hearing. Upon Mr. Bergrin's entry into the courtroom, Edward Bryan and Claire Curtis told Mr. Bergrin that Judge Polster told them: "If Mr. Bergrin were to say anything during the hearing, I will hold Mr. Bergrin in Contempt of Court and I will sentence Mr. Bergrin to six months in prison for each time he opens his mouth".

156. At the end of the sham competency hearing, Judge Polster stated that there was evidence that Mr. Bergrin is *Incompetent to Stand Trial*, which was a total fabrication, and Judge Polster stated that he is sending Mr. Bergrin to a prison hospital for "Competency Restoration". Mr. Bergrin then filed an Appeal of Judge Polster's Order with the United States Court of Appeals for the Sixth Circuit, but the corrupt Judges at the United States Court of Appeals for the Sixth Circuit also

violated Mr. Bergrin's constitutional rights by refusing to rule on Mr. Bergrin's appeal, and Mr. Bergrin remained incarcerated, having committed no crime and having never been incompetent.

157.    On or about December 23, 2015, Mr. Bergrin filed one of many *pro-se* Motions For Discovery requesting twenty-one (21) specific items that Mr. Bergrin needed for trial, but Judge Polster violated Mr. Bergrin's constitutional rights by verbally denying his Motion for Discovery, and Judge Polster once again violated Mr. Bergrin's constitutional rights by refusing to issue a *final order* in an effort to prevent Mr. Bergrin from appealing such denial.

158.    Judge Polster repeatedly violated Mr. Bergrin's *due process* rights to a trial and to a *speedy trial*, because Mr. Bergrin did not commit a crime, and because the Government could not take Mr. Bergrin to trail because they could not convict Mr. Bergrin of a crime that never occurred.

159.    Despite being found *Competent to Stand Trial* by the government's own doctors in June of 2015 (and again on December 9, 2015), Judge Polster violated Mr. Bergrin's constitutional rights by sending Mr. Bergrin to the Federal Medical Center in Butner, North Carolina (an institution that houses the *criminally insane) allegedly* for "Competency Restoration". Judge Polster sent Mr. Bergrin to the Federal Medical Center because the Federal Medical Center is a very difficult environment in which to survive, and Judge Polster was maliciously attempting to force Mr. Bergrin to plead guilty to a crime that never occurred by way of a *misdemeanor*.

160.    On or about January 3, 2016, Mr. Bergrin was removed from his prison cell at the Northeast Ohio Correctional Center and Mr. Bergrin's wrists, ankles, and waist were shackled together, and Mr. Bergrin was put on an airplane and forced to endure three (3) days of sleep-deprivation and physical-abuse by members of the United States Air Marshals, prior to Mr. Bergrin arriving at the Federal Medical Center in Butner, North Carolina. When Mr. Bergrin attempted to *doze-off* in the airplane, the U.S. Air Marshal kicked Mr. Bergrin in his leg hard enough for Mr. Bergrin's entire body to go into shock, and Mr. Bergrin had a hematoma on his leg for at least 4 weeks. The United States Marshals were instructed to deprive Mr. Bergrin of sleep and to abuse Mr. Bergrin.

161.    On the afternoon of January 6, 2016, Mr. Bergrin arrived at the Federal Medical Center in Butner, North Carolina. However, within two hours of Mr. Bergrin's arrival, Mr. Bergrin was once again placed into a *freezer* by himself for the following 24-hour period. The *freezer* was similar to the

freezer that Mr. Bergrin and Mr. Slater had been forced to endure in July of 2015, but this freezer was substantially worse. The filthy, freezing-cold cell had Ice-Cold Air being pumped into the small room, which had bright blinding lights that could have lit-up an entire city, which lights were causing severe pain and discomfort to Mr. Bergrin's eyes. The bed in the freezer consisted of "a slab of concrete" with a "turquoise-colored one-inch-thick vinyl mattress that was covered with human feces". The temperature of the freezer felt like it was Below Zero degrees, and it was obvious that the government was once again attempting to murder Mr. Bergrin.

162.    Throughout the next 24-hours, Mr. Bergrin had gotten Hypothermia, and Mr. Bergrin did not believe that he was going to survive. Every few hours a Corrections Officer would come around and check to see if Mr. Bergrin was still alive. Mr. Bergrin begged the Correction Officers to raise the temperature or to provide him with a blanket, but they refused to help Mr. Bergrin. After 24-hours, Mr. Bergrin was semi-conscious and he was picked up off of the floor by two correctional officers and was dragged from that environment. It took Mr. Bergrin weeks to physically recover from that experience, but Mr. Bergrin still suffers severe heart-related illness and other medical issues as a result of being incarcerated for 24-hours in what can only be described as a "torture chamber". The United States Marshal, Peter Elliott, and members of the Federal Bureau of Prisons conspired together to cause Mr. Bergrin's death. Had Mr. Bergrin died in that torture chamber, Mr. Bergrin's Death Certificate would have stated "Death by Natural Causes", but Mr. Bergrin's death would have been via *homicide*.

163.    Several weeks after Mr. Bergrin arrived at the Federal Medical Center in Butner, North Carolina, Judge Dan Polster committed numerous *crimes* in the herein case. Judge Polster contacted Tanya Cunic, Psy.D, who was Mr. Bergrin's primary doctor at the Federal Medical Center, and Judge Polster *instructed* Dr. Cunic to commit medical malpractice, fraud, and perjury, by instructing Dr. Cunic to fraudulently declare Mr. Bergrin *Incompetent to Stand Trial*, but Dr. Cunic *refused* to declare Mr. Bergrin *Incompetent to Stand trial*, and she told Mr. Bergrin that she documented Judge Polster's *criminal-behavior* in Mr. Bergrin's first Competency Report that was prepared by Dr. Cunic on or about March 6, 2016.

164.    When Judge Polster received his copy of Mr. Bergrin's first Competency Report, Judge Polster became *furious* with Dr. Cunic, and Judge Polster committed another *crime* by contacting Dr. Cunic a second time, and Judge Polster threatened to have Dr. Cunic *"terminated from the Federal*

*Bureau of Prisons if she refuses to declare Mr. Bergrin Incompetent to Stand Trial in the second Competency Report*", which Competency Report was to be prepared 60 days after the first Competency Report (and the second Competency Report was supposed to be the *final* Competency Report, because the Order in which Judge Polster sent Mr. Bergrin to the Federal Medical Center stated that Mr. Bergrin is to be there for 120 days).

165.    After being threatened with termination from the Federal Bureau of Prisons, Dr. Cunic approached Mr. Bergrin and she told Mr. Bergrin that she was *devastated* about the possibility of losing her job with the Federal Bureau of Prisons, because she is married with children and she needed the income. Dr. Cunic actually sought permission from Mr. Bergrin to opine that Mr. Bergrin is Incompetent to Stand Trial, because Dr. Cunic was convinced that Judge Polster was going to have her terminated. At that time, Mr. Bergrin was extremely concerned that he would be fraudulently declared *Incompetent to Stand Trial*, and he wrote three (3) letters to Dr. Cunic expressing his concerns, and he explained to Dr. Cunic that if she were to declare Mr. Bergrin *Incompetent to Stand Trial* then she would be engaging in perjury, fraud, and medical malpractice. Mr. Bergrin also explained to Dr. Cunic that if she does *not* declare Mr. Bergrin *Incompetent to Stand Trial* that Judge Polster might attempt to have her terminated from her position with the Federal Bureau of Prisons. Mr. Bergrin then advised Dr. Cunic that she needed to retain competent counsel immediately. Dr. Cunic took Mr. Bergrin's advice and she retained highly competent counsel. After Dr. Cunic's attorney spoke with the "Director of the Federal Bureau of Prisons", Dr. Cunic received a promotion, a substantial increase in salary, and an offer to be relocated to any federal institution in the United States.

166.    In the second (and what was supposed to be the *final)* Competency Report in accordance with Judge Polster's Order dated December 9, 2015, Dr. Cunic once again found Mr. Bergrin *Competent to Stand Trial*, and Dr. Cunic told Mr. Bergrin that she once again documented in Mr. Bergrin's second Competency Report that "Judge Dan Polster threatened to have Dr. Cunic terminated from the Federal Bureau of Prisons if she did not declare Mr. Bergrin *Incompetent to Stand Trial*".

167.    Upon receiving the second Competency Report that Dr. Cunic had prepared, Judge Dan Polster immediately ordered the Federal Bureau of Prisons and the Freedom of Information Offices in Washington, DC to SEAL Mr. Bergrin's first 2 Competency Reports, because those documents contain evidence of the *crimes* that were committed by Judge Dan Polster.

168.    Mr. Bergrin attempted on numerous occasions to receive copies of his first 2 Competency Reports by contacting numerous people at FMC-Butner and his attorneys from the Office of the Federal Public Defender and the FOIA offices in Washington, DC and by filing a Petition for a Writ of Mandamus with the United States Court of Appeals for the Sixth Circuit, but because Judge R. Guy Cole had entered into the criminal conspiracy with Judge Polster, the United States Court of Appeals for the Sixth Circuit denied Mr. Bergrin's numerous requests to receive his Competency Reports despite Mr. Bergrin having a constitutional right to receive his Competency Reports, which state that "Ronald Bergrin is Competent to Stand Trial".

169.    After Dr. Cunic refused to declare Mr. Bergrin *Incompetent to Stand Trial* in her second (and what was supposed to be the *final)* Competency Report, Judge Polster then committed another *crime* by contacting Warden J.C. Holland at the Federal Medical Center, and contacting Dr. Cunic's supervisor at the Federal Medical Center, and Judge Polster instructed the Warden and the Supervisor to "keep Mr. Bergrin incarcerated at the Federal Medical Center for an additional period of ninety (90) days, and Judge Polster insisted that another Competency Evaluation be performed, and he once again insisted that Dr. Cunic declare Mr. Bergrin *Incompetent to Stand Trial"*. Dr. Cunic told Mr. Bergrin that she had no choice but to keep Mr. Bergrin incarcerated for an additional period of 90 days, but at the end of the 90-day period, Dr. Cunic once again found Mr. Bergrin *Competent to Stand Trial* in her third and final Competency Evaluation/Report. Judge Polster's erroneous actions were not only a violation of Mr. Bergrin's constitutional rights, but they were *actual crimes*, because it is a crime for a Judge to instruct a doctor to make a medical diagnosis, and Judge Polster was well aware that it was a crime or Judge Polster and Judge R. Guy Cole would not have *sealed* Mr. Bergrin's first 2 Competency Reports, which contain evidence of Judge Polster's numerous crimes.

170.    Mr. Bergrin will produce documentary evidence and several witnesses will testify that Judge Dan Polster, repeatedly attempted to coerce the government's own doctors who are employed by the Federal Bureau of Prisons to declare Mr. Bergrin to be *Incompetent to Stand Trial*, but each and every one of the government's doctors at the Metropolitan Correctional Center in Chicago and at the Federal Medical Center in Butner, NC refused to commit fraud, medical malpractice, and perjury, and after undergoing numerous months of psychological evaluations "for no legitimate reason whatsoever", and despite Judge Polster threatening the careers of the doctors if they did not

cooperate with his illicit demands, all of the government's doctors found Mr. Bergrin *Competent to Stand Trial.*

171.    As a result of the abuse that Mr. Bergrin was subject to at the Federal Medical Center by those who are employed by the United States Department of Justice and the Federal Bureau of Prisons, Mr. Bergrin did not believe that he would be leaving the Federal Medical Center alive, and therefore, on March 15, 2016, Mr. Bergrin wrote a 4-page letter to President Obama, to Vice President Biden, to the Inspector General, to the nine Supreme Court Justices, and to numerous others in Washington, DC to let them know that Mr. Bergrin had not committed a crime and was being held without a trial and was being severely abused, and was most likely going to be murdered by members of the government. Mr. Bergrin wrote that letter, which he entitled: "The Government Has 60 Days To Murder Me". Mr. Bergrin gave the letter that *title* because he thought that it would cause the recipients of the document to read it.

172.    Mr. Bergrin was being verbally abused by the prison staff on a daily basis in an effort to provoke Mr. Bergrin into doing something that would allow the prison staff to charge Mr. Bergrin with a crime. But Mr. Bergrin would not respond to the abuse. However, approximately 10 days after sending that letter, the abuse at the Federal Medical Center ended. The letter that Mr. Bergrin had written actually saved Mr. Bergrin's life, because there was no possible way the members of the government who violated Mr. Bergrin's constitutional rights were going to permit Mr. Bergrin to walk out of prison alive after everything that the government had done to him, and nobody from the United States Department of Justice wanted to be responsible for the civil suit that Mr. Bergrin had repeatedly threatened to file against those that violated his constitutional rights and committed numerous heinous crimes against Mr. Bergrin.

173.    On or about May 25, 2016, which was during the period of time that Mr. Bergrin was incarcerated at the Federal Medical Center in Butner, North Carolina, and *allegedly* "Undergoing Competency Restoration", Mr. Bergrin's cellmate, RTB, attempted to set-up and entrap Mr. Bergrin in a *murder-for-hire scheme* in which RTB offered to arrange for Judge Dan Polster to be murdered for a nominal amount of money. Mr. Bergrin immediately declined his cellmate's generous offer and Mr. Bergrin left his cell and wrote a letter to Judge Polster informing him of what Mr. Bergrin's cellmate had offered to do at Mr. Bergrin's behest. This attempt to set-up and entrap Mr. Bergrin in a crime, represents incontrovertible evidence that the Federal Bureau of Prisons and the United

61

States Marshal, Peter Elliott, and the Assistant U.S. Attorneys (who pulled Peter Elliott into the criminal conspiracy) were well aware that Mr. Bergrin was *Competent to Stand Trial*, because the Government is not permitted to set-up and entrap a person that is mentally ill, nor do they have an incentive to set-up and entrap a person that is mentally ill, because "a person that is *mentally ill* or *Incompetent to Stand Trial* cannot go to trial and cannot be convicted of a crime". This attempt to entrap Mr. Bergrin in a crime was an act of *desperation* by those members of the government who entered into the criminal conspiracy and repeatedly violated Mr. Bergrin's constitutional rights.

174.    In June of 2016, Judge Polster blatantly violated Mr. Bergrin's constitutional rights by issuing an Order to the Clerk of the Court preventing the Clerk of the Court from opening or filing any of Mr. Bergrin's *pro-se* legal documents, which Order prevented Mr. Bergrin from being able to defend him-self in the criminal case. Mr. Bergrin had little contact with his appointed counsel, because the attorneys from the Office of the Federal Public Defender were working hand-in-hand with the Assistant U.S. Attorneys and with Judge Polster to keep Mr. Bergrin incarcerated. Judge Polster maliciously issued this wrongful Order in violation of Mr. Bergrin's due process rights, despite knowing that *Mr. Bergrin had a liberty interest at stake*, and despite knowing that Mr. Bergrin's legal counsel from the Office of the Federal Public Defender had already been disqualified from the case by the Honorable Nancy Vecchiarelli. Mr. Bergrin filed an Appeal of Judge Polster's flawed Order, but the United States Court of Appeals for the Sixth Circuit denied Mr. Bergrin's motion by stating that Mr. Bergrin cannot file *pro-se* documents because he is represented by counsel. The United States Court of Appeals for the Sixth Circuit denied Mr. Bergrin appeal despite Mr. Bergrin having filed nine (9) pro-se motions and appeals in which to remove such conflicted and ineffective counsel who had previously been disqualified by the Honorable Nancy Vecchiarelli. The constitution of the United States means absolutely nothing to these people.

175.    Mr. Bergrin had also written numerous angry letters to Judge Polster and in one letter Mr. Bergrin compared Judge Polster to a Nazi War Criminal, but the letters had no effect on Judge Polster and when Mr. Bergrin appeared before Judge Polster, Judge Polster stated that he found Mr. Bergrin's letters to be "entertaining".

176.    On or about September 26, 2016, which was days after Mr. Bergrin returned to the Northeast Ohio Correctional Center from the Federal Medical Center in Butner, North Carolina, Edward Bryan, Esq. came to see Mr. Bergrin at the prison. Whenever Edward Bryan would come to see Mr.

Bergrin, Mr. Bryan would always antagonize Mr. Bergrin in an effort to get Mr. Bergrin to physically assault Mr. Bryan so that Mr. Bergrin could then be sentenced to 20-years in prison for slugging a federal official. Mr. Bergrin knew about Mr. Bryan's motives and strategies, so when Mr. Bryan would come to see Mr. Bergrin at the prison, Mr. Bergrin would ask him what he wanted, and Mr. Bergrin would spend no more than 2 minutes with Edward Bryan prior to walking out of the meeting and returning to his prison cell. But this time, Mr. Bryan behaved differently. Mr. Bryan pretended to be Mr. Bergrin's friend, and he told Mr. Bergrin that he came to visit with him to ask how Mr. Bergrin was feeling. Mr. Bergrin did not answer Mr. Bryan's question, because Mr. Bergrin knew not to trust Mr. Bryan, and Mr. Bergrin was not going to be fooled by a man who repeatedly violated Mr. Bergrin's constitutional rights throughout the prior fourteen months, and worked with the Assistant U.S. Attorneys and with Judge Dan Polster to keep Mr. Bergrin incarcerated for crimes that never occurred.

177. Then Mr. Bryan asked Mr. Bergrin: "Do you want to see something? Look at the photo of this beautiful lady that I'm representing". Mr. Bryan then opened a document to the third-page and he handed the document to Mr. Bergrin, which had a photo of a very attractive woman. The woman's name was Jonida Alicka, and the document was a Presentence Investigation Report. Mr. Bergrin looked at the photo of the highly attractive woman, and Mr. Bryan then asked Mr. Bergrin if Mr. Bergrin wanted to keep the document, and Mr. Bryan told Mr. Bergrin that he has additional copies at his office. Mr. Bergrin then responded that he would take the copy of the document, and he thanked Mr. Bryan. However, at that time, Mr. Bergrin knew that Mr. Bryan was violating the constitutional rights of Ms. Alicka when he gave Mr. Bergrin the inmate's Presentence Investigation Report, and Mr. Bergrin also thought that it was possible that Mr. Bergrin was being set-up and entrapped by Mr. Bryan, because possession of another inmate's PSI report is considered "contraband", and it is a crime to possess contraband. The meeting ended within a few minutes, and Mr. Bergrin immediately made copies of the inmates PSI report, and Mr. Bergrin then arranged for two inmates at the Northeast Ohio Correctional Center who were not located in Mr. Bergrin's unit to send copies of Ms. Alicka's Presentence Investigation Reports to Mr. Bergrin's people in New York. The next morning, Mr. Bergrin was returning from breakfast, and there were two Corrections Officers shaking down Mr. Bergrin's cell. The Corrections Officers went through Mr. Bergrin's cell with a fine-tooth-comb looking for any kind of contraband that they could find, but there was none. Mr. Bergrin had been set-up by Edward Bryan and most likely by other members of the U.S.D.O.J. Mr. Bergrin had a telephone conversation with Ms. Alica's attorney

after Mr. Bergrin arrived home from prison, and was given permission to share this information with the Court. Attached hereto are a few pages of the Presentence Investigation Report of Jonida Alicka.

178. On October 26, 2016, Judge Polster once again *blatantly* violated Mr. Bergrin's constitutional rights by wrongly and maliciously declaring Mr. Bergrin *Incompetent to Stand Trial* immediately prior to dismissing the bogus criminal case. Judge Polster stated that he is dismissing the criminal charges because *Mr. Bergrin is suffering from a mental disease or defect and is therefore Incompetent to Stand Trial*, which was a total fabrication and could not have been further from the truth, and despite Mr. Bergrin having never been to a psychiatrist, a psychologist, a mental institution, and had never been prescribed psychotropic medication, and despite each and every one of the government's own doctors opining that "Mr. Bergrin is *Competent to Stand Trial*", Judge Polster wrongly, maliciously, and sadistically declared Mr. Bergrin *Incompetent to Stand Trial*, in an effort to prevent Mr. Bergrin from being able to go to trial for the bogus criminal charges that were brought against Mr. Bergrin, and because Judge Polster was attempting to prevent Mr. Bergrin from suing the FBI in New York City and all of the government's employees in Ohio and the numerous members of the Northeast Ohio Correctional Center who violated Mr. Bergrin's constitutional rights and committed numerous crimes in the herein case.

179. By declaring Mr. Bergrin *Incompetent to Stand Trial,* Judge Polster was in essence stating that "Mr. Bergrin had committed a crime, but because Mr. Bergrin is *Incompetent to Stand trial*, Mr. Bergrin could not be prosecuted", which could not have been further from reality.

180. Judge Dan Polster, Brian McDonough, Matthew Shepherd, and the attorneys from the Office of the Federal Public Defender kept Mr. Bergrin incarcerated for 22+ months, knowing that Mr. Bergrin did not commit a crime and knowing that Mr. Bergrin is extremely Competent, and such despicable behavior should not be condoned by this Court.

181. One might think that after Mr. Bergrin was released from prison that the government would no longer harass Mr. Bergrin and would no longer attempt to set-up and entrap Mr. Bergrin in crimes, but since returning home from prison on October 27, 2016, the FBI has continued to harass Mr. Bergrin on a daily basis and has continued its attempts to entrap Mr. Bergrin in crimes, because the FBI agents are angry that Mr. Bergrin is suing the FBI and the other members of the government

64

that violated Mr. Bergrin's constitutional rights. The FBI agents have repeatedly violated Mr. Bergrin's constitutional rights by utilizing the FBI's technology and resources to find out which law firms and which attorneys are representing Mr. Bergrin.

182.    The FBI agents have wrongfully gained access to all of Mr. Bergrin's emails, his email addresses, his computers, and his cell phones. The FBI agents then met Mr. Bergrin's attorneys at their offices, and they intimidated, pressured, coerced, and threatened the numerous attorneys that Mr. Bergrin repeatedly retained in order to overturn Judge Polster's wrongful Decision in which Judge Polster stated that "Mr. Bergrin is Incompetent to Stand Trial", and in order to prepare the voluminous lawsuit against the government and against those that violated Mr. Bergrin's constitutional rights. The numerous attorneys that Mr. Bergrin had retained did exactly what the FBI agents instructed them to do, which was to "eat-up the Statue of Limitations clock and to then abandon Mr. Bergrin", despite Mr. Bergrin paying all of his attorneys legal fees, costs, and expenses.

183.    The following is a partial list of the numerous crimes and the numerous violations of Mr. Bergrin's constitutional rights that were committed by members of the Federal Bureau of Investigation <u>after Mr. Bergrin's release from prison on October 27, 2016</u>, and many of these crimes and violations of Mr. Bergrin's constitutional rights occurred within the past six (6) months. Mostly all of these crimes and violations of Mr. Bergrin's constitutional rights were committed in New York City, and only 2 or 3 of the numerous crimes were committed in the State of Florida. As a result of the damage that the members of the U.S.D.O.J. and members of Corrections Corporation of America and members of the Northeast Ohio Correctional Center did to Mr. Bergrin's heart, Mr. Bergrin cannot be in cold temperatures in the winter, which is the reason that Mr. Bergrin is now spending the winter months in Florida.

184.    After Mr. Bergrin was released from prison on October 27, 2016, the United States Court of Appeals for the Sixth Circuit appointed CJA attorney, Steven Jaeger, Esq., to represent Mr. Bergrin in preparing the appeal brief, because Mr. Bergrin needed to overturn Judge Polster's flawed and malicious Decision and Order in which Judge Polster declared Mr. Bergrin *Incompetent to Stand Trial* prior to dismissing the bogus criminal case.  Mr. Bergrin was aware that such a Decision and Order would destroy any chances that Mr. Bergrin would have to engage in any business ventures. However, Mr. Jaeger had been coerced by the United States Court of Appeals for the Sixth Circuit

65

and by members of the Department of Justice to betray Mr. Bergrin and to file *an intentionally deficient appeal brief* on Mr. Bergrin's behalf. Mr. Bergrin knew *instantly* that Mr. Jaeger was planning to file an *intentionally deficient appeal*, because Mr. Jaeger refused to subpoena Mr. Bergrin's first 2 Competency Reports that were prepared by Tanya Cunic, Psy.D at the Federal Medical Center in Butner, North Carolina in accordance with Judge Polster's Order dated December 10, 2015, and those documents were of paramount importance to Mr. Bergrin having Judge Polster's malicious and wrongful Order overturned on appeal, because the Competency Reports represent undeniable evidence that Mr. Bergrin is Competent to Stand Trial.

185.    During a telephone call, Mr. Bergrin told Mr. Jaeger that there would be *severe consequences* (or words to that effect) for filing an *intentionally deficient appeal brief on Mr. Bergrin's behalf,* and Mr. Jaeger got scared and chose to exit the case. Mr. Jaeger then fabricated a story to the United States Court of Appeals for the Sixth Circuit so that he could be removed from the case. The Office of the U.S. Attorney coerced Mr. Jaeger to join in their *criminal conspiracy* and to file an *intentionally deficient appeal brief* on Mr. Bergrin's behalf, which were crimes and violations of Mr. Bergrin's constitutional rights. This agreement to violate Mr. Bergrin's constitutional rights was part of the *criminal conspiracy* that was initially developed by the FBI, by Judge Dan Polster, by the Assistant U.S. Attorneys, (Brian McDonough and Matthew Shepherd), by the United States Marshals Service, by the Office of the Federal Public Defender, by the Judges in the United States Court of Appeals for the Sixth Circuit, by others that are employed by the U.S.D.O.J., and by those at the Northeast Ohio Correctional Center, and by those at CoreCivic, Inc. (formerly known as "Corrections Corporation of America"), and by numerous others.

186.    After Mr. Jaeger was removed from the case, the United States Court of Appeals for the Sixth Circuit then appointed Gary W. Crim, Esq. to represent Mr. Bergrin in his appeal, but Edward Bryan, Esq. (who was working hand-in-hand with the Assistant U.S. Attorneys), "instructed Mr. Crim not to subpoena Mr. Bergrin's Competency Reports and he instructed Mr. Crim to file an intentionally deficient appeal brief on Mr. Bergrin's behalf". Mr. Crim communicated directly with Edward Bryan, who acted as an intermediary or conduit, and Edward Bryan communicated directly with his *handler*, Brian McDonough (Mr. Bergrin possesses incontrovertible evidence of the existence of this illicit relationship, because Mr. Crim inadvertently forwarded an email to Mr. Bergrin stating that he is talking with Edward Bryan, which was another violation of Mr. Bergrin's constitutional right to *conflict-free counsel*).

187. Mr. Bergrin was aware that Mr. Crim was also planning to file an *intentionally deficient appeal brief* on Mr. Bergrin's behalf, because Mr. Crim also refused to subpoena Mr. Bergrin's first 2 Competency Reports that were prepared by Tanya Cunic, Psy.D at the Federal Medical Center in Butner, North Carolina in accordance with Judge Polster's Order dated December 10, 2015, which documents were needed for the appeal, and which documents Mr. Bergrin had a constitutional right to receive, because they are "part of Mr. Bergrin's medical records".

188. Mr. Bergrin sent Mr. Crim more than fifteen (15) letters and emails instructing Mr. Crim to subpoena Mr. Bergrin's first 2 Competency Reports, which were prepared at the Federal Medical Center, and to not file the appeal brief without including _all_ four (4) of the Competency Reports, but Mr. Crim violated Mr. Bergrin's constitutional rights and he filed the *intentionally deficient appeal brief* with the Court, and he did not include *any* of the four (4) Competency Reports with the appeal brief, which Competency Reports were prepared by the government's own doctors who are employed by the Federal Bureau of Prisons, and all four (4) of the Competency Reports state that *Mr. Bergrin is Competent to Stand Trial.* Mr. Crim became part of the criminal conspiracy to violate Mr. Bergrin's constitutional rights.

189. On or about October 5, 2017, Mr. Bergrin sent a letter to the United States Court of Appeals for the Sixth Circuit in which Mr. Bergrin insisted that the *intentionally deficient document* that Mr. Crim filed be removed from the docket immediately, and Mr. Bergrin also requested that the venue be transferred to the Southern District of New York so that Mr. Bergrin can receive *justice* in the herein case. However, Mr. Bergrin's request for the venue to be transferred was denied, as was Mr. Bergrin's appeal, because "Judge R. Guy Cole had also entered into the criminal conspiracy with Judge Polster". Throughout the 22+ months of Mr. Bergrin's incarceration, and after Mr. Bergrin's release from prison on October 27, 2016, Judge Cole denied *all* of Mr. Bergrin's Motions, Appeals, and Petitions for a Writ of Mandamus, despite knowing that Mr. Bergrin had a constitutional right for each and every legal brief to be *granted.*

190. Judge R. Guy Cole and the Associate Judges of the United States Court of Appeals for the Sixth Circuit repeatedly violated Mr. Bergrin's Sixth Amendment constitutional rights in accordance with Strickland v. Washington, 466 U.S. 668 (1984) by denying Mr. Bergrin's numerous requests for such conflicted and ineffective CJA counsel to be removed from the herein case, but Judge R.

Guy Cole appointed counsel that had agreed to take part in the *criminal conspiracy*, and Judge Cole refused to remove Gary Crim, Esq. from the case, and Mr. Crim then filed the *intentionally deficient appeal*, which was of course denied. How does an attorney appeal a Decision and Order in which a highly competent person was declared incompetent by a corrupt Judge, and the attorney does not subpoena nor present the victim's Competency Reports, which clearly state that the victim is competent?

191. After Mr. Bergrin was released from prison and arrived in New York City on October 27, 2016, the criminal conspiracy continued within the ambit of the Fourteenth Amendment, and the above-named Defendants acted *under color of law,' and the conspiracy included numerous actions by* the United States through its Judges in the District Court of Ohio, in the U.S. Court of Appeals for the Sixth Circuit, through the CJA attorneys whom were appointed to represent Mr. Bergrin, through numerous members of the FBI in order to punish the victim in violation of the Fourteenth Amendment's direct admonition to the States."

192. After Mr. Bergrin was released from prison on October 27, 2016, the FBI violated Mr. Bergrin's constitutional rights by committing *Witness Tampering* and *Obstruction of Justice*, by contacting and coercing *several* of Mr. Bergrin's trial-witnesses to work as Confidential Informants for the FBI. Jodi Gold was contacted by the FBI after the Assistant U.S. Attorneys learned that Mr. Bergrin was planning to call Ms. Gold as a witness in the herein case. Mr. Bergrin traveled to Ohio in November 2014 because Ms. Gold was in severely critical condition at the Cleveland Clinic. Tragically, Jodi Gold has since passed away, but prior to her death, Ms. Gold executed a notarized affidavit, and her husband, Dr. Gold, will testify that everything in the affidavit is truthful and accurate. Prior to her death, Jodi Gold shared with Mr. Bergrin that a male and a female FBI agent came to Dr. and Ms. Gold's home in Roslyn, New York and "attempted to coerce and intimidate Ms. Gold not to testify on behalf of Mr. Bergrin". Witness Tampering and Obstruction of Justice means absolutely nothing to members of the FBI, similar to the way in which the Constitution of the United States means absolutely nothing to Judge Dan Polster and to Judge R. Guy Cole.

193. One of Mr. Bergrin's Harvard educated attorneys who was intimidated and threatened by the FBI told Mr. Bergrin: "Between the Judges in Ohio and the FBI agents in New York, we're living in a third world country". Another Harvard educated attorney who Mr. Bergrin retained and who ultimately admitted to Mr. Bergrin that he was forced by the FBI agents to throw Mr. Bergrin

under the proverbial bus prior to abandoning his case, stated to Mr. Bergrin: "I've been a criminal defense attorney and a civil rights attorney for the past 42 years, and the worst people that I've come across are those employed by the government". Both of these witnesses are highly reputable attorneys who will be called to testify in the herein case.

194.    After Mr. Bergrin was released from prison on October 27, 2016, the FBI agents also violated Mr. Bergrin's constitutional right to healthcare privacy under the HIPAA Act by contacting two (2) of Mr. Bergrin's doctors in New York City and by requesting that the doctors provide the FBI agents with *copies of Mr. Bergrin's medical records*. Mr. Bergrin will be calling both of these doctors to testify against the government in the herein case. The contacting of Mr. Bergrin's doctors by the FBI is defined as Witness Tampering and Obstruction of Justice, and the doctors will testify that they were *intimidated* by the members of the FBI. One of the doctors refused to cooperate with the FBI agents and the other doctor refused to say whether or not he cooperated with the FBI agents, but both of them will be called to testify against the government in the herein case.

195.    After Mr. Bergrin was released from prison on October 27, 2016, Mr. Bergrin received a letter from Mr. Bergrin's former cellmate at the Federal Medical Center in Butner, North Carolina, RTB. In his letter, RTB wrote that he had been "released from prison" (after serving less than two (2) years for being charged with selling methamphetamines, Guns, and Dynamite to an undercover ATF agent). Prior to being arrested for selling illegal drugs, guns, and dynamite, RTB had been arrested in the past for selling drugs, and RTB has a prior felony record. Under federal law, a person with a felony conviction is not permitted to possess or sell drugs, guns, or dynamite, and RTB is a convicted felon. The prison sentence for a convicted felon possessing only "a gun" is up to ten (10) years in prison, but RTB could have received a sentence of up to 24 years in prison. Mr. Bergrin knew instantly that this was another attempt by the U.S.D.O.J. to set-up and entrap Mr. Bergrin in a crime.

196.    In the letter that RTB had written to Mr. Bergrin, RTB asked Mr. Bergrin if Mr. Bergrin would finance a new business venture that RTB was starting. However, Mr. Bergrin knew that RTB was working as a Confidential Informant for the United States Department of Justice, because it's quite obvious that nobody from the United States Department of Justice informed RTB or RTB's handler, that after RTB offered to murder Judge Polster on Mr. Bergrin's behalf in May of 2016, that Mr. Bergrin then sent a letter to Judge Polster accusing the Government and RTB of

attempting to entrap Mr. Bergrin in a crime. Had the Government told RTB that Mr. Bergrin is aware that RTB was working as an informant for the Government when RTB attempted to set-up and entrap Mr. Bergrin in a murder-for-hire scheme, RTB would not have sent Mr. Bergrin the recent letter in which RTB fabricated a story about having been released from prison. After receiving RTB's letter, Mr. Bergrin contacted his investigator and learned that RTB was still in prison, but because RTB agreed to work as an informant for the government in an effort to set-up and entrap Mr. Bergrin in a crime, RTB's sentence was substantially reduced, but RTB was still in prison when he attempted to set-up and entrap Mr. Bergrin, despite stating in his letter that RTB had already been released from prison.

197.    After the FBI agents harassed Mr. Bergrin for five years, and then the FBI falsely charged  Mr. Bergrin in a *Retaliatory Arrest* with a crime that never occurred, and after Mr. Bergrin was wrongly indicted by the Assistant U.S. Attorneys and incarcerated for a period of 22+ months and denied a trial, during which time members of the United States Department of Justice and the members of the Medical Staff at the Northeast Ohio Correctional Center and others attempted to murder Mr. Bergrin (to intentionally cause Mr. Bergrin's death via homicide on three (3) separate occasions), Mr. Bergrin arrived home from prison, and the United States Department of Justice is still attempting to set-up and entrap Mr. Bergrin in crimes, because the government is attempting to prevent Mr. Bergrin from filing this lawsuit against those that violated Mr. Bergrin's constitutional rights and committed numerous crimes against Mr. Bergrin.

198.    Since being released from prison on October 27, 2016, the FBI agents contacted, coerced, intimidated, and threatened Mr. Bergrin's attorney in Miami, Florida, Richard K, who was one (1) of five (5) attorneys that were retained to sue the government on behalf of Mr. Bergrin and to prepare a Petition for a Writ of Certiorari in order to have Judge Polster's wrongful, malicious, and sadistic Decision and Order overturned. Richard K had been preparing a *Petition for a Writ of Certiorari* that was to be filed with the Supreme Court of the United States on or prior to August 13, 2018. However, after Mr. Bergrin made numerous requests to read the Cert Petition prior to it being filed by his attorney, Mr. Bergrin finally received a copy of the Cert Petition from Richard K (on August 9, 2018) only four (4) days prior to the deadline for submission to the Supreme Court of the United States. Mr. Bergrin read the first 2 pages of the 30+ page Cert Petition, and Mr. Bergrin knew instantly that Richard K had been contacted by the FBI and was forced to file an *intentionally deficient Cert Petition.*

199.  Mr. Bergrin immediately left his home in Boynton Beach, Florida and traveled to Richard K's office in Miami, Florida. When Mr. Bergrin arrived at Richard K's office, Mr. Bergrin did not share his name or identity with the receptionist who repeatedly asked Mr. Bergrin for his name and the name of the person whom Mr. Bergrin was waiting to see, but instead of sharing any information with the receptionist, Mr. Bergrin only responded: "I am waiting for someone". After approximately 2 hours, Richard K finally passed by the reception area of his law firm, and when Richard K saw Mr. Bergrin in the reception area, Richard K panicked, because he was concerned that Mr. Bergrin might physically attack him. Richard K was literally *shaking*. Mr. Bergrin then told Richard K that he was not going to hurt him, and Mr. Bergrin opened the conference room door which was right off of the reception area and Mr. Bergrin insisted that Richard K step into the conference room. Richard K then walked into the conference room and he ran around the other side of the conference table. Mr. Bergrin then asked Richard K: "How did the FBI find out that you were representing me?" To which Richard K responded: "I filed for an extension of time with the Supreme Court Justice, Elena Kagan, and the Assistant U.S. Attorneys most likely saw my name and arranged for the FBI agents to meet with me. A few days later the FBI agents came to my office and told me that if I file the lawsuit, or if any of my motions or petitions is granted, we will destroy your life and your family's lives".

200.  Mr. Bergrin then asked Richard K: "Why didn't you just resign from the case?" To which Richard K responded: "They told me that I needed to stay on the case in order to eat up as much time as possible, because they wanted the Statute of Limitations to expire". Richard K then apologized to Mr. Bergrin and he stated: "If I were you, I would change the Cert Petition and then I would file it *pro-se*". Mr. Bergrin then responded: "I only have four days to work on the document", but Richard K responded: "You do *not* have four days. You only have 24 hours to change it because it needs to go to the printer tomorrow". Mr. Bergrin made a few changes to the document, and then Mr. Bergrin sent it to Richard K so that Richard K could then send it to the printer. As a result of the FBI engaging in *Obstruction of Justice*, by contacting, intimidating, coercing, and threatening Mr. Bergrin's attorney, the complaint that Richard K had prepared was never given to Mr. Bergrin and the Cert Petition was denied by the Supreme Court of the United States, and the Statute of Limitations on a very limited number of the Causes of Action *might* have been compromised as a result of the government's Obstruction of Justice. However, the Statute of Limitations must be tolled as a result of the criminal behavior by the members of the United States Department of

Justice, who joined in the criminal conspiracy that has plagued this case since Mr. Bergrin was first harassed by members of the FBI in September of 2009, and who continue to harass Mr. Bergrin today.

201.    Richard K also shared with Mr. Bergrin that the FBI agents asked Richard K: "How did Mr. Bergrin pay you", and Richard K responded "I just received an additional $10,000 from Mr. Bergrin by credit card". The FBI agents then insisted that Richard K provide them with the number of Mr. Bergrin's credit card, which Richard K provided to the FBI agents, and days later, "Mr. Bergrin's credit card was revoked by Comenity Bank", despite Mr. Bergrin having an excellent credit rating. The FBI agents who contacted, intimidated, coerced, and threatened Richard K and his family, also contacted "Comenity Bank" and they arranged to have Mr. Bergrin's MasterCard terminated (Account number: 5358 7820 0844 0752) which credit card had a $14,000 credit line, and the effects of such termination of Mr. Bergrin's credit card caused damage to Mr. Bergrin's credit report. Mr. Bergrin's attorney, Richard K, will be subpoenaed to testify in the herein case, and Mr. Bergrin does not believe that any of his attorneys would commit perjury on the witness stand.

202.    After writing numerous letters to Comenity Bank and making numerous telephone calls in order to obtain evidence that members of the FBI engaged in Intentional Interference, Obstruction of Justice, Fraud, and numerous other Intentional Torts, Mr. Bergrin was able to confirm that the FBI instructed Comenity Bank to terminate Mr. Bergrin's credit card. Mr. Bergrin was not only able to obtain such evidence, but Mr. Bergrin has a witness from Comenity Bank (as well as Richard K and another attorney that is connected to Richard K) that will testify at trial that the FBI agents contacted Comenity Bank and insisted that they terminate Mr. Bergrin's credit card. The FBI agents engaged in Intentional Interference with respect to Mr. Bergrin's relationship with Comenity Bank and they committed Obstruction of Justice with respect to Richard K, and with five (5) other attorneys that Mr. Bergrin retained to represent him in the herein case, who also threw Mr. Bergrin under the proverbial bus and then abandoned Mr. Bergrin after being contacted, intimidated, coerced, and threatened by members of the FBI, which is the reason that Mr. Bergrin prepared this complaint and has now chosen to represent himself *pro-se*.

203.    Since being released from prison on October 27, 2016, the FBI agents contacted and arranged for Mr. Bergrin's former girlfriend, Ana P., to work as an *informant for the FBI* in an effort to attempt

72

to set-up and entrap Mr. Bergrin in a crime. When Mr. Bergrin dated Ana P for a period of 3 years on-and-off, Mr. Bergrin was very respectful to Ana P and he treated her extremely well, and therefore, the only way that Ana P would work as a Confidential Informant against Mr. Bergrin would be if Ana P was intimidated or threatened by the FBI. Ana P is of Serbian descent and would be frightened if she were approached by the FBI, especially if she were threatened with deportation. Prior to being arrested, the FBI agents made more than 60 attempts to set-up and entrap Mr. Bergrin in crimes, but were unsuccessful, because Mr. Bergrin does not commit crimes. Ana P and numerous others will of course be subpoenaed to testify in the herein case.

204. Since being released from prison on October 27, 2016, the FBI contacted Mr. Bergrin's numerous business associates, clients, his partners, and his investors, who are in the restaurant industry, in the commercial real estate industry, and in the investment banking industry, and several of those people told Mr. Bergrin: "Because of you, the FBI is harassing me". One business associate in the restaurant industry, Marc B, recently told Mr. Bergrin: "The FBI threatened to have the Internal Revenue Service audit the books of my restaurant if I refused to work as an informant for the FBI", and a close friend of Mr. Bergrin told Mr. Bergrin: "My wife hasn't been able to sleep since we were threatened by the FBI agents!"

205. On or about February 8, 2019, Mr. Bergrin purchased a printer from Xerox Corporation. Mr. Bergrin communicated with a person from Xerox, whom Mr. Bergrin later learned was "Connie M. Looney". Despite knowing that the FBI agents have full access to Mr. Bergrin's telephone conversations, his text messages, his computers, and his emails, Mr. Bergrin never thought that the FBI agents would be so immature as to *insult* Ms. Looney in an email that the FBI made to appear to have been sent by Mr. Bergrin. In the email, the FBI agents made fun of Ms. Looney's last name (By telling her that she is "Looney"). Mr. Bergrin was aware that the FBI agents were able to obtain access to his emails, has text messages, and his telephone conversations (which is how the FBI was able to obtain the names of Mr. Bergrin's numerous attorneys), but the FBI agents sent Ms. Looney an email poking fun of her name, which Ms. Looney certainly did not appreciate. The email appeared as if Mr. Bergrin had sent it, because it was sent from Mr. Bergrin's email address, but Mr. Bergrin would not do such a thing, let alone to someone whom Mr. Bergrin was doing business with. Ms. Looney became extremely angry with Mr. Bergrin and she threatened to go to the authorities and to file a complaint against Mr. Bergrin, but Mr. Bergrin did not know what Ms. Looney was talking about until Mr. Bergrin read the email that the immature and malicious FBI

agents sent to Ms. Looney. This is just another example of the severe, persistent, and pervasive *harassment* that Mr. Bergrin still suffers on a daily basis at the hands of the FBI agents.

206.   On August 26, 2019, Mr. Bergrin received an email from one of the FBI's informants (or from one of the FBI agents) in which the FBI attempted to entrap Mr. Bergrin in an "Insurance Fraud Scheme". The FBI agents contacted Mr. Bergrin's former Client, Vito R, and coerced Vito R to permit the FBI to use his name in an attempt to set-up and entrap Mr. Bergrin in the Insurance Fraud Scheme. Mr. Bergrin has the email that he received from the member of the FBI (who pretended to be a relative of Mr. Bergrin's client, Vito R) and Mr. Bergrin will be calling Vito R and his wife to testify at trial. The FBI had destroyed another business relationship that Mr. Bergrin had for many years with his client, Vito R.

207.   Since being released from prison on October 27, 2016, Mr. Bergrin had joined an online dating service. The FBI agents then contacted Mr. Bergrin *repeatedly* through the online dating site, and the FBI agents pretended to be *young beautiful women* who wanted to date Mr. Bergrin. Many of the *so-called* women who contacted Mr. Bergrin were either working as *informants* for the FBI or they were "only photos of women" and behind those photos were FBI agents pretending to have a romantic interest in Mr. Bergrin. However, Mr. Bergrin knew that "the FBI" had been contacting him and not the *beautiful young women*, because the *alleged* women that contacted Mr. Bergrin allegedly lived hundreds or thousands of miles away from Mr. Bergrin so that Mr. Bergrin would not be able to have had any direct contact with any of them. Mr. Bergrin played-along with the FBI agents by pretending that Mr. Bergrin thought that he was communicating with *young beautiful women who were dying to date this 61 year old bald man with a heart condition,* and Mr. Bergrin permitted the FBI agents to continue their charade.

208.   All of Mr. Bergrin's responses and communications to the FBI's informants were nothing more than misleading fabrications and false information that Mr. Bergrin had been feeding to the informants that were working for the FBI. The FBI also contacted numerous women that Mr. Bergrin had been dating, and the FBI agents destroyed those relationships by slandering Mr. Bergrin and by scaring the women that Mr. Bergrin had been dating. The FBI agents are extremely immature people, extremely malicious people, and extremely dangerous people, who have entirely too much power, and they do not think twice about abusing that power.

209.    The FBI agents contacted numerous women who contacted Mr. Bergrin on the dating site and the FBI then attempted to arrange for the women to work as informants for the FBI, but the only thing that was accomplished is that the women abandoned their relationships with Mr. Bergrin. The FBI has full access to all dating websites and social media websites, because the information that is transmitted is considered to be "public information". When several women sent Mr. Bergrin their telephone numbers and asked Mr. Bergrin to call them, the FBI would then contact the woman and attempt to either destroy the relationships or pressure the women to work as informants for the FBI, and the women always abandoned the relationships because they do not want that type of drama in their lives, and who could blame them.

210.    Since being released from prison on October 27, 2016, Mr. Bergrin had two (2) civil suits pending before Judge Robert R. Reed of the Supreme Court of the State of New York. In one case, Mr. Bergrin was suing a former client, Kenneth Kelner, MD, who had been contacted by the FBI in or about 2013 in which the FBI asked Dr. Kelner to work as an *informant* for the FBI against Mr. Bergrin. In 2013, Dr. Kelner shared with Mr. Bergrin that he had been contacted by the FBI, but he told Mr. Bergrin that he refused to work as a Confidential Informant. Dr. Kelner refused to work as an informant at that time, because Dr. Kelner needed Mr. Bergrin to retrieve substantial monies that were owed to Dr. Kelner in a personal business matter. However, because the FBI fabricated a story to Dr. Kelner that "Ronald Bergrin had committed crimes with his cousin", Dr. Kelner believed that the FBI would eventually arrest Mr. Bergrin, and for that reason, after Mr. Bergrin concluded his business with Dr. Kelner, Dr. Kelner refused to pay Mr. Bergrin the substantial fees that Mr. Bergrin had earned, which fees were in the millions of dollars. Dr. Kelner refused to pay to Mr. Bergrin the monies that were owed to Mr. Bergrin, despite Dr. Kelner and Mr. Bergrin executing a contractual agreement and despite Dr. Kelner and Mr. Bergrin subsequently executing an Affidavit stating that Mr. Bergrin had achieved all of Dr. Kelner's goals.

211.    As a result of Dr. Kelner's refusal to pay Mr. Bergrin the millions of dollars that were owed to Mr. Bergrin, after Mr. Bergrin was released from prison, Mr. Bergrin was left with no choice other than to retain counsel and to commence a civil suit against Dr. Kelner. The case that Mr. Bergrin's attorneys brought against Dr. Kelner was for approximately $20 million, which included late fees, interest, legal fees and expenses, as outlined in the Contractual Agreement between Mr. Bergrin and Dr. Kelner. As a result of the FBI contacting Dr. Kelner and engaging in Intentional

Interference, Slander, and Obstruction of Justice, Dr. Kelner did not pay Mr. Bergrin the monies that Dr. Kelner owed to Mr. Bergrin.

212.    Until as recently as 150 days ago, the case against Dr. Kelner had been pending before Judge Robert R. Reed of the Supreme Court of the State of New York for approximately 24 months. However, Judge R. Guy Cole contacted Judge Robert R. Reed and requested that Judge Reed throw Mr. Bergrin under the proverbial bus by holding a Competency Hearing and declaring Mr. Bergrin *Incompetent to Bring a Civil Suit*, which Judge Robert Reed ultimately agreed to do, in order to support his corrupt colleague from the Sixth Circuit. However, Judge Reed made a couple of mistakes, which will permit Mr. Bergrin to prove that Judge R. Guy Cole Intentionally Interfered with Mr. Bergrin's civil litigation.

213.    One mistake that Judge Cole made was stating on the record that he was *"planning to declare Mr. Bergrin Incompetent to Bring a Civil Suit"*, because, in response to that threat, Mr. Bergrin's attorney immediately withdrew the lawsuit against Dr. Kelner so that Judge Reed could not fraudulently declare Mr. Bergrin *Incompetent to bring a civil suit*. Judge R. Guy Cole brought Judge Robert R. Reed into the criminal conspiracy, which cost Mr. Bergrin in excess of $23 million as a result of the Intentional Interference and the Obstruction of Justice that was committed by Judge R. Guy Cole, with the assistance of Brian McDonough, Judge Dan Polster, and Dr. Kelner's attorney, Robert Costello, Esq. (a former "Assistant U.S. Attorney"), but unfortunately, that wasn't the only civil suit that Mr. Bergrin had pending before Judge Robert R. Reed, and Judge Reed also threw Mr. Bergrin under the proverbial bus in that second civil litigation as well.

214.    As mentioned earlier in the complaint, the FBI contacted Mr. Bergrin's landlord months prior to the FBI falsely arresting Mr. Bergrin, and after *slandering* Mr. Bergrin by telling Mr. Bergrin's landlord that Mr. Bergrin engaged in criminal behavior with his cousin, and the FBI agents insisted that the landlord rent Mr. Bergrin's apartment to a new tenant. During the 22-months that Mr. Bergrin was incarcerated for a crime that never occurred, Mr. Bergrin continued to pay his monthly rent for his apartment in New York City, and Mr. Bergrin never stopped paying his rent, because Mr. Bergrin hadn't committed a crime, and Mr. Bergrin knew that he could not be convicted of a crime.

215.    Mr. Bergrin's criminal case was dismissed on October 26, 2016, and upon entering into his apartment on the evening of October 27, 2016, Mr. Bergrin was surprised to see that his apartment had been *cleaned-out*, and in excess of One Million Dollars in valuables were taken from Mr. Bergrin's apartment. Mr. Bergrin's apartment had been *cleaned-out* at the behest of the FBI agents, who pressured Mr. Bergrin's landlord to rent the apartment to another tenant. Mr. Bergrin then needed to retain counsel so that Mr. Bergrin could be compensated for his substantial losses, and when Mr. Bergrin's counsel brought a lawsuit against his Landlord and against the Managing Agent of the residential building for removing all of Mr. Bergrin's valuables and his personal belongings from his apartment, the Judges in Ohio interfered with Mr. Bergrin's civil suit that was being litigated in the Supreme Court of the State of New York, which lawsuit had also been pending before Judge Robert Reed.

216.    All of Mr. Bergrin's custom designed and hand manufactured furniture that was built into the walls of Mr. Bergrin's apartment was gone. The carpeting was gone. All of Mr. Bergrin's artwork, antiques, and his antique gold jewelry collection were gone. His clothing was gone, and all of his valuables were gone. The apartment was painted and a new wooden floor had been installed. Mr. Bergrin was the only tenant in the building who had been granted permission to install a *special security door* and *custom manufactured gated bars on the windows*, because Mr. Bergrin's personal belongings were worth in excess of *one million dollars*, and in order to receive permission from his landlord to install the *special security door* and the *custom made gated bars on the windows*, Mr. Bergrin had to provide evidence of the value of Mr. Bergrin's personal belongings to the landlord, which he had accomplished many years earlier.

217.    On October 28, 2016, which was the day after Mr. Bergrin returned home from prison, Mr. Bergrin contacted the Managing Agent of the apartment building (David Parks, Esq.) to find out where Mr. Bergrin's personal belongings were located, but Mr. Parks told Mr. Bergrin that: "The FBI said you weren't coming home". The landlord and the Managing Agent did not deny that they had called a moving company and arranged for the apartment to be *cleaned-out*. However, instead of compensating Mr. Bergrin and settling the case, the Managing Agent and the Landlord handed the case to their insurance company in order for the insurance company to compensate Mr. Bergrin for his loss. The insurance company then gave the case to a law firm in which to handle the settlement, but because all of the receipts for Mr. Bergrin's personal belongings and valuables were removed from Mr. Bergrin's apartment with all of his belongings, the attorneys for the insurance company

did not want to settle the case because they wanted to earn lots of hourly fees from the insurance company, so they decided to litigate the case. Mr. Bergrin then retained attorney, Jeffrey H, who told Mr. Bergrin the following:

> "I rarely say this to a client, but the case is a Slam Dunk. You had a lease and you were paying your rent, and you were never late with a rent payment. The Managing Agent arranged for a moving company to enter into your apartment and they cleaned it out. The landlord or the landlord's insurance company must compensate you for your losses".

218.   This case was also pending in the Supreme Court of the State of New York for approximately 2 years before the same Judge Robert R. Reed, who was also presiding over the case of <u>Ronald Bergrin v. Kenneth Kelner, MD</u>. Throughout the 2 years, Mr. Bergrin felt blessed to be before Judge Reed because Judge Reed is a very intelligent man and he understood both of the cases very well. Judge Reed was befuddled as to why Dr. Kelner hadn't paid Mr. Bergrin and as to why the Landlord or the Landlord's insurance company hadn't settled the case with Mr. Bergrin, because it was clear in Judge Reed's mind that both of these defendants owed Mr. Bergrin the monies that Mr. Bergrin had sought. However, after Judge R. Guy Cole contacted Judge Reed, and Judge Cole requested that Judge Reed insure that "Mr. Bergrin does not receive any money from his client, Kenneth Kelner, or from his lawsuit against his landlord", Judge Reed then threw Mr. Bergrin under the proverbial bus by threatening to declare Mr. Bergrin "Incompetent to Bring a Civil Suit" in the case against Kelner, but 2 weeks later, Judge Reed ordered Mr. Bergrin to have his deposition taken (which meant that Judge Cole knew a week earlier that Mr. Bergrin is "Competent to Bring a Civil Suit"), but Judge Cole then fined Mr. Bergrin $250.00 in which Judge Reed falsely claimed that Mr. Bergrin had filed the lawsuit against his landlord *too early*, which could not have been further from the truth, and it was an absurd allegation.

219.   As soon as Judge Reed fined Mr. Bergrin $250.00 "for no legitimate reason whatsoever", Mr. Bergrin's other attorney, Jeffrey H, told Mr. Bergrin: "This Case is also Fixed" and Mr. Bergrin's attorney told Mr. Bergrin that Judge Reed is not going to permit us to receive the monies that we are entitled to receive, and the attorney then withdrew the lawsuit against Mr. Bergrin's Landlord and against the Managing Agent. Mr. Bergrin's attorney told Mr. Bergrin that the government must compensate Mr. Bergrin for its Intentional Interference and for its Obstruction of Justice.

220. The second *mistake* that was made by Judge Robert Reed was that Judge Reed stated on the record that he was planning to declare Mr. Bergrin *Incompetent to Bring a Civil Suit* in the case that Mr. Bergrin had pending against Dr. Kelner, but two (2) weeks later, Judge Reed ordered Mr. Bergrin to have his deposition taken in the case against Mr. Bergrin's landlord, and the evidence is undeniable and incontrovertible, because it's in the transcripts. Both of Mr. Bergrin's attorneys will be testifying as witnesses and as expert witnesses to the *blatant corruption* that the government engaged in.

221. Despite Judge Robert Reed ordering Mr. Bergrin to pay his landlord $250.00 (The same landlord that removed all of Mr. Bergrin's valuables and personal items from Mr. Bergrin's apartment), when Mr. Bergrin and his attorney exited the courtroom, the insurance company's attorney walked over to Mr. Bergrin's attorney, Jeffrey H, and he said: "Mr. Bergrin does not need to pay my client the $250.00 because Mr. Bergrin is the victim in this case, and not the perpetrator."

222. After Mr. Bergrin's attorney sent a stipulation to the insurance company's attorney in which to withdraw the civil suit against Mr. Bergrin's landlord, Mr. Bergrin's attorney was contacted by members of the FBI (who had been in touch with the insurance company's attorney) and the FBI agents *insisted* that when Mr. Bergrin's attorney enters into a stipulation to withdraw the civil suit, that Mr. Bergrin's attorney insert in the stipulation that he is "withdrawing the case because Mr. Bergrin was declared *Incompetent to Bring a Civil Suit*" by Judge Reed, which of course was not truthful. Mr. Bergrin's attorney actually attempted to insert such language into the stipulation to the withdrawal of the civil suit, "twice", because Mr. Bergrin's attorney was *intimidated* by the FBI agents, but Mr. Bergrin assured his attorney that nothing will happen to him, and such language was then removed from the stipulation agreement. As a result of Judge Cole contacting Judge Reed, and as a result of the FBI agents contacting and intimidating Mr. Bergrin's counsel, the government must compensate Mr. Bergrin and his attorneys for the Intentional Interference and for the Obstruction of Justice for the cases that Mr. Bergrin brought against his former client, Dr. Kelner, and for the case that Mr. Bergrin brought against his Landlord and Managing Agent.

223. Had the members of the FBI, the Assistant U.S. Attorneys, and the two federal Judges not engaged in Intentional Interference and Obstruction of Justice with respect to Mr. Bergrin's 2 civil suits, Mr. Bergrin would have received the $23 Million that is owed to him. However, as a result of such

Intentional Interference and the Obstruction of Justice, Mr. Bergrin is owed at least $23 Million for his *actual losses* that occurred due to the "criminal conspiracy" that victimized Mr. Bergrin by the numerous Defendants who are employed by the United States. Mr. Bergrin will be able to prove at trial the nexus between the FBI agents contacting Mr. Bergrin's attorneys, and Judge Cole contacting Judge Reed.

224.    Mr. Bergrin will also prove at trial that Dr. Kelner's attorney, Robert Costello, Esq. (a former Assistant U.S. Attorney), contacted Assistant U.S. Attorney, Brian McDonough, who then met with Judge Dan Polster, and Judge Polster then contacted Judge R. Guy Cole who then contacted Judge Robert R. Reed of the Supreme Court of the State of New York. Judge Cole requested that Judge Reed prevent Mr. Bergrin from receiving the monies that he is entitled to receive by declaring Mr. Bergrin *"Incompetent to Bring a Civil Suit"*. Both of Mr. Bergrin's civil suits were coincidentally pending before Judge Robert R. Reed for almost 2 years in the Supreme Court of the State of New York. When Judge R. Guy Cole contacted Judge Robert Reed, the conversation was extremely similar to the following:

**Judge R. Guy Cole:** Hey my little brother, how are you doing?

**Judge Robert Reed:** Great Guy, what can I do for you?

**Judge R. Guy Cole:** You've got a couple of cases before you entitled <u>Ronald Bergrin v. Kenneth Kelner, MD and Ronald Bergrin v. 218 West 72nd Street Realty Corp</u>.

**Judge Robert Reed:** Yes. Dr. Kelner owes Mr. Bergrin more than $20 million and didn't pay Mr. Bergrin. In-fact, Dr. Kelner executed a Contract with Mr. Bergrin and Dr. Kelner subsequently executed an Affidavit stating that Mr. Bergrin had fulfilled the terms of the Contractual Agreement between Mr. Bergrin and Dr. Kelner, but Dr. Kelner has second thoughts about parting with the $20 million that he owes to Mr. Bergrin. In the second case, Mr. Bergrin was falsely arrested by the FBI and incarcerated for 22 months for a crime that never occurred, and during the period of time that Mr. Bergrin was incarcerated, his landlord cleaned-out his apartment and Mr. Bergrin lost more than a million dollars worth of valuables that Mr. Bergrin is entitled to be compensated for.

**Judge R. Guy Cole:** Bob, I need a very big favor from you. Judge Dan Polster and I, and numerous members of the United States Department of Justice committed numerous crimes against Mr. Bergrin and he's about to sue us, so we're trying to tie his hands financially so that he would not be able to sue us, and I need your help. I need you to hold a *competency hearing* and to declare Mr. Bergrin *Incompetent to Bring a Civil Suit* so that he cannot sue us for engaging in the crimes that we committed.

**Judge Robert Reed:** But Guy, Mr. Bergrin is *Not Incompetent to Bring a Civil Suit*. Mr. Bergrin is an extremely competent person.

**Judge R. Guy Cole:** I know that Mr. Bergrin is extremely competent. I would not be calling you if he weren't competent. I need you to declare Mr. Bergrin *Incompetent to Bring a Civil Suit* in the case against Kelner. It's extremely important that Mr. Bergrin is not able to sue us, and if a Judge from another State were to declare Mr. Bergrin *Incompetent to Bring a Civil Suit*, then Mr. Bergrin cannot sue us. We in Ohio are working very closely with Dr. Kelner's attorney, Robert Costello, who is a former Assistant U.S. Attorney, who's in touch with Brian McDonough, the Assistant U.S. Attorney who wrongly indicted Mr. Bergrin. We need to insure that Mr. Bergrin would not receive the monies that are owed to Mr. Bergrin by Mr. Costello's client, Dr. Kelner, so if you declare Mr. Bergrin *Incompetent to Bring a Civil Suit*, it's a win-win for everyone except for Mr. Bergrin, because we don't want Mr. Bergrin to be able to sue us, and Mr. Costello wants to win the case for his client, Dr. Kelner.

**Judge Robert Reed:** Okay, I will do as you wish. I will declare Mr. Bergrin *Incompetent to Bring a Civil Suit* in the case against Dr. Kelner. But what do you want me to do in the second case that Mr. Bergrin has pending against his landlord?

**Judge R. Guy Cole:** I don't care what you do as long as Mr. Bergrin doesn't receive any money.

**Judge Robert Reed:** Okay Guy. Consider it done!

225.    After Judge Guy Cole convinced Judge Robert Reed to throw Mr. Bergrin under the proverbial bus during the litigation against Kenneth Kelner, MD, (which occurred less than 6 months ago), Judge Robert R. Reed announced on the record that he was "Planning to declare Mr. Bergrin *Incompetent*

*to Bring a Civil Suit* and that he was going to appoint a *Guardian Ad Litem* to represent Mr. Bergrin, and then the case will be settled for *nuisance value*". Upon hearing these words from Judge Reed, Mr. Bergrin's attorney, David B, immediately withdrew the lawsuit prior to Judge Reed holding a competency hearing, and now, Mr. Bergrin is exercising his constitutional rights by suing the United States for the monies that Mr. Bergrin was denied as a result of the corruption that the federal Judges and the Assistant U.S. Attorneys in Ohio (Polster, Cole, McDonough, and Shepherd) and the state Judge in New York (Reed) engaged in, and specifically for the Intentional Interference and the Obstruction of Justice that Judge Cole and the other members of the United States Department of Justice engaged in.

226.    As a result of the FBI contacting practically everyone that Mr. Bergrin had relationships with from late 2009 through late 2014, and telling these people that Mr. Bergrin engaged in *criminal activity*, and then falsely arresting and imprisoning Mr. Bergrin, Mr. Bergrin lost his relationships with several friends, with two relatives, with Mr. Bergrin's neighbors in New York and in Florida, and with all of Mr. Bergrin's business associates, colleagues, investors, partners, and clients. Such contact by the FBI agents caused the destruction of Mr. Bergrin's once successful commercial real estate and investment banking business, and Mr. Bergrin's reputation was completely destroyed by members of the FBI who repeatedly slandered Mr. Bergrin and ultimately arrested Mr. Bergrin and charged him with crimes that never occurred. As a result of the numerous financial, physical, reputational, and emotional injuries that Mr. Bergrin suffered, and continues to suffer on a daily basis, Mr. Bergrin needs to be compensated by the United States, and Mr. Bergrin is entitled to be compensated by the United States.

227.    As a result of the FBI harassing and slandering Mr. Bergrin from September 2009 through November 2014, and as a result of the FBI falsely arresting Mr. Bergrin, and as a result of the Assistant U.S. Attorneys wrongly indicting Mr. Bergrin, and then Judge Polster saddling Mr. Bergrin with defense attorneys who had been disqualified from the case and then Judge Polster denying Mr. Bergrin a trial and then wrongfully and maliciously declaring Mr. Bergrin *Incompetent to Stand Trial* (which caused everyone that owed Mr. Bergrin money not to pay him, because they simply claimed that Mr. Bergrin is *not competent to bring a civil suit*), Mr. Bergrin is entitled to receive from the United States all of the monies that were owed to Mr. Bergrin, in addition to lost income from late 2009 through the present date. Mr. Bergrin would have earned millions of dollars from late 2009 through late 2014 if the FBI hadn't destroyed Mr. Bergrin's

reputation and his business, and Mr. Bergrin must be compensated for those financial losses as well. Mr. Bergrin also needs to be compensated for the loss of any future income, because people will not do business with anyone that was charged with crimes, despite crimes that never occurred, and then wrongly *declared incompetent to stand trial* by corrupt Judges. This case is the definition of "Outrageous Government Conduct".

## The ironies of this case are three-fold:

228. **Firstly**, the reason that Special Agent Shawn Brokos and the other FBI agents severely, persistently, and pervasively harassed Mr. Bergrin from September 2009 through November 2014 and repeatedly attempted to set-up and entrap Mr. Bergrin in crimes is because Mr. Brokos was concerned that the investigators that Mr. Bergrin was planning to retain to represent Mr. Bergrin's cousin would discover that Shawn Brokos' Confidential Informant was murdered as a direct result of the negligence of Shawn Brokos, which negligence Ms. Brokos was attempting to conceal, and it was Ms. Brokos' own negligence which led to her Confidential Informant's death, and

229. **Secondly**, what is also ironic about this case is that the Assistant U.S. Attorneys falsely indicted Mr. Bergrin on a "cyber-stalking" charge when it would have been *impossible* for Mr. Bergrin to cyber-stalk Ms. Brokos when Mr. Bergrin did not have her email address and never communicated an email to Ms. Brokos. The evidence is voluminous and incontrovertible that *the only person* that "stalked" anyone was Shawn Brokos, who had been stalking Mr. Bergrin for a period of 5 years prior to the false arrest of Mr. Bergrin by Ms. Brokos' cronies at the FBI, and

230. **Thirdly**, what is also ironic about this case is that Ronald Bergrin was the only person who was charged with a crime in the herein case, but Mr. Bergrin was "the only person involved in the case that did not commit a crime nor violate anyone's constitutional rights".

## JURISDICTION

231. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's causes of action and the numerous violations of Plaintiff's constitutional rights arise under the Constitution and the laws of the United States, and under 28 U.S.C. § 1361 because such employees of the United States and its agencies must perform its duties owed to Plaintiff as required under law.

## BIVENS ACTION

232.   In this complaint, Plaintiff Ronald Bergrin asserts claims against certain members and former members of the FBI and of the United States Department of Justice for violating Mr. Bergrin's constitutional rights in New York City, where Mr. Bergrin resides for 40 years. This action is brought pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).

## VENUE

233.   Venue is appropriate in the Southern District of New York because the severe, persistent, and pervasive harassment of Plaintiff Ronald Bergrin, the fabrication of evidence against Plaintiff, and the destruction of Plaintiff's reputation, his business, and his health, occurred within this judicial district, and

234.   Venue is appropriate in the Southern District of New York because Plaintiff Ronald Bergrin was an entrepreneur engaged in the business of commercial real estate and investment banking in New York City for approximately 28 years, until Mr. Bergrin was severely, persistently, and pervasively *harassed* by the FBI in New York City, and later accused of a crime that never occurred, and

235.   Venue is appropriate in the Southern District of New York because Plaintiff Ronald Bergrin resides in New York City for the past forty (40) years at 218 West 72nd Street, Apt. 3RE, New York, New York 10023, and

236.   Venue is appropriate in the Southern District of New York because Defendant CoreCivic, Inc. has been registered to do business in the State of New York since September 2001 and its Registered Agent ("CT Corporation System, 28 Liberty Street, New York, New York, 10005") is located in New York County. Upon information and belief, Corrections Corporation of America changed its name to "CoreCivic, Inc." on or about November 16, 2016 as a result of the abhorrent reputation that Corrections Corporation of America had earned over the years, and

237. Venue is appropriate in the Southern District of New York because the criminal case against Mr. Bergrin initiated in New York City and Ronald Bergrin's constitutional rights were first violated by members of the United States Department of Justice in New York City, and prior to being falsely arrested solely for *retaliatory reasons* in order to prevent Mr. Bergrin from filing his lawsuit against the FBI for harassment, Mr. Bergrin was approximately 60 days away from filing a civil suit against the FBI in 2014 and against the United States Department of Justice for *harassment* in the Southern District of New York, and

238. Venue is appropriate in the Southern District of New York because despite the bogus criminal case against Mr. Bergrin being dismissed, Mr. Bergrin's constitutional rights are still being violated *today* by members of the United States Department of Justice in New York County. In order to prevent Mr. Bergrin from defending himself throughout Mr. Bergrin's 22+ months of incarceration for crimes that never occurred, Mr. Bergrin was housed in eight (8) different prisons that were located in six (6) different States. The prisons in which Mr. Bergrin was incarcerated include the Grady County Prison in Oklahoma City, the Oklahoma City Transit Hub, the Cuyahoga County Prison in Cleveland, Ohio, the Northeast Ohio Correctional Center in Youngstown, Ohio, the Federal Prison in Philadelphia, the Federal Prison in Virginia, the Metropolitan Correctional Center in Chicago, Illinois, and the Federal Medical Center in Butner, North Carolina, and

239. Venue is appropriate in the Southern District of New York because Mr. Bergrin is unable to travel outside of New York City due to his heart condition, and Mr. Bergrin's doctors that care for Mr. Bergrin are located in New York City, and

240. Venue is appropriate in the Southern District of New York because Mr. Bergrin's doctors and his expert witnesses who will be called to testify in the herein case are located in New York County, and

241. Venue is appropriate in the Southern District of New York because Mr. Bergrin's case file, and the majority of Mr. Bergrin's *one hundred and thirty* (130) witnesses to be called to testify at trial reside in New York County, and

242. Venue is appropriate in the Southern District of New York because Mr. Bergrin would have no chance of receiving even a scintilla of justice if this case were transferred to Ohio, because the numerous Judges in Ohio entered into a *criminal conspiracy* against Mr. Bergrin and they blatantly violated Mr. Bergrin's constitutional rights and they engaged in numerous *crimes* against Mr. Bergrin throughout the 22+ months that the bogus criminal case was pending, and such Judges are angry with Mr. Bergrin for exposing such corruption and for knowing that Mr. Bergrin was planning to sue them, and

243. Venue is appropriate in the Southern District of New York because of "fairness" and "economy" *Caterpillar Inc. v. Lewis*, 519 U.S. 61 (1996).

## TOLLING AND STATUTE OF LIMITATIONS

244. Mr. Bergrin was released from prison on October 27, 2016 after being incarcerated for crimes that never occurred and for crimes that the government had known never occurred. As a result of the damage that was done to Mr. Bergrin's heart and to other parts of Mr. Bergrin's body by members of the Northeast Ohio Correctional Center, by members of CoreCivic, Inc., and by members of the United States Department of Justice, Mr. Bergrin was unable to leave his home to retain legal counsel for many months after Mr. Bergrin arrived home from prison, with the exception of attending doctors' visits and hospital visits. After several months, Mr. Bergrin was able to leave his home, and he then retained legal counsel to represent him in the herein case, and in the case against his former client, and in the case against his landlord.

245. After the FBI agents learned the identities of Mr. Bergrin's legal counsel in the herein case (by the FBI illegally gaining access to Mr. Bergrin's cell phones, his text messages, his laptop computer, his emails, and his email addresses), the FBI agents committed numerous crimes, including, but not limited to, Obstruction of Justice, Witness Tampering, Intentional Interference, and they repeatedly violated Mr. Bergrin's constitutional rights by meeting with Mr. Bergrin's counsel and threatening such counsel that there would be severe consequences if Mr. Bergrin were to win the herein case. The FBI agents also instructed Mr. Bergrin's attorneys to remain on the case without informing Mr. Bergrin that they were intentionally eating up the Statute of Limitations clock, and they instructed Mr. Bergrin's counsel to prepare *intentionally deficient legal documents* on Mr. Bergrin's behalf, which legal documents had to be discarded.

246.    For the above reasons, Mr. Bergrin is cutting-it-close with respect to a *very limited number* of Causes of Action with respect to the Statute of Limitations as a result of the abhorrent actions of the FBI and other members of the United States Department of Justice. Therefore, the Statute of Limitations *must be tolled* from the time that Mr. Bergrin was falsely arrested on December 19, 2014. The Statute of Limitations has certainly not expired for Mr. Bergrin's claims against CoreCivic, Inc., and against the Northeast Ohio Correctional Center, and against the individuals that are employed by those private corporations, nor has the Statute of Limitations expired for any of the numerous violations of Mr. Bergrin's constitutional rights that occurred after Mr. Bergrin's release from prison on October 27, 2016.

## FIRST CAUSE OF ACTION

42 U.S.C. § 1983 – False Arrest

(Against Defendant United States of America and all Individual Defendants)

247. Plaintiff repeats and realleges the above paragraphs as if they were fully set forth at length herein.

248. By the actions described above, the Individual Defendants and Defendant, the FBI falsely arrested, unreasonably seized, falsely imprisoned, and detained Plaintiff. The wrongful, unjustifiable, and unlawful apprehension, arrest, seizure, and detention of Plaintiff was carried out with any basis, without Plaintiff's consent, and without reasonable suspicion or probable cause.

249. The Individual Defendants and Defendant United States Department of Justice knew they lacked probable cause to arrest/unreasonably seize Plaintiff because they knew that Plaintiff had not engaged in any unlawful conduct.

250. No reasonable officer would have believed there was probable cause to arrest and unreasonably seize Plaintiff under these circumstances.

251. At all relevant times, the Individual Defendants and Defendant United States acted forcibly in apprehending and arresting/unreasonably seizing Plaintiff. Throughout this period, Plaintiff was unlawfully, wrongfully, and unjustifiably held under arrest, unreasonably seized, deprived of his liberty, and falsely charged. At all times, the unlawful, wrongful, and false arrest/unreasonable seizure of Plaintiff was without basis and without probable cause or reasonable suspicion.

252. The Individual Defendants and Defendant United States deliberately undertook these actions and their misconduct occurred without any fault or provocation on the part of Plaintiff.

253. The Individual Defendants and Defendant United States acted under pretense and color of state law. The Individual Defendants and Defendant United States acted in abuse of their powers and beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

254. The Individual Defendants' and Defendant United States Department of Justice's conduct was willful, wanton, and reckless.

255. As a direct and proximate result of the Individual Defendants' and Defendants misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## SECOND CAUSE OF ACTION

42 U.S.C. § 1983 – Malicious Prosecution

(Against Defendants the United States of America, FBI and Office of the United States Attorney and the Individual Defendants of the Office of the United States Attorney)

256. Plaintiff repeats and realleges the above paragraphs as if they were fully set forth at length herein.

257. The FBI and the Office of the United States Attorney maliciously and without justification indicted and commenced criminal proceedings against Plaintiff.

258. The FBI and the Office of the United States Attorney charged Plaintiff with crimes falsely, maliciously, in bad faith, and without probable cause. At no subsequent point did any FBI agent or member of the Office of the United States Attorney attempt to intervene and prevent the unlawful prosecution of Plaintiff.

259. The FBI and the Office of the United States Attorney knew they lacked probable cause to prosecute Plaintiff because they knew he had done nothing wrong and should not have been arrested, and that no reliable information suggested he had committed any offense.

260. No reasonable officer would have believed there was probable cause to prosecute Plaintiff under these circumstances.

261. After Plaintiff spent twenty two (22) months in prison, all charges against Plaintiff were terminated, but in an attempt to conceal Defendants wrongdoing, Defendants arranged for Judge Dan Polster to declare Plaintiff "Incompetent to Stand Trial", knowing full well that Plaintiff is extremely competent.

262. The FBI and the Office of the United States Attorney acted under pretense and color of state law. The FBI and the Office of the United States Attorney acted in abuse of their powers and beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

263. The Defendants' conduct was willful, wanton, and reckless.

264. As a direct and proximate result of FBI and the Office of the United States Attorney's misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**THIRD CAUSE OF ACTION**

42 U.S.C. § 1983 – Excessive Force

(Against Defendants United States of America, United States Marshals Service, the Federal Bureau of Prisons, and Individual Defendants)

265. Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

266. Plaintiff was forced into a freezer in July of 2015 for approximately seven (7) hours, and in January of 2016 for approximately twenty four (24) hours. The Individual Defendants' brutal and unconscionable force deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but

not limited to, rights guaranteed under the Fourth and Fourteenth Amendments of the United States Constitution.

267. The abuse of Plaintiff was Cruel and Unusual Punishment.

268. The above Defendants acted under pretense and color of law.

269. The above Defendants acted in abuse of their powers and beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth and Fourteenth Amendments to the United States Constitution.

270. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## FOURTH CAUSE OF ACTION

42 U.S.C. § 1983 – Judicial Misconduct

(Against Defendant United States of America and all of the Judges that are named as Defendants)

271. Plaintiff repeats and realleges the above paragraphs as if they were fully set forth at length herein.

272. The Judges entered into a criminal conspiracy to prevent Plaintiff from being brought to trial and the Judges violated Plaintiff's constitutional rights by saddling Plaintiff with attorneys that were *under FBI criminal Investigation* and had previously been disqualified from the herein case for engaging in Actual Conflicts of Interest and for the Appearance of Conflicts of Interest.

273. At all relevant times, the Individual Defendants and Defendant United States acted forcibly in denying Plaintiff his constitutional rights. Throughout this period, Plaintiff was unlawfully,

wrongfully, and unjustifiably held under arrest, unreasonably seized, deprived of his liberty, and falsely charged. At all times, the unlawful, wrongful, and false arrest/unreasonable seizure of Plaintiff was without basis and without probable cause or reasonable suspicion.

274. The Individual Defendants and Defendant United States deliberately undertook these actions and their misconduct occurred without any fault or provocation on the part of Plaintiff.

275. The Individual Defendants and Defendant United States acted under pretense and color of state law.

276. The Individual Defendants and Defendant United States acted in abuse of their powers and beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

277. The Individual Defendants' and Defendant United States conduct was willful, wanton, and reckless.

278. As a direct and proximate result of the Individual Defendants' and Defendants misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## FIFTH CAUSE OF ACTION

42 U.S.C. § 1983 – Failure to Intervene

(Against Defendant United States of America, United States Marshals Service, the Federal Bureau of Prisons, Northeast Ohio Correctional Center, CoreCivic, Inc., Office of the Inspector General, Individual Defendants, James Comey, Aaron Ford, Paul Fishman, Judge Solomom Oliver, Judge R. Guy Cole, Damon Hininger, Steve Grooms, Laura Bedard, J.C. Holland, Steven Dettlebach, Dennis Terez)

279. Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

280. The above Defendants have an affirmative duty to ensure the lawfulness of interactions between their fellow members of service and civilians and to intervene where they observe another uniformed employee falsely arresting a civilian or using excessive force against a civilian.

281. The Individual Defendants were present and witnessed other defendants falsely arrest/unreasonably seize, harass, arrest, and indict Plaintiff and use excessive force against Plaintiff.

282. The Individual Defendants had a reasonable opportunity to intervene to prevent the false arrest and imprisonment of Plaintiff and the use of excessive force against Plaintiff.

283. The Individual Defendants failed to take any action or make any effort to intervene, halt the unlawful actions of their fellow FBI agents, Assistant U.S. Attorneys, Judges, and the Individual Defendants refused to protect Plaintiff.

284. The above Defendants acted under pretense and color of law.

285. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

286. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## SIXTH CAUSE OF ACTION

42 U.S.C. § 1983

Interference with Intimate Associations, Personal Relationships, and Business Relationships.

(Against Defendant United States of America, FBI and Individual Defendants Aaron Ford, James Comey, Shawn Brokos, Steven Cline, John and Jane Doe, and all Defendants of the FBI)

287.  Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

288.  Plaintiff has a fundamental, constitutionally-protected liberty interest in the companionship, care, intimate associations, and personal relationships with women, with friends, with colleagues, and with others, and pursuant to the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments, Plaintiff is entitled to the preservation of his intimate and private familial relationships, free from unjustified government intrusion. *See Roberts v. United States Jaycees*, 468 U.S. 609, 617-19 (1984); *Patel v. Searles*, 305 F.3d 130, 135-36 (2d Cir. 2002).

289.  The Supreme Court has long recognized that protecting close familial relationships—here, a man and a woman—"from unwarranted state interference . . . safeguards the ability to define one's identity that is central to any concept of liberty." *Roberts*, 468 U.S. at 619.

290.  The FBI, the Assistant U.S. Attorneys, and the above Defendants prevented Plaintiff from spending 22 months with his Mother who was suffering from terminal cancer, and who passed away less than one year after Plaintiff was released from prison after being incarcerated for a crime that never occurred. The right of a nuclear family to remain together without coercive government interference is among the most essential and basic aspects of the constitutionally recognized familial privacy and associational rights.

291.  The Individual Defendants' conduct deprived Plaintiff of his constitutional rights to familial and intimate association. The Individual Defendants and Defendants FBI intentionally interfered with Plaintiff's numerous relationships, including those in which Plaintiff was involved with women and in which Plaintiff had romantic interests. The Individual Defendants

298.    In violating Plaintiff's Due Process rights, the Individual Defendants engaged in outrageous and conscience-shocking conduct.

299.    The Individual Defendants acted beyond the scope of their authority and jurisdiction to willfully, knowingly, and intentionally deprive Plaintiff of his constitutional rights secured by 42 U.S.C. § 1983 including, but not limited to, rights guaranteed by the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

300.    The above Defendants acted under pretense and color of law.

301.    The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

302.    As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## EIGHTH CAUSE OF ACTION
42 U.S.C. § 1983 - Severe, Persistent, and Pervasive Harassment

(Against Defendants United States of America, the FBI, Shawn Brokos, Aaron Ford, James Comey, Paul Fishman, and numerous unknown FBI agents)

303.    The United States of America and the FBI was aware that FBI Special Agent Shawn Brokos caused the death of her Confidential Informant, by exposing to a drug gang that her Confidential Informant was working as a Confidential Informant for the FBI, and

304.    The United States of America was aware that FBI Special Agent Shawn Brokos had a history of disobeying the FBI's rules and procedures, and had been punished in the past for such violations, and

305. The United States of America was aware that it is part of the FBI's own mandate not to harass family members of those that are charged with crimes, and

306. The United States of America was aware that Plaintiff had a constitutional right to retain a defense team for his cousin, and that Plaintiff had not engaged in any criminal behavior, and

307. The United States of America was aware that FBI Special Agent Shawn Brokos had become *obsessed* with Plaintiff, because Plaintiff filed numerous complaints about Ms. Brokos by telephone and by U.S. Mail, and Ms. Brokos and other FBI agents had been harassing Plaintiff from September 2009 through November 2014, simply because Plaintiff retained a defense team for his cousin, and

308. The United States of America was aware that FBI Special Agent Shawn Brokos did not want Plaintiff to assist his cousin in his cousin's defense, and

309. The United States of America was aware that FBI Special Agent Shawn Brokos was harassing Plaintiff, which caused Plaintiff write at least six (6) letters to the FBI complaining about being harassed by Ms. Brokos, in addition to making at least twelve (12) telephone calls to the FBI and to others at the United States Department of Justice requesting that Ms. Brokos put an end to such severe, persistent, and pervasive harassment, and

310. The United States of America refused to instruct FBI Special Agent Shawn Brokos not to harass Plaintiff, whom the United States of America knew had absolutely no involvement in the case against Plaintiff's cousin, and

311. The United States of America failed to adequately supervise FBI Special Agent Shawn Brokos, and

312. The United States of America knew the danger that FBI Special Agent Shawn Brokos posed to Plaintiff, and

313. The government knew that if the harassment did not end, that Plaintiff would file a civil suit for *harassment* against Ms. Brokos and against the FBI, and

314. In November 2014, Plaintiff notified the FBI in writing that they could expect to be served with a civil suit for *harassment* within the next 60 days, and

315. Thirty days after Plaintiff threatened to sue the FBI, the FBI arrested Plaintiff in Cleveland, Ohio and charged Plaintiff with sending an email to Shawn Brokos threatening to murder her, which never occurred, and

316. Plaintiff did not send Ms. Brokos an email, and Plaintiff did not know Ms. Brokos' email address, and

317. The government seized Plaintiff's laptop computer, which was sent overnight to the FBI's headquarters in Quantico, Virginia, and

318. Three (3) days after the FBI arrested Plaintiff and charged Plaintiff with threatening a federal agent via email, the United States of America offered to send the case down to the *state level* and to sentence Plaintiff to *time-served* (after being arrested only three (3) days earlier), but only if Plaintiff would agree to plead guilty to a *misdemeanor*, and

319. Plaintiff rejected the United States of America's plea deal because Plaintiff did not commit a crime, and Plaintiff requested a *speedy trial* and to represent himself *pro-se* at trial, and

320. Plaintiff was then denied a trial and was denied the constitutional right to represent himself, and

321. Plaintiff had been arrested solely for *retaliatory purposes* in an effort to prevent Plaintiff from suing Ms. Brokos and the FBI for five (5) years of Severe, Persistent, and Pervasive Harassment, and

322. The United States of America was aware that Plaintiff had not committed a crime.

323. The above Defendants acted under pretense and color of law.

324. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

325. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## NINTH CAUSE OF ACTION

42 U.S.C. § 1983 – *Monell* Liability

(Against Defendants United States of America and FBI, United States Marshals Service)

326. Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

327. At all relevant times, the United States of America and FBI, acting through the Individual Defendants, had *de facto* policies, practices, customs, and usages that directly and proximately caused the violation of Plaintiff's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights as alleged herein.

328. At all relevant times, the Defendants and United States of America and FBI thereby directly and proximately caused the violation of Plaintiff's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights as alleged herein.

329. At all relevant times, the United States of America failed to train the FBI agents and thereby directly and proximately caused the violation of Plaintiff's Fourth and Fourteenth Amendment rights as alleged herein.

330. All acts complained of were carried out by FBI agents in their capacities and pursuant to the customs and practices of the Defendants or as a result of the Defendant's failure to train.

331. The United States of America and FBI maintains a widespread practice and custom of permitting, tolerating, and sanctioning acts of harassment and abuse by the FBI against citizens of the United States. The actions of the Individual Defendants reflect the customs and practices of the FBI. The United States of America and the FBI knew of and ignored the FBI's pattern and practice of abusing United States citizens, and its widespread tolerance of this abuse constituted a policy, practice, and/or custom which caused the mistreatment of Plaintiff.

332. The United States of America and FBI has failed to sufficiently train its FBI agents such that they commit repeated acts of harassment and abuse against United States citizens. The actions of the FBI Defendants reflect the United States of America's and FBI's failure to train which led to mistreatment of Plaintiff.

333. The United States of America and FBI failed to train FBI agents thereby permitting the FBI to arrest innocent citizens of the United States when there is no probable cause to arrest such citizens. The actions of the FBI Defendants reflect the United States of America and FBI failure to train, which injured Plaintiff and resulted in a violation of Plaintiff's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

334. United States of America and FBI, through its policymakers and agents, condoned, permitted, encouraged, and/or ratified the FBI's customs and practices challenged herein, and failed to train FBI agents, which allowed FBI agents to disregard and violate Plaintiff's Fourth and Fourteenth Amendment rights.

335. The United States of America and FBI, through its policymakers and agents, was aware of, and did nothing about, the fact that its policies, procedures, and failures to train would result in the deprivation of the rights of individuals—including Plaintiff. The United States of America and FBI failed to adequately train, monitor, supervise, and/or discipline its agents, officers, and employees, including the Individual Defendants, to respect and comply with the Fourth and Fourteenth Amendment rights of individuals like Plaintiff. As a result of the United States of America and FBI's failure, Plaintiff's Fourth and Fourteenth Amendment rights were infringed when Plaintiff was falsely arrested and charged with an array of sham offenses, all of which were dismissed in their entirety.

336. The above Defendants acted under pretense and color of law.

337. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

338. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## TENTH CAUSE OF ACTION
42 U.S.C. § 1983 – Common Law False Arrest / False Imprisonment
(Against All Defendants and All Individual Defendants)

339. Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

340. By reason of the foregoing, and by wrongfully and illegally arresting, detaining, and imprisoning Plaintiff , Defendants, under pretense and color of law and acting within the scope of their employment as FBI agents, falsely arrested, unreasonably seized, and falsely imprisoned Plaintiff.

341.    Defendants' wrongful, unjustifiable, and unlawful apprehension, arrest, and detention of Plaintiff was intentional and carried out with Plaintiff's knowledge but without his consent. Defendants lacked probable cause or any other basis in law to arrest, unreasonably seize, or imprison Plaintiff. At all relevant times, Defendants acted forcibly in apprehending and arresting Plaintiff.

342.    Defendants acted with a knowing, willful, wanton, grossly reckless, unlawful, unreasonable, unconscionable, and flagrant disregard of Plaintiff's 's rights, privileges, welfare, and well-being, and are guilty of egregious and gross misconduct toward Plaintiff.

343.    The United States of America, as direct or indirect, employer of the Individual Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.*

344.    The above Defendants acted under pretense and color of law.

345.    The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

346.    As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## ELEVENTH CAUSE OF ACTION
42 U.S.C. § 1983 – Malicious Prosecution

(Against All Defendants and All Individual Defendants – particularly, United States of America, FBI, Office of the United States Attorney, Brian McDonough, Matthew Shepherd, Steven Dettlebach, Judge Dan Polster, and Judge R. Guy Cole)

347.    Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

348.    The Defendants and Individual Defendants - United States of America, FBI, Office of the United States Attorney and Brian McDonough, Matthew Shepherd, and Judge Dan Polster, acting in their official capacity and within the scope of their employment as such, maliciously commenced criminal proceedings against Plaintiff.

349.    The Defendants and Individual Defendants - United States of America, FBI, Office of the United States Attorney and Brian McDonough, Matthew Shepherd, and Judge Dan Polster charged Plaintiff falsely, in bad faith, and without probable cause.

350.    After Plaintiff spent twenty two months in prison being severely abused by those charged with the welfare, safety, and security of Plaintiff, all charges against Plaintiff were terminated.

351.    The original case was terminated in favor of the plaintiff (despite Judge Dan Polster wrongly, falsely, and maliciously stating that he is dismissing the criminal case because Plaintiff is not competent to stand trial, which was a *blatant* lie, which lie was used by Judge Polster in an effort to protect and insulate those who violated Plaintiff's constitutional rights), and

352.    The Defendants played an active role in the original case, and

353.    The Defendants did not have probable cause or reasonable grounds to support the original case, and

354.    The Defendant initiated or continued the initial case with an improper purpose, and the Defendants refused to terminate the case upon the Supreme Court of the United States issuing the Decision of <u>Anthony Elonis v. United States</u>, which Decision clearly confirmed that Plaintiff had not engaged in any wrongdoing, and Plaintiff remained imprisoned for an additional sixteen (16) months after the Supreme Court issued its Decision on June 1, 2015, and

355.    After the Supreme Court issued its Decision in <u>Anthony Elonis v. United States</u> on June 1, 2015, when Defendant refused to plead guilty to a crime that never occurred, Defendants attempted to cause the death of Plaintiff by arranging for the United States Marshals Service to

103

withdraw one of Plaintiff's *prescription heart-related medications* and to put Plaintiff in freezers, despite knowing that Plaintiff had a severe heart condition.

356. The above Defendants acted under pretense and color of law.

357. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

358. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## TWELFTH CAUSE OF ACTION

42 U.S.C. § 1983 – Assault

(Against All Defendants United States of America, and All Individual Defendants, particularly, Federal Bureau of Prisons, United States Marshals Service, numerous unknown members of the United States Marshals Service, numerous unknown FBI agents, and numerous unknown member members of the Federal Bureau of Prisons)

359. Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

360. By reason of the foregoing and by tormenting, intimidating, and threatening Plaintiff, the Individual Defendant, acting in their capacity as FBI agents and members of the Federal Bureau of Prisons, and within the scope of their employment as such, committed a willful, unlawful, unwarranted, and intentional Assault upon Plaintiff, for a period of five years prior to Plaintiff's arrest and imprisonment, and throughout the 22+ months of Plaintiff's imprisonment.

361. The above Defendants acted under pretense and color of law.

362. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

363. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## THIRTEENTH CAUSE OF ACTION

42 U.S.C. § 1983 – Battery

(Against Defendant United States and All Individual Defendants)

364. Plaintiff repeats and realleges the above paragraphs as if they were set forth fully herein.

365. By reason of the foregoing and by kicking, restraining, and putting Plaintiff in a virtual freezer for a period of seven (7) hours and for a period of twenty four (24) hours, the Individual Defendants, acting in their capacity as members of the United States Department of Justice, and within the scope of their employment as such, committed a willful, unlawful, unwarranted, and intentional battery upon Plaintiff.

366. The battery committed by the Individual Defendants was unnecessary and unwarranted in the performance of their duties, and constituted an unreasonable and excessive use of force and Cruel and Unusual Punishment.

367. The United States of America, as employer of the Individual Defendants, is liable for their wrongdoing under the doctrine of *respondeat superior.*

368. The above Defendants acted under pretense and color of law.

369. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

370. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## FOURTEENTH CAUSE OF ACTION

42 U.S.C. § 1983 – Negligent Hiring, Retention, Training and Supervision

(Against Defendants United States of America, FBI, Office of the United States Attorney, Federal Bureau of Prisons, United States Marshals Sevice, Northeast Ohio Correctional Center, CoreCivic, Inc., Damon Hininger, and Steve Grooms)

371. Plaintiff repeats and realleges the foregoing paragraphs as if they were fully set forth herein.

372. The Defendants and its employees, servants and/or agents, acting within the scope of their employment, did negligently hire, retain, train, and/or supervise the Individual Defendants who were unfit, and whom they knew to be unfit, for the performance of their official duties on the dates of the Incidents.

373. The Defendants had an obligation to ensure that law enforcement officers be trained in how to carry-out their official duties without violating the constitutional rights of its citizens, and how to coordinate with each other and other quasi-law-enforcement agencies, and how to handle disputes between the above Defendants and Civilians. On information and belief, the Individual Defendants did not receive such training and there was no oversight or enforcement of the constitutional rights of America's citizens.

374. On information and belief, the Individual Defendants would not have acted as they did if the Defendants had provided adequate training and disciplined the officers and agents who harassed Plaintiff and who falsely arrested Plaintiff, and who imprisoned Plaintiff.

375. As a direct and proximate result of the Defendants negligence, Plaintiff sustained the damages hereinbefore alleged.

376. The Northeast Ohio Correctional Center is owned and operated by CoreCivic, Inc., a company formerly doing business as Corrections Corporation of America ("CCA"), a for-profit prison

owner and operator of private prisons nationwide, under a contract with the United States Department of Justice.

377. The Northeast Ohio Correctional Center is a medium security facility with a capacity of approximately 2500 male inmates.

378. CoreCivic is a publicly traded corporation that manages or owns approximately 66 correctional and detention facilities with a capacity of approximately 90,000 beds in 19 states and the District of Columbia. In 2015, CCA reported total revenues of $1.79 billion.

379. Mr. Bergrin arrived at the Northeast Ohio Correctional Center on or about December 22, 2014 and Mr. Bergrin got along well with all of the staff members at the Northeast Ohio Correctional Center. Mr. Bergrin respected all of the people who were employed at the Northeast Ohio Correctional Center and all of the people who were employed at the Northeast Ohio Correctional Center respected Mr. Bergrin and treated him well. However, when Mr. Bergrin returned to the Northeast Ohio Correctional Center after being sent to Chicago for a period of 3 months for unnecessary *psychological evaluation*, allegedly to confirm that Mr. Bergrin was Competent to Stand Trial, the medical staff at the Northeast Ohio Correctional Center withdrew one of Mr. Bergrin's prescription heart-related medications ("Polyethylene Glycol 2250 Powder"), which Mr. Bergrin needed to take every day.

380. The above Defendants acted under pretense and color of law.

381. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

382. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## FIFTEENTH CAUSE OF ACTION

Deliberate Indifference to Serious Medical Needs Resulting in Physical Injury in Violation of the Eighth Amendment's Prohibition of Cruel and Unusual Punishment and Fourteenth Amendment Substantive Due Process, via 42 USC Section 1983.

(Against Defendants United States of America, Federal Bureau of Prisons, United States Marshals Service, CoreCivic, Inc., and Northeast Ohio Correctional Center, Peter Elliott, Judge Dan Polster, Judge R. Guy Cole, Damon Hininger, Steve Grooms, Laura Bedard, and all members of the medical staff at the Northeast Ohio Correctional Center)

383.    Plaintiff repeats and realleges the foregoing paragraphs as if they were fully set forth herein.

384.    The United States Marshal Peter Elliott, Warden Laura Bedard, the medical staff at the Northeast Ohio Correctional Center and the Senior Executives of CoreCivic, Inc. (formerly known as "Corrections Corporation of America") acted negligently in rendering care to Mr. Bergrin, and such negligence resulted in severe, permanent, and irreparable damage to Mr. Bergrin's heart, which injuries include pain and suffering, and such injuries will severely affect Mr. Bergrin for the remainder of his life.

385.    The Warden and the medical staff at the Northeast Ohio Correctional Center and the Senior Executives of CoreCivic, Inc. acted intentionally to render inadequate care and in depriving Mr. Bergrin of any meaningful medical treatment, and by withholding one of Mr. Bergrin's *prescription heart-related medications*, resulting in severe, permanent, and irreparable damage to Mr. Bergrin's heart, which injuries include shortness of breath and pain and suffering, and such injuries will severely affect Mr. Bergrin for the remainder of his life. The above parties entered into a criminal conspiracy and were *instructed* by United States Marshal, Peter Elliott, to deny Mr. Bergrin his prescription heart-related medication.

386.    The Warden and the medical staff at the Northeast Ohio Correctional Center and the Senior Executives of CoreCivic, Inc. had a professional duty to Plaintiff Ronald Bergrin, and the

above parties breached its professional duty, which resulted in severe, permanent, and irreparable damage to Mr. Bergrin's heart, and to other areas of Mr. Bergrin's body, and such injuries include shortness of breath and pain and suffering and will severely affect Mr. Bergrin for the remainder of his life, and will no doubt shorten the length of Mr. Bergrin's life.

387. Prison officials are obligated under the Eighth Amendment to provide prisoners with adequate medical care. This principle applies regardless of whether the medical care is provided by governmental employees or by private medical staff under contract with the government. The evidence is voluminous and incontrovertible that the above parties acted with "deliberate indifference to Mr. Bergrin's serious medical needs", knowing that their actions and inactions were causing severe damage to Mr. Bergrin's heart and could have resulted in Mr. Bergrin's death. Mr. Bergrin sent the each of the above parties in excess of 36 documents (more than 200 in total) requesting to be administered his prescription heart-related medication and adequate medical treatment, but Mr. Bergrin's numerous requests were denied, because the United States Marshal, Peter Elliott, entered into a criminal conspiracy and instructed the above parties to deny Mr. Bergrin his medication and any meaningful medical treatment.

388. Defendant CCA's actions as described above were taken under color of state law, and were the result of an official policy or custom manifesting deliberate indifference to Plaintiff's constitutional rights and/or a failure to train.

389. In addition, Defendant CCA does not adequately train corrections officers regarding the medical needs of its prisoners despite the obvious and demonstrated need for such training. The need for training is obvious because of the numerous grievances Defendant has received from Plaintiff regarding denial of basic medical treatment.

390. The failure to train occurred despite a pattern of constitutional violations or such a high likelihood of a constitutional violation that the need to train should have been obvious.

391. Defendant CCA's actions were taken with deliberate indifference to the Individual Plaintiffs' serious medical needs and with deliberate indifference to Individual Plaintiffs' clearly established Constitutionally protected rights to adequate medical care.

109

392. These Defendants' actions were intentional and/or resulted from a reckless disregard for the substantial risk posed by the Individual Plaintiffs' serious medical condition amounting to deliberate indifference that "shocks the conscience."

393. As a result of Defendants' actions, Plaintiff was deprived of fundamental rights guaranteed by the United States Constitution, including the right to adequate medical care for his serious medical needs while in the custody of the United States Marshals Service.

394. The Defendants' actions as described above violated the Eighth Amendment's prohibition against cruel and unusual punishment and the Fourteenth Amendment's guarantee of substantive due process.

395. As a direct and foreseeable result of these Defendants' violations of Plaintiff's Eighth and Fourteenth Amendment rights as secured by 42 USC Section 1982, Plaintiff suffered and will continue to suffer permanent physical injury.

396. As a direct and foreseeable result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer physical injuries for the remainder of Plaintiff's life.

397. Plaintiff is now suffering, and will continue to suffer irreparable injury from Defendants' unlawful conduct as set forth herein.

398. The above Defendants acted under pretense and color of law.

399. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

400. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## SIXTEENTH CAUSE OF ACTION
42 U.S.C. §1983
Conspiracy to Interfere With Civil Rights in Violation of Title 18, U.S.C, Section 241
(Against All Defendants and All Individual Defendants)

401.    Plaintiff repeats and realleges the prior allegations of the Complaint as is fully alleged herein.

402.    The United States Marshal Peter Elliott and the Senior Executives of CoreCivic, Inc. (formerly known as "Corrections Corporation of America") entered into a conspiracy and conspired with the United States Marshals Service to deprive Plaintiff Ronald Bergrin of his equal protection under the law in an illicit scheme in which to force Mr. Bergrin to plead guilty to a crime that never occurred, which Conspiracy to Interfere with Mr. Bergrin's Civil Rights deprived Mr. Bergrin of his *prescription heart-related medication* and *any meaningful medical treatment*, which resulted in severe, permanent, and irreparable damage to Mr. Bergrin's heart, and to other areas of Mr. Bergrin's body, and such injuries include shortness of breath and pain and suffering and will severely affect Mr. Bergrin for the remainder of his life, and will no doubt shorten the length of Mr. Bergrin's life.

403.    The Warden and the medical staff at the Northeast Ohio Correctional Center and the Senior Executives of CoreCivic, Inc. (formerly known as "Corrections Corporation of America") conspired with others for the purpose of depriving Ronald Bergrin of equal protection of the laws of the United States and of equal privileges under the laws of the United States.

404.    The Warden and the medical staff at the Northeast Ohio Correctional Center and the Senior Executives of CoreCivic, Inc. conspired with United States Marshal, Peter Elliott, and others for the purpose of causing injury to Ronald Bergrin by depriving Mr. Bergrin of his constitutional rights. The above parties were aware that their actions and inactions were causing severe damage to Mr. Bergrin's heart and to other areas of Mr. Bergrin's body, and could have resulted in Mr. Bergrin's death.

405.    The Warden and the medical staff at the Northeast Ohio Correctional Center and the Senior Executives of CoreCivic, Inc. conspired to falsify Mr. Bergrin's medical records in order to conceal the numerous violations of Mr. Bergrin's constitutional rights.

406.    As a direct and foreseeable result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer physical injuries for the remainder of Plaintiff's life.

407.    Plaintiff is now suffering, and will continue to suffer irreparable injury from Defendants' unlawful conduct as set forth herein.

408.    The above Defendants acted under pretense and color of law.

409.    The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

410.    As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## SEVENTEENTH CAUSE OF ACTION
42 U.S.C. §1983 - Intentional Infliction of Emotional Distress
(Against All Defendants and All Individual Defendants)

411.    Plaintiff repeats and realleges the prior allegations of the Complaint as is fully alleged herein.

412.    Plaintiff is now suffering, and will continue to suffer irreparable injury from Defendants' unlawful conduct as set forth herein.

413.    The above Defendants acted under pretense and color of law.

414.    The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

415. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## EIGHTEENTH CAUSE OF ACTION

### 42 U.S.C. §1983 - Breach of Fiduciary Duty

(Against Defendant United States of America, Northeast Ohio Correctional Center, CoreCivic, Inc, all Individual members of the medical staff at the Northeast Ohio Correctional Center, Warden Laura Bedard, United States Marshals Service, Peter Elliott, Office of the United States Attorney, Brian McDonough, Matthew Shepherd, Judge Dan Polster, Judge R. Guy Cole, Judge Robert R. Reed)

416. Plaintiff repeats and realleges the prior allegations of the Complaint as is fully alleged herein.

417. The actions and the inactions of United States Marshal Peter Elliott, Warden Laura Bedard, and the medical staff at the Northeast Ohio Correctional Center and the Senior Executives of CoreCivic, Inc. (formerly known as "Corrections Corporation of America") breached its Fiduciary Duty to Plaintiff Ronald Bergrin because Mr. Bergrin was in the care of the United States Marshal, the Warden, and the medical staff at the Northeast Ohio Correctional Center and the Senior Executives of CoreCivic, Inc. These people were aware that Plaintiff Ronald Bergrin had a severe heart condition and was in a highly vulnerable situation and was not able to be treated medically by any other means, other than the care that he was to receive at the Northeast Ohio Correctional Center. The breach of its fiduciary duties caused severe, permanent, and irreparable damage to Mr. Bergrin's heart and other areas of Mr. Bergrin's body, which injuries include shortness of breath, pain and suffering, and severe anxiety, and such injuries will severely affect Mr. Bergrin for the remainder of his life.

418. As Plaintiff Ronald Bergrin's health declined from July 2015 through January 2016, and his physical appearance changed daily as a result of the  actions and the inactions of the Warden and the medical staff at the Northeast Ohio Correctional Center and the Senior Executives of Corrections Corporation of America, the above parties did absolutely nothing to help Mr. Bergrin and "made no attempt to help Mr. Bergrin", which actions and inactions caused severe, permanent, and irreparable damage to Mr. Bergrin's heart, and such injuries include severe

shortness of breath, pain, suffering, and anxiety, and will severely affect Mr. Bergrin for the remainder of his life, and will no doubt shorten the length of Mr. Bergrin's life.


## NINETEENTH CAUSE OF ACTION

42 U.S.C. §1983

Eighth Amendment Violation - Cruel and Unusual Punishment

(Against All Defendants, particularly, Northeast Ohio Correctional Center, Warden Laura Bedard, CoreCivic, Inc., Damon Hininger, Steve Grooms, Office of the United States Attorney, Brian McDonough, Matthew Shepherd, United States Marshals Service, Peter Elliott, all members of the medical staff at the Northeast Ohio Correctional Center, and the Federal Bureau of Prisons, Judge Dan Polster, Judge R. Guy Cole, Judge Robert R. Reed)

419.   Plaintiff repeats and realleges the prior allegations of the Complaint as is fully alleged herein.

420.   The United States Marshal Peter Elliott, the Warden and the medical staff at the Northeast Ohio Correctional Center and the Senior Executives of Corrections Corporation of America (now known as CoreCivic, Inc.) acted negligently in rendering medical care to Plaintiff Ronald Bergrin, and such negligence resulted in severe, permanent, and irreparable damage to Mr. Bergrin's heart, and such injuries include pain and suffering and will severely affect Mr. Bergrin for the remainder of his life.

421.   Prison officials are obligated under the Eighth Amendment to provide prisoners with adequate medical care. This principle applies regardless of whether the medical care is provided by governmental employees or by private medical staff under contract with the government. The evidence is voluminous and incontrovertible that the above parties deprived Mr. Bergrin of his prescription heart-related medication and deprived Mr. Bergrin of any meaningful medical treatment. The Supreme Court of the United States held that a prisoner does not need to experience significant injury by employees of the prison in order for the inmate to suffer Eighth Amendment violations. Rather, if the employees of the prison acted maliciously and/or sadistically to punish the inmate, then that punishment would constitute cruel and unusual punishment, and would accordingly violate the Eighth Amendment. The above parties were

114

aware that their actions and inactions were causing severe damage to Mr. Bergrin's heart and could have resulted in Mr. Bergrin's death.

422. In July of 2015, United States Marshal, Peter Elliott, instructed his underlings at the United States Marshals Service to put Mr. Bergrin in a freezer for a period of seven (7) hours, which was meant to cause Mr. Bergrin's death, and it almost did cause Bergrin's death. Mr. Bergrin sustained lifelong coronary injuries and other injuries.

423. In January of 2016, United States Marshal instructed the Federal Bureau of Prisons in Butner, North Carolina to put Mr. Bergrin in a freezer for a period of twenty-four (24) hours, which was meant to cause Mr. Bergrin's death, and it almost did cause Bergrin's death. Mr. Bergrin sustained lifelong coronary injuries, lifelong injuries to his eyes, and other injuries.

## TWENTIETH CAUSE OF ACTION
42 U.S.C § 1983 - False Arrest/False Imprisonment Claim

(Against Defendant United States of America, FBI, Shawn Brokos, numerous unknown membersof the FBI, Office of the United States Attorney, Brian McDonough, Matthew Shepherd, Judge Dan Polster, Judge R. Guy Cole, Office of the United States Attorney, and all Individual FBI agents)

424. Plaintiff repeats and realleges the prior allegations of the Complaint as is fully alleged herein.

425. As set forth above, through direct actions, Defendants FBI, Brokos, and the United States Attorney's Office personally participated in and caused the false arrest and false imprisonment of Plaintiff.

426. The documentary evidence against the government is voluminous and incontrovertible, and numerous eye witnesses will testify to everything that is written in this complaint, including, but not limited to the following:

427. Mr. Bergrin was severely victimized by the FBI and by the FBI's Confidential Informants by being severely, pervasively, and persistently harassed in New York City for a period of five (5) years (from September 2009 through the current day).

428. Mr. Bergrin being falsely arrested and charged with crimes that never occurred in retaliation for Mr. Bergrin threatening to sue the FBI,

429. In an effort to cover up the illegal detention and illegal arrest, and overall gross negligence, Defendants FBI and Special Agent Brokos, with the assistance of the United States Attorney's Office, unlawfully noted incorrect information on sworn documents of the arrest that occurred on December 19, 2014.

430. In as much as Defendants FBI and Brokos knew or should have known that Mr. Bergrin never committed the allegations as charged in the indictment, Defendants' FBI and Brokos actions when arresting Mr. Bergrin were taken without lawful authority. Therefore, said actions constitute the false arrest and false imprisonment of Mr. Bergrin.

431. As a further direct and proximate result of the conduct described above, Plaintiff Mr. Bergrin suffered loss of his liberty and mental anguish. These losses are either permanent or continuing, and Mr. Bergrin will suffer financial losses in the future, in violation of his civil rights.

## TWENTY-FIRST CAUSE OF ACTION

42 U.S.C. § 1983 - Malicious Prosecution

(Against Defendant United States of America, Office of the United States Attorney, Judge Dan Polster, Judge Guy Cole, Brian McDonough, and Matthew Shepherd)

432. Plaintiff repeats and realleges the prior allegations of the Complaint as is fully alleged herein.

433. Defendants Polster, Cole, McDonough, and Shepherd wrongfully caused criminal proceedings to be instituted against Plaintiff with malice and absence probable cause, or arguable probable cause, by submitting police reports to prosecuting authorities containing false statements and/or material omission, which reports were relied upon by prosecuting authorities.

434. Based on the story that Defendants fabricated, the United States Attorney's Office brought a federal indictment.

435. Judge Dan Polster and Judge R. Guy Cole entered into a criminal conspiracy with the Office of the U.S. Attorney and with the Office of the Federal Public Defender in which to commit numerous crimes and to violate Mr. Bergrin's constitutional rights throughout Mr. Bergrin's incarceration and subsequent to Mr. Bergrin's incarceration, and

436. Throughout Mr. Bergrin's incarceration, Judge Dan Polster, Judge R. Guy Cole, Brian McDonough, Matthew Shepherd, and numerous others, conspired together to deny Mr. Bergrin a trial, and to declare Mr. Bergrin *Incompetent to Stand Trial* in order to prevent the government from being able to take Mr. Bergrin to trial for crimes that never occurred, and in order to prevent Mr. Bergrin from suing the government for the numerous crimes and the numerous violations of Mr. Bergrin's constitutional rights that were violated by the government, and

437. These bogus charges were ultimately dismissed by Judge Dan Polster.

438. As a further direct and proximate result of the conduct described above, Plaintiff Ronald Bergrin suffered loss of his liberty and freedom, mental anguish. These losses are either permanent or continuing, and Mr. Bergrin will suffer losses in the future, in violation of his civil rights.

## TWENTY-SECOND CAUSE OF ACTION

42 U.S.C. § 1983 - Intentional Interference

with respect to the Bergrin / Kelner Civil Litigation in the

Supreme Court of the State of New York

(Against Defendants United States of America, FBI, Office of the United States Attorney, Brian McDonough, Matthew Shepherd, Judge Dan Polster, Judge R. Guy Cole, and Judge Robert R. Reed)

117

439.    Plaintiff repeats and realleges the prior allegations of the Complaint as if fully alleged herein.

440.    Plaintiff was retained by Kenneth Kelner, MD ("Kelner") pursuant to a contractual agreement.

441.    In or about 2013, the FBI contacted Kelner, and the FBI requested that Kelner work as an informant for the FBI against Plaintiff. Kelner refused to work with the FBI as an informant, and Kelner informed Plaintiff that Kelner had been contacted by the FBI.

442.    Upon information and belief Kelner refused to work with the FBI as an informant because Plaintiff was representing Kelner in which Plaintiff was arranging for Kelner to receive a very substantial amount of money from the estate of Kelner's father.

443.    Plaintiff achieved Kelner's goals, and Plaintiff and Kelner subsequently executed an affidavit stating that Plaintiff achieved Kenneth Kelner's goals, in accordance with the contractual agreement.

444.    After Plaintiff achieved Kelner's goals in accordance with the contractual agreement, Kelner did not pay to Plaintiff the monies that were owed to Plaintiff,

445.    Kelner retained Robert Costello, Esq., a former Assistant U.S. Attorney in New York City, whom was in constant telephone contact with Assistant U.S. Attorney, Brian McDonough, Esq. in Cleveland, Ohio.

446.    Plaintiff brought a civil suit against Kelner, which civil suit was pending in the Supreme Court of the State of New York before Judge Robert Reed for approximately 2 years.

447.    Brian McDonough, Esq. arranged for Judge Dan Polster to contact Judge R. Guy Cole and to request that Judge R. Guy Cole contact Judge Robert Reed and request that Judge Robert Reed prevent Plaintiff from receiving the monies that were owed to Plaintiff from Kelner by declaring Plaintiff "Incompetent to Bring a Civil Suit".

448.    Judge Dan Polster contacted Judge Cole and Judge Cole then contacted Judge Robert Reed.

449. Judge Robert Reed then stated on the record that he was going to declare Plaintiff "Incompetent to Bring a Civil Suit", and the case would be "settled for nuisance value", despite Plaintiff being owed in excess of Twenty Million U.S. Dollars ($20,000,000.00).

450. Plaintiff's attorney then withdrew the civil suit against Kelner before Judge Robert Reed could conclude a competency hearing, and declare Plaintiff "Incompetent to Bring a Civil Suit".

451. Defendants intentionally induced Kelner to breach the Bergrin / Kelner Agreement and/or otherwise hindered Kelner's performance under the Bergrin / Kelner Agreement.

452. The Defendants Intentionally Interfered with Plaintiff receipt of the monies that were owed to Plaintiff by Kelner.

453. Accordingly, Plaintiff has been damaged in an amount to be determined at trial, but at least in the amount of the $20 million fee that was owed to Plaintiff, plus attorneys' fees, costs, interest, and expenses.

454. The above Defendants acted under pretense and color of law.

455. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

456. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

119

**TWENTY-THIRD CAUSE OF ACTION**

42 U.S.C. § 1983 - Conversion

with respect to the Bergrin / Kelner Civil Litigation in the

Supreme Court of the State of New York

(Defendants United States of America, FBI, Office of the United States Attorney, Brian McDonough, Matthew Shepherd, Judge Dan Polster, Judge R. Guy Cole, and Judge Robert R. Reed)

457. Plaintiff repeats and realleges the prior allegations of the Complaint as if fully alleged herein.

458. The Defendants unjustly caused Plaintiff to lose in excess of $20 Million U.S. Dollars by conspiring with Judge Robert Reed to violate Plaintiff Bergrin's constitutional rights as a result of the Defendant's failed attempt to have Plaintiff adjudged *Incompetent to Bring a Civil Suit* by Judge Robert Reed.

459. Accordingly, Plaintiff has been damaged in an amount to be determined at trial, but at least in the amount of the $20 million fee that was owed to Plaintiff, plus attorneys' fees, costs, interest, and expenses.

460. In converting Plaintiff's Personal Property, Valuables and Furniture, Defendants acted with malice, oppression and in conscious disregard of Plaintiff's rights. Plaintiff, therefore, seeks an award of punitive damages.

461. The above Defendants acted under pretense and color of law.

462. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

463. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## TWENTY-FOURTH CAUSE OF ACTION

42 U.S.C. § 1983 - Civil Conspiracy

with respect to the Bergrin / Kelner Civil Litigation in the

Supreme Court of the State of New York

(Against Defendants United States of America, FBI, Office of the United States Attorney, Brian McDonough, Matthew Shepherd, Judge Dan Polster, Judge R. Guy Cole, and Judge Robert R. Reed)

464. Plaintiff repeats and realleges the prior allegations of the Complaint as if fully alleged herein.

465. The Defendants conspired together in order to prevent Plaintiff from receiving the moneys that were owed to Plaintiff by Kelner.

466. Accordingly, Plaintiff has been damaged in an amount to be determined at trial, but at least in the amount of the $20 million fee that was owed to Plaintiff, plus attorneys' fees, costs, interest, and expenses.

467. The above Defendants acted under pretense and color of law.

468. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

469. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**TWENTY-FIFTH CAUSE OF ACTION**

42 U.S.C. § 1983 - Criminal Conspiracy

with respect to the Bergrin / Kelner Civil Litigation in the

Supreme Court of the State of New York

(Against Defendants United States of America, FBI, Office of the United States Attorney, Brian McDonough, Matthew Shepherd, Judge Dan Polster, Judge R. Guy Cole, and Judge Robert R. Reed)

470.    Plaintiff repeats and realleges the prior allegations of the Complaint as if fully alleged herein.

471.    The Defendants conspired together in order to prevent Plaintiff from receiving the moneys that were owed to Plaintiff by Kelner.

472.    Accordingly, Plaintiff has been damaged in an amount to be determined at trial, but at least in the amount of the $20 million fee that was owed to Plaintiff, plus attorneys' fees, costs, interest, and expenses.

473.    The above Defendants acted under pretense and color of law.

474.    The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

475.    As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## TWENTY-SIXTH CAUSE OF ACTION

42 U.S.C. § 1983 - Unjust Enrichment

with respect to the Bergrin / Kelner Civil Litigation in the

Supreme Court of the State of New York

(Against Defendants United States of America, FBI, Brian McDonough, Office of the United States Attorney, Matthew Shepherd, Judge Dan Polster, Judge R. Guy Cole, and Judge Robert R. Reed)

476.   Plaintiff repeats and realleges the prior allegations of the Complaint as if fully alleged herein.

477.   The Defendants enriched themselves in their attempt to have Judge Robert Reed fraudulently declare Plaintiff "Incompetent to Bring a Civil Suit" because the Defendants were attempting to prevent Plaintiff from being able to bring the herein case against Defendants.

478.   Had Plaintiff's attorney not withdrawn the civil suit against Kelner, Plaintiff would not have been able to bring the herein suit against the Defendants.

479.   Accordingly, Plaintiff has been damaged in an amount to be determined at trial, but at least in the amount of the $20 million fee that was owed to Plaintiff, plus attorneys' fees, costs, interest, and expenses.

480.   The above Defendants acted under pretense and color of law.

481.   The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

482.   As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## TWENTY-SEVENTH CAUSE OF ACTION

42 U.S.C. § 1983 - Intentional Interference

with respect to the Bergrin / Landlord Civil Litigation in the

Supreme Court of the State of New York

(Against Defendants United States of America, FBI, Office of the United States Attorney, Brian McDonough, Matthew Shepherd, Judge Dan Polster, Judge R. Guy Cole, and Judge Robert R. Reed)

483. Plaintiff repeats and realleges the prior allegations of the Complaint as if fully alleged herein.

484. Plaintiff was falsely arrested and imprisoned for a period of 22 months for a crime that never occurred.

485. The FBI contacted Plaintiff's landlord and fabricated that Plaintiff engaged in criminal behavior and pressured the landlord not to renew Plaintiff's lease.

486. When Plaintiff was falsely imprisoned, Plaintiff's Landlord then *cleaned-out* Plaintiff's apartment.

487. Plaintiff's personal belongings and valuables worth in excess of $3 Million U.S. Dollars.

488. Plaintiff's Landlord cleaned-out Plaintiff's apartment as a result of being coerced by the FBI agents who had met with Plaintiff's Landlord.

489. Plaintiff's Landlord contacted its insurance company to settle the matter with Plaintiff, but the insurance company's attorney wanted to litigate in order to earn substantial hourly fees from the insurance company.

490. Plaintiff brought a civil suit against the Landlord, which civil suit was pending in the Supreme Court of the State of New York before Judge Robert Reed for approximately 2 years.

491. Plaintiff's case was a "slam-dunk", because Plaintiff had a lease for his apartment, and Plaintiff was current in the payment of his rent, and Plaintiff was never late in the payment of his rent,

and the Landlord *cleaned-out* Plaintiff's apartment during the time that Plaintiff was wrongly imprisoned.

492. Brian McDonough, Esq. arranged for Judge Dan Polster to contact Judge R. Guy Cole and to request that Judge R. Guy Cole contact Judge Robert Reed and request that Judge Robert Reed prevent Plaintiff from receiving the monies that were owed to Plaintiff from his Landlord.

493. Judge Dan Polster contacted Judge R. Guy Cole and Judge Cole then contacted Judge Robert Reed.

494. Judge Robert Reed then stated on the record that he was going to fine Plaintiff $250.00 for bringing the civil suit too early, which was not true.

495. Plaintiff's attorney knew immediately that the case against Plaintiff's landlord was "fixed" as was Plaintiff's case against Plaintiff's client, Kenneth Kelner, MD.

496. Plaintiff's attorney then withdrew the civil suit against the Landlord before Judge Robert Reed could deny Plaintiff the monies that are owed to Plaintiff from the Landlord.

497. The FBI agents Intentionally Interfered with Plaintiff's relationship with his Landlord by slandering Plaintiff and coercing Landlord to remove Plaintiff's personal belongings and his valuables.

498. The Defendants Intentionally Interfered with Plaintiff's receipt of the monies that were owed to Plaintiff by has Landlord.

499. Accordingly, Plaintiff has been damaged in an amount to be determined at trial, but at least in the amount of $3 million that was owed to Plaintiff, plus attorneys' fees, costs, interest, and expenses.

500. The above Defendants acted under pretense and color of law.

501. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

502.  As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## TWENTY-EIGHTH CAUSE OF ACTION

42 U.S.C. § 1983 - Conversion

with respect to the Bergrin / Landlord Civil Litigation in the

Supreme Court of the State of New York

(Defendants United States of America, FBI, Office of the United States Attorney, Brian McDonough, Matthew Shepherd, Judge Dan Polster, Judge R. Guy Cole, and Judge Robert R. Reed)

503.  Plaintiff repeats and realleges the prior allegations of the Complaint as if fully alleged herein.

504.  The Defendants unjustly caused Plaintiff to lose in excess of $3 Million U.S. Dollars by conspiring with Judge Robert Reed to violate Plaintiff Bergrin's constitutional rights as a result of the Defendant's failed attempt to have Plaintiff adjudged *Incompetent to Bring a Civil Suit* by Judge Robert Reed.

505.  Accordingly, Plaintiff has been damaged in an amount to be determined at trial, but at least in the amount of the $3 million fee that was owed to Plaintiff, plus attorneys' fees, costs, interest, and expenses.

506.  In converting Plaintiff's Personal Property, Valuables and Furniture, Defendants acted with malice, oppression and in conscious disregard of Plaintiff's rights. Plaintiff, therefore, seeks an award of punitive damages.

507.  The above Defendants acted under pretense and color of law.

508.  The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

126

509.    As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## TWENTY-NINTH CAUSE OF ACTION

42 U.S.C. § 1983 - Civil Conspiracy

with respect to the Bergrin / Landlord Civil Litigation in the

Supreme Court of the State of New York

(Defendants United States of America, FBI, Office of the United States Attorney, Brian McDonough, Matthew Shepherd, Judge Dan Polster, Judge R. Guy Cole, and Judge Robert R. Reed)

510.    Plaintiff repeats and realleges the prior allegations of the Complaint as if fully alleged herein.

511.    The Defendants conspired together in order to prevent Plaintiff from receiving the moneys that were owed to Plaintiff by his Landlord.

512.    Accordingly, Plaintiff has been damaged in an amount to be determined at trial, but at least in the amount of $3 million that was owed to Plaintiff, plus attorneys' fees, costs, interest, and expenses.

513.    The above Defendants acted under pretense and color of law.

514.    The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

515.    As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

## THIRTIETH CAUSE OF ACTION

42 U.S.C. § 1983 - Criminal Conspiracy

with respect to the Bergrin / Landlord Civil Litigation in the

Supreme Court of the State of New York

(Defendants United States of America, FBI, Office of the United States Attorney, Brian McDonough, Matthew Shepherd, Judge Dan Polster, Judge R. Guy Cole, and Judge Robert R. Reed)

516. Plaintiff repeats and realleges the prior allegations of the Complaint as if fully alleged herein.

517. The Defendants conspired together in order to prevent Plaintiff from receiving the moneys that were owed to Plaintiff by his Landlord.

518. Accordingly, Plaintiff has been damaged in an amount to be determined at trial, but at least in the amount of $3 million that was owed to Plaintiff, plus attorneys' fees, costs, interest, and expenses.

519. The above Defendants acted under pretense and color of law.

520. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

521. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**THIRTY-FIRST CAUSE OF ACTION**

42 U.S.C. § 1983 - Unjust Enrichment

with respect to the Bergrin / Landlord Civil Litigation in the

Supreme Court of the State of New York

(Defendants United States of America, FBI, Office of the United States Attorney, Brian McDonough, Matthew Shepherd, Judge Dan Polster, Judge R. Guy Cole, and Judge Robert R. Reed)

522. Plaintiff repeats and realleges the prior allegations of the Complaint as if fully alleged herein.

523. The Defendants enriched themselves in their attempt to have Judge Robert Reed fraudulently declare Plaintiff "Incompetent to Bring a Civil Suit" because the Defendants were attempting to prevent Plaintiff from being able to bring the herein case against Defendants.

524. Had Plaintiff's attorney not withdrawn the civil suit against Kelner, Plaintiff would not have been able to bring the herein suit against the Defendants.

525. Accordingly, Plaintiff has been damaged in an amount to be determined at trial, but at least in the amount of the $3 million fee that was owed to Plaintiff, plus attorneys' fees, costs, interest, and expenses.

526. The above Defendants acted under pretense and color of law.

527. The Individual Defendants' failure to intervene proximately caused the violation of Plaintiff's constitutional rights.

528. As a direct and proximate result of the Individual Defendants' misconduct and abuse of authority detailed above, Plaintiff sustained the damages hereinbefore alleged.

**IMMEDIATE HEARING REQUESTED - STATUTE OF LIMITATIONS**

529. The FBI agents and numerous other members of the United States Department of Justice engaged in numerous crimes and countless violations of Mr. Bergrin's constitutional rights under 42 U.S.C. §1983, including, but not limited to Obstruction of Justice which violations may have caused the Statute of Limitations to be compromised on a *very limited number* of Causes of Action, and therefore, Plaintiff Ronald Bergrin requests *an immediate hearing* in which Mr. Bergrin would subpoena at least five (5) of his attorneys from five (5) different law firms who were contacted, intimidated, pressured, coerced, and threatened by members of the FBI who conspired with others to delay the filing of this complaint and they attempted to prevent Mr. Bergrin from filing the herein complaint, and those attorneys would testify that they were forced to throw Mr. Bergrin (their client) under the proverbial bus by eating-up-the *Statue of Limitations clock* as instructed by members of the FBI, thereby *possibly* causing the Statute of Limitations to be compromised on a very limited number of the herein Causes of Action.

**Wherefore**, Plaintiff Ronald Bergrin respectfully requests that this Honorable Court Grant Judgment against the Defendants on all of the Causes of Action as follows:

A.    With respect to the two (2) civil suits that Mr. Bergrin had pending in the Supreme Court of the State of New York (Index numbers 655268/2017 and 155613/2017), Plaintiff Ronald Bergrin requests that this Court issue a Judgment in Mr. Bergrin's favor against the United States of America, Judge R. Guy Cole, Judge Dan A. Polster, Judge Robert R. Reed, and Assistant U.S. Attorneys Brian McDonough, Esq. and Matthew Shepherd, Esq. on a joint and several basis in an amount to be determined at trial, but in no event less than **$23 Million Dollars**, which monies were maliciously "stolen" from Mr. Bergrin via "Intentional Interference, Conversion, Civil Conspiracy, Criminal Conspiracy, and Unjust Enrichment" as a result of the corruption that the above parties engaged in, and

B.    Plaintiff Ronald Bergrin requests a judgment in his favor on all of the Causes of Action against CoreCivic, Inc, against Damon Hininger and against Steve Grooms (the Chief Executive Officer and the former General Counsel of CoreCivic, Inc., respectively), and against the Northeast Ohio Correctional Center, and against the Warden and above Defendants that are

130

members of the Medical Staff at the Northeast Ohio Correctional Center, on a joint and several basis in an amount to be determined at trial, but in no event less than **$120 Million Dollars** in compensatory damages, plus legal fees, costs, and expenses, plus pre and post-judgment interest, and punitive damages, in order to deter such unlawful acts in the future, and

C.   Plaintiff Ronald Bergrin requests a judgment in his favor on all of the crimes and the violations of Mr. Bergrin's constitutional rights by the United States of America and by *all* of those Defendants that are employed by the United States of America, and by those who were formerly employed by the United States of America, and against the remaining above-named Defendants, which damages shall be determined by a Jury, but shall in no event be less than **$140 Million Dollars** in compensatory damages, plus legal fees, costs, and expenses, plus pre and post-judgment interest, and punitive damages in order to deter such unlawful acts in the future, **or**

D.   Plaintiff Ronald Bergrin requests that the Court instruct the United States and CoreCivic, Inc. to enter into Settlement Negotiations with Ronald Bergrin *immediately*, and

E.   The Court may Grant such other and further relief as the Court may deem just and proper.

Dated: New York, New York

     October 21, 2019

Respectfully submitted,

By: _____

Ronald A. Bergrin, pro-se
218 West 72nd Street
Apt. 3RE
New York, New York 10023
rbergrin@aol.com
Tel: (646) 771-6690

131

# VERIFICATION

STATE OF NEW YORK
                        ss.:
COUNTY OF NEW YORK


I, Ronald Bergrin, am the Plaintiff in the above entitled action. I have read the foregoing complaint and and exhibits attached hereto, and I know the contents thereof. The contents are true to my own knowledge except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.


Ronald A. Bergrin

132

## Names and Addresses of Defendants to be Served

1.  United States of America, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001

2.  United States Department of Justice, U.S. Department of Justice, 950 Pennsylvania Avenue, NW, Washington, DC 20530-0001

3.  Federal Bureau of Investigation, FBI Headquarters, 935 Pennsylvania Avenue, NW, Washington, D.C. 20535-0001

4.  James B. Comey, Jr., former Director, Federal Bureau of Investigation, 935 Pennsylvania Avenue, NW, Washington, D.C. 20535-0001

5.  Aaron T. Ford, former Director, Field Office, Federal Bureau of Investigation, 11 Centre Place, Newark, NJ 07102

6.  Shawn Brokos, Special Agent, Federal Bureau of Investigation, 3311 E Carson Street, Pittsburgh, PA 15203

7.  Steven Cline, IRS/Special Agent, Federal Bureau of Investigation, 11 Centre Place, Newark, NJ 07102

8.  "John/Jane Doe", Special Agent, Field Office, Federal Bureau of Investigation, 11 Centre Place, Newark, NJ 07102

9.  Paul Fishman, Former United States Attorney, United States Department of Justice, 970 Broad Street, Newark, New Jersey 07102

10. Office of the Inspector General, U.S. Department of Justice, 1200 New Jersey Ave SE, Washington, DC 20590

11. Office of the Attorney General, United States Department of Justice, 555 4th Street, NW, Washington, DC 20530

12. United States Marshals Service, 801 West Superior Avenue; Suite 1200, Cleveland, Ohio 44113-1852

13. Peter Elliott, United States Marshal, United States Marshals Service, 801 West Superior Avenue; Suite 1200, Cleveland, Ohio 44113-1852

14.    "John Doe", United States Marshals Service, 801 West Superior Avenue; Suite 1200, Cleveland, Ohio 44113-1852

15.    "John Doe" United States Marshals Service, 323 E Chapel Hill St # 217, Durham, NC 27701

16.    CoreCivic, Inc. (formerly known as "Corrections Corporation of America"), 5501 Virginia Way, Suite 110, Brentwood, TN 37027

17.    Damon Hininger, Chief Executive Officer, CoreCivic, Inc., 5501 Virginia Way, Suite 110, Brentwood, TN 37027

18.    Steven Grooms, former General Counsel, CoreCivic, Inc., 5501 Virginia Way, Suite 110, Brentwood, TN 37027

19.    Northeast Ohio Correctional Center, 2240 Hubbard Rd, Youngstown, OH 44505

20.    Laura Bedard, former Warden, Northeast Ohio Correctional Center, 2240 Hubbard Rd, Youngstown, OH 44505

21.    Dana Hivner, Health Services Administrator, Northeast Ohio Correctional Center, 2240 Hubbard Rd, Youngstown, OH 44505

22.    Jason Rupeka, MD, Medical Staff, Northeast Ohio Correctional Center, 2240 Hubbard Rd, Youngstown, OH 44505

23.    Steven Senich, Medical Staff, Northeast Ohio Correctional Center, 2240 Hubbard Rd, Youngstown, OH 44505

24.    Renee Sferra, Medical Staff, Northeast Ohio Correctional Center, 2240 Hubbard Rd, Youngstown, OH 44505

25.    Kurt Kampfer, Medical Staff, Northeast Ohio Correctional Center, 2240 Hubbard Rd, Youngstown, OH 44505

26.    Deborah Johnson, Medical Staff, Northeast Ohio Correctional Center, 2240 Hubbard Rd, Youngstown, OH 44505

27.    Arlene Glass, Medical Staff, Northeast Ohio Correctional Center, 2240 Hubbard Rd, Youngstown, OH 44505

28.    Federal Bureau of Prisons, 320 First Street NW, Washington, DC 20534

29.    "John Doe", Federal Bureau of Prisons, Federal Medical Center, Federal Medical Center, Old North Carolina Highway 75, Butner, NC 27509

30.    J.C. Holland, Warden, Federal Medical Center, Old North Carolina Highway 75, Butner, NC 27509

31.   Office of the United States Attorney, United States Court House, 801 West Superior Avenue; Suite 400, Cleveland, Ohio 44113-1852

32.   Steven Dettlebach, Former United States Attorney, Office of the United States Attorney, United States Court House, 801 West Superior Avenue; Suite 400, Cleveland, Ohio 44113-1852

33.   Brian McDonough, Assistant United States Attorney, Office of the United States Attorney, United States Court House, 801 West Superior Avenue; Suite 400, Cleveland, Ohio 44113-1852

34.   Matthew Shepherd, Assistant United States Attorney, Office of the United States Attorney, United States Court House, 801 West Superior Avenue; Suite 400, Cleveland, Ohio 44113-1852

35.   Office of the Federal Public Defender, Skylight Office Tower, 1660 West Second Street, Cleveland, Ohio 44113-1454

36.   Dennis Terez, former Federal Public Defender, Office of the Federal Public Defender, Skylight Office Tower, 1660 West Second Street, Cleveland, Ohio 44113-1454

37.   Edward Bryan, Assistant Federal Public Defender, Office of the Federal Public Defender, Skylight Office Tower, 1660 West Second Street, Cleveland, Ohio 44113-1454

38.   Claire Curtis, Assistant Federal Public Defender, Office of the Federal Public Defender, Skylight Office Tower, 1660 West Second Street, Cleveland, Ohio 44113-1454

39.   Carolyn Kucharski, Assistant Federal Public Defender, Office of the Federal Public Defender, Skylight Office Tower, 1660 West Second Street, Cleveland, Ohio 44113-1454

40.   Steven R. Jaeger, Esq., CJA Counsel, 23 Erlanger Road, Erlanger, Kentucky 41018

41.   Gary W. Crim, Esq. CJA Counsel, 943 Manhattan Ave., Dayton, Ohio 45406

42.   George W. Schmedlen, PhD., Court Appinted Expert Witness, 18435 Van Aken Blvd., Shaker Heights, Ohio 44120

43.   Judge Dan Polster, District Court Judge, United States Court House, 801 West Superior Avenue; Suite 400, Cleveland, Ohio 44113

44.   Judge Solomon Oliver, Jr., Chief United States District Judge, United States Court House, 801 West Superior Avenue; Suite 400, Cleveland, Ohio 44113

45.   Judge R. Guy Cole, Jr., Chief Judge, United States Court of Appeals for the Sixth Circuit, 100 E. 5th Street, Cincinnati, Ohio 45202-3988

46.   Judge Eric L. Clay, United States Court of Appeals for the Sixth Circuit, 100 E. 5th Street, Cincinnati, Ohio 45202-3988

47.    Judge Damon J. Keith, United States Court of Appeals for the Sixth Circuit, 100 E. 5th Street, Cincinnati, Ohio 45202-3988

48.    Judge Deborah L. Cook, United States Court of Appeals for the Sixth Circuit, 100 E. 5th Street, Cincinnati, Ohio 45202-3988

49.    Judge Jeffrey S. Sutton, United States Court of Appeals for the Sixth Circuit, 100 E. 5th Street, Cincinnati, Ohio 45202-3988

50.    Judge Bernice B. Donald, United States Court of Appeals for the Sixth Circuit, 100 E. 5th Street, Cincinnati, Ohio 45202-3988

51.    Judge Ronald Lee Gilman, United States Court of Appeals for the Sixth Circuit, 100 E. 5th Street, Cincinnati, Ohio 45202-3988

52.    Judge Karen Nelson Moore, United States Court of Appeals for the Sixth Circuit, 100 E. 5th Street, Cincinnati, Ohio 45202-3988

53.    Judge Richard Allen Griffin, United States Court of Appeals for the Sixth Circuit, 100 E. 5th Street, Cincinnati, Ohio 45202-3988

54.    Judge Richard F. Suhrheinrich, United States Court of Appeals for the Sixth Circuit, 100 E. 5th Street, Cincinnati, Ohio 45202-3988

55.    Judge Jane Branstetter Stranch, United States Court of Appeals for the Sixth Circuit, 100 E. 5th Street, Cincinnati, Ohio 45202-3988

56.    Judge Robert R. Reed, Supreme Court of the State of New York, 60 Centre Street, New York, NY 10007

57.    Geoffrey S. Berman, United States Attorney for the Sourthern District of New York, United States Attorney's Office, One St. Andrews Plaza, New York, NY 10007

58.    Attn: Chief, Civil Rights Unit, United States Attorney's Office, Sourthern District of New York, 86 Chambers Street, 3rd Floor, New York, NY 10007

## List of Exhibits

A.    List of nine (9) Motions to Remove the Conflicted and Ineffective defense counsel from the Office of the Federal Public Defender who had previously been disqualified from the case by the Honorable Nancy Vecchiareeli prior to Judge Dan Polster reappointing them to represent me and and Judge R. Guy Cole refusing to remove them from the case.

B.    List of forty (40) Confidential Informants who attempted to set-up and entrap Mr. Bergrin in crimes

C.    List of nine (9) Jailhouse Informants who threatened Mr. Bergrin's life at the behest of the U.S.D.O.J.

D.    List of eighty-four (84) pieces of documentary evidence to prove Mr. Bergrin's allegations.

E.    List of Forty-Nine (49) Defendants and the crimes and the numerous violations of Mr. Bergrin's constitutional rights that they engaged in against Mr. Bergrin.

F.    List of Eighteen (18) Entrapment Schemes in which the FBI and its Confidential Informants attempted to set-up and entrap Mr. Bergrin.

G.    The following is a list of Thirty Six (36) documents proving that the members of the U.S.D.O.J. attempted to cause Mr. Bergrin's death by instructing the Northeast Ohio Correctional Center and CoreCivic, Inc. to withhold Mr. Bergrin's prescription heart-related medication, and evidence that Mr. Bergrin exhausted his Administrative Remedies.

H.    List of One Hundred and Thirty (130) individuals that will be called to testify at trial if the Court does not Grant Plaintiff's Motion for Summary Judgment or if the Court does not issue an Order instructing the United States to enter into settlement discussions in the herein case. Plaintiff Ronald Bergrin is not listing the names of the witnesses because they would be contacted, harassed, coerced, intimidated, and threatened by members of the FBI.

I.    Documentary evidence that Judge Dan Polster saddled Mr. Bergrin with attorneys who were *under FBI criminal investigation* and were not permitted to represent Mr. Bergrin. These attorneys betrayed Mr. Bergrin by working hand-in-hand with the Office of the U.S. Attorney and with Judge Dan Polster to keep Mr. Bergrin incarcerated and to prevent Mr. Bergrin from being taken to trial. The attorneys repeatedly threw Mr. Bergrin under the proverbial bus in order to curry-favor with the Office of the United States Attorney so that the government would not file the criminal charges against the attorneys.

J.    Letter dated September 8, 2015 from Ronald Bergrin to Senior Nurse, Steven Senich, evidencing that the United States Marshal's Service instructed the medical staff at the Northeast Ohio Correctional Center ("NEOCC") to deny Mr. Bergrin his *prescription heart-related medication* (which caused Mr. Bergrin to become severely ill), and that the NEOCC then refused to provide any medical treatment to Mr. Bergrin, and they then falsified Mr. Bergrin's medical records. There is a second lawsuit that needs to be brought against Corrections Corporation of America, but Mr. Bergrin's understanding is that the United States will settle both cases at the same time. Mr. Bergrin has in his possession the 400+ pages of Mr. Bergrin's medical reports that Mr. Bergrin was able to retrieve from the Northeast Ohio Correctional Center.

K.    Three (3) letters that Mr. Bergrin had written to his doctor at the Federal Medical Center in Butner, North Carolina, Tanya Cunic, Psy.D, dated June 6, 2016, June 8, 2016, and July 29, 2016, which letters were written during Mr. Bergrin's incarceration at FMC-Butner in response to Judge Polster instructing Dr. Cunic to commit fraud, perjury, obstruction of justice, and medical malpractice, by erroneously instructing and pressuring Dr. Cunic to declare Mr. Bergrin to be *Incompetent to Stand Trial*, which is a *"crime"*. A Judge is not permitted to instruct a doctor to issue a pre-determined medical diagnosis.

L.    Three (3) Forensic Examinations which state that Ronald Bergrin is *Competent to Bring a Civil Suit*, and there is no evidence whatsoever that Mr. Bergrin was ever Incompetent to Stand Trial or Incompetent to Bring a Civil Suit. The three Forensic Reports were prepared by private doctors in NYC after Mr. Bergrin's release from prison. The reason that Mr. Bergrin chose to undergo Forensic Examinations in New York City after his release from prison is because Mr. Bergrin had 2 civil suits pending in the Supreme Court of New York State, and the Defendants were using Judge Polster's wrongful and malicious Order in which Judge Polster erroneously

138

stated that Mr. Bergrin is *Incompetent to Stand Trial* prior to dismissing the bogus criminal case. Mr. Bergrin will produce two (2) Forensic Reports that were prepared by the doctors at the Federeal Bureau of Prisons, which Forensic Reports also state that Mr. Bergrin is *Competent to Stand Trial*, and with the Court's permission and support, Mr. Bergrin will subpoena the two (2) Forensic Reports that were also prepared by the doctors at the Federeal Bureau of Prisons, that Judge Dan Polster and Judge R. Guy Cole SEALED in order to conceal the numerous crimes that were committed by Judge Dan Polster. Both of those Forensic Reports also state that Mr. Bergrin is Competent to Stand Trial.

M.   Letter entitled: "The Government Has 60 Days To Murder Me". In March 2016 Mr. Bergrin's sent copies of this document to President Obama and to Vice President Biden and to numerous others in Washington, DC, which letter was then forwarded to members of the Supreme Court of the United States. It was the response from this letter that forced Judge Polster to release Mr. Bergrin from prison. Had Mr. Bergrin not sent that letter, Mr. Bergrin would either still be in prison or he would have been murdered by members of the United States.

N.   Order dated December 9, 2016 in which the United States Court of Appeals for the Sixth Circuit violated Mr. Bergrin's constitutional rights by denying Mr. Bergrin's Petition for a Writ of Mandamus (for Mr. Bergrin to receive his competency reports), despite Mr. Bergrin having a constitutional right to receive HIS Competency Reports.

O.   Letter dated April 1, 2017 from Ronald Bergrin to Judge R. Guy Cole, Chief Judge, United States Court of Appeals for the Sixth Circuit.

P.   Letter dated dated November 22, 2017 from Ronald Bergrin to Judge R. Guy Cole, Chief Judge, United States Court of Appeals for the Sixth Circuit.

Q.   Documentary evidence which proves that Judge Polster's wrongful and malicious Decision and Order dated October 26, 2016 (in which Judge Polster stated that I am "Suffering from a Mental Disease or Defect and am therefore Incompetent to Stand Trial") has caused Mr. Bergrin's business client, Kenneth Kelner, MD, and his attorney, Robert Costello, Esq., to refuse to pay Mr. Bergrin the millions of dollars that are owed to Mr. Bergrin from a prior business representation/transaction. These documents evidence that Mr. Bergrin's client has refused to pay Mr. Bergrin monies that are owed to Mr. Bergrin as a result of Judge Polster falsely declaring Mr. Bergrin to be "Suffering from a Mental Disease or Defect and therefore

Incompetent to Stand Trial". Mr. Bergrin's client took advantage of the fact that Judge Polster wrongly and maliciously stated that Mr. Bergrin was Incompetent to Stand Trial, and Mr. Bergrin client refused to pay Mr. Bergrin's fee, which is now approximately $20+ Million. Mr. Bergrin's client owed Mr. Bergrin $6.6 Million in January 2014, and Mr. Bergrin's Contractual Agreement with his client contains interest at 1.5% monthly (18% annually) in addition to legal fees and expenses up to one-third of the amount owed to Mr. Bergrin, which is now $20+ Million. After Judge R. Guy Cole contacted Judge Robert R. Reed, Judge Reed forced Mr. Bergrin to withdraw the lawsuit, and now the people who are responsible for Mr. Bergrin's losses must compensate Mr. Bergrin. Please see the letter from Dr. Kelner's attorney, Robert Costello, Esq. and the stipulation withdrawing the lawsuit. Also, as a result of Judge R. Guy Cole interfering with Mr. Bergrin's lawsuit against his Landlord, Mr. Bergrin's other attorney, had to withdraw that lawsuit as well. Please see the attached exhibits.

R.    Letters dated February 2, 2016 and March 21, 2016 that Mr. Bergrin received from Assistant Federal Public Defender, Claire Curtis, Esq., of the Office of the Federal Public Defender, requesting that Mr. Bergrin waive his constitutional right to "healthcare privacy under the HIPAA act". Mr. Bergrin received these letters during the period of time that Mr. Bergrin was *allegedly incompetent* and was *allegedly* undergoing "Competency Restoration" at FMC-Butner after Judge Polster falsely and maliciously opined that Mr. Bergrin was "Suffering from a Mental Disease or Defect and is therefore Incompetent to Stand Trial". These documents further prove that the Office of the Federal Public Defender was fully-aware that Mr. Bergrin was *Competent to Stand Trial*, because an attorney cannot request that an inmate/defendant relinquish his/her constitutional rights if the inmate/defendant is *Not Competent to Stand Trial.*

S.    Judge Polster's Order dated October 26, 2016 in which he wrongfully and maliciously declared Mr. Bergrin to be "Suffering from a Mental Disease or Defect and therefore Incompetent to Stand Trial" prior to dismissing the frivolous criminal case.

T.    Judge Polster's Order dated December 10, 2015 in which Judge Polster falsely and maliciously declared Mr. Bergrin to be "Suffering from a Mental Disease or Defect and therefore Incompetent to Stand Trial" and he then sent Mr. Bergrin for *Competency Restoration* to the Federal Medical Center in Butner, North Carolina, and requested that the doctors at FMC-Butner send him two (2) Competency Reports. These 2 Competency Reports were *sealed* by Judge Polster and by Judge R. Guy Cole, because those Reports contain evidence of crimes that

were committed by Judge Polster in which Judge Polster instructed Mr. Bergrin's doctor at the Federal Medical Center (Tanya Cunic, Psy.D) to declare Mr. Bergrin Incompetent to Stand Trial, which Dr. Cunic refused to do, and in the second Competency Report Judge Polster threatened to have Dr. Cunic terminated from the Federal Bureau of Prisons if she refused to declare Mr. Bergrin Incompetent, which she refused to do.

U.    Certified Letter to CJA attorney, Gary W. Crim, Esq. dated September 19, 2017 in which Mr. Bergrin informed Mr. Crim that Mr. Crim is not permitted to file an appeal on Mr. Bergrin's behalf with respect to the appeal of Judge Polster's Order dated October 27, 2016 in which Judge Polster wrongly and maliciously declared Mr. Bergrin to be "Suffering from a Mental Disease or Defect and therefore Incompetent to Stand Trial". Mr. Bergrin informed Mr. Crim that Mr. Crim is going to be replaced within the coming weeks/months. However, Mr. Crim ignored Mr. Bergrin's letter and he filed the *intentionally deficient appeal* brief without including any of Mr. Bergrin's Competency Reports, which was summarily denied. The appeal was summarily denied because Mr. Crim enjoined the criminal conspiracy, which kept Mr. Bergrin incarcerayed for 22+ months for a crime that never occurred. Mr. Bergrin had never spoken with the CJA attorney (Gary Crim, Esq.) but Mr. Bergrin sent Mr. Crim at least fifteen (15) letters instructing Mr. Crim not to file the appeal brief unless he were to subpoena Mr. Bergrin's competency reports, which needed to be filed with the appeal, which Mr. Crim refused to do. Mr. Crim violated Mr. Bergrin's constitutional right to have his appeal granted, because he was working hand-in-hand with the Assistant U.S. Attorney, Brian McDonough, Esq.

V.    Hearing Transcript dated December 30, 2014 in which the Honorable Nancy Vecchiarelli Disqualified the Office of the Federal Public Defender for engaging in an Actual Conflict of Interest and for the Appearance of Conflicts of Interest. Judge Vecchiarelli was decent enough to seal the parts of the transcript that would have caused severe damage to the reputations of Carolyn Kucharski, Esq. and Edward Bryan, Esq. However, Judge Dan Polster then violated Mr. Bergrin's constitutional right to "Conflict-Free Counsel" by reappointing Carolyn Kucharski, Esq., Edward Bryan, Esq., and Claire Curtis, Esq. (of the Office of the Federal Public Defender) to represent Mr. Bergrin in an effort to keep Mr. Bergrin incarcerated until I agree to plead guilty to a misdemeanor, which I refused to do. The attorneys then kept Mr. Bergrin incarcerated for 22+ months in exchange for the Office of the U.S. Attorney agreeing not to indict the attorneys.

W. Presentence Investigation Report of Jonida Alicker, which was given to Mr. Bergrin by his court appointed attorney from the Office of the Federal Public Defener, Edward Bryan, Esq. Mr. Bryan then attempted to have Mr. Bergrin arrested for possessing "contraband".

EXHIBIT "A"

EXHIBIT "A"

List of nine (9) *pro-se* Motions to Remove Such Conflicted, Ineffective, and Previously-Disqualified Counsel from the Office of the Federal Public Defender who had already been disqualified and removed from the case by the Honorable Nancy Vecchiarelli, for engaging in Actual Conflicts of Interest, and due to the Appearance of Conflicts of Interest, which Motions to Remove such Counsel were repeatedly denied by Judge Dan Polster and by Judge R. Guy Cole, in violation of Mr. Bergrin's constitutional right to *"conflict-free counsel"*

1.    Document dated October 4, 2015 is a pro-se "Motion for Substitution of Counsel" that was sent to Judge Polster by Mr. Bergrin, which motion was verbally denied. Judge Polster would deny Mr. Bergrin's motions "verbally" so that he would not have to issue a Final Order so that Mr. Bergrin could not appeal Judge Polster's denials of Mr. Bergrin's motions, because in order to appeal a Judge's Decision and/or Order, the Judge must file a "Final Order" with the Clerk of the Court, which Judge Polster refused to do. In the herein case, Mr. Bergrin was forced to write his own *pro-se* motions because the Office of the Federal Public Defender had betrayed Mr. Bergrin and was working hand-in-hand with the Office of the U.S. Attorney, and with Judge Polster, and Mr. Bergrin's conflicted and ineffective legal counsel refused to file any motions throughout this case that could have benefited Mr. Bergrin in any way.

2.    Letter dated October 13, 2015 from Mr. Bergrin to Judge Polster informing Judge Polster that Edward Bryan, Esq. had betrayed Mr. Bergrin and had conspired with the Office of the U.S. Attorney. The allegations in the document can be verified with incontrovertible documentary evidence and witness testimony.

3.    Document dated November 17, 2015 is a second pro-se "Motion for Substitution of Counsel" that was sent to Judge Polster by Mr. Bergrin, which motion was also verbally denied. Judge Polster would deny Mr. Bergrin's motions "verbally" so that he would not have to issue a Final Order so that Mr. Bergrin would not be able to appeal Judge Polster's denials of Mr. Bergrin's motions. Then Judge Polster would violate Mr. Bergrin's constitutional rights by instructing the court reporters to remove anything from the transcripts that could cause injury to Judge Polster in any way.

144

4.  Document dated December 20, 2015 is a *pro-se* motion requesting that Judge Polster "Remove Such Conflicted and Ineffective Counsel", which motion Judge Polster denied. Mr. Bergrin was forced to write his own *pro-se* motions because the Office of the Federal Public Defender had betrayed Mr. Bergrin and was working hand-in-hand with the Office of the U.S. Attorney, and Mr. Bergrin's conflicted and ineffective legal counsel refused to file any motions that could have benefited Mr. Bergrin in any way.

5.  Document dated February 16, 2016 is a *pro-se* "Motion for an Evidentiary Hearing in which to Remove Mr. Bergrin's Counsel", which Motion Judge Polster denied in violation of Mr. Bergrin's constitutional rights.

6.  Document dated March 22, 2016 is a *pro-se* "Motion for Change of Counsel" which Judge Polster verbally denied. Every allegation in the motion is 100% truthful and accurate.

7.  Document dated May 25, 2015 is a *pro-se* "Motion for Removal of Mr. Bergrin's Counsel" that was sent to Judge Polster by Mr. Bergrin, which motion was verbally denied. Judge Polster would deny Mr. Bergrin's motions "verbally" so that he would not have to issue a Final Order so that Mr. Bergrin could not appeal Judge Polster's denials of Mr. Bergrin's motions. All of the allegations listed in all of Mr. Bergrin's pro-se motions are 100% truthful and accurate.

8.  Document dated June 3, 2016 is a "Notice of Appeal" of the Court's denial of Mr. Bergrin's Motion to Dismiss Counsel" and a "Notice of Appeal of the Court's denial of Mr. Bergrin's Motion for Change of Counsel". However, Judge Polster refused to issue a Final Order for these Motions, and, in further violation of Mr. Bergrin's constitutional rights, these appeals were never forwarded to the United States Court of Appeals for the Sixth Circuit in order to prevent Mr. Bergrin from appealing Judge Polster's wrongful Decisions and Orders, as required by statute.

9.  Document dated June 22, 2016 is Mr. Bergrin's written response to Judge Polster's Order dated April 11, 2016 in which Judge Polster denied Mr. Bergrin's "Motion to Remove Conflicted and Ineffective Counsel". The allegations contained in this document are 100% truthful.

EXHIBIT "B"

146

**EXHIBIT "B"**

Partial list of only forty (40) of the more than sixty (60) people who worked as Confidential Informants for the FBI throughout the 5-year period (from late 2009 – to late 2014) prior to Mr. Bergrin being falsely arrested by the FBI and charged with crimes that never occurred. There will be in excess of sixty (60) people who will be called to testify that worked as Confidential Informants for the FBI, who unsuccessfully attempted to set-up and entrap Mr. Bergrin in crimes.

1.  Anya N. (Pennsylvania)

2.  Marc B and girlfriend Suzy (New York)

3.  Ned P (New York)

4.  Ana P (New York)

5.  Mr. T (New York)

6.  Mr. J (New Jersey)

7.  Mark S (New York)

8.  Frank G (New York)

9.  Marc Wigder (New York)

10. David Parks (New York)

11. Rob K (New York)

12. Lisa T (New York)

13. Ruth S (New York)

14. Gerald S (New York)

15. Ray Carolin (Delray Beach, Florida)

16. Katy L (Boynton Beach, Florida) was contacted by the FBI, but refused to work as a Confidential Informant.

17.  Irwin B. (Boynton Beach, Florida) was contacted by the FBI, but refused to work as a Confidential Informant.

18. Wanda C. (New York)

19. Scot R. (New York)

20. Anthony A.  (New York)

21. Glenn G. (New York)

22. Yolanda Jauregui (Nutley, New Jersey)

23. Beth Goldberg and Seth Goldberg (New York)

24. Mr. and Mrs. Band (New York)

25. John S. (New York)

26. Mark R (New York)

27. John F (Florida)

28. Eyton L. (New York)

29. Eddie O. (New York)

30. Mira - (New York)

31. Valerie C (New York)

32. Babe C (New York)

33. Regina M. (New York)

34.    Rob N. (Florida)

35.    Howard S (New York)

36.    2 Female Neighbors in Boynton Beach, Florida

37.    Debbie H. - (New York )

38.    Wakeem W. (New York)

39.    R.T.B. (New Mexico)

40.    Vito R (New York)

EXHIBIT "C"

## EXHIBIT "C"

List of nine (9) Jailhouse Informants who threatened Mr. Bergrin's life and/or stole Mr. Bergrin's legal file from his prison cell and/or attempted to set-up and entrap Mr. Bergrin in crimes that Mr. Bergrin would never even think of committing

1. R.T.B.: - Federal Medical Center, Butner, North Carolina
   Inmate Registration Number: 27074-XXX

2. Richard (Rick) Springs - Federal Medical Center, Butner, North Carolina
   Inmate Register Number: 17397-085) Deceased). Sadly, Mr. Springs committed suicide while at FMC-Butner because the federal prosecutor requested that the Judge "forcibly administer mind-altering drugs to Mr. Springs", who was not mentally ill and did not need to take any drugs, and the corrupt Judge granted the corrupt prosecutor's motion, and as a result of the prosecutor granting such motion Mr. Springs committed suicide. There is evidence that Mr. Springs was working for the government as a Confidential Jailhouse Informant.

3. Mr. Love  – Northeast Ohio Correctional Center, Youngstown, Ohio

4. Mr. Pratt  – Northeast Ohio Correctional Center, Youngstown, Ohio
   Inmate Registration Number: 35448-XXX

5. Mr. Griffin – Metropolitan Correctional Center  , Chicago, Illinois and the Northeast Ohio Correctional Center, Youngstown, Ohio   Inmate Registration Number: 47320-XXX

6. Mr. Rodriguez – Northeast Ohio Correctional Center, Youngstown, Ohio
   Inmate Registration Number: 60780-XXX

7. Mr. Waller – Northeast Ohio Correctional Center, Youngstown, Ohio
   Inmate Registration Number: 30240-XXX

8. Mr. Butler – Northeast Ohio Correctional Center, Youngstown, Ohio
   Inmate Register Number: 35501-XXX

9. Mr. Gooch – Northeast Ohio Correctional Center, Youngstown, Ohio
   Inmate Register Number: 58940-XXX

EXHIBIT "D"

EXHIBIT "D"

**List of eighty-four (84) of the more than 2,000 pieces of Evidence/Documents**

1.  Letter to the Honorable William J. Martini, United States District Judge, dated April 21, 2011 notifying Judge Martini that Mr. Bergrin is being harassed as a result of Mr. Bergrin's support for Mr. Bergrin's cousin the FBI is harassing Mr. Bergrin.

2.  Letter to Aaron Ford, the Director of the FBI's Newark, New Jersey Field Office dated December 3, 2013 complaining that as a result of Mr. Bergrin's support for Mr. Bergrin's cousin the FBI is harassing Mr. Bergrin.

3.  Letter to the Honorable Dennis M. Cavanaugh, United States District Judge, dated December 3, 2013 notifying Judge Cavanaugh that Mr. Bergrin is being harassed by the FBI as a result of Mr. Bergrin's support for his cousin.

4.  Letter to Aaron Ford, the Director of the FBI's Newark, New Jersey Field Office dated December 4, 2013 complaining that Mr. Bergrin is being "stalked" by the FBI, and Mr. Bergrin threaten to bring a lawsuit against the FBI.

5.  Letter to Mr. Bergrin's cousin Fishman, the United States Attorney for the District of New Jersey dated December 21, 2013 complaining that Mr. Bergrin is being harassed by the FBI and by its Confidential Informants.

6.  Letter to Aaron Ford, the Director of the FBI's Newark, New Jersey Field Office dated September 9, 2014 complaining that despite Special Agent Shawn Brokos being transferred to the Pittsburgh office of the FBI, the FBI is still harassing Mr. Bergrin.

7.  Letter to Michael Kiley of the FBI's Newark, New Jersey Field Office dated July 31, 2014 complaining that "Mr. Bergrin is still being harassed by the FBI and Mr. Bergrin is intending to bring a lawsuit against the FBI as well as going to the news Media". Mr. Bergrin had spoken with Michael Kiley and Mr. Bergrin told Mr. Kiley that Mr. Bergrin is going to do something very bad if the FBI does not stop harassing Mr. Bergrin. Mr. Bergrin was going to contact the television news networks, the radio news networks, the internet news networks, and the print Media in order to expose the wrongdoing by the FBI. In response to Mr. Bergrin's conversation with Mr. Kiley, the FBI issued a BOLO that was circulated throughout the tri-state area. A BOLO is a document that stated: "Be On The Lookout for Mr. Bergrin". The FBI had become

extremely "paranoid" as a result of the FBI harassing Mr. Bergrin to the point that they expected Mr. Bergrin to retaliate against the FBI agents by possibly doing something violent.

8.  Email dated December 18, 2014 from Mr. Bergrin to Beth Bergrin Goldberg stating that Mr. Bergrin is going to stop by the home of FBI Special Agent Shawn Brokos "to say hello!" CLEARLY NOT A THREAT. Mr. Bergrin was considering stopping by her home so that she would know that Mr. Bergrin know where she lives, because Mr. Bergrin was hoping that if Shawn. Brokos was aware that Mr. Bergrin knew where she lives, that she would pull the FBI agents off of Mr. Bergrin and the *harassment* would hopefully end.

9.  Criminal Complaint dated December 18, 2014 in which Mr. Bergrin is charged with 2 counts of "communicating a threat". However, Mr. Bergrin did not communicate a threat, unless you consider threatening to sue someone a crime.

10. Indictment dated January 6, 2015 in which  Mr. Bergrin is charged with 2 counts of "communicating a threat" and 1 count of "cyber-stalking". Brian McDonough, Esq. obviously lied to the Grand Jury or he never would have been able to indict Mr. Bergrin for a crime that never occurred.

11. Document dated January 8, 2015 is a transcript from Mr. Bergrin's "Detention Hearing" in which Mr. Bergrin was denied bail/bond.

12. Document dated May 20, 2015 is a list of  Mr. Bergrin's prescription medications, which list was given to  Mr. Bergrin by the Federal Bureau of Prisons at the Metropolitan Correctional Center in Chicago, Illinois, which document evidences that  Mr. Bergrin had a prescription for "Polyethylene Glycol 3350 Powder" during the 22+ months that he was incarcerated for a crime that never occurred.

13. Psychological Evaluation Report dated June 28, 2015 and entitled "Forensic Report" which document was prepared by the Government's own doctor, Mr. Bergrin Nieberding, PhD, in which Dr. Nieberding opined in his Psychological Evaluation Report that " Mr. Bergrin is Competent to Stand Trial".

14. A document entitled "Bergrin Defense Strategy" which document was prepared by  Mr. Bergrin and given to Edward Bryan, Esq. and Claire Curtis, Esq. of the Office of the Federal Public Defender in July of 2015. Subsequent to receiving the document, neither Mr. Bryan nor Ms. Curtis filed any of the motions that Mr. Bergrin had requested be filed, nor did they subpoena any of the evidence that Mr. Bergrin requested be subpoenaed. Edward Bryan and

Claire Curtis shared copies of this document with the Office of the U.S. Attorney in violation of the attorney-client privilege.

15.  Document dated June 1, 2015 is a copy of the *Anthony A. Elonis* Decision, which was issued by the Supreme Court of the United States, which Decision confirmed that Mr. Bergrin, did not communicate a threat. Mr. Bergrin sent a copy of the *Elonis* Decision to Judge Dan Polster, to the Office of the U.S. Attorney, to Mr. Bergrin's attorney, and Mr. Bergrin personally handed copies of the Decision to Edward Bryan, Esq. and to Claire Curtis, Esq. in early July 2015. If the Government actually believed that Mr. Bergrin had "communicated a threat", then one must ask why the Government did not release Mr. Bergrin from prison upon knowing about the Supreme Court's *Elonis* Decision, and the answer is, because the Government knew that Mr. Bergrin had not communicated a threat or a crime prior to falsely charging Mr. Bergrin, arresting Mr. Bergrin, and indicting Mr. Bergrin.

16.  Document dated July 9, 2015 is a copy of the *Houston* Decision in which the United States Court of Appeals for the Sixth Circuit issued the *Houston* Decision, which Decision confirmed that Mr. Bergrin, did not communicate a threat.

17.  Letter dated September 8, 2015 from Mr. Bergrin to Registered Nurse Steven Senich memorializing that Mr. Senich refused to provide Mr. Bergrin with his prescription heart-related medication, and that the medical staff refused to provide medical treatment to Mr. Bergrin, and Mr. Senich falsified the medical records of Mr. Bergrin. This is a very important document because this document and Mr. Bergrin's medical record represents incontrovertible evidence that the Northeast Ohio Correctional Center was attempting to murder Mr. Bergrin at the behest of Brian McDonough, Esq. and United States Marshal Peter Elliott.

18.  Document dated September 23, 2015 is an "Intentionally Deficient Motion for Change of Venue" that was filed by Edward Bryan, Esq. Prior to seeing the deficient motion, Mr. Bergrin told Mr. Bryan that he is "terminated", because he did not permit Mr. Bergrin to review the document prior to the deficient document being filed with the court, but Judge Polster refused to remove Mr. Bryan from the herein case in violation of Mr. Bergrin's constitutional right to *conflict-free counsel.*

19.  Document dated October 4, 2015 is a *pro-se* "Motion for Substitution of Counsel" that was sent to Judge Polster by Mr. Bergrin, which motion was verbally denied. Judge Polster would deny Mr. Bergrin's motions "verbally" and refused to issue a Final Order, because without a Final Order, Mr. Bergrin could not appeal Judge Polster's denials of Mr. Bergrin's motions. In the herein case, Mr. Bergrin was forced to write his own *pro-se* motions because the Office of the Federal Public Defender had betrayed Mr. Bergrin and was working hand-in-hand with the Office of the U.S. Attorney, and Mr. Bergrin's conflicted and ineffective legal counsel refused

to file any motions that could have benefited Mr. Bergrin in any way. Judge Dan Polster would then arrange for the court reporters to remove Judge Polster's denials of Mr. Bergrin's motions from the hearing transcripts.

20.    Letter dated October 13, 2015 from Mr. Bergrin to Judge Polster telling him that Edward Bryan, Esq. had betrayed Mr. Bergrin and had conspired with the Office of the U.S. Attorney. Mr. Bergrin has witnesses to prove that all of the allegations in the document can be verified with incontrovertible documentary evidence and witness testimony.

21.    Document dated October 29, 2015 is a *pro-se* "Motion to Dismiss" the frivolous case that was brought against Mr. Bergrin. Mr. Bergrin was forced to prepare the document *pro-se* because Edward Bryan and Claire Curtis had refused to file a "Motion to Dismiss" on behalf of Mr. Bergrin. Claire Curtis and Edward Brian reluctantly filed an "Intentionally Deficient Motion to Dismiss", which was of course denied by Judge Polster.

22.    Letter dated November 3, 2015 from  Mr. Bergrin to Judge Polster in which Mr. Bergrin compare Judge Polster to a Nazi War Criminal for violating Mr. Bergrin's constitutional rights. If you were wondering why Judge Polster did not "hold Mr. Bergrin in contempt of court" for sending him this letter, it's because everything stated in Mr. Bergrin's letter was truthful, and there is voluminous evidence supporting Mr. Bergrin's allegations.

23.    Document dated November 17, 2015 is a second *pro-se* "Motion for Substitution of Counsel" that was sent to Judge Polster by Mr. Bergrin, which motion was verbally denied. Judge Polster would deny Mr. Bergrin's motions "verbally" so that he would not have to issue Final Orders so that Mr. Bergrin could not appeal Judge Polster's denials of Mr. Bergrin's motions.

24.    Document dated November 23, 2015 and entitled "Competency Evaluation" which document was prepared by George Schmedlen, PhD (a Liar-for-Hire), who conspired with the Office of the Federal Public Defender and with Judge Polster to falsely opine and testify falsely under oath that  Mr. Bergrin, is "Incompetent to Stand Trial". Judge Polster then issued an Order in which he declared Mr. Bergrin to be Incompetent to Stand Trial, and he sent  Mr. Bergrin to the Federal Medical Center in Butner, North Carolina for a period of 8+ months, *allegedly* for "Competency Restoration". Dr. Schmedlen is NOT a government-employed psychologist and Dr. Schmedlen was brought into the case by the Office of the Federal Public Defender who had previously been *disqualified from representing Mr. Bergrin* for engaging in Actual Conflicts of Interest, and the Office of the Federal Public Defender was *under FBI criminal investigation.* Dr. Schmedlen committed perjury and medical malpractice, by falsely opining that Mr. Bergrin is Incompetent to Stand Trial. All of the doctors that are employed by the Federal Bureau of Prisons found Mr. Bergrin "Competent to Stand Trial".

25.    Letter from Mr. Bergrin to Judge Dan Polster dated November 30, 2015. Once Judge Polster violated Mr. Bergrin's constitutional rights and Mr. Bergrin learned that Judge Polster had conspired with the Office of the U.S. Attorney and with the Office of the Federal Public Defender, to develop an illicit scheme in which to declare Mr. Bergrin to be Incompetent to Stand Trial, Mr. Bergrin then sent several disrespectful (but truthful) letters to Judge Polster.

26.    Transcript dated December 9, 2015 in which Judge Polster held a *"surprise competency hearing"* and violated Mr. Bergrin's constitutional rights throughout the hearing, and then Judge Polster falsely opined that " Mr. Bergrin is Incompetent to Stand Trial" and Judge Polster then issued an Order sending Mr. Bergrin to FMC-Butner for an initial period of 120-days for "competency restoration". However, the entire hearing was a sham and a violation of Mr. Bergrin's constitutional rights, because in accordance with statutory law, at a Competency Hearing, the defendant has the constitutional right to be made aware that there would be a "Competency Hearing" and that Mr. Bergrin is entitled to subpoena witnesses, to question witnesses, to subpoena evidence, to present evidence, and to testify at the hearing, but Judge Polster, the Office of the U.S. Attorney, and the Office of the Federal Public Defender, violated Mr. Bergrin's constitutional rights and would not permit Mr. Bergrin to participate at the *surprise competency hearing*. Mr. Bergrin was then sent to FMC-Butner (for a total period of 8.5 months for no legitimate reason whatsoever) and was found to be "Competent to Stand Trial" in three (3) Competency Reports. However, Mr. Bergrin subsequently attempted to obtain copies of Mr. Bergrin's first 2 'Competency Reports" (that were prepared by Dr. Cunic on February 26, 2016 and on or about May 8, 2016) in accordance with Judge Polster's Order dated December 10, 2015 (from Judge Polster, from FMC-Butner, from Warden J.C. Holland, from Dr. Cunic, from Byron Herbal, MD, from the Office of the U.S. Attorney, and from the Office of the Federal Public Defender, and from the Freedom of Information Offices in Washington, DC and other offices, because the reports stated that Mr. Bergrin is "Competent to Stand Trial"), but Judge Polster and Judge R. Guy Cole had conspired together to prevent Mr. Bergrin from receiving Mr. Bergrin's first 2 "Competency Reports" because, in addition to the reports stating that  Mr. Bergrin is Competent to Stand Trial, the reports also contain evidence that Judge Polster *committed numerous crime*.

27.    Document dated December 20, 2015 is a *pro-se* motion requesting that Judge Polster "Remove Such Conflicted and Ineffective Counsel" and a *pro-se* "Motion to Dismiss Counsel" which motion Judge Polster denied, without issuing Final Orders. Mr. Bergrin was forced to write his own *pro-se* motions because the Office of the Federal Public Defender had betrayed Mr. Bergrin and was working hand-in-hand with the Office of the U.S. Attorney throughout the herein case, and Mr. Bergrin's conflicted and ineffective legal counsel refused to file any motions that could have benefited Mr. Bergrin in any way as a result of the criminal conspiracy that the Judges and the members of the U.S.D.O.J. entered into.

28.   Document dated January 10, 2016 entitled "Attempt at Informal Resolution". Mr. Bergrin filed this Grievance Form a few days after arriving at FMC-Butner. Upon Mr. Bergrin's arrival at FMC-Butner (on or about January 6, 2016), the Office of the Attorney General and the Federal Bureau of Prisons attempted to murder Mr. Bergrin by incarcerating Mr. Bergrin for 24 hours in an Ice Cold Torture Chamber. Mr. Bergrin had gotten Hypothermia and almost died. The institution is aware that Mr. Bergrin has a severe heart condition and the people managing the institution were instructed by Assistant U.S. Attorney and Judge Dan Polster to murder Mr. Bergrin.

29.   Document dated February 2, 2016 is a cover letter from Claire Curtis, Esq. of the Office of the Federal Public Defender, which states in part "Enclosed please find both a General Release and a HIPAA-Compliant Release", and a "HIPAA Privacy Authorization Form". However, Mr. Bergrin did not request any such documents, nor would Mr. Bergrin ever relinquish Mr. Bergrin's constitutional right to healthcare privacy to people that are betraying Mr. Bergrin on a daily basis and conspiring to keep Mr. Bergrin incarcerated and who filed *Intentionally Deficient Motions* on Mr. Bergrin's behalf. What is extremely meaningful about this document is that it offers indisputable evidence that the Office of the Federal Public Defender knew for a fact that Mr. Bergrin was "Competent to Stand Trial", because the Office of the Federal Public Defender cannot ask someone that is "incompetent" or who "might be incompetent" to relinquish his/her constitutional rights. This is actually the second such request that Mr. Bergrin received in writing from the Office of the Federal Public Defender requesting that Mr. Bergrin execute a waiver of Mr. Bergrin's constitutional right to healthcare privacy under the HIPAA act, during the period of time that Mr. Bergrin was *allegedly* "Incompetent to Stand Trial".

30.   Document dated February 16, 2016 is a *pro-se* "Motion for an Evidentiary Hearing in which to Remove Mr. Bergrin's Counsel", which Motion Judge Polster verbally Denied.

31.   Document dated February 17, 2016 is an Affidavit from Leonard Golden, MD confirming that Mr. Bergrin had taken "Ambien" every day that Mr. Bergrin was in Ohio prior to sending the non-violent email to Mr. Bergrin's cousin, which email clearly stated "Please Do Not Send This Out!" and which email was not a threat.

32.   Document dated February 26, 2016 in which Judge Polster issued an Order to the Clerk of the Court instructing them not to open nor read any of Mr. Bergrin's *pro-se* filings. This violation of Mr. Bergrin's constitutional rights was issued in order to prevent Mr. Bergrin from being able to defend himself in the herein case, and in order to be able to keep Mr. Bergrin incarcerated so that Mr. Bergrin would not be able to stand trial. Mr. Bergrin, filed an appeal of this wrongful Order, but the United States Court of Appeals for the Sixth Circuit violated Mr. Bergrin's constitutional rights by denying Mr. Bergrin's appeal.

33.     Document dated March 1, 2016 entitled "Attempt at Informal Resolution". Mr. Bergrin filed this second Grievance Form two months after arriving at FMC-Butner, because Mr. Bergrin had not received a response to his first "Attempt at Informal Resolution". Upon Mr. Bergrin's arrival at FMC-Butner (on or about January 6, 2016), the Federal Bureau of Prisons attempted to murder Mr. Bergrin by incarcerating Mr. Bergrin for 24 hours in an Ice Cold Torture Chamber. Mr. Bergrin had gotten Hypothermia and almost died. The institution is aware that Mr. Bergrin has a severe heart condition and the people managing the institution were instructed to murder Mr. Bergrin.

34.     Letters dated March 3, 2016 and March 4, 2016 from Mr. Bergrin to Claire Curtis, Esq. requesting that she forward to Mr. Bergrin copies of Mr. Bergrin's "Midterm Competency Report" (the "Interim" report that was requested by Judge Polster in his Order dated December 10, 2015). Ms. Curtis did not respond to Mr. Bergrin, nor did Ms. Curtis forward copies of Mr. Bergrin's "Midterm Competency Reports" to Mr. Bergrin. Ms. Curtis lied to Mr. Bergrin by stating in a letter that the Office of the Federal Public Defender had not received the documents, which was not truthful, and in its Order denying Mr. Bergrin's Petition for a Writ of Mandamus, in which Mr. Bergrin requested that the United States Court of Appeals for the Sixth Circuit instruct the Office of the Federal Public Defender to provide Mr. Bergrin with his Competency Reports, Mr. Bergrin's Petition for a Writ of Mandamus was denied by Judge R. Guy Cole who entered into a criminal conspiracy with Judge Dan Polster in violation of Mr. Bergrin's constitutional rights.

35.     Document dated March 9, 2016 is a letter from Mr. Bergrin to the Office of the Inspector General entitled "**The Government has 60 days to Murder Mr. Bergrin**". This document was sent to more than fifteen (15) of the most powerful people in the United States because Mr. Bergrin was being terribly abused at FMC-Butner, and Mr. Bergrin knew that Mr. Bergrin was going to be murdered at some point in time. Approximately 2 weeks after sending out this letter, someone ordered the Federal Bureau of Prisons to **Back Off!** Mr. Bergrin honestly believe that had Mr. Bergrin not sent out this document, that Mr. Bergrin would have been murdered at FMC-Butner. Evidently, too many people were informed as to what was being done to Mr. Bergrin, and someone with lots of clout put an end to the abuse.

36.     Document dated March 16, 2016 is an "Intentionally Deficient Motion to Dismiss the Charges" that was filed by Edward Bryan, Esq. and Claire Curtis, Esq. This motion was filed in response to a demand letter that Mr. Bergrin sent to Claire Curtis in which Mr. Bergrin insisted that she file the Motion to Dismiss the Case, and Ms. Curtis reluctantly agreed to prepare the document. However, a high school student could have written a substantially better motion, because Ms. Curtis prepared an "Intentionally Deficient Motion" so that the motion would not be granted. Mr. Bergrin responded to this document with a letter dated March 29, 2016 to Judge Polster after Mr. Bergrin had read the incompetently prepared document that Mr. Bergrin's conflicted and ineffective legal counsel had filed (see number 40 below).

37.    Document dated March 22, 2016 is a *pro-se* "Motion for Change of Counsel" which Judge Polster denied. Every allegation in the motion is 100% truthful and accurate.

38.    Document dated March 29, 2016 is a letter from Mr. Bergrin to Judge Polster that was written in response to the "Intentionally Deficient Motion to Dismiss the Charges" that was filed by Edward Bryan, Esq. and Claire Curtis, Esq.

39.    Document dated March 31, 2016 is an Affidavit from Jodi Golden (wife of Dr. Golden), requesting that the case against Mr. Bergrin be dismissed so that Mr. Bergrin can be released from prison. Mr. Bergrin is very pleased to say that Jodi Golden recovered from her illness, which was caused by a complication that occurred in the operating room at the Cleveland Clinic. Tragically however, Jodi Golden passed away at the age of 47 years from a heart attack. Prior to Jodi Golden's death, Jodi Golden wrote a letter in support of Mr. Bergrin and Jodi Golden's husband, Dr. Golden, will be testifying on behalf of Mr. Bergrin.

40.    Document dated April 29, 2016 from the Office of the Inspector General. This letter was written to Mr. Bergrin in response to the document that Mr. Bergrin sent to the Office of the Inspector General dated March 9, 2016 entitled "**The Government has 60 days to Murder Mr. Bergrin**". In his document entitled "**The Government has 60 days to Murder Mr. Bergrin**", Mr. Bergrin describes the abuse and the numerous attempts to murder Mr. Bergrin by the Federal Bureau of Investigation, by the Northeast Ohio Correctional Center, and by the U.S. Marshal's Service,. In response to Mr. Bergrin's letter, the Office of the Inspector General suggested that Mr. Bergrin complain to the same organizations that had attempted to murder Mr. Bergrin. The Office of the Inspector General refused to investigate Mr. Bergrin's complaints and clearly violated Mr. Bergrin's constitutional rights. The Office of the Inspector General will be named as a Defendant in the civil suit, which will be filed shortly.

41.    Document dated May 23, 2016 is a *pro-se* Notice of Appeal entitled "Notice of Appeal of the Court's Order finding Mr. Bergrin, Incompetent to Stand Trial". The United States Court of Appeals for the Sixth Circuit knowingly, intentionally, falsely, and maliciously stated in its decision that: "The Order is non-appealable" (or words to that effect, which was not truthful).

42.    Document dated May 25, 2016 is a *pro-se* "Motion for Removal of Mr. Bergrin's Counsel" that was sent to Judge Polster by Mr. Bergrin, which motion was verbally denied. Judge Polster would deny Mr. Bergrin's motions "verbally" in order to avoid issuing a Final Order so that Mr. Bergrin could not appeal Judge Polster's denials of Mr. Bergrin's motions, appeals, and other legal briefs. All of the allegations listed in the motion are 100% truthful and accurate.

43. Document dated May 27, 2016 is a letter from the Warden at FMC-Butner (Mr. J.C. Holland) to Judge Polster requesting that Judge Polster permit FMC-Butner to keep Mr. Bergrin incarcerated at FMC-Butner for an additional period of ninety (90) days, which request Judge Polster granted. However, Mr. Bergrin's doctor, Tanya Cunic, Psy.D told Mr. Bergrin that Judge Polster contacted Warden Holland and requested that FMC-Butner keep Mr. Bergrin at FMC-Butner for an additional period of 90 days, and Judge Polster "Ordered Warden Holland to instruct Dr. Cunic to find Mr. Bergrin Incompetent to Stand Trial". This document was prepared at the behest of Judge Polster and not at the volition of Warden J.C. Holland.

44. Document dated May 30, 2016 is a *pro-se* motion entitled "Motion to Stay the Court's Order dated December 10, 2015, pending appeal". Mr. Bergrin's constitutional rights were repeatedly violated during the *surprise competency hearing* that took place on December 9, 2015. However, to Mr. Bergrin's knowledge, such appeal was not ruled on by the United States Court of Appeals for the Sixth Circuit, which falsely stated that: "The Order is non-appealable" (or words to that effect), which was not truthful, because Mr. Bergrin had "a liberty interest at stake".

45. Document dated June 3, 2016 is a *pro-se* "Notice of Appeal of the Court Denying Mr. Bergrin's Motion to Dismiss Counsel" and a "Notice of Appeal of the Court's Denying Mr. Bergrin's Motion for Change of Counsel". However, Judge Polster violated Mr. Bergrin's constitutional rights by refusing to issue a ruling or a Final Order on these appeals, and Judge Polster once again violated Mr. Bergrin's constitutional rights because Judge Polster never forwarded these appeals to the United States Court of Appeals for the Sixth Circuit, as required by statute.

46. A document dated June 4, 2016 is a counter-offer to Judge Polster's and the Office of the U.S. Attorney's offer to release Mr. Bergrin immediately in exchange for Mr. Bergrin agreeing to postpone his trial for a period of 365 days. The deal in which Judge Polster and the Office of the U.S. Attorney offered to release Mr. Bergrin in exchange for Mr. Bergrin agreeing to delay his trial for a period of 365 days is evidence that Judge Polster, the Office of the U.S. Attorney, and the Office of the Federal Public Defender knew for a fact that Mr. Bergrin was, and always has been, "Competent to Stand Trial", because Judge Polster, the Office of the U.S. Attorney, and the Office of the Federal Public Defender cannot ask a Defendant who they believe "might be incompetent" to relinquish his/her constitutional right to healthcare privacy, in addition to requesting that Mr. Bergrin relinquish his constitutional right to a *speedy trial*, which constitutional right Judge Polster had already violated by sending Mr. Bergrin for competency evaluation and restoration, knowing full well that Mr. Bergrin was and is Competent to Stand Trial. This is actually the "second proposal" that Mr. Bergrin received from Judge Polster, from the Office of the U.S. Attorney, and from the Office of the Federal Public Defender, during the period of time that Judge Polster wrongfully and maliciously declared Mr. Bergrin to be "Incompetent to Stand Trial".

47.    Letter dated June 6, 2016 from  Mr. Bergrin to Tanya Cunic, Psy.D was written to Dr. Cunic after Dr. Cunic shared with Mr. Bergrin that Judge Polster threatened to have Dr. Cunic terminated from the Federal Bureau of Prisons if she does not declare Mr. Bergrin Incompetent to Stand Trial". Had Mr. Bergrin not written the three (3) letters to Dr. Cunic dated June 6, 2016, June 8, 2016, and July 29, 2016, Dr. Cunic might have committed fraud, perjury, and medical malpractice, by falsely declaring Mr. Bergrin to be "Incompetent to Stand Trial". It was only as a result of these three (3) letters that Dr. Cunic decided against violating the law and violating Mr. Bergrin's constitutional rights, because Dr. Cunic was frightened that Judge Polster was going to have Dr. Cunic terminated from the Federal Bureau of Prisons as Judge Polster threatened to do.

48.    Letter dated June 8, 2016 from  Mr. Bergrin to Tanya Cunic, Psy.D was written to Dr. Cunic after Dr. Cunic shared with Mr. Bergrin that Judge Polster was pressuring her to find Mr. Bergrin "Incompetent to Stand Trial". Had Mr. Bergrin not written the three (3) letters to Dr. Cunic dated June 6, 2016, June 8, 2016, and July 29, 2016, Dr. Cunic would have committed fraud, perjury, and medical malpractice, by falsely declaring Mr. Bergrin to be "Incompetent to Stand Trial". It was only as a result of these three (3) letters that Dr. Cunic decided against violating the law and violating Mr. Bergrin's constitutional rights.

49.    Document dated June 13, 2016 from the Internal Investigations Section of the FBI was written in response to Mr. Bergrin's letter in which Mr. Bergrin requested an investigation into: 1). Mr. Bergrin's Federal Public Defenders engaging in Actual Conflicts of Interest, and 2). Judge Polster developing an illicit scheme in which to falsely declare Mr. Bergrin to be "Incompetent to Stand Trial", and 3). The Office of the Attorney General conspiring with the FBI and/or the U.S. Marshal's Service to cause Mr. Bergrin's death on three (3) occasions. This response to Mr. Bergrin's complaint shows that the FBI is conspiring in a cover-up, and that the FBI blatantly violated Mr. Bergrin's constitutional rights by refusing to investigate Mr. Bergrin's allegations and by refusing to punish those that attempted to murder Mr. Bergrin.

50.    Document dated June 16, 2016 is an Order that Judge Polster issued in an effort to prevent Mr. Bergrin from Defending himself in the herein case. Mr. Bergrin's court-appointed legal counsel had betrayed Mr. Bergrin and was working hand-in-hand with Judge Polster and with the Office of the U.S. Attorney against Mr. Bergrin's best interests, and Judge Polster then issued an Order instructing the Clerk of the Court not to read, open, nor file any of Mr. Bergrin's *pro-se* documents. Mr. Bergrin appealed Judge Polster's Order but the United States Court of Appeals for the Sixth Circuit Rubber-Stamped Mr. Bergrin's Appeal "DENIED", without ever reading Mr. Bergrin's 85-page appeal. The United States Court of Appeals for the Sixth Circuit entered into a criminal conspiracy with Judge Polster, and they repeatedly violated Mr. Bergrin's constitutional rights. The evidence of this criminal conspiracy is incontrovertible.

51.    Letter dated July 29, 2016 from Mr. Bergrin to Tanya Cunic, Psy.D was written to Dr. Cunic after Dr. Cunic shared with Mr. Bergrin that Judge Polster was pressuring her to find Mr. Bergrin "Incompetent to Stand Trial", and threatened to have Dr. Cunic terminated from the Federal Bureau of Prisons. Had Mr. Bergrin not written the three (3) letters to Dr. Cunic dated June 6, 2016, June 8, 2016, and July 29, 2016, Dr. Cunic would have falsely declared Mr. Bergrin to be "Incompetent to Stand Trial" by committing perjury, fraud, and medical malpractice. It was only as a result of these three (3) letters that Mr. Bergrin had written to Dr. Cunic that convinced Dr. Cunic not to violate the law and Mr. Bergrin's constitutional rights. Dr. Cunic will of course be subpoenaed to testify in the civil case.

52.    Document dated June 21, 2016 is a request that Mr. Bergrin made to the Freedom of Information Office in Washington, DC requesting Mr. Bergrin be given his mental health records, because Mr. Bergrin needed his "Competency Reports". Mr. Bergrin received everything except the "Competency Reports" which the FOIA office claimed was "CLASSIFIED". The FBI, Judge Polster, the Federal Bureau of Prisons, the Office of the U.S. Attorney, the Office of the Federal Public Defender, and the United States Court of Appeals for the Sixth Circuit conspired together in order to prevent Mr. Bergrin from receiving his Competency Reports that were issued in accordance with Judge Polster's Order dated December 10, 2015. Once Mr. Bergrin receive those Competency Reports, this entire case turns on its head, because those Competency Reports prove that Judge Polster knew that Mr. Bergrin was Competent to Stand Trial, and that Mr. Bergrin was *never* Incompetent to Stand Trial, and these reports contain incontrovertible evidence of numerous crime that were committed by Judge Dan Polster.

53.    Document dated June 22, 2016 is Mr. Bergrin's written response to Judge Polster's Order dated April 11, 2016 in which Judge Polster Denied Mr. Bergrin's "Motion to Remove Conflicted and Ineffective Counsel". The allegations contained in this document are 100% truthful and accurate, because such conflicted and ineffective legal counsel knew that the criminal case could not have been taken to trial, because no crime had been committed.

54.    Document dated July 1, 2016 is the 100th request that Mr. Bergrin made to Mr. Bergrin's conflicted and ineffective legal counsel to subpoena the 21 discovery items that Mr. Bergrin had requesting since July 1, 2015. Mr. Bergrin's legal counsel refused to subpoena ANY discovery in the herein case, because such conflicted and ineffective legal counsel was aware that the criminal case could not have been taken to trial, because no crime had been committed.

55.    Document dated July 6, 2016 is Mr. Bergrin's written request to the Federal Bureau of Prisons to provide Mr. Bergrin with the first two (2) "Competency Reports" that Dr. Cunic had written in accordance with Judge Polster's Order dated December 10, 2015, which reports were dated on or about February 26, 2016 and on or about May 8, 2016. Dr. Cunic told Mr. Bergrin that Judge Polster had instructed Dr. Cunic, Warden J.C. Holland, the Federal Bureau of Prisons,

the Office of the U.S. Attorney, the Office of the Federal Public Defender, and the Freedom of Information Office in Washington, DC not to release the two (2) Competency Reports to Mr. Bergrin.

56. Documents dated July 18, 2016 is a *pro-se* Notice of Appeal and a Motion to Stay the Court's Order dated December 10, 2015 in which Judge Polster repeatedly violated Mr. Bergrin's constitutional rights throughout a *"surprise competency hearing"*. Mr. Bergrin's appeal was denied by the United States Court of Appeals for the Sixth Circuit who ruled "that Mr. Bergrin's appeal was from a non-appealable Order", which was not truthful because Mr. Bergrin had "a liberty interest at stake", and a liberty interest always carries with it "a constitutional right to appeal".

57. Document dated July 18, 2016 is a *pro-se* "Motion to Stay the Court's Order dated June 16, 2016" in which the Court issued an Order preventing the Clerk of the Court from opening, reading, or filing any of Mr. Bergrin's pro-se documents. The United States Court of Appeals for the Sixth Circuit violated Mr. Bergrin's constitutional rights by maliciously and improperly denying Mr. Bergrin's Motion to Stay, which Denial prevented Mr. Bergrin from being able to defend him-self in the herein case.

58. Document dated July 19, 2016 is a *pro-se* "Petition for a Writ of Mandamus" (Court of Appeals case number 16-3833). After Mr. Bergrin exhausted his administrative remedies, by requesting his "Competency Reports" from Judge Polster, Dr. Cunic, Warden J.C. Holland, the Federal Bureau of Prisons, the Office of the U.S. Attorney, the Office of the Federal Public Defender, and the Freedom of Information Office in Washington, DC, Mr. Bergrin then filed the "Petition for a Writ of Mandamus" with the United States Court of Appeals for the Sixth Circuit, but Judge R. Guy Cole conspired with Judge Polster and with the Office of the U.S. Attorney to deny Mr. Bergrin's "Petition for a Writ of Mandamus". Mr. Bergrin has a constitutional right to receive his Competency Reports, and particularly because Mr. Bergrin is appealing Judge Dan Polster's Order dated October 27, 2016 in which Judge Polster wrongly and maliciously declared Mr. Bergrin to be "incompetent to stand trial" prior to dismissing the bogus criminal case.

59. A document dated July 21, 2016 in which the FOIA office in Annapolis, Mrs. Band land, provided Mr. Bergrin with most of his "medical records" (274 pages), but refused to provide Mr. Bergrin with his "Competency Reports" (approximately 25 pages) that are dated on or about February 26, 2016 and on or about May 8, 2016. This represents incontrovertible evidence that the government conspired to prevent Mr. Bergrin from receiving his Competency Records, which records Mr. Bergrin has a constitutional right to receive.

60.    Document dated July 29, 2016 is a letter from Mr. Bergrin, to Tanya Cunic, Psy.D. This letter was written to Dr. Cunic after Dr. Cunic shared with Mr. Bergrin that Judge Polster was pressuring her to fraudulently declare Mr. Bergrin to be "Incompetent to Stand Trial", and that Judge Polster threatened to have Dr. Cunic terminated by the Federal Bureau of Prisons. Had Mr. Bergrin not written the three (3) letters to Dr. Cunic dated June 6, 2016, June 8, 2016, and July 29, 2016, Dr. Cunic would have committed perjury, fraud, and medical malpractice, by falsely declaring Mr. Bergrin to be "Incompetent to Stand Trial".

61.    Document dated August 1, 2016 is an Appeal to the Freedom of Information Office in which the FOIA office refused to provide to Mr. Bergrin his Competency Reports that are dated on or about February 26, 2016 and on or about May 8, 2016. The FOIA office never responded to Mr. Bergrin's Appeal.

62.    Document(s) dated August 1, 2016 is a request for the Federal Bureau of Prisons to provide Mr. Bergrin with his Competency Reports. This request was made in response to the FBOP's refusal to provide to Mr. Bergrin his first 2 Competency Reports that were prepared by Dr. Cunic in accordance with Judge Polster's Order dated December 10, 2015, and which documents are dated on or about February 26, 2016 and on or about May 8, 2016. The FBOP never responded to Mr. Bergrin's request.

63.    Document dated August 29, 2016 is a cover letter from the Federal Medical Center in Butner, North Carolina which states that "A forensic evaluation of Mr. Bergrin has been completed" and a document dated August 29, 2016, which states: "Enclosed please find a Certificate of Restoration of Competency to Stand Trial on the above-referenced individual", and a document dated August 17, 2016 entitled "Forensic Evaluation". Although these documents certify that Mr. Bergrin is "Competent to Stand Trial", these forensic reports were not totally accurate, nor were they prepared honestly, because Dr. Cunic attempted to curry favor with Judge Polster by insinuating that Mr. Bergrin just-squeaked-by the threshold that determines if Mr. Bergrin is Competent to Stand Trial. Dr. Cunic admitted this to Mr. Bergrin when he was given this third and final Competency Report from Dr. Cunic. The accurate forensic reports were the first 2 forensic reports that were prepared by Dr. Cunic that are dated on or about February 26, 2016 and on or about May 8, 2016.

64.    Document dated August 30, 2016 from Mr. Bergrin to the Office of the U.S. Attorney is a *pro-se* request for twenty-one (21) discovery items, which Mr. Bergrin needed and which Mr. Bergrin was entitled to receive. Mr. Bergrin was forced to send this letter to the Office of the U.S. Attorney because Mr. Bergrin's conflicted and ineffective legal counsel from the Office of the Federal Public Defender repeatedly refused to request or subpoena any discovery in the herein case (CJA attorney, Michael O'Shea, Esq. was actually being truthful on December 29, 2014 when he told Mr. Bergrin that "Judge Polster would not permit you to receive your discovery").

65.    A document dated October 14, 2016 is a reply from Mr. Bergrin's conflicted and ineffective legal counsel that betrayed Mr. Bergrin and was working hand-in-hand with Judge Polster and with the Office of the U.S. Attorney in order to declare Mr. Bergrin to be Incompetent to Stand Trial, and Mr. Bergrin's conflicted and ineffective legal counsel filed the document under seal, which document is entitled "Defendant's Objections To The August 29, 2016 Competency Report". The Office of the Federal Public Defender conspired with Judge Polster and with the Office of the U.S. Attorney to dispute Dr. Cunic's medical diagnosis of Mr. Bergrin. The Office of the U.S. Attorney wisely pretended to support Dr. Cunic's findings in order to prevent Mr. Bergrin from bringing a civil suit against the Office of the U.S. Attorney, which is an inaccurate assumption on the part of Mr. McDonough. There is incontrovertible evidence that the Office of the Federal Public Defender was well aware that Mr. Bergrin was extremely Competent to Stand Trial.

66.    A document dated October 21, 2016 is a reply brief from the Office of the U.S. Attorney (Brian McDonough, Esq.) who was working hand-in-hand with Judge Polster and with the Office of the Federal Public Defender in order to declare Mr. Bergrin to be Incompetent to Stand Trial, because the Office of the U.S. Attorney could not take the herein case to trial, because Mr. Bergrin did not commit a crime. The Office of the U.S. Attorney filed under seal the document entitled "GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S OBJECTIONS TO THE AUGUST 29, 2016 COMPETENCY REPORT", and has cleverly taken a contradictory position by insisting that Mr. Bergrin is in-fact Competent to Stand Trial, but that Mr. Bergrin is "pretending to be incompetent", which is a blatant lie, because Mr. Bergrin has not given anyone the impression that he is not competent. The Office of the Federal Public Defender conspired with Judge Polster and with the Office of the U.S. Attorney to dispute Dr. Cunic's medical diagnosis, which diagnosis states that: " Mr. Bergrin, is Competent to Stand Trial". The Office of the U.S. Attorney cleverly pretended to support Dr. Cunic's findings, in order to prevent Mr. Bergrin from bringing a civil suit against the Office of the U.S. Attorney.

67.    A document dated October 25, 2016 is a reply brief from Mr. Bergrin's conflicted and ineffective legal counsel that betrayed Mr. Bergrin by working hand-in-hand with Judge Polster and with the Office of the U.S. Attorney in order to declare Mr. Bergrin to be Incompetent to Stand Trial. Mr. Bergrin's conflicted and ineffective legal counsel filed under seal the document entitled "DEFENDANT'S REPLY TO THE GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S OBJECTIONS TO THE AUGUST 26, 2016 COMPETENCY REPORT". The Office of the Federal Public Defender conspired with Judge Polster and with the Office of the U.S. Attorney to dispute Dr. Cunic's medical diagnosis.

68.    Document dated august 15, 2016 is a *pro-se* "Petition for a Writ of Mandamus" (Court of Appeals case number 16-3958). Judge Polster refused to rule on several of Mr. Bergrin's pro-se

motions, and Mr. Bergrin was therefore forced to file the "Petition for a Writ of Mandamus" in order to force Judge Polster to issue rulings. However, the United States Court of Appeals for the Sixth Circuit conspired with Judge Polster to deny Mr. Bergrin's Petition. This document, like most documents, was filed *pro-se*, because Mr. Bergrin's legal counsel refused to file any documents that could benefit Mr. Bergrin in any way.

69.    Letter to Judge Dan Polster dated September 5, 2016 requesting that Judge Polster permit Mr. Bergrin to subpoena evidence to be presented (such as the "Competency Reports") and to subpoena witnesses to testify at "The upcoming 4247(d) Hearing" in which Judge Polster surreptitiously planned to declare Mr. Bergrin to be "Incompetent to Stand Trial". Judge Polster refused to subpoena any of the requested evidence, and the only witness that Judge Polster permitted to testify was Dr. Cunic (via telephone). Judge Polster would not permit Mr. Bergrin to ask Dr. Cunic any questions, nor would Judge Polster permit Mr. Bergrin to later retrieve a copy of the Transcript from the Hearing. Judge Polster violated Mr. Bergrin's constitutional rights by falsely and maliciously declaring Mr. Bergrin to be "Incompetent to Stand Trial" and Judge Polster then dismissed the frivolous case so that Mr. Bergrin cannot bring a lawsuit against those that violated Mr. Bergrin's constitutional rights.

70.    Document dated September 16, 2016 is an Order issued by the United States Court of Appeals for the Sixth Circuit in which Mr. Bergrin filed an 85-page Appeal requesting the right to file *pro-se* legal documents as a result of Mr. Bergrin's court-appointed legal counsel betraying Mr. Bergrin and working hand-in-hand with the Office of the U.S. Attorney. The United States Court of Appeals for the Sixth Circuit did not read Mr. Bergrin's 85-page appeal and they fraudulently ruled that "The Court Lacks Jurisdiction Over This Appeal". The United States Court of Appeals for the Sixth Circuit blatantly conspired with Judge Polster to violate Mr. Bergrin's constitutional rights.

71.    Document dated October 10, 2016 is a *pro-se* document entitled: "Complaint Against Judge Dan Aaron Polster and Against Judge Solomon Oliver, Jr. Under 28 USCS 351" from Mr. Bergrin to the United States Court of Appeals for the Sixth Circuit. However, the United States Court of Appeals for the Sixth Circuit violated Mr. Bergrin's constitutional rights by refusing to rule on the Complaint.

72.    Document dated October 13, 2016 is a 125-page *pro-se* motion (which was sent to Judge Polster and to all parties related to this action) entitled "Motion for Judge Dan Aaron Polster to Disqualify Himself". However, Judge Polster refused to rule on this motion, and instead, he wrongfully and maliciously declared Mr. Bergrin to be Incompetent to Stand Trial prior to dismissing the frivolous case on October 26, 2016.

73.    A letter dated October 14, 2016 from Mr. Bergrin to Judge Polster requesting that certain Witnesses and Evidence be subpoenaed for the upcoming October 26, 2016 4247(d)

Competency Hearing. However, despite Mr. Bergrin's request, neither the Evidence nor the Witnesses were present at the Hearing in violation of Mr. Bergrin's constitutional rights. Tanya Cunic, Psy.D testified via telephone, but Judge Polster refused to permit Mr. Bergrin to ask Dr. Cunic any questions, and Judge Polster subsequently refused to permit Mr. Bergrin to obtain a copy of the transcript from the Hearing. However, Mr. Bergrin did in-fact obtain a copy of that transcript, which will form a part of the complaint to be filed shortly.

74.    Letter dated October 19, 2016 from Mr. Bergrin to Claire Curtis, Esq. pointing-out the "blatant lie" that Ms. Curtis wrote to Mr. Bergrin in a letter dated October 14, 2016, in which Ms. Curtis falsely claimed that Dr. Cunic and the Federal Medical Center at Butner, North Carolina did not send the "midterm evaluation reports" that were prepared, sent, and received in accordance with Judge Polster's Order dated December 10, 2015. Brian McDonough, Esq. instructed Ms. Curtis to fabricate this absurd story, as if a United States District Judges Order is going to be "ignored", and as if that United States District Judge is not going to wonder where the inmate's Competency Reports are? Incidentally, prior to being released from FMC-Butner, Dr. Cunic told Mr. Bergrin that Mr. Bergrin's competency reports were sent and received by Judge Polster, by the Office of the U.S. Attorney, and by the Office of the Federal Public Defender, and Dr. Cunic will testify to this in the upcoming civil suit that Mr. Bergrin will be prosecuting against those that violated Mr. Bergrin's constitutional rights.

75.    Document dated October 24, 2016 from  Mr. Bergrin to the United States Court of Appeals for the Sixth Circuit is a *pro-se* document entitled "Judicial Misconduct Complaint Against Judge Dan Aaron Polster under 28 USCS 351(a)".

76.    Document dated October 26, 2016 is the "Minutes of the Proceeding" from the October 26, 2016 Competency Hearing in which Judge Polster falsely and maliciously declared Mr. Bergrin Incompetent to Stand Trial, despite Dr. Cunic NOT opining that Mr. Bergrin is Incompetent to Stand Trial. Mr. Bergrin has a copy of the transcript which will form a part of the civil suit and which transcript also evidences Judge Polster instructing Mr. Bergrin not to ask Dr. Cunic any questions, which was a violation of Mr. Bergrin's constitutional rights.

77.    Document dated October 26, 2016 is the Order that was issued by Judge Polster in which Judge Polster wrongfully and maliciously declared Mr. Bergrin, to be "Incompetent to Stand Trial" in order to prevent Mr. Bergrin from being taken to trial, and from bringing a civil suit against Judge Polster and against those that violated Mr. Bergrin's constitutional rights throughout this case.

78.    Document dated October 26, 2016 is a "Judgment Entry" Dismissing the frivolous criminal case that was brought against Defendant Mr. Bergrin.

79. Document dated October 27, 2016 is a *pro-se* "Notice of Appeal" of the October 26, 2016 Order in which Judge Polster declared Mr. Bergrin "Incompetent to Stand Trial" prior to dismissing the frivolous case (so that Mr. Bergrin would not be able to bring a lawsuit against those that violated Mr. Bergrin's constitutional rights).

80. An email to CJA legal counsel, Steven Jaeger, Esq., dated November 18, 2016 informing Mr. Jaeger that he would not be representing Mr. Bergrin in the appeal of Judge Polster's Order declaring Mr. Bergrin to be "Incompetent to Stand Trial". Mr. Bergrin had been wrongly incarcerated for 22-months as a result of the cronyism and the corruption by those who are Judges and employees of the U.S.D.O.J. in the cesspool known as the Sixth Circuit.

81. Document dated November 19, 2016 to Steven Jaeger apologizing for being rude to Mr. Jaeger. Mr. Bergrin did not threaten Mr. Jaeger as Mr. Jaeger subsequently alleged in his documents dated November 23, 2016. Mr. Bergrin did tell Mr. Jaeger that if he filed an *intentionally deficient appeal*, that there would be severe consequences".

82. Document dated November 23, 2016 is a "Motion for Leave to Withdraw as Counsel to Mr. Bergrin". Mr. Jaeger filed this motion because Mr. Bergrin made it perfectly clear to Mr. Jaeger that there would be "severe consequences if he were to file an intentionally deficient appeal on Mr. Bergrin's behalf". Evidently, Mr. Jaeger was advised by the government to file an "Intentionally Deficient Appeal", but after speaking with Mr. Bergrin, Mr. Jaeger knew that Mr. Bergrin would in-fact make Mr. Jaeger "pay dearly" if he were to betray Mr. Bergrin, so Mr. Jaeger then fabricated a lie in which to insure that he would be removed from the case.

83. Document dated December 9, 2016 is an Order from the United States Court of Appeals for the Sixth Circuit in which the Court DENIED Mr. Bergrin's Petition for a Writ of Mandamus dated July 19, 2016 (Court of Appeals case number 16-3833). Mr. Bergrin filed the Petition for a Writ of Mandamus dated July 19, 2016 after Mr. Bergrin exhausted his administrative remedies, by requesting his "Competency Reports" from Judge Polster, Dr. Cunic, Warden J.C. Holland, the Federal Bureau of Prisons, the Office of the U.S. Attorney, the Office of the Federal Public Defender, and the Freedom of Information Office in Washington, DC. However, despite Mr. Bergrin "exhausting his administrative remedies", the United States Court of Appeals for the Sixth Circuit denied Mr. Bergrin's Petition for a Writ of Mandamus to compel the aforementioned parties to provide Mr. Bergrin with his "Competency Reports", and in the Order, the Judges blatantly lied by ruling that "Mr. Bergrin had not exhausted his administrative remedies". The Order is a blatant violation of Mr. Bergrin's constitutional rights and the three Judges that issued the ruling engaged in a "criminal conspiracy" to violate Mr. Bergrin's constitutional rights.

84.   Letter from Mr. Bergrin dated December 19, 2016 to the United States Court of Appeals for the Sixth Circuit, in which Mr. Bergrin corrects the record with respect to his conversation with Mr. Jaeger (Mr. Bergrin never threatened Mr. Jaeger with violence), and Mr. Bergrin included in his document the following: a). A Motion for Appointment of CJA Counsel from the Southern District of New York, and b). A Motion for permission for Mr. Bergrin to take a polygraph examination in order to prove that Mr. Bergrin never threatened Steven Jaeger, and c). Mr. Bergrin offered evidence which confirms the reason that Carolyn Kucharski, Esq. and Edward Bryan, Esq. are *under FBI criminal Investigation* and the reason that Claire Curtis and Edward Bryan betrayed Mr. Bergrin and worked hand-in-hand with the Office of the U.S. Attorney and with Judge Polster to keep Mr. Bergrin incarcerated for 22+ months for a crime that never occurred, and then conspired to declare Mr. Bergrin "Incompetent to Stand Trial".

EXHIBIT "E"

171

EXHIBIT "E"

The following is a list of Forty-Nine (49) Defendants and a partial list of the crimes and the violations of Mr. Bergrin's constitutional rights that were committed by the Defendants.

1.     **The United States Department of Justice**: Severe, Persistent, and Pervasive Harassment, False Arrest, Fabricated Statements by Prosecutors to prevent Defendant from being given Bail, Selective Prosecution,  Selective enforcement, Prosecutorial Misconduct, Outrageous Government Conduct, Unlawful Entry into Mr. Bergrin's hotel room, Unlawful Search and Seizure, Coercion, Conspiracy to Interfere with Civil Rights, Fabrication of Evidence, Witness Intimidation, Witness Tampering, Obstruction of Justice, Deprivation of Rights, Brady Violations – The Withholding of Material Evidence by the Government, Intentional Infliction of Emotional Distress, Intentional Interference, Refusal to Present Evidence, Failure to Produce Discovery, Obstructing, Influencing, and Impeding the Due Administration of Justice, Stigma plus Claim – Civil (Damage to one's reputation), Monell Claim – Civil – Damages for Emotional Suffering and Stress (Government's Failure to Train its CI's), Civil Conspiracy, Criminal Conspiracy, Action for neglect to prevent civil conspiracy and criminal conspiracy, Actual Malice, Inadequate Medical Treatment, Excessive Force (Too Tight Handcuffs and Chest Chains in order to inflict pain and suffering on inmate because inmate would not plead guilty to a crime that never occurred), Cruel and Unusual Punishment (Removal of Mr. Bergrin's *prescription heart-related medication* and forcing Mr. Bergrin into freezers for 7 hours and then for 24 hours, which almost caused Mr. Bergrin's death), Failure to provide adequate medical treatment, Sleep Deprivation, Breach of Fiduciary Duty, Engaged in Conduct that is prejudicial to the Administration of Justice, Conspiring with federal Judges to violate Mr. Bergrin's constitutional rights, Conspiracy to Commit Murder, etc., etc., etc.  The above is only a partial list of the crimes and the numerous violations of Mr. Bergrin's the constitutional rights by members of the United States Department of Justice.

2.     **Federal Bureau of Investigation** – Harassed and abused Mr. Bergrin for five (5) years (from September 2009 – November 2014) *prior* to falsely arresting Mr. Bergrin. Harassment, False arrest, Actual Vindictiveness, Selective Prosecution, Outrageous Government Conduct, Unlawful Entry, Unlawful Search and Seizure, Conspiracy to Interfere with Civil Rights, Fabrication of Evidence, Witness Intimidation, Witness Tampering, Obstruction of Justice, Deprivation of Rights, Violations of the Attorney-Client Privilege, Brady Violations, Giglio Violations, Intentional Infliction of Emotional distress, Obstructing, Influencing, and Impeding the Due Administration of Justice, Action for neglect to prevent conspiracy, Actual Malice, Engaged in Conduct that is prejudicial to the Administration of Justice, Civil Conspiracy, Criminal Conspiracy, threatened and intimidated Mr. Bergrin's numerous attorneys who were retained to represent Mr. Bergrin in the herein case. Intentional Interference. The FBI instructed

172

Comenity Bank to terminate one of Mr. Bergrin's credit cards (MasterCard number 5358 7820 0844 0752) in violation of Mr. Bergrin's constitutional rights. Mr. Bergrin will be calling a witness from Comenity Bank who will confirm such abhorrent behavior by the FBI. The FBI repeatedly attempted to set-up and entrap Mr. Bergrin in crimes and is still doing so today.

3.   **Former FBI Director James Comey** – Mr. Bergrin wrote numerous letters to Mr. Comey complaining about being harassed by the people that work under Mr. Comey at the FBI, but Mr. Comey did nothing to end the harassment. Outrageous Government Conduct, Deprivation of Rights, Intentional Infliction of Emotional Distress, Obstructing, Influencing, and Impeding the Due Administration of Justice, Action for neglect to prevent conspiracy, etc., etc.

4.   **Shawn Brokos and other FBI Agents** – Shawn Brokos destroyed Mr. Bergrin's life as a result of Mr. Bergrin supporting his cousin, despite the fact that Mr. Bergrin had a constitutional right to support his cousin. Throughout a period of five (5) years (from September 2009 through November 2014), Ms. Brokos (and numerous other FBI agents) contacted practically every person that Mr. Bergrin knew, and the FBI agents either convinced those people to work as Confidential Informants, and the FBI attempted to set-up and entrap Mr. Bergrin in illegal schemes, and those people ultimately abandoned their relationships with Mr. Bergrin after the FBI told them that Mr. Bergrin engaged in criminal behavior with his cousin. As a result of the stress that Mr. Bergrin suffered as a result of the harassment that Mr. Bergrin experienced at the hands of Ms. Brokos and the other FBI agents, Mr. Bergrin had a very severe heart attack in mid 2011, which left Mr. Bergrin with lifelong coronary problems. Severe, Persistent, and Pervasive Harassment, Outrageous Government Conduct, Conspiracy to Interfere with Civil Rights, Civil Conspiracy, Criminal Conspiracy, Witness Intimidation, Witness Tampering, Obstruction of Justice, Deprivation of Rights, Abuse of Discretion, Intentional Infliction of Emotional Distress, Obstructing, Influencing, and Impeding the Due Administration of Justice, Actual Malice, Near Lockstep Surveillance of Mr. Bergrin, Engaged in Conduct that is prejudicial to the Administration of Justice, etc., etc., etc.

5.   **Steven Cline, FBI/IRS Agent** – Mr. Cline conspired with Shawn Brokos to set-up and entrap Mr. Bergrin in money laundering and tax evasion schemes despite knowing that Mr. Bergrin did not commit a crime. Harassment, Outrageous Government Conduct, Conspiracy to Interfere with Civil Rights, Obstruction of Justice, Intentional Infliction of Emotional Distress, Action for neglect to prevent conspiracy, Actual Malice, Civil Conspiracy, Criminal Conspiracy, etc., etc., etc.

6.   **Aaron Ford, former Director, FBI, Newark, New Jersey Field Office** – Mr. Bergrin had contacted Mr. Ford numerous times via U.S. Mail and by telephone to complain about being harassed in New York City by the FBI agents that work in the same office under Mr. Ford, but Mr. Ford would not accept Mr. Bergrin's telephone calls, nor would Mr. Ford respond to Mr. Bergrin's numerous letters, nor would Mr. Ford lift a finger to help Mr. Bergrin. Mr. Bergrin

173

left numerous telephone messages, including descriptions of the misconduct by Ms. Brokos and numerous other FBI agents, but Mr. Ford did nothing to put an end to the harassment. Mr. Bergrin wrote at least four (4) letters to Aaron Ford begging Mr. Ford to instruct the FBI to stop harassing Mr. Bergrin, but Mr. Ford did nothing to stop the harassment and abuse. Severe, Persistent, and Pervasive Harassment, Outrageous Government Conduct, Conspiracy to Interfere with Civil Rights, Fabrication of Evidence, Witness Intimidation, Witness Tampering, Obstruction of Justice, Deprivation of Rights, Abuse of Discretion, Intentional Infliction of Emotional Distress, Obstructing, Influencing, and Impeding the Due Administration of Justice, Action for neglect to prevent conspiracy, Actual Malice, Civil Conspiracy, Criminal Conspiracy, False Arrest, Selective Prosecution, etc., etc., etc.

7.   **Numerous Unknown Special Agents of the FBI** who were the handlers for more than sixty (60) individuals who repeatedly violated Mr. Bergrin's constitutional rights by attempting to set-up and entrap Mr. Bergrin in numerous crimes, and who destroyed Mr. Bergrin's reputation and his successful business and who caused Mr. Bergrin severe emotional stress, which resulted in personal injuries to Mr. Bergrin. The FBI agents attempted to murder Mr. Bergrin by attempting to run him over with their vehicle. False Arrest, Severe, Persistent, and Pervasive Harassment, Conspiracy to Commit Murder, Outrageous Government Conduct, Conspiracy to Interfere with Civil Rights, Civil Conspiracy, Criminal Conspiracy, Witness Intimidation, Witness Tampering, Obstruction of Justice, Deprivation of Rights, Abuse of Discretion, Intentional Infliction of Emotional Distress, Obstructing, Influencing, and Impeding the Due Administration of Justice, Actual Malice, Engaged in Conduct that is prejudicial to the Administration of Justice, Near Lockstep Surveillance of Mr. Bergrin, etc., etc., etc.

8.   **Unknown members of the United States Department of Justice that were the handlers for the Confidential Jailhouse Informants at the Northeast Ohio Correctional Center and at the Federal Medical Center in Butner, North Carolina:** Mr. Bergrin was being harassed and threatened by several inmates that were working as Confidential Informants for the government who, in addition to threatening Mr. Bergrin's life, the informants were stealing Mr. Bergrin's legal files from Mr. Bergrin's prison cells in order for the government to obtain information that could be used against Mr. Bergrin, and so that Mr. Bergrin is unable to defend himself, and unable to prosecute a civil suit against the government. Such Confidential Informants included Mr. Gooch, Mr. Butler, Mr. Waller, Mr. Rodriguez, Mr. Griffin, Mr. Pratt, Mr. Love, and several others. Such Confidential Informants included R.T.B., Richard (Rick) Springs (deceased), and several other inmates. R.T.B. attempted to set-up and entrap Mr. Bergrin in a murder-for-hire scheme in which R.T.B. offered to murder Judge Polster for Mr. Bergrin for a very nominal amount of money. Mr. Bergrin obviously refused R.T.B's generous offer or Mr. Bergrin would currently be serving life in prison without the possibility of parole. Harassment, Outrageous Government Conduct, Conspiracy to Interfere with Civil Rights, Stealing Evidence, Obstruction of Justice, Deprivation of Rights, Violations of Due Process Rights, Intentional Infliction of Emotional Distress, Obstructing, Influencing, and Impeding the Due Administration of Justice, Criminal Conspiracy, Engaged in Conduct that is prejudicial to the

174

Administration of Justice, Threatening Mr. Bergrin's Life, Cruel and Unusual Punishment, etc., etc., etc.

9.  **Office of the Inspector General:** Mr. Bergrin had written numerous letters to the Office of the Inspector General in which Mr. Bergrin repeatedly described to them that Mr. Bergrin's constitutional rights were being violated by the FBI and by the FBI's Confidential Informants and by many of the defendant's that are listed herein. During Mr. Bergrin's incarceration for a crime that never occurred, Mr. Bergrin sent several letters to the Office of the Inspector General in which Mr. Bergrin discussed the three (3) attempts to murder Mr. Bergrin by the United States Marshals Service, by the Federal Bureau of Prisons, by the Office of the United States Attorney, and by members of the FBI, but instead of investigating the case, the Office of the Inspector General suggested that "Mr. Bergrin contact the FBI and to file a complaint with the FBI". The Office of the Inspector General has a responsibility to protect Mr. Bergrin's constitutional rights, but instead, the Office of the Inspector General violated Mr. Bergrin's constitutional rights, because they are corrupt, and there is no oversight. The Office of the Inspector General did nothing to uphold Mr. Bergrin's constitutional rights.

10. **CoreCivic, Inc. (a/k/a Corrections Corporation of America" or "CCA") and the Northeast Ohio Correctional Center (a/k/a the "NEOCC"):** CoreCivic, Inc. is a publicly held Corporation whose stock trades on the NASDAQ stock market. CoreCivic is the entity that owns and owns and manages the Northeast Ohio Correctional Center in Youngstown, Ohio. The inmates at the Northeast Ohio Correctional Center are in the custody of the U.S. Marshals Service. Mr. Bergrin had sent approximately 36 letters and documents to the Senior Executives of CCA and to the United States Marshal (Peter Elliott), to the Warden (Laura Bedard), requesting that they intervene and to instruct the Northeast Ohio Correctional Center to administer Mr. Bergrin's *prescription heart-related medication* to him, but CCA refused to do anything to help Mr. Bergrin, and they never responded to any of Mr. Bergrin's 36 written communications.

The United States Marshals Service conspired with CCA and with the Northeast Ohio Correctional Center to violate Mr. Bergrin's constitutional rights and to cause Mr. Bergrin's death. Mr. Bergrin was incarcerated at the Northeast Ohio Correctional Center for a period of approximately twelve (12) months throughout a period of 22 months that Mr. Bergrin was incarcerated. Throughout a period of approximately six (6) months (from around July 1, 2015 through January 3, 2016), the Northeast Ohio Correctional Center refused to administer to Mr. Bergrin one of Mr. Bergrin's *prescription heart-related medications*, because the Northeast Ohio Correctional Center had received orders from Peter Elliott of the United States Marshals Service to withhold that particular medication in an effort to force Mr. Bergrin to plead guilty to a crime that never occurred. The position that the Government took was that Mr. Bergrin was going to plead guilty, or he is going to die! Mr. Bergrin sent numerous communications to many of the Senior Executives that own and control the Northeast Ohio Correctional Center

requesting that those people intervene and to instruct the medical staff at the Northeast Ohio Correctional Center to administer Mr. Bergrin's prescription medication to him, but the medical staff would not administer Mr. Bergrin's medication to him, because they were instructed to deny Mr. Bergrin his medication and any meaningful medical treatment by the United States Marshal, Peter Elliott. The United States Marshals Service then instructed the medical Staff at the NEOCC to fraudulently alter Mr. Bergrin's medical records, and there is "incontrovertible evidence" that the employees of the Northeast Ohio Correctional Center falsified Mr. Bergrin's medical records.

11. **Damon Hininger, Chief Executive Officer, CoreCivic, Inc. (a/k/a Corrections Corporation of America or CCA):** CCA is the entity that owns and controls the Northeast Ohio Correctional Center in Youngstown, Ohio. Mr. Bergrin had written numerous letters to Damon Hininger, the President and Chief Executive Officer of CCA requesting that he intervene and instruct the Northeast Ohio Correctional Center to administer Mr. Bergrin's prescription medication to Mr. Bergrin, but Damon Hininger refused to do anything to help Mr. Bergrin, nor did Damon Hininger respond to any of Mr. Bergrin's numerous communications. Damon Hininger conspired with the United States Marshals Service and with others to cause Mr. Bergrin's death. The United States Marshals Service then instructed the medical Staff at the NEOCC to fraudulently alter Mr. Bergrin's medical records, and there is incontrovertible evidence that Damon Hininger was aware that the medical staff of the Northeast Ohio Correctional Center had been instructed to deny Mr. Bergrin any meaningful medical treatment and to falsify Mr. Bergrin's medical records, which they did in-fact do.

12. **Steve Grooms, former General Counsel, CoreCivic, Inc. (a/k/a Corrections Corporation of America or CCA):** Steve Grooms left CCA in mid 2016, which is after the time period in which the Northeast Ohio Correctional Center refused to administer Mr. Bergrin's prescription medication to Mr. Bergrin. Mr. Bergrin had written numerous letters to Steve Grooms requesting that he intervene and to instruct the Northeast Ohio Correctional Center to administer to Mr. Bergrin his *prescription heart-related medication*, but Mr. Grooms refused to do anything to help Mr. Bergrin, nor did Mr. Grooms respond to any of Mr. Bergrin's numerous communications. Steve Grooms conspired with the United States Marshals Service and with others to cause Mr. Bergrin's death, because it was in CCA's financial interests to do so.

13. **Laura Bedard, Warden, Northeast Ohio Correctional Center:** Laura Bedard was the Warden at the Northeast Ohio Correctional Center for the period of time in which Mr. Bergrin was denied his *prescription heart-related medication* and denied any meaningful medical treatment, and had his medical records falsified by the medical staff. Mr. Bergrin had contacted Laura Bedard on numerous occasions to request that Mr. Bergrin is administered Mr. Bergrin's prescription medication and medically treated for his coronary problems, but Warden Bedard refused to instruct the medical staff to administer to Mr. Bergrin his prescription medication,

and Warden Bedard actually conspired with others to prevent Mr. Bergrin from receiving his prescription medication and prevented Mr. Bergrin from being administered any meaningful medical treatment. At one point in time Mr. Bergrin requested to be brought to the hospital for medical treatment because Mr. Bergrin's heart was malfunctioning, and Mr. Bergrin was suffering greatly, but Warden Bedard refused to permit Mr. Bergrin to receive any form of medical treatment, because Warden Bedard conspired with the United States Marshals Service and with others to cause Mr. Bergrin's death. Laura Bedard instructed the Medical Staff to Falsify Mr. Bergrin's Medical Records. Ms. Bedard also engaged in Civil Conspiracy and Criminal Conspiracy. Please see the attached letter to Senior Nurse, Steven Senich.

14. **Dana Hivner, Director, Health Service Administration, Northeast Ohio Correctional Center** : Dana Hivner was in charge of Health Services Administration for the Northeast Ohio Correctional Center during the period of time that Mr. Bergrin was incarcerated at the NEOCC. Mr. Bergrin had written numerous letters to Ms. Hivner requesting that she instruct the medical staff at the Northeast Ohio Correctional Center to administer to Mr. Bergrin his prescription heart-related medication, and to transfer Mr. Bergrin to the nearest hospital, but Ms. Hivner refused to help Mr. Bergrin. Ms. Hivner would respond to Mr. Bergrin's written requests in writing, but most of what Ms. Hivner had written to Mr. Bergrin was either half-truths or blatant lies. Ms. Hivner conspired with others to deny Mr. Bergrin his heart medication, to prevent Mr. Bergrin from receiving any meaningful medical treatment, to falsify Mr. Bergrin's medical records, and therefore, to cause Mr. Bergrin's death.

15. **Jason Rupeka, MD, Northeast Ohio Correctional Center:** Mr. Bergrin had sent many letters and other written requests to Dr. Rupeka requesting that he reinstate Mr. Bergrin's prescription for "Polyethylene Glycol 3350 Powder", but Dr. Rupeka refused to respond to any of Mr. Bergrin's communications. At one point in time Mr. Bergrin was able to meet with Dr. Rupeka, and at that meeting, Dr. Rupeka pretended that he hadn't received any of Mr. Bergrin's written communications, despite the fact that some of the documents had been sent Via Certified Mail. After that meeting Dr. Rupeka refused to reinstate Mr. Bergrin's prescription and Mr. Bergrin was unable to receive his prescription heart-related medication. Dr. Rupeka was instructed not to comply with Mr. Bergrin's requests, because the government was attempting to force Mr. Bergrin to plead guilty to a crime that never occurred, and the Government's philosophy was "Mr. Bergrin will plead guilty to a crime that never occurred. Dr. Rupeka committed medical malpractice and he violated the Hippocratic Oath that he took to become a medical doctor.

16. **Renee Sferra, Senior Nurse, Northeast Ohio Correctional Center:** Renee Sferra is a senior member of the medical staff at the Northeast Ohio Correctional Center. On numerous occasions, Mr. Bergrin requested that Ms. Sferra administer to Mr. Bergrin his prescription heart-related medication, but Ms. Sferra refused to do so. Ms. Sferra conspired with others to cause Mr. Bergrin's death. Mr. Bergrin then arranged for Mr. Bergrin's doctor in New York, Leonard Gold, MD, to contact Renee Sferra at the Northeast Ohio Correctional Center to

request that the medical staff administer to Mr. Bergrin his prescription heart-related medication ("Polyethylene Glycol 3350 Powder"), but Ms. Sferra refused to comply with Dr. Gold's request, which resulted in severe and permanent damage to Mr. Bergrin's heart. Ms. Sferra denied Mr. Bergrin any meaningful medical treatment and then she and others falsified Mr. Bergrin's medical records in order to cover-up the Cruel and Unusual Punishment and the numerous violations of Mr. Bergrin's constitutional rights.

17.   **Deborah Johnson, Nurse (Northeast Ohio Correctional Center ):** Nurse Johnson not only refused to administer Mr. Bergrin's prescription heart-related medication to Mr. Bergrin, but Nurse Johnson wrote in Mr. Bergrin's medical record that Mr. Bergrin was *"non-compliant"* in taking his medication, which Ms. Johnson claimed was the reason that Mr. Bergrin's medication was withheld. However, this was not truthful. Mr. Bergrin then asked Ms. Johnson how Mr. Bergrin was non-compliant, and Ms. Johnson responded to Mr. Bergrin that he was taking a greater amount of "Polyethylene Glycol 3350 Powder" than had been prescribed to Mr. Bergrin (At the time, Ms. Johnson was unaware that Mr. Bergrin did not *self-carry* the medication, and that the medication was administered to Mr. Bergrin at the Pill Line Window). Mr. Bergrin then responded to Ms. Johnson, "That's impossible, because I receive my medication at the Pill Line Window!" Ms. Johnson then thought for moment and then stated: "Okay, now I remember why they discontinued your medication. You told the nurses to fill the powder up to the top of the bottle-cap when there is a line below the bottle-cap". However, Mr. Bergrin did not tell any of the nurses at the medical staff how to administer the medication to Mr. Bergrin, and the nurses that dispense the medications to the inmates are not permitted to give the inmate what the inmate requests. The nurses are only permitted to dispense medications in accordance with the inmates/patients prescriptions, which must be specifically adhered to and as stated in the medical department's computer system. Furthermore, if Mr. Bergrin were to take a greater amount of "Polyethylene Glycol 3350 Powder" than is prescribed, Mr. Bergrin would have *severe gastrointestinal issues*, and if the Mr. Bergrin were to take a lesser amount of "Polyethylene Glycol 3350 Powder" than is prescribed, then Mr. Bergrin would then *strain his heart*, which could lead to heart failure and/or another heart attack. On February 6, 2015, Nurse Deborah Johnson falsely accused Mr. Bergrin of being *non-compliant* with Mr. Bergrin's KOP medication (medication that Mr. Bergrin self-carried), which allegation was *not* truthful. Ms. Johnson denied Mr. Bergrin any meaningful medical treatment and she then falsified Mr. Bergrin's medical records.

18.   **Steven Senich, Nurse, Northeast Ohio Correctional Center**: Please see the attached document that Mr. Bergrin sent to Steven Senich dated August 13, 2015.

19.   **Kurt Kampfer, Nurse (Northeast Ohio Correctional Center):** Nurse Kurt Kampfer violated Mr. Bergrin's constitutional rights by withholding one of his *prescription heart-related medication*s, and by denying Mr. Bergrin any meaningful medical treatment whatsoever.

**20.    Judge Dan Polster (United States District Judge):** There are too many violations of Mr. Bergrin's constitutional rights by Judge Dan Polster, and too many *crimes* that were committed by Judge Polster to list them all. On October 13, 2016, Mr. Bergrin filed a Motion entitled "Motion for Judge Dan Aaron Polster to Disqualify Himself", which includes only a small portion of the many violations of Mr. Bergrin's constitutional rights that were committed by Judge Polster. Judge Polster conspired with the Office of the U.S. Attorney and with the Office of the Federal Public Defender, and with the United States Court of Appeals for the Sixth Circuit, to keep Mr. Bergrin incarcerated and to falsely declare Mr. Bergrin "Incompetent to Stand Trial", despite knowing that Mr. Bergrin is extremely Competent to Stand Trial and despite knowing that Mr. Bergrin did not commit a crime. Judge Polster conspired with the Office of the U.S. Attorney, with the Office of the Federal Public Defender, and with the United States Court of Appeals for the Sixth Circuit, to keep Mr. Bergrin incarcerated for a period of twenty-two (22) months while Mr. Bergrin was physically abused by the U.S. Marshal's Service, by members of the Northeast Ohio Correctional Center, and by members of the Federal Bureau of Prisons, and Mr. Bergrin's constitutional rights were then violated by Judge Polster who conspired with the United States Court of Appeals for the Sixth Circuit to prevent Mr. Bergrin from overturning Judge Polster's wrongful and malicious Order, in which Judge Polster falsely stated that "Mr. Bergrin is not competent to stand trial".

Judge Polster is well aware that Mr. Bergrin is planning to bring this civil action against him, and in response, Judge Polster conspired with the United States Court of Appeals for the Sixth Circuit to deny every Motion, every Appeal, and every Petition for a Writ of Mandamus that Mr. Bergrin filed in the herein case. Judge Polster then arranged for the United States Court of Appeals for the Sixth Circuit to interfere with two (2) civil suits that Mr. Bergrin had pending in the Supreme Court of the State of New York, which Intentional Interference cost Mr. Bergrin in excess of $23 Million Dollars. Judge Polster engaged in Outrageous Government Conduct, and Denied Mr. Bergrin Bail despite Mr. Bergrin not being a danger to society, nor a flight risk. Judge Polster violated Mr. Bergrin's constitutional right to a Speedy Trial, Violated Mr. Bergrin's constitutional right to a trial, engaged in a Conspiracy to Interfere with Civil Rights, Violated Mr. Bergrin's constitutional right to Conflict-Free Counsel, Violated Mr. Bergrin's Constitutional Right to Testify in a Competency Hearing, to call witnesses in a Competency Hearing, and to present evidence in a Competency Hearing, and to question witnesses in a Competency Hearing. Judge Polster violated Mr. Bergrin's constitutional right to Conflict-free Counsel, Violated Mr. Bergrin's constitutional right to be given his prescription medications and any meaningful medical treatment, Judge Polster Intimidated and Threatened Dr. Cunic. Judge Polster engaged in Witness Tampering by threatening Dr. Cunic, Obstruction of Justice, Deprivation of Rights - Depriving person of Rights or Privileges, Violations of Due Process Rights, Excessive Detention, Abuse of Discretion, Judicial Misconduct, Intentional Infliction of Emotional Distress, Failure to Request Discovery, Obstructing, Influencing, and Impeding the Due Administration of Justice, Actual Malice, Inadequate Medical Treatment, Cruel and Unusual Punishment, Procedural Unreasonableness, Legal Malpractice, Violated the Rules of Professional Conduct, Engaged in Conduct that is prejudicial to the Administration of

179

Justice, Violated Mr. Bergrin's 8th Amendment Right to Adequate medical Care, Actual Malice, etc., etc., etc.

21. **Judge Solomon Oliver, Jr. (Chief United States District Judge, Cleveland, Ohio):** Mr. Bergrin had written several letters to Judge Oliver in which Mr. Bergrin represented evidence that Judge Polster has been repeatedly violating Mr. Bergrin's constitutional rights, and Mr. Bergrin requested that Judge Oliver intervene and remove Judge Polster from the herein case, however, Judge Oliver refused to do anything to help Mr. Bergrin, because Judge Oliver joined in Judge Polster's criminal Conspiracy, and Judge Oliver continued to violate Mr. Bergrin's due process rights and Mr. Bergrin's constitutional rights.

22. **R. Guy Cole, Chief Judge, United States Court of Appeals for the Sixth Circuit:** Judge R. Guy Cole conspired with Judge Dan Polster and with others (including, but not limited to at least eleven (11) other Judges) to knowingly and intentionally violate Mr. Bergrin's constitutional rights. Judge Polster was aware that Mr. Bergrin did not commit a crime and is Competent to Stand Trial, but Judge Polster asked his crony at the United States Court of Appeals for the Sixth Circuit, Judge R. Guy Cole, to "deny" Mr. Bergrin's Petition for a Writ of Mandamus in which Mr. Bergrin requested to be given copies of Mr. Bergrin's "Competency Reports" which reports state that "Mr. Bergrin is Competent to Stand Trial". The United States Court of Appeals for the Sixth Circuit is well aware that if Mr. Bergrin did not receive a copy of his Competency Evaluation Reports, that Mr. Bergrin cannot overturn Judge Polster's improper Order in which Judge Polster violated Mr. Bergrin's constitutional rights by declaring Mr. Bergrin to be *Incompetent to Stand Trial*, when Judge Polster knew for a fact that Mr. Bergrin was Competent to Stand Trial.

Mr. Bergrin's Competency Reports were sent from Dr. Cunic and FMC-Butner to Judge Polster, to the Office of the U.S. Attorney, and to the Office of the Federal Public Defender on or about February 26, 2016 (the interim report) and on or about May 8, 2016 (the second report) in accordance with the Order that was issued by Judge Polster dated December 10, 2015, but the Judge Cole and the aforementioned defendants colluded to prevent Mr. Bergrin from receiving a copy of Mr. Bergrin's Competency Reports. Not only did the aforementioned parties and the United States Court of Appeals for the Sixth Circuit conspire to prevent Mr. Bergrin from receiving "Mr. Bergrin's Competency Reports, which Mr. Bergrin has a constitutional right to receive", but by doing so, the United States Court of Appeals for the Sixth Circuit prevented Mr. Bergrin from being able to file a competent appeal of Judge Polster's malicious and improper Decision and Order in which he falsely declared Mr. Bergrin to be "Incompetent to Stand Trial". The malicious and improper Order needed to be overturned in order for Mr. Bergrin to bring a civil suit against those that violated Mr. Bergrin's constitutional rights, and because the Order destroyed Mr. Bergrin's reputation, Mr. Bergrin's credibility, and Mr. Bergrin's livelihood.

The United States District Court and the United States Court of Appeals for the Sixth Circuit entered into a criminal conspiracy that has been pervasive throughout the herein case. The Judges in the United States Court of Appeals for the Sixth Circuit were unwilling to issue rulings that have any correlation to the facts or to the law. The Judges in the United States Court of Appeals for the Sixth Circuit have engaged in a criminal conspiracy in which to violate Mr. Bergrin's constitutional rights by denying each and every one of Mr. Bergrin's Motions, Appeals, and Petitions for Writs of Mandamus. The United States Court of Appeals for the Sixth Circuit denied every Motion, Appeal, and Petition for a Writ of Mandamus that was filed by Mr. Bergrin. Judge Cole's engaged in Judicial Misconduct. Judge Cole was aware that Mr. Bergrin had not committed a crime, but he permitted Mr. Bergrin to remain incarcerated for 22 months, knowing that Mr. Bergrin did not commit a crime.

Judge R. Guy Cole recently contacted Judge Robert R. Reed of the Supreme Court of the State of New York and requested that Judge Reed throw Mr. Bergrin under the proverbial bus by holding a Competency Hearing and declaring Mr. Bergrin *Incompetent to bring a civil suit*, and to deny Mr. Bergrin the monies that Mr. Bergrin was entitled to receive, which Judge Robert Reed ultimately agreed to do, in order to support his corrupt colleague from the Sixth Circuit. Judge R. Guy Cole brought Judge Robert R. Reed into the criminal conspiracy, which cost Mr. Bergrin in excess of $23 million as a result of the Intentional Interference and the Obstruction of Justice that was committed by Judge R. Guy Cole, with the assistance of Brian McDonough, Judge Dan Polster, and Dr. Kenneth Kelner's attorney, Robert Costello, Esq. (a former "Assistant U.S. Attorney"), but unfortunately, that wasn't the only civil suit that Mr. Bergrin had pending before Judge Robert R. Reed, and Judge Reed also threw Mr. Bergrin under the proverbial bus in that second civil litigation as well, which was a case against Mr. Bergrin's Landlord who was coerced by the FBI to clean-out Mr. Bergrin's apartment, despite knowing that Mr. Bergrin had extremely valuable objects and artwork in his apartment.

23.  **Senior Judge Richard F. Suhrheinrich** - United States Court of Appeals for the Sixth Circuit knowingly and intentionally violated Mr. Bergrin's constitutional rights by entering into the criminal conspiracy in which to deny each and every one of Mr. Bergrin's Motions, Appeals, and Petitions for Writs of Mandamus and engaged in Judicial Misconduct.

24.  **Judge Deborah L. Cook** - United States Court of Appeals for the Sixth Circuit knowingly and intentionally violated Mr. Bergrin's constitutional rights by entering into the criminal conspiracy in which to deny each and every one of Mr. Bergrin's Motions, Appeals, and Petitions for Writs of Mandamus and engaged in Judicial Misconduct.

25.  **Judge Jane Branstetter Stranch-** United States Court of Appeals for the Sixth Circuit knowingly and intentionally violated Mr. Bergrin's constitutional rights by entering into the criminal conspiracy in which to deny each and every one of Mr. Bergrin's Motions, Appeals, and Petitions for Writs of Mandamus and engaged in Judicial Misconduct.

On September 16, 2016 Judges Suhrheinrich, Cook, and Stranch of the United States Court of Appeals for the Sixth Circuit issued an Order pertaining to case number 16-3891 in which their flawed Order stated "This Court Lacks Jurisdiction Over The Appeal". However, the court did not lack jurisdiction over the appeal because Mr. Bergrin had "a liberty interest at stake", and when a defendant files an appeal where a liberty interest is at stake, the United States Court of Appeals for the Sixth Circuit does in-fact have jurisdiction. It is painfully obvious that none of the Judges ever read Mr. Bergrin's eighty-five page legal brief (including exhibits). As a result of the cronyism and the corruption that exists in the United States Court of Appeals for the Sixth Circuit. Mr. Bergrin's appeal of Judge Dan Polster's intentionally flawed decision was not granted.

The Judges of the United States Court of Appeals for the Sixth Circuit did not respond to anything that was written in the 85-page document in which Mr. Bergrin requested that Judge Polster be disqualified for numerous blatant violations of Plaintiff's constitutional rights. Judges Suhrheinrich, Cook, and Stranch of the United States Court of Appeals for the Sixth Circuit *conspired* with Judge Cole and with Judge Polster to deny all of Mr. Bergrin's Motions, Appeals, and Petitions for Writs of Mandamus.

26.    **Judge Eric L. Clay** - United States Court of Appeals for the Sixth Circuit knowingly and intentionally violated Mr. Bergrin's constitutional rights by entering into the criminal conspiracy in which to deny each and every one of Mr. Bergrin's Motions, Appeals, and Petitions for Writs of Mandamus and engaged in Judicial Misconduct.

27.    **Judge Karen Nelson Moore** - United States Court of Appeals for the Sixth Circuit knowingly and intentionally violated Mr. Bergrin's constitutional rights by entering into the criminal conspiracy in which to deny each and every one of Mr. Bergrin's Motions, Appeals, and Petitions for Writs of Mandamus and engaged in Judicial Misconduct.

28.    **Judge Bernice B. Donald** - United States Court of Appeals for the Sixth Circuit knowingly and intentionally violated Mr. Bergrin's constitutional rights by entering into the criminal conspiracy in which to deny each and every one of Mr. Bergrin's Motions, Appeals, and Petitions for Writs of Mandamus and engaged in Judicial Misconduct.

29.    **Judge Jeffrey S. Sutton** - United States Court of Appeals for the Sixth Circuit knowingly and intentionally violated Mr. Bergrin's constitutional rights by entering into the criminal conspiracy in which to deny each and every one of Mr. Bergrin's Motions, Appeals, and Petitions for Writs of Mandamus and engaged in Judicial Misconduct.

30. **Senior Judge Damon J. Keith** - United States Court of Appeals for the Sixth Circuit knowingly and intentionally violated Mr. Bergrin's constitutional rights by entering into the criminal conspiracy in which to deny each and every one of Mr. Bergrin's Motions, Appeals, and Petitions for Writs of Mandamus and engaged in Judicial Misconduct.

31. **Senior Judge Ronald Lee Gilman** - United States Court of Appeals for the Sixth Circuit knowingly and intentionally violated Mr. Bergrin's constitutional rights by entering into the criminal conspiracy in which to deny each and every one of Mr. Bergrin's Motions, Appeals, and Petitions for Writs of Mandamus and engaged in Judicial Misconduct.

32. **Judge Richard Allen Griffin** - United States Court of Appeals for the Sixth Circuit knowingly and intentionally violated Mr. Bergrin's constitutional rights by entering into the criminal conspiracy in which to deny each and every one of Mr. Bergrin's Motions, Appeals, and Petitions for Writs of Mandamus and engaged in Judicial Misconduct.

33. **George Walker Schmedlen, Esq., Ph.D:** George Schmedlen is a Liar-for-Hire with a Ph.D who repeatedly violated Mr. Bergrin's constitutional rights by committing medical malpractice, fraud, obstruction of justice, and perjury, by testifying falsely at Mr. Bergrin's Competency Hearing that he believes that Mr. Bergrin is "Incompetent to Stand Trial". Edward Bryan, Esq. who had been disqualified from representing Mr. Bergrin in the bogus criminal case was *under FBI criminal investigation* and *was about to be indicted*, and in order to not be indicted, Edward Bryan retained George Schmedlen and Edward Bryan worked hand-in-hand with the Assistant U.S. Attorneys, and Edward Bryan retained and conspired with Dr. Schmedlen to testify falsely at Mr. Bergrin's Competency Hearing. Dr. Schmedlen committed medical malpractice, fraud, obstruction of justice, and perjury, by testifying falsely at Mr. Bergrin's Competency Hearing, at which hearing Judge Dan Polster violated Mr. Bergrin's constitutional rights throughout the hearing by preventing Mr. Bergrin from partaking in the hearing. Dr. Schmedlen entered into the criminal conspiracy through Edward Bryan, Esq.

34. **United States Marshals Service:** Many unknown members of the United States Marshals Service conspired with the Federal Bureau of Prisons, with the Northeast Ohio Correctional Center, with Corrections Corporation of America, with the FBI, with Judge Polster, with the Office of the Federal Public Defender, and with others to cause Mr. Bergrin's death. First the U.S. Marshals Service conspired with the aforementioned entities to prevent Mr. Bergrin from being able to receive Mr. Bergrin's prescription heart-related medication. The U.S. Marshals Service was aware that Mr. Bergrin had become extremely ill and would eventually die as a result of Mr. Bergrin not receiving his prescription heart-related medication, because of the numerous letters that Mr. Bergrin had written to the U.S. Marshals Service, and because the U.S. Marshals Service had access to all of Mr. Bergrin's medical records at the Northeast Ohio Correctional Center. Then the U.S. Marshals Service attempted to murder Mr. Bergrin by putting Mr. Bergrin in a freezer for seven (7) hours, which caused Mr. Bergrin to get

183

Hypothermia, and which almost caused Mr. Bergrin's death, and the death of another inmate, Kevin Slater, who also got Hypothermia, resulting in a severe head injury as a result of Mr. Slater becoming unconscious and falling face first onto the cement floor of the freezer. The following violations of Mr. Bergrin's constitutional rights were committed by the U.S. Marshals Service: Cruel and Unusual Punishment, Outrageous Government Conduct, Conspiracy to Interfere with Civil Rights, Failure to Hospitalize Inmate, Denial of medical treatment, Deprivation of Rights, Intentional Infliction of Emotional Distress, Conspiracy To Commit Medical Malpractice, Inadequate Medical Treatment, Excessive Force – Too Tight Handcuffs, Sleep Deprivation, Procedural Unreasonableness, Engaged in Conduct that is Prejudicial to the Administration of Justice, Violated Mr. Bergrin's 8th Amendment Right to Adequate medical Care, instructed the NEOCC to falsify Mr. Bergrin's medical records, Actual Malice, etc., etc., etc..

35.    **U.S. Marshal, Peter Elliott, Cleveland, Ohio:** U.S. Marshal Peter Elliott is a "Sadistic Sociopath" that runs the U.S. Marshals Service in Cleveland, Ohio and is the person that instructed the Northeast Ohio Correctional Center and Corrections Corporation of America to withhold Mr. Bergrin's *prescription heart-related medication* so that Mr. Bergrin would either plead guilty or die, and Peter Elliot is the person that instructed the U.S. Marshals Service to keep Mr. Bergrin in a sub-zero freezer for seven hours in Cleveland, which caused Mr. Bergrin to get Hypothermia, and which caused Kevin Slater to get Hypothermia resulting in a severe head trauma. Peter Elliott was aware that Mr. Bergrin was extremely ill as a result of not receiving his prescription medication, because of the numerous letters that Mr. Bergrin had written to Peter Elliott and to numerous others, and because Mr. Elliott had access to all of Mr. Bergrin's medical records at the Northeast Ohio Correctional Center, and because all of the inmates at the NEOCC are in the custody of Peter Elliott. Peter Elliott does not generally get his hands dirty, because he has his henchmen do his dirty work. When Mr. Bergrin was transported from the Northeast Ohio Correctional Center to the Federal Medical Center in Butner, North Carolina on or about January 3, 2016, the U.S. Marshals Service forced Mr. Bergrin to endure sleep-deprivation by not permitting Mr. Bergrin to sleep for a period of 72+ hours, and when Mr. Bergrin attempted to nod-off in the airplane, Mr. Bergrin was kicked by one of the U.S. Air Marshals hard enough that Mr. Bergrin's entire body went into shock and caused Mr. Bergrin to feel nauseous. Mr. Bergrin was left with a hematoma that lasted for at least 1 month. Once Mr. Bergrin arrived at FMC-Butner, Mr. Bergrin was then forced into a freezer for a period of 24 hours, which almost caused Mr. Bergrin's death, and which left Mr. Bergrin with severe damage to his heart. Cruel and Unusual Punishment, Harassment, Outrageous Government Conduct, Conspiracy to Interfere with Civil Rights, Denial of Medical Treatment, Obstruction of Justice, Deprivation of Rights, Intentional Infliction of Emotional Distress, Obstructing, Influencing, and Impeding the Due Administration of Justice, Actual Malice, Excessive Force – Too Tight Handcuffs, Inadequate medical Treatment, Cruel and Unusual Punishment – Failure to provide Adequate Medical Treatment, Ice- Cold Freezer = Torture Chamber, Sleep Deprivation, Breach of Fiduciary Duty, Engaged in Conduct that is prejudicial to the Administration of Justice, etc., etc., etc.

36.    **John from the United States Marshals Service, Cleveland, Ohio:** John is one of Peter Elliott's henchmen. Mr. Bergrin does not know John's last name. John is a stocky 50ish aged while male who every time Mr. Bergrin was brought to the courthouse, John intentionally put the leg irons, hand cuffs and the waist-chain on Mr. Bergrin's body "extremely tight" so that it would cause Mr. Bergrin extreme pain and discomfort. During one trip to the courthouse, John wrapped the chain around Mr. Bergrin's waist so tight that Mr. Bergrin could hardly breathe and Mr. Bergrin's back started hurting, and when Mr. Bergrin complained that he couldn't breathe and John responded "It's not tight", and in order to prove that the chain wasn't too tight, John then attempted to slide his fingers between the chain and Mr. Bergrin's body, but he couldn't even get one finger between the chain and Mr. Bergrin's body. Despite being in excruciating pain and not able to breathe, John refused to loosen the chain. As soon as Mr. Bergrin got into the van, the driver of the van apologized to Mr. Bergrin and told Mr. Bergrin that "Unfortunately, I am not permitted to loosen the chains until we arrive at the Northeast Ohio Correctional Center". The driver saw that Mr. Bergrin was having trouble breathing and that Mr. Bergrin was in severe pain and he drove extremely quickly to their destination, which still took at least one hour to arrive at the Northeast Ohio Correctional Center in Youngstown, Ohio. As soon as Mr. Bergrin arrived at the Northeast Ohio Correctional Center in Youngstown, Ohio, the driver of the van told the corrections officer "Get The Chains Off Bergrin Immediately!" After they took the chains off of Mr. Bergrin they lifted Mr. Bergrin's shirt and suggested that Mr. Bergrin go straight to the medical office, but the medical staff refused to provide any medical treatment to Mr. Bergrin. It took approximately two weeks for the marks on Mr. Bergrin's body that were made by the tight chain around Mr. Bergrin's waist to disappear, and approximately 2 weeks for the pain to dissipate. The other inmates were not mistreated.

37.    **Federal Bureau of Prisons, Butner, North Carolina:** Upon Mr. Bergrin's arrival at the Federal Medical Center in Butner, North Carolina, Mr. Bergrin was put into an "Ice Cold and Filthy Solitary-confinement Freezer" that could only be described as "A Torture Chamber". The Freezer had freezing cold air being pumped into the Freezer, and the Freezer had illuminated-bright lights, which could have lit-up an entire city, and which lights were blinding Mr. Bergrin's eyes and causing Mr. Bergrin's eyes much pain and discomfort, and the bed in the Freezer consisted of a block of concrete with "a one-inch thick turquoise-colored vinyl-mattress that had human feces all over it". It was so cold in the Freezer that numerous times during the 24-hour period Mr. Bergrin believed that he was going to die. A corrections officer would come by every few hours to check if Mr. Bergrin was still alive. Mr. Bergrin had endured sleep deprivation for 3 nights and then 24-hours of ice-cold torture. After finally being dragged out of the torture chamber semi-conscious, Mr. Bergrin experienced severe chest pain, severe neck pain, shortness of breath, and severe eye pain. Mr. Bergrin was then deprived an appointment with the eye doctor for a period of six weeks. The eye doctor at FMC-Butner diagnosed Mr. Bergrin as having Mr. Bergrin's "tear ducts blown-out as a result of Mr. Bergrin's eyes freezing for a period of 24-hours". For the next eleven (11) months that Mr.

185

Bergrin was incarcerated, and since that time, Mr. Bergrin must apply hot mineral oil compresses on his eyes every morning and every evening in order to alleviate pain and discomfort. Mr. Bergrin's diagnosis is in his medical records, unless the Federal Bureau of Prisons also falsified Mr. Bergrin's medical records.

38.    **Warden J.C. Holland, Federal Medical Center, Butner, North Carolina:** Upon Mr. Bergrin's arrival at the Federal Medical Center in Butner, North Carolina, Mr. Bergrin was put into an "Ice Cold and Filthy Solitary-confinement Freezer" for a period of twenty-four (24) hours. Warden J.C. Holland conspired with the United States Marshal – Peter Elliott, to cause Mr. Bergrin's death. Judge Polster then conspired with Warden J.C. Holland to keep Mr. Bergrin incarcerated at FMC-Butner, despite the fact that Dr. Tanya Cunic had found Mr. Bergrin "Competent to Stand Trial" and Warden J.C. Holland conspired with Judge Polster to then pressure Dr. Cunic and to instruct Dr. Cunic to declare Mr. Bergrin "Incompetent to Stand Trial", despite Warden Holland knowing that Mr. Bergrin was in-fact competent.

39.    **Steven Dettlebach, Esq., United States Attorney, Northern District of Ohio:** The corrupt prosecutors in this case, Brian McDonough, Esq. and Matthew Shepherd, Esq. prosecuted the criminal case against Mr. Bergrin, knowing full well that Mr. Bergrin did not commit a crime, and knowing full well that no crime had ever occurred in the herein case. The Assistant U.S. Attorneys did to Mr. Bergrin what Mike Nifong did to the innocent students in the infamous Duke Rape Case, but unlike Mr. Bergrin, the Defendants' in the Duke Rape Case were not denied bail, they were not incarcerated for 22-months, they were not abused or tortured, and they did not survive 3 near-death experiences in which the government attempted to murder them. As a result of the cronyism and the corruption in the Sixth Circuit, had Duke University been located in Ohio, there would be 3 innocent young men in prison today or they might be dead. Brian McDonough, Esq. and Matthew Shepherd, Esq. deserve to be disbarred, they deserve to be charged criminally, they deserve to be imprisoned, and they deserve the same treatment that Mr. Bergrin endured throughout the 22-months of Mr. Bergrin's incarceration. The Office of the United States Attorney conspired with Judge Polster and with the Office of the Federal Public Defender to keep Mr. Bergrin incarcerated in an effort to pressure Mr. Bergrin to plead guilty to a crime that never occurred. The Assistant U.S. Attorneys engaged in Prosecutorial Misconduct, Cruel and Unusual Punishment, Malicious Prosecution, Actual Vindictiveness – Refusal to take the case to trial – Produced a flawed and inaccurate document to prevent Mr. Bergrin from being given Bail - Argued Against Mr. Bergrin receiving Bail that Mr. Bergrin supported his cousin, Selective Prosecution, Outrageous Government Conduct, Fabrication of Evidence, Obstruction of Justice, Violations of Due Process Rights, Excessive Detention, Violations of the Attorney-Client Privilege, Brady Violations – The Withholding of Material Evidence by the Government, Intentional Infliction of Emotional Distress, Refusal to Present Evidence, Failure to Produce Discovery, Obstructing, Influencing, and Impeding the Due Administration of Justice, Action for neglect to prevent conspiracy, Actual malice, Counsel Breached Its Fiduciary Duty, Procedural Unreasonableness, Violations of Article 3500 "Demands for Production of Statements and Reports of Witnesses", Legal Malpractice,

Violated the Rules of Professional Conduct, Engaged in Conduct that is prejudicial to the Administration of Justice, etc., etc., etc.

40.   **Brian McDonough, Esq., Assistant United States Attorney:** Prosecutorial Misconduct. The corrupt prosecutors in this case, Brian McDonough, Esq. and Matthew Shepherd, Esq. prosecuted the criminal case against Mr. Bergrin, knowing full well that Mr. Bergrin did not commit a crime, and knowing full well that no crime had ever occurred in the herein case. These Assistant U.S. Attorneys did to Mr. Bergrin what Mike Nifong did to the innocent students in the infamous Duke Rape Case, except the Defendants' in the Duke Rape Case were not incarcerated for 22-months, they were not abused or tortured, and they did not survive 3 near-death experiences in which the government attempted to murder them. As a result of the cronyism and the corruption in the Sixth Circuit, had Duke University been located in Ohio, there would be 3 innocent young men in prison today or dead. Brian McDonough, Esq. and Matthew Shepherd, Esq. deserve to be disbarred and they deserve to be charged criminally, they deserve to be imprisoned. They deserve the same treatment that Mr. Bergrin endured throughout the 22-months of Mr. Bergrin's incarceration. The prosecutors should be charged with Conspiracy to Commit Murder.

In cataloging the ways the case is unusual, I put near the top of the list the obvious lack of prosecutorial merit. Obvious lack of merit likely was a function of the fact that no crime occurred, as well as Mr. Bergrin's ability to defend him-self *pro-se*, which no doubt also contributed to Brian McDonough's violation of the prosecutor's duty to provide potentially exculpatory evidence to the defense. The clarity of proof of Brian McDonough's knowledge and intent in violating his duty to provide exculpatory information is indeed unusual. The fact that Assistant U.S. Attorney, Brian McDonough himself made statements to the media and that they were strongly positive assertions of guilt had a profound impact on the general public and on Mr. Bergrin's reputation. These statements had even more power initially because such inaccurate statements made its way to the worldwide web and the Internet News Networks, and such statements landed on receptive ears, despite none of the allegations against Mr. Bergrin having even a scintilla of truthfulness.

The Office of the United States Attorney conspired with Judge Polster and with the Office of the Federal Public Defender to keep Mr. Bergrin incarcerated in an effort to pressure Mr. Bergrin to plead guilty to a crime that never occurred. Malicious Prosecution, Actual Vindictiveness – Refusal to take the case to trial – Produced a flawed and inaccurate document to prevent Mr. Bergrin from being given Bail - Argued Against Bail by stating that Mr. Bergrin supported his cousin, Selective Prosecution, Outrageous Government Conduct, Fabrication of Evidence, Obstruction of Justice, Violations of Due Process Rights, Excessive Detention, Violations of the Attorney-Client Privilege, Brady Violations – The Withholding of Material Evidence by the Government, Intentional Infliction of Emotional Distress, Refusal to present evidence, Failure to Produce Discovery, Obstructing, Influencing, and Impeding the Due

187

Administration of Justice, Action for neglect to prevent conspiracy, Actual malice, Counsel Breached Fiduciary Duty, Procedural Unreasonableness, Violations of Article 3500 "Demands for Production of Statements and Reports of Witnesses", Breach of Fiduciary Duty, Legal Malpractice, Violated the Rules of Professional Conduct, Engaged in Conduct that is prejudicial to the Administration of Justice, and Prosecutorial Misconduct.

41. **Matthew Shepherd, Esq., Assistant United States Attorney**: Prosecutorial Misconduct. The corrupt prosecutors in this case, Brian McDonough, Esq. and Matthew Shepherd, Esq. prosecuted the criminal case against Mr. Bergrin, knowing full well that Mr. Bergrin did not commit a crime, and knowing full well that no crime had ever occurred in the herein case. These Assistant U.S. Attorneys did to Mr. Bergrin what Mike Nifong did to the innocent students in the infamous Duke Rape Case, except the Defendants' in the Duke Rape Case were not incarcerated for 22-months, they were not abused or tortured, and they did not survive 3 near-death experiences in which the government attempted to murder them. As a result of the cronyism and the corruption in the Sixth Circuit, had Duke University been located in Ohio, there would be 3 innocent young men in prison today. Brian McDonough, Esq. and Matthew Shepherd, Esq. deserve to be disbarred, they deserve to be sued by Mr. Bergrin in a civil action, they deserve to be charged criminally, they deserve to be imprisoned, and they deserve the same treatment that Mr. Bergrin endured throughout the 22-months of Mr. Bergrin's incarceration. The prosecutors should be charged with Conspiracy to Commit Murder.

The Office of the United States Attorney conspired with Judge Polster and with the Office of the Federal Public Defender to keep Mr. Bergrin incarcerated in an effort to pressure Mr. Bergrin to plead guilty to a crime that never occurred. Malicious Prosecution, Actual Vindictiveness – Refusal to take the case to trial – Produced a flawed and inaccurate document to prevent Mr. Bergrin from being given Bail - Argued Against Bail because Mr. Bergrin supported his cousin, Selective Prosecution, Outrageous Government Conduct, Fabrication of Evidence, Obstruction of Justice, Violations of Due Process Rights, Excessive Detention, Violations of the Attorney-Client Privilege, Brady Violations – The Withholding of Material Evidence by the Government, Intentional Infliction of Emotional Distress, Refusal to present evidence, Failure to Produce Discovery, Obstructing, Influencing, and Impeding the Due Administration of Justice, Action for neglect to prevent conspiracy, Actual malice, Counsel Breached Fiduciary Duty, Procedural Unreasonableness, Violations of Article 3500 "Demands for Production of Statements and Reports of Witnesses", Breach of Fiduciary Duty, Legal Malpractice, Violated the Rules of Professional Conduct, Engaged in Conduct that is prejudicial to the Administration of Justice, and Prosecutorial Misconduct.

42. **Office of the Federal Public Defender:** There are too many violations of Mr. Bergrin's constitutional rights by the Office of the Federal Public Defender to list them all. Mr. Bergrin therefore draw your attention to the document dated May 25, 2016 and entitled "Motion for Immediate Removal of Mr. Bergrin's Counsel due to Counsel engaging in numerous "Actual

Conflicts of Interest" and numerous "Violations of Mr. Bergrin's Constitutional Rights" resulting in "Ineffective Assistance of Counsel". Mr. Bergrin filed nine (9) motions to remove such conflicted and ineffective counsel, but Judge Polster had colluded with the Office of the United States Attorney to deny all of Mr. Bergrin's motions and appeals. The members of the Office of the Federal Public Defender entered into a criminal conspiracy to violate Mr. Bergrin's constitutional rights with Judge Dan Polster and with the Office of the U.S. Attorney, which is a crime.

43. **Dennis Terez, Esq., Federal Public Defender, Cleveland, Ohio** There are too many violations of Mr. Bergrin's constitutional rights by Dennis Terez, Esq. to list them all. Mr. Bergrin therefore draws your attention to the document dated May 25, 2016 and entitled "Motion for Immediate Removal of Mr. Bergrin's Counsel due to Counsel engaging in numerous "Actual Conflicts of Interest" and numerous "Violations of Mr. Bergrin's Constitutional Rights", resulting in "Ineffective Assistance of Counsel". Despite Mr. Terez knowing that the Office of the Federal Public Defender had a Conflict of Interest and was not permitted to represent Mr. Bergrin, Mr. Terez refused to disqualify the Office of the Federal Public Defender from the herein case. Despite Mr. Terez knowing that Mr. Bergrin had not committed a crime, Mr. Terez conspired with others to keep Mr. Bergrin incarcerated and to cause Mr. Bergrin's death. The members of the Office of the Federal Public Defender entered into a criminal conspiracy to violate Mr. Bergrin's constitutional rights with Judge Dan Polster and with the Office of the U.S. Attorney, which is a crime.

44. **Carolyn Kucharski, Esq., Assistant Federal Public Defender:** There are too many violations of Mr. Bergrin's constitutional rights by Carolyn Kucharski, Esq. to list them all. Mr. Bergrin therefore draw your attention to the document dated May 25, 2016 and entitled "Motion for Immediate Removal of Mr. Bergrin's Counsel due to Counsel engaging in numerous "Actual Conflicts of Interest" and numerous "Violations of Mr. Bergrin's Constitutional Rights", resulting in "Ineffective Assistance of Counsel". Despite Ms. Kucharski knowing that the Office of the Federal Public Defender had a Conflict of Interest and was not permitted to represent Mr. Bergrin, Ms. Kucharski refused to disqualify herself from the herein case. However, after Ms. Kucharski betrayed Mr. Bergrin and engaged in an "Actual Conflict of Interest", Ms. Kucharski was disqualified and removed from the case by the Magistrate Judge. The members of the Office of the Federal Public Defender entered into a criminal conspiracy to violate Mr. Bergrin's constitutional rights with Judge Dan Polster and with the Office of the U.S. Attorney, which is a crime. This was not only a case of Ineffective Assistance of Counsel, but it was substantially worse than that. It was a case in which the Office of the United States Attorney violated Mr. Bergrin's constitutional rights by entering into a criminal conspiracy with those that were representing Mr. Bergrin.