UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Case No.  19 CV 9681.

## FIRST AMENDED VERIFIED COMPLAINT

**Jury Trial Demanded**

RONALD A. BERGRIN,

*Plaintiff,*

-v-

UNITED STATES OF AMERICA

and

UNITED STATES DEPARTMENT OF JUSTICE
Washington, DC 20535,

and

FEDERAL BUREAU OF INVESTIGATION,
Washington, DC 20535,

and

JAMES COMEY, JR.,
individually and in his
capacity as former Director of the
Federal Bureau of Investigation,
Washington, DC 20505,

and

AARON T. FORD,
individually and in his
capacity as former Director of the
Federal Bureau of Investigation
Newark, NJ 07102,

and



SHAWN BROKOS,
individually and in her
capacity as Special Agent,
Federal Bureau of Investigation
Pittsburgh, PA 15203,

and

STEVEN CLINE,
individually and in his
capacity as IRS/Special Agent,
Federal Bureau of Investigation,
Newark New Jersey 07102,

and

"JOHN/JANE DOE",
individually and in his/her
capacity as Special Agents,
Federal Bureau of Investigation,
Newark, New Jersey 07102,

and

PAUL FISHMAN,
individually and in his
capacity as former United States Attorney,
United States Department of Justice,
Newark, New Jersey 07102,

and

OFFICE OF THE INSPECTOR GENERAL
U.S. Department of Justice
Washington, DC 20505,

and

OFFICE OF THE ATTORNEY GENERAL
Washington, DC 20505,

and

UNITED STATES MARSHALS SERVICE
Cleveland, Ohio

and

PETER ELLIOTT,
individually and in his
capacity as United States Marshal,
United States Marshals Service
Cleveland, Ohio

and

"JOHN DOE",
United States Marshals Service,
Cleveland, Ohio,

and

"JOHN DOE",
United States Marshals Service,
Butner, North Carolina,

and

CORECIVIC, INC.
(Formerly known as Corrections Corporation of America)
Brentwood, TN 37027

and

DAMON HININGER,
individually and in his
capacity as Chief Executive Officer, CoreCivic, Inc.
(Formerly known as Corrections Corporation of America)
Brentwood, TN 37027

and

STEVEN GROOMS
individually and in his
capacity as former General Counsel, CoreCivic, Inc.
(Formerly known as Corrections Corporation of America)
Brentwood, TN 37027

and

NORTHEAST OHIO CORRECTIONAL CENTER
Youngstown, Ohio

and

3

LAURA BEDARD
individually and in her capacity as Warden,
Northeast Ohio Correctional Center
Youngstown, Ohio

and

DANA HIVNER,
individually and in her
capacity as Health Services Administrator,
Northeast Ohio Correctional Center
Youngstown, Ohio

and

JASON RUPEKA, STEVEN SENICH, RENEE SFERRA,
KURT KAMPFER, DEBORAH JOHNSON, ARLENE GLASS,
individually and in his/her capacity as
members of the medical staff,
Northeast Ohio Correctional Center
Youngstown, Ohio

and

FEDERAL BUREAU OF PRISONS
Butner, North Carolina

and

J.C. HOLLAND,
individually and in his capacity as Warden,
Federal Medical Center
Butner, North Carolina

and

OFFICE OF THE UNITED STATES ATTORNEY
Cleveland, Ohio

and

STEVEN DETTLEBACH,
individually and in his capacity as
former United States Attorney
Cleveland, Ohio

and

4

BRIAN MCDONOUGH,
individually and in his capacity as
Assistant United States Attorney
Cleveland, Ohio

and

MATTHEW SHEPHERD
individually and in his capacity as
Assistant United States Attorney
Cleveland, Ohio

and

OFFICE OF THE FEDERAL PUBLIC DEFENDER
Cleveland, Ohio

and

DENNIS TEREZ,
individually and in his capacity as
former Federal Public Defender,
Cleveland, Ohio

and

EDWARD BRYAN,
individually and in his capacity as
Assistant Federal Public Defender,
Cleveland, Ohio

and

CLAIRE CURTIS,
individually and in her capacity as
Assistant Federal Public Defender,
Cleveland, Ohio

and

CAROLYN KUCHARSKI,
individually and in her capacity as
Assistant Federal Public Defender,
Cleveland, Ohio

and

STEVEN R. JAEGER,
individually and in his capacity as
court-appointed CJA Counsel,
Erlanger, Kentucky 41018

and

GARY W. CRIM,
individually and in his capacity as
court-appointed CJA Counsel,
Dayton, Ohio 45406

and

GEORGE W. SCHMEDLEN,
individually and in his capacity as
court-appointed expert witness,
Shaker Heights, Ohio 44120

and

DAN POLSTER
individually and in his capacity as
District Court Judge individually
Cleveland, Ohio

and

R. GUY COLE
individually and in his capacity as
Chief Judge, United States Court of Appeals for the Sixth Circuit
Cincinnati, Ohio

and

ERIC L. CLAY,
DAMON J. KEITH,
DEBORAH L. COOK,
JEFFREY S. SUTTON,
BERNICE B. DONALD,
RONALD LEE GILMAN,
KAREN NELSON MOORE,
RICHARD ALLEN GRIFFIN,
RICHARD F. SUHRHEINRICH,
JANE BRANSTETTER STRANCH,
individually and in his/her capacity as Judge,
United States Court of Appeals for the Sixth Circuit
Cincinnati, Ohio

6

and

SOLOMON OLIVER, JR.
individually and in his capacity as
Chief United States District Judge,
Cleveland, Ohio

and

ROBERT R. REED
individually and in his capacity as Judge,
Supreme Court of the State of New York
New York, New York

*Defendants.*

_____

# C O M P L A I N T

(Civil Rights Violations; Constitutional Violations; Constitutional Torts;)

_____

COMES NOW Plaintiff, RONALD BERGRIN, by and through as a pro-se litigant, hereby files his Complaint against all Defendants referenced above:

## INTRODUCTION

1. Plaintiff Ronald Bergrin believes that the United States government remains "a government of laws, and not of men," *Marbury v. Madison*, 5 U.S. 137, 163 (1803), and has brought this civil suit primarily for three (3) reasons: First, to obtain the Justice that Mr. Bergrin is entitled to receive under the Constitution of the United States of America. Second, to prevent other citizens of the United States from suffering the same or similar victimization that Mr. Bergrin suffered by members of the Judiciary and by members of the United States Department of Justice, and by America's privately-owned prison systems, and Lastly, to hopefully bring change to the Judiciary and to the United States Department of Justice. Mr. Bergrin believes that the United States of America has the best judicial system in the world, and that it can be improved upon, and that it should be improved upon, and that it must be improved upon. Plaintiff, Ronald Bergrin, regrets having to file this lawsuit against the United States of America because Mr. Bergrin did not want to embarrass the United States of America by revealing to its citizens the misdeeds of those at the highest levels of government who repeatedly and blatantly violated Mr. Bergrin's constitutional rights and committed numerous crimes against Mr. Bergrin in the herein case.

2. Plaintiff Ronald Bergrin did not bring the above-named Judges into the herein case as Defendants. The Judges who engaged in criminal behavior in this case are solely responsible for bringing themselves into this case. District Court Judge Dan Polster brought Judge R. Guy Cole into the herein case in an effort to conceal the numerous *crimes* that District Court Judge Dan Poster and others had engaged in. Judge R. Guy Cole, Chief Judge, United States Court of Appeals for the Sixth Circuit, then brought his Associate Judges into the criminal conspiracy, specifically to violate Mr. Bergrin's constitutional rights, in an effort to protect Judge Dan Polster from being removed from the bench, disbarred, and possibly charged criminally. Throughout the pendency of this case, and as recently as November 16, 2019, there were more than three hundred (300) violations of Mr. Bergrin's constitutional rights and *crimes* that were committed against Mr. Bergrin by the above Defendants. There are in excess of two thousand (2,000) pieces of documentary evidence supporting the more than 300 crimes and violations of Mr. Bergrin's constitutional rights that were

committed against Mr. Bergrin by the above defendants, and there are in excess of one hundred and thirty (130) witnesses that will testify in the herein case.

## PLAINTIFF PRO-SE

Plaintiff Ronald Bergrin is prosecuting the herein civil suit *pro-se* for three reasons:

3.    **First**, Mr. Bergrin had already retained several civil litigation attorneys from several different law firms to represent Mr. Bergrin in the herein case, but the Assistant U.S. Attorneys who had wrongly indicted Mr. Bergrin and engaged in numerous crimes, do not want to be sued by Mr. Bergrin, so they arranged for members of the FBI to engage in Obstruction of Justice, Witness Tampering, and a host of other crimes, by contacting, coercing, intimidating, and threatening Mr. Bergrin's numerous civil litigation attorneys (in addition to his experts, his doctors, and his witnesses), which attorneys then threw Mr. Bergrin under the proverbial bus prior to abandoning the herein case, and such attorneys (experts, doctors, and witnesses), will be subpoenaed to testify at pre-trial hearings in order for the Court to confirm that the herein allegations are truthful.

4.    As a result of the FBI's Special Agents and other members of the United States Department of Justice conspiring together to engage in Obstruction of Justice, Witness Tampering, and numerous other crimes and numerous other violations of Mr. Bergrin's constitutional rights, the Statute of Limitations *might* have been compromised on *a very limited number* of Mr. Bergrin's herein claims. However, the Statute of Limitations must be tolled from the time that the members of the United States Department of Justice engaged in such Obstruction of Justice and Witness Tampering so that Mr. Bergrin can proceed with *all* of the herein Causes of Action, and therefore, at the end of this complaint, Mr. Bergrin will be requesting *an immediate hearing* in which Mr. Bergrin would subpoena at least five (5) attorneys from at least five (5) different law firms who were contacted, pressured, coerced, intimidated, and threatened by members of the FBI, and Mr. Bergrin would prove that the Statute of Limitations would not have expired on *any* of the herein Causes of Action  had it not been for the Obstruction of Justice and the Witness Tampering that members of the FBI engaged in.

5.    Crimes constituting Obstruction of Justice are defined primarily in Chapter 73 of Title 18 of the United States Code as follows.

> "Anyone who corruptly endeavors to influence, obstruct, or impede, the due administration of justice in connection with a pending court proceeding is subject to punishment."

6.    If so permitted, Mr. Bergrin would *also* subpoena numerous Experts, Doctors, Witnesses, and Defendants, who would also testify that the FBI agents and several other Defendants conspired together to violate Mr. Bergrin's constitutional rights and they committed numerous *crimes* against Mr. Bergrin, including, but in no way limited to, Obstruction of Justice, Witness Tampering, Intentional Interference, numerous Due Process of Law violations, and numerous other crimes and violations of Mr. Bergrin's constitutional rights.

> The crime of Witness Tampering is defined by statute at 18 U.S.C. § 1512, which defines it as:
>
> "Tampering with a witness, victim, or an informant"

> The punishment for Witness Tampering is up to 20 years in prison if physical force was used, attempted, or threatened. In the herein case, physical force was in-fact *threatened* against Mr. Bergrin's numerous witnesses, expert witnesses, and his attorneys.

7.    **Second**, Mr. Bergrin is also prosecuting the herein case *pro-se* because he wants to prove to the jury and to the Court that Mr. Bergrin is extremely *competent*. As a result of Mr. Bergrin being arrested, indicted, and imprisoned for crimes that never occurred, the government was unable to take Mr. Bergrin to trial, and in an effort to protect the members of the FBI who wrongly harassed and arrested Mr. Bergrin, and in an effort to protect members of the Office of the United States Attorney who wrongly indicted Mr. Bergrin, and in order to protect numerous other people that are employed by the United States Department of Justice, Judge Dan Polster then violated *all* of Mr. Bergrin's due process rights, prior to wrongly, maliciously, and sadistically declaring Mr. Bergrin *Incompetent to Stand Trial* prior to dismissing the bogus criminal case that was brought against Mr. Bergrin.

8.    By wrongly declaring Mr. Bergrin *Incompetent to Stand Trial,* Judge Dan Polster was also attempting to prevent Mr. Bergrin from exposing Judge Polster's numerous *crimes* and from suing the above Defendants. Mr. Bergrin believes that it is of paramount importance for the Jury and for the Court to know that Mr. Bergrin is extremely competent, and has never been incompetent. Mr. Bergrin is not an attorney and has no legal training/education, and although Mr. Bergrin is not an attorney, and his legal papers have much to be improved upon, Mr. Bergrin is able to prove all of the herein allegations at trial as a *pro-se* litigant, because the evidence in the herein case is voluminous and incontrovertible. Mr. Bergrin would like to apologize to the Court in advance for the format and numbering of this complaint being imperfect, as this is the first time that Mr. Bergrin has prepared a *pro-se* complaint for submission to the United States District Court, and

9.    **Third,** Mr. Bergrin is also representing himself pro-se because he prefers not to retain more attorneys who would only be contacted, pressured, coerced, intimidated, and threatened by members of the FBI, as the FBI had done to five (5) of Mr. Bergrin's prior attorneys whom Mr. Bergrin paid to represent him in the herein case, and Mr. Bergrin does not want to waste nor spend any more money than is absolutely necessary.

10.    Consistent with the past and present actions of those whom are named as Defendants, this Court will most likely be contacted by the Judges in the Sixth Circuit or by members of the United States Department of Justice, who are going to attempt to "Corrupt the Court" by requesting that the Court enter into its "Criminal Conspiracy" by denying Mr. Bergrin his constitutional right to receive justice in the herein case. The wrongdoing and the corruption that Plaintiff suffered by those members of the United States has plagued this case for the past ten (10) years. If Mr. Bergrin's constitutional rights are not violated by the Judiciary in the Southern District of New York after being contacted by the Judges in the Sixth Circuit or after being contacted by members of the United States Department of Justice, then Mr. Bergrin would annihilate the government's best defense attorneys at trial, and the government is well aware of this fact.

11.    After the FBI wrongly arrested Mr. Bergrin, and after the Office of the U.S. Attorney wrongly indicted Mr. Bergrin, the Assistant U.S. Attorneys realized that Mr. Bergrin had not committed a crime. The Assistant U.S. Attorneys then offered Mr. Bergrin a Plea-Deal in which to send the

bogus criminal case down to the *State Level* and to sentence Mr. Bergrin to *time-served*, but only if Mr. Bergrin were willing to plead guilty to a *misdemeanor*. Mr. Bergrin rejected the Assistant U.S. Attorneys Plea-Deal, and in response, the Assistant U.S. Attorneys, conspired with Judge Dan Polster, with the Office of the Federal Public Defender, with Judge R. Guy Cole of the United States Court of Appeals for the Sixth Circuit, and with numerous others to keep Mr. Bergrin incarcerated until he pleads guilty to a misdemeanor, but when Mr. Bergrin refused to plead guilty to a crime that never occurred, the Assistant U.S. Attorneys conspired with others at the United States Department of Justice to have Mr. Bergrin declared Incompetent to Stand Trial, but when that attempt *failed*, the Assistant U.S. Attorneys then conspired with others at the United States Department of Justice to the cause Mr. Bergrin's death via homicide.

## THE DEFENDANTS

12.    Each of the above Defendants are a "person" under 42 U.S.C. § 1983 and at all times relevant to this case acted under color of law. Each of the above Defendants are being sued individually and in his/her official capacity as an employee of the United States of America, of the United States Department of Justice, of the Federal Medical Center in Butner, NC, of the Federal Bureau of Prisons, of the State of New York, of the Northeast Ohio Correctional Center, and of CoreCivic, Inc.

## PLAINTIFF

13.    Plaintiff Ronald Bergrin was born in New York, New York in April 1958. Mr. Bergrin's paternal great-grandparents came to the United States from Austria in the mid 1800s and his maternal grandparents came to the United States from Poland in 1926. Mr. Bergrin's Father and his Father's Brother grew-up in Brooklyn, New York and they both served in the Korean War. Mr. Bergrin grew-up in Rockland County, and when he was 13 years old he started a neighborhood lawn maintenance business. Mr. Bergrin joined the local volunteer ambulance corps when he was 16 years old and he became certified in Standard and Advanced First Aid, and he rode the ambulance weekly for approximately 5 years. When Mr. Bergrin was 17 years old he decided to forego college and to continue operating his lawn maintenance business in which Mr. Bergrin employed 10 full-time employees. Mr. Bergrin sold his lawn maintenance business in 1980, four years after graduating from high school.

14. After selling his lawn maintenance business, Mr. Bergrin became a licensed real estate broker and he relocated to Manhattan in 1981. Mr. Bergrin worked as a commercial real estate broker and he taught himself the investment banking business and become a Licensed Investment Advisor. For the following twenty-eight years, Mr. Bergrin was in the business of putting together commercial real estate transactions and investment banking transactions. Mr. Bergrin was also a partner in several small businesses and Mr. Bergrin also owned 2 small restaurant chains with numerous partners. Prior to being arrested in December of 2014, and charged with crimes that never occurred, and incarcerated for a period of 22+ months prior to the bogus criminal case being dismissed, Mr. Bergrin was active in several charitable organizations, including those that support individuals that suffer from Mesothelioma, Autism, and organizations that help people with intellectual and developmental disabilities.

15. Mr. Bergrin was appointed Special Advisor to the late Prime Minister of Israel, Yitzhak Shamir, from 1990-1992. Mr. Bergrin also headed a small organization which sent tens of thousands of New Testament Bibles and Christmas CDs annually to United States service men and women who are stationed overseas. Although Mr. Bergrin has only a high school education, Mr. Bergrin has had several civil litigations that he handled *pro-se*, including one case in the United States District Court in which Mr. Bergrin appeared before the so very Honorable Shira A. Scheindlin, which case lasted in excess of 3 years. Mr. Bergrin won all of his *pro-se* cases as both Plaintiff and Defendant.

16. Plaintiff has complied with all requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e (a) in that Plaintiff has exhausted his administrative remedies and all appeals that were available.

## STATEMENT OF FACTS

17. On or about March 19, 2009, Ronald Bergrin's cousin, a high-profile criminal defense attorney in Newark, New Jersey (formerly, a very well-respected federal prosecutor who worked under both Michael Chertoff and the Honorable Samuel Alito) was arrested and charged with committing numerous crimes (hereinafter referred to as "Mr. Bergrin's Cousin" or "his Cousin"). Mr. Bergrin had no idea why his cousin was arrested, nor did Mr. Bergrin know anything about his cousin's business. Days after his cousin's arrest, Mr. Bergrin had traveled to Florida to take care of his Mother who had been diagnosed with Mesothelioma, a terminal cancer. Mr. Bergrin was in Florida

overseeing his Mother's cancer treatment and aiding his Mother from April 1, 2009 through late June 2009, and then Mr. Bergrin traveled to Washington, DC to attend a Mesothelioma Medical Symposium from late June 2009 thru early July 2009. Mr. Bergrin attended the Mesothelioma Medical Symposium in order to learn about his Mother's disease and to find out who are the best doctors to treat the disease.

18.    In July of 2009, Mr. Bergrin learned that the government had alleged that Mr. Bergrin's cousin had gone into business with several of his criminal clients who are in the drug trade, in an effort to earn millions of dollars from illegal activities. When Mr. Bergrin's cousin was arrested by the FBI, the FBI seized his cousin's assets and his cousin was denied bail. Mr. Bergrin learned that one of the crimes that his cousin was accused of being involved in was "a conspiracy to cause the death of a drug dealer in Newark, New Jersey who had been working for the FBI as a Confidential Informant". In July of 2009, Mr. Bergrin's cousin was transferred to the Metropolitan Detention Center in Brooklyn, New York.

19.    In July of 2009, the cousin contacted Mr. Bergrin, and he requested that Mr. Bergrin visit with him. When Mr. Bergrin visited with his cousin, the cousin assured Mr. Bergrin that he was "innocent of the charges", and the cousin requested that Mr. Bergrin retain a defense team consisting of competent counsel, experts, and private investigators to assist in the cousin's defense of the criminal charges. Mr. Bergrin agreed to support his cousin and to retain the defense team. Several weeks after visiting with his cousin, Mr. Bergrin started interviewing criminal defense attorneys in New York and in New Jersey.

20.    In or about August 2009, Mr. Bergrin was interviewing several criminal defense attorneys when his cousin asked Mr. Bergrin to visit with him once again at the prison, and at that meeting, the cousin dictated a letter to Mr. Bergrin, and he asked that Mr. Bergrin forward the letter to the Office of the U.S. Attorney in Newark, New Jersey. Mr. Bergrin's recollection is that the letter was "a 54-month plea-deal". At the time, Mr. Bergrin's cousin assured Mr. Bergrin once again that he was "innocent of the charges". Mr. Bergrin printed the letter that his cousin had dictated to him and Mr. Bergrin sent the letter to the Office of the U.S. Attorney in Newark, New Jersey as his cousin had requested.

14

21.    Several days later, Mr. Bergrin received a telephone call from one of the Assistant U.S. Attorneys in New Jersey. The gentleman told Mr. Bergrin that they had reviewed his letter and the gentleman told Mr. Bergrin: "We are very interested in meeting with you to discuss the plea deal". The Assistant U.S. Attorney set up a meeting with Mr. Bergrin for the following day, and the gentleman gave Mr. Bergrin the address in Newark, New Jersey where the meeting was to be held. At the time, Mr. Bergrin had never been arrested or accused of a crime, and Mr. Bergrin knew nothing about the criminal justice system.

22.    Upon Mr. Bergrin's arrival in Newark, New Jersey, Mr. Bergrin learned that the meeting was taking place at the office of the Federal Bureau of Investigation. Special Agent Shawn Brokos and Special Agent Steven Cline greeted Mr. Bergrin, and the three of them went into a conference room. Mr. Bergrin learned shortly thereafter that Steven Cline was the FBI's Internal Revenue Service Agent and that Shawn Brokos was the FBI Agent that investigated and arrested Mr. Bergrin's cousin.

23.    The two FBI agents asked Mr. Bergrin many questions about his cousin's past and about Mr. Bergrin's own background. Mr. Bergrin answered all of the questions openly and truthfully, and it was a relatively pleasant meeting. The two FBI agents pretended that the proposal that Mr. Bergrin had sent to the Office of the U.S. Attorney was going to be accepted, but after a couple of hours, Ms. Brokos' demeanor changed, and Ms. Brokos surprised Mr. Bergrin by stating: "We are not going to consider the proposal that you sent to us. If you and your cousin would like to offer us a 20-year plea deal, we would consider it, but we would not consider anything less than 20 years." Ms. Brokos' statement was very surprising to Mr. Bergrin, because the impression that had been given to Mr. Bergrin throughout the prior 2 hours is that the 54-month plea deal was going to be accepted. Mr. Bergrin remembers feeling disappointed that he would have to tell his cousin that the government would not consider anything less than a 20 year sentence.

24.    Approximately one week after the meeting at the office of the FBI, Ms. Brokos contacted Mr. Bergrin by telephone and she asked Mr. Bergrin if he would help the FBI in their prosecution of his cousin, by working as an *informant* for the FBI, but Mr. Bergrin explained to Ms. Brokos that he could not do that because he did not want to be disloyal to his cousin. The conversation was short, but very cordial.

25. Mr. Bergrin did not know it at that time, but in an effort to prevent Mr. Bergrin from helping his cousin financially, Ms. Brokos was planning to destroy Mr. Bergrin's business. Mr. Bergrin was extremely naive at the time, but has since learned that sometimes overzealous FBI agents attempt to cut-off the defendant's or the defendant's family's *cash-flow* in order to prevent the defendant from being able to defend himself or herself against the criminal charges.

26. Within a couple of weeks, the FBI started *harassing* Mr. Bergrin by arranging for FBI agents to wait outside of Mr. Bergrin's residence in New York City and they would say obnoxious things to Mr. Bergrin when he walked out of his residence. The FBI agents were sitting in cars that had New Jersey license plates, and when Mr. Bergrin would walk out of the building in which he resides, the FBI agents would get out of their cars and they would accuse Mr. Bergrin of being "A Traitor To Your Country!", and they would make numerous other obnoxious remarks.

27. Within a month, the FBI agents had downloaded the names of everyone on Mr. Bergrin's FaceBook account and on Mr. Bergrin's LinkedIn account, and the FBI started contacting all of Mr. Bergrin's friends, relatives, business associates, partners, investors, and his clients. The FBI agents contacted in excess of 200 people that Mr. Bergrin had relationships with, and the FBI agents told these people: "Mr. Bergrin was involved in crimes with his cousin, and the FBI needs people to work as *informants* so that the FBI could charge Mr. Bergrin with crimes".

28. Numerous people who were contacted by the FBI told Mr. Bergrin what the FBI agents had told them about Mr. Bergrin, which was not truthful, and many of these people were intimidated and threatened by the FBI. More than sixty (60) of the more than two hundred (200) people that were contacted by the FBI had *agreed* to work as Confidential Informants for the FBI after being coerced, intimidated, pressured, misled, and threatened, and those people will be called to testify as witnesses to the FBI's illicit behavior and to the slandering of Mr. Bergrin's reputation by the FBI and to the severe, persistent, and pervasive *harassment* by the FBI and by the FBI's Confidential Informants who repeatedly attempted to set-up and entrap Mr. Bergrin in numerous crimes throughout a period of five (5) years. Such Slander by the members of the FBI was an Intentional Tort which caused severe damage to Mr. Bergrin's reputation, and also caused severe damage to

Mr. Bergrin's business, which resulted in a substantial loss of business and substantial financial damages.

29. After only a few months, the people that Mr. Bergrin had done business with for the prior 28 years would no longer take Mr. Bergrin's calls and many of Mr. Bergrin's business associates, clients, investors, partners, and friends told Mr. Bergrin that they are being contacted, coerced, pressured, intimidated, and threatened by the FBI agents. Mr. Bergrin was extremely stressed-out, and his business was destroyed in a matter of only a few months. Every 45-60 days, the FBI agents arranged for its *informants* to attempt to set-up and entrap Mr. Bergrin in criminal schemes, which attempts were unsuccessful, because Mr. Bergrin refused to engage in any criminal behavior. Throughout a period of five (5) years, the FBI made in excess of fifty (50) attempts to set-up and entrap Mr. Bergrin in crimes.

30. After only a few months of being harassed by the FBI, Mr. Bergrin contacted James Comey, the Director of the FBI in Washington, DC, and Aaron Ford, the Director of the FBI's field office in Newark, New Jersey, by telephone and in writing, but neither of these people would accept Mr. Bergrin's telephone calls nor would they do anything to put an end to the FBI's severe, persistent, and pervasive *harassment.*

31. Mr. Bergrin learned that the FBI had arranged for his neighbor in Manhattan to work as a Confidential Informant for the FBI, who then stole highly confidential information from Mr. Bergrin's computer. The neighbor had rented-out a room in the neighbor's apartment to a young man who knocked on Mr. Bergrin's front door and brought Mr. Bergrin into the neighbor's apartment in order to show Mr. Bergrin all of Mr. Bergrin's personal files that had been downloaded to the desktop of the neighbor's computer. The young man explained to Mr. Bergrin that the neighbor had gone up to the roof of the brownstone in which Mr. Bergrin and his neighbor resides, and the neighbor spliced into Mr. Bergrin's cable-wire and the neighbor was then able to run a wire into his own apartment in order to download all of Mr. Bergrin's personal files from the hard-drive of Mr. Bergrin's personal computer, and the neighbor would then share such information with the FBI agents.

17

32.    Mr. Bergrin then confronted the neighbor and the FBI agent together outside of Mr. Bergrin's home, and a verbal altercation ensued. Mr. Bergrin then contacted the 20th Precinct to file a police report, and he contacted Time Warner Cable, and the following day Time Warner went to the roof of the building and ran all new cable wires. These wrongful acts were a violation of Mr. Bergrin's constitutional rights and caused property injury, financial injury, and numerous intangible injuries to Mr. Bergrin, which consisted of Intentional Torts and violations of Mr. Bergrin's Fourth Amendment rights to protect against unlawful search and seizure, and it was a violation of Mr. Bergrin's Fourteenth Amendment right to Due Process by the FBI agents who conspired with the neighbor. Despite the FBI embarking on a campaign to arrange for people that Mr. Bergrin had known (and had not known) to set-up and entrap Mr. Bergrin in numerous crimes throughout a period of 5 years, the FBI was unable to achieve its goals.

33.    The FBI agents repeatedly attempted to set-up and entrap Mr. Bergrin in murder-for-hire schemes, extortion schemes, prostitution schemes, schemes in which the informants for the FBI attempted to set-up Mr. Bergrin with underage girls for sex, money laundering schemes, tax evasion schemes, extortion schemes, fraud schemes, insurance fraud schemes, etc., etc., etc. In-fact, the FBI agents are still *today* attempting to set-up and entrap Mr. Bergrin in crimes because they are angry that Mr. Bergrin is suing them, and they are hoping to charge Mr. Bergrin *legitimately* with a crime in order to prevent Mr. Bergrin from being able to obtain justice.

34.    In an effort to further harass Mr. Bergrin, in early 2011 the FBI put "near-lockstep surveillance" on Mr. Bergrin, and Mr. Bergrin could not leave his home without FBI agents following him around his neighborhood and harassing him. Unless Mr. Bergrin had something very important to attend to outside of his home, Mr. Bergrin only left his home after 12:00 a.m. because Mr. Bergrin did not want anyone to see him in the streets with FBI agents walking in lockstep with him because it was extremely annoying and embarrassing. Despite the FBI's repeated attempts to entrap Mr. Bergrin in crimes, the FBI was unable to entrap Mr. Bergrin, because Mr. Bergrin did not have any desire or any motivation to do anything improper. When Mr. Bergrin would visit frequently with his Mother in Florida (now deceased), the FBI would arrange for local Palm Beach County Police to sit in police cars outside of his Mother's home 24/7 for the sole purpose of harassing Mr. Bergrin. The injuries and damages to Mr. Bergrin's reputation, to his personal life, and to his business, were

a directly foreseeable result of the FBI's intentional bad faith, and their willful, wanton, reckless, and deliberately indifferent acts and omissions.

35.    In mid 2011, Mr. Bergrin was under a tremendous amount of stress as a result of the FBI harassing Mr. Bergrin and putting *near lockstep surveillance* on him, and despite having normal blood pressure, low cholesterol, low body fat, and no history of heart-related illness, in June of 2011, Mr. Bergrin suffered a severe heart attack, which left Mr. Bergrin with a permanently damaged heart, and throughout the following period of 7+ months, Mr. Bergrin underwent several surgical procedures. Mr. Bergrin was prescribed numerous *prescription heart-related medications* that Mr. Bergrin must take each and every day for the remainder of his life. Through a "process of elimination", Mr. Bergrin's doctors, who will testify in the herein case, determined that the cause of Mr. Bergrin's heart attack was "stress related".

36.    The FBI was well aware that Mr. Bergrin had a heart attack, because they would say obnoxious things to Mr. Bergrin about his heart attack when he would walk out of his residence, but instead of backing off of Mr. Bergrin, the FBI agents continued to harass him, and they became even more aggressive. Although Mr. Bergrin was hoping that his cousin would not be convicted at trial, Mr. Bergrin's thinking at the time was that if his cousin were convicted, then the FBI would most likely end its campaign of harassment against him.

37.    Mr. Bergrin once again left several telephone messages and wrote numerous letters to Aaron Ford, to James Comey, and to the United States Attorney in New Jersey, Paul Fishman, complaining about the *extreme harassment* that was being perpetrated against Mr. Bergrin by the FBI, but Mr. Ford, Mr. Comey, and Mr. Fishman would not do anything to put an end to the harassment. Mr. Bergrin also contacted the Office of the Inspector General in Washington, DC, but they also refused to intervene. In fact, the Office of the Inspector General advised Mr. Bergrin to file a complaint against the FBI "with the FBI", which did not make any sense whatsoever, until Mr. Bergrin learned just how corrupt the United States Department of Justice is. The members of the United States Department of Justice protect each other no matter what the circumstances are.

38. In February of 2012, Mr. Bergrin had a second heart-attack, which was substantially milder than the first, but it caused Mr. Bergrin to have another surgical procedure and a set-back in his recovery from his prior heart attack in June of 2011.

39. In early 2013, Mr. Bergrin wrote a letter to the District Court Judge that presided over his cousin's first criminal trial, the Honorable William J. Martini. Mr. Bergrin asked Judge Martini to issue a Restraining Order against the FBI in order to put an end to the severe, persistent, pervasive, and unwarranted *harassment* by the FBI, but Judge Martini advised Mr. Bergrin that he was unable to do so, and at that time, Judge Martini suggested that Mr. Bergrin file a lawsuit against the FBI for *harassment* in order for the FBI to end its abuse. Mr. Bergrin did not file a lawsuit at that time because he did not want to sue the FBI.

40. The second trial of Mr. Bergrin's cousin was to take place in late 2013, and approximately one month prior to commencement of the second trial, Mr. Bergrin was crossing the street on West 72nd Street between Broadway and West End Avenue in order to stop into Kinko's/Federal Express, and one of the FBI agents who was sitting in his car in front of Mr. Bergrin's residence pushed on his accelerator and tried to hit Mr. Bergrin with his car as Mr. Bergrin was crossing the street. Had Mr. Bergrin not heard the roar of the engine, and had Mr. Bergrin not run across the street as fast as he could, he would have been killed by the car that swerved towards him. The car actually clipped the tail end of Mr. Bergrin's long coat which was open (unbuttoned), and the tail of the coat sort-of slapped Mr. Bergrin on the side of his body. Mr. Bergrin then turned around and went back into his apartment and he packed his bags and drove out to Kennedy airport without telling anyone where he was going. Mr. Bergrin flew to Central America, where he spent approximately one month, prior to flying into Miami to visit with his Mother for a few days, and then Mr. Bergrin spent several months in Las Vegas traveling from hotel to hotel, without ever using his credit cards or his cell phone or his computer, so that the FBI would not know where Mr. Bergrin was located. Mr. Bergrin returned to New York a couple of months after the conclusion of his cousin's second trial.

41. The second trial of Mr. Bergrin's cousin took place in late 2013, and Mr. Bergrin's cousin was convicted on all counts. After Mr. Bergrin's cousin was convicted, Mr. Bergrin assumed that the FBI would end its *harassment* of Mr. Bergrin, but they didn't.

42.   In late 2013, the daughter of Mr. Bergrin's cousin, called Mr. Bergrin to tell him that she had received a call from the FBI in which the FBI asked her to stop by the FBI's field office in Red Bank, New Jersey in order to pick-up her father's watch and his jewelry, which had been seized by the FBI in 2009 when her father was arrested. However, when she walked into the FBI's office she noticed that a large photo of "Ronald Bergrin" was hanging on the wall of the FBI's reception area. She then asked the FBI agent that brought her the jewelry: "Why is my cousin's photo on your wall?" To which the FBI agent responded: "We need to know what he looks like in case he comes to our office". It seems that as a result of the FBI's severe, persistent, and pervasive harassment of Mr. Bergrin, and as a result of the FBI destroying Mr. Bergrin's business and his life throughout the prior 4-year period of time, the FBI agents had become "paranoid", and they thought that Mr. Bergrin might "retaliate against them with violence". Mr. Bergrin was in-fact planning to retaliate at some point by suing them, as the Honorable William J. Martini had suggested, but the concept of doing something violent never entered Mr. Bergrin's mind.

43.   Several weeks later, the FBI issued a BOLO that was circulated throughout the tri-state area. A BOLO is a document that was sent to all of the FBI agents throughout the tri-state area that stated: "Be On The Lookout For Ronald Bergrin". This BOLO was issued as a result of the FBI agents becoming "paranoid" that Mr. Bergrin might retaliate and do something violent to them as a result of the severe, pervasive, and persistent harassment that victimized Mr. Bergrin throughout the prior 4 year period of time.

44.   In late 2013, Mr. Bergrin contacted his cousin's second Judge who presided over the cousin's second trial, the Honorable Dennis Cavanaugh of the United States District Court of New Jersey. Mr. Bergrin also asked Judge Cavanaugh to issue a Restraining Order against the FBI, but Judge Cavanaugh also declined Mr. Bergrin's request, and he strongly advised Mr. Bergrin to sue the FBI for *harassment*, and Judge Cavanaugh advised Mr. Bergrin that: "The FBI would not stop harassing you if you do not sue them".

45.   The following are two (2) actual examples of the FBI's 50+ attempts to set-up and entrap Mr. Bergrin in crimes, and one (1) example of the FBI harassing Mr. Bergrin and violating Mr. Bergrin's constitutional rights by slandering Mr. Bergrin. Mr. Bergrin is not revealing the last names of the Confidential Informants who worked for the FBI at this time, but all of the more than

sixty (60) Confidential Informants that Mr. Bergrin was able to identify will be subpoenaed to testify at trial.

## Entrapment Scheme

46. **Abdul J:** Abdul J was one of the first people to work as a Confidential Informant for the FBI whose mission it was to set-up and entrap Mr. Bergrin in a crime. Abdul did a great job as a Confidential Informant, but because Mr. Bergrin had no interest in committing a crime, Abdul was not able to achieve his ultimate goal of having Mr. Bergrin arrested by the FBI and charged with "conspiracy to commit murder". The following is what took place when Abdul J contacted Mr. Bergrin:

47. Mr. Bergrin received a telephone call from a man whose name is Abdul J. Abdul told Mr. Bergrin that he's a friend and a former client of Mr. Bergrin's cousin, and he heard about Mr. Bergrin's cousin's arrest, and that he feels terrible about it. Abdul told Mr. Bergrin that Mr. Bergrin's cousin saved-his-life and the lives of several of his family members and friends who were charged with crimes. Abdul told Mr. Bergrin that he believes that he could help his cousin with his defense case, because he was getting information that could potentially be extremely helpful to the defense, and he asked to meet with Mr. Bergrin. Mr. Bergrin told Abdul that Mr. Bergrin would be speaking with his cousin on Monday, and if Mr. Bergrin's cousin advises Mr. Bergrin to meet with Abdul, then Mr. Bergrin will call Abdul back on Monday after Mr. Bergrin speaks with his cousin.

48. Mr. Bergrin went to visit with his cousin at the Metropolitan Detention Center in Brooklyn, New York on Monday, and Mr. Bergrin told his cousin that Abdul J called and that Abdul said he might be able to help Mr. Bergrin's cousin with his case. Mr. Bergrin's cousin responded by telling Mr. Bergrin that he strongly recommends that Mr. Bergrin meet with Abdul, and he told Mr. Bergrin that Abdul is a really great guy and he's highly intelligent. Mr. Bergrin called Abdul later that afternoon and Abdul asked if he could meet with Mr. Bergrin the following day. Mr. Bergrin agreed to meet with Abdul the following day in Mr. Bergrin's neighborhood on the Upper West Side of Manhattan at Francesco's Pizzeria on Columbus Avenue and 68th Street at 1:00 p.m. The following day, Mr. Bergrin walked into the pizza place, and Abdul introduced himself. Abdul had been waiting for Mr. Bergrin at a table. Mr. Bergrin was about to sit down, but Abdul told Mr.

22

Bergrin that he did not want to talk in the pizza place because he didn't want anyone to overhear what they are discussing. Abdul then suggested that they take a walk around the block and then come back to the pizza place and have lunch. Mr. Bergrin sort of liked the fact that Abdul was being careful and that he didn't want anyone to overhear their conversation.

49. Abdul and Mr. Bergrin then walked around the block, and Abdul asked Mr. Bergrin how is your cousin doing? Mr. Bergrin said he's doing okay, but he doesn't like being in Solitary Confinement. Abdul then asked Mr. Bergrin if Mr. Bergrin likes the Yankees or the Mets. Then he asked Mr. Bergrin if Mr. Bergrin likes the Knicks or the Nets? Then he asked Mr. Bergrin if Mr. Bergrin likes the Giants or the Jets. It was mostly just light conversation, and Abdul didn't talk about Mr. Bergrin's cousin's case other than to say "I'm working on something for your cousin, and I will let you know about it soon". Abdul seemed like a very sharp and a well-spoken guy from the streets. Mr. Bergrin treated Abdul to lunch and they said goodbye.

50. The following week, Mr. Bergrin received another call from Abdul, and Abdul asked if Mr. Bergrin could meet with him again the following day. Mr. Bergrin responded that he would meet with Abdul at the same pizza place at 1:00 p.m. The following day Mr. Bergrin arrived at the pizza place, and Abdul was sitting at a table, and at the next table was Abdul's 2 children. Abdul had ordered pizza for the kids, and when Mr. Bergrin walked into the restaurant, Abdul said: "C'mon let's take a walk around the block so that we could talk". They then walked around the block, and Mr. Bergrin was expecting Abdul to tell Mr. Bergrin something important, but instead, Abdul asked Mr. Bergrin "How's your cousin doing?" Then he talked about the New York Mets, the New York Jets, and the New York Knicks. Then Abdul told Mr. Bergrin that he's working on something "very big", and he might know something in a week or two. Abdul did not have anything to say that could not have been discussed in the restaurant, but Mr. Bergrin remembers thinking that Abdul is a smart street guy, and he's just being cautious. It was basically just uneventful discussion. Then they walked back to the pizza place and they had lunch, and Mr. Bergrin treated Abdul and his kids to lunch. When Mr. Bergrin saw his cousin a few days later, Mr. Bergrin told his cousin that Abdul said he was working on something "very big", and Mr. Bergrin's cousin assured Mr. Bergrin that "Abdul is a really great guy!"

51.    The following week, Mr. Bergrin received a call from Abdul who told Mr. Bergrin that he needed to meet with him, and he asked Mr. Bergrin if Mr. Bergrin could meet with him in Newark, New Jersey the following day. Abdul told Mr. Bergrin that he doesn't have any gasoline in his car because of "financial issues", and he therefore cannot meet with Mr. Bergrin in New York City. Mr. Bergrin told Abdul that he would meet with him in Newark and that he would take Abdul to lunch. Mr. Bergrin met with Abdul the following day at a park in Newark, which was located across the street from where Mr. Bergrin's cousin's law office used to be located. Mr. Bergrin handed Abdul an envelope with $500 cash in it, and Mr. Bergrin told Abdul: "This $500 is for you because you're helping my cousin and so that you would be able to put gasoline in your car and so that you would be able to meet with me in New York City". Abdul seemed pleasantly surprised and was very grateful that Mr. Bergrin had given him the $500.

52.    Abdul started off by telling Mr. Bergrin that the information that he was waiting to receive was going to be "coming down any day" and he wants to meet with Mr. Bergrin as soon as he receives the information. He told Mr. Bergrin that he knows the information is "very big" but doesn't know what it is yet. They also discussed that Mr. Bergrin's cousin was supposed to have a hearing in the courthouse in Philadelphia in approximately 10 days at the U.S. Court of Appeals for the Third Circuit, and Abdul asked Mr. Bergrin if he was going to be attending the hearing. Mr. Bergrin told Abdul that Mr. Bergrin was in-fact planning to attend the hearing, and Abdul then asked Mr. Bergrin "How are you going to be traveling to Philadelphia?" Mr. Bergrin told Abdul that he was driving his car to the hearing and that Mr. Bergrin told Abdul that he would be glad to pick Abdul up and to give him a ride to Philadelphia to attend the hearing, which offer Abdul gladly accepted. Abdul told Mr. Bergrin that he was very appreciative that Mr. Bergrin was going to be picking him up in Newark to attend the hearing in Philadelphia, and that it wasn't going to cost him any money to travel to Philadelphia. The court hearing was scheduled for 10:00 a.m. and they agreed that Mr. Bergrin would pick Abdul up at his home at 8:00 a.m., and Abdul once again told Mr. Bergrin that he appreciated the money and the ride to Philadelphia. Everything else that they discussed was the same uneventful chatter. They then had lunch and Mr. Bergrin then traveled back to Manhattan.

53.    One week later, Mr. Bergrin received a call from Abdul who told Mr. Bergrin that he received the information that he was waiting for, and Abdul asked Mr. Bergrin if they could meet the following day at 3:00 p.m. at Francesco's Pizzeria, which Mr. Bergrin agreed to do. The following day, Mr.

Bergrin walked to the pizza place, but just before Mr. Bergrin was about to enter the restaurant, Mr. Bergrin noticed that the FBI agents were not following Mr. Bergrin and walking with him throughout the neighborhood. Mr. Bergrin also noticed that there was a red car sitting in front of the pizza place with two men sitting in the front seat, but the car was parked at a fire hydrant. Mr. Bergrin knows that the police and the meter-maids do not permit people to park or sit in front of fire hydrants, and Mr. Bergrin was going to tell the driver that he might get a ticket from the meter maid, but then Mr. Bergrin realized that the two men were probably just waiting for their pizza to be ready, so instead of saying something to the men, Mr. Bergrin just entered into the pizza place. When Mr. Bergrin walked into the pizza place, Abdul was sitting at a table waiting for Mr. Bergrin. Mr. Bergrin walked over to Abdul and they shook hands, and Mr. Bergrin sat down. It was Tuesday, and Abdul and Mr. Bergrin had made plans for Mr. Bergrin to pick Abdul up on Thursday (in 2 days) to travel to Philadelphia for Mr. Bergrin's cousin's hearing. Mr. Bergrin immediately confirmed with Abdul that Mr. Bergrin would be picking Abdul up at 8:00 a.m. on Thursday to go to Philadelphia to attend the cousin's hearing, and Abdul once again thanked Mr. Bergrin for the ride. A waitress then came over to their table and Abdul and Mr. Bergrin ordered lunch. After the waitress walked away, Abdul leaned towards Mr. Bergrin and he told Mr. Bergrin the following:

> **"I have the information that I've been waiting for. Tommy Moran is a lawyer that was arrested with your cousin. Tommy worked for your cousin. I found out that Tommy made a deal to testify against your cousin in exchange for a very substantial reduction in his prison sentence. I have a guy on the inside at the prison where Tommy Moran is being held, and I could arrange to have Tommy killed in prison if you give me the go ahead"**

54. Upon hearing those words, Mr. Bergrin realized that Abdul had just asked Mr. Bergrin if he wanted to cause the murder of Tommy Moran. Mr. Bergrin immediately responded to Abdul: "I would never get involved in anything like that!" Mr. Bergrin then remembered that at the prior two meetings that Mr. Bergrin had with Abdul at the pizza place, Abdul would not even discuss the Mets and the Yankees in the pizza place for fear that someone might overhear their conversation, but now, Abdul is asking Mr. Bergrin to sanction a hit on Tommy Moran in the same pizza place. Something didn't seem right. A few minutes later the waitress brought over their lunch. Mr. Bergrin remembers feeling extremely uncomfortable. Mr. Bergrin ate his lunch very quickly and

Mr. Bergrin then asked the waitress for a check. Mr. Bergrin paid the check and then Mr. Bergrin told Abdul that Mr. Bergrin had to go.

55.    However, when Mr. Bergrin walked out of the pizza place, Mr. Bergrin noticed that the red car was still sitting in the same location in front of the fire hydrant, and both of the men who were sitting in the front seat of the car were staring at Mr. Bergrin as Mr. Bergrin exited the restaurant. At that time, Mr. Bergrin realized that Abdul had just attempted to set-up and entrap Mr. Bergrin in a "murder-for-hire scheme", and those two guys in the red car are most likely FBI agents. Mr. Bergrin remembers thinking that Abdul was probably wearing a wire, and that he probably wanted to meet with Mr. Bergrin a little later in the day (at 3:00 p.m. instead of at 1:00 p.m.) so that it wasn't noisy in the pizza place so that if Mr. Bergrin were to agree to cause the murder of Tommy Moran, the conversation would be clearly heard on the recording device.

56.    Mr. Bergrin got back to his apartment and Mr. Bergrin was very upset. Mr. Bergrin then realized that he had to tell his cousin that Abdul was working as a Confidential Informant for the FBI, but Mr. Bergrin did not think that his cousin would believe him, so Mr. Bergrin devised a strategy that would permit Mr. Bergrin the opportunity to confirm his belief "that Abdul was working with the FBI to set-up and entrap Mr. Bergrin in a crime". Mr. Bergrin decided to send an email to his cousin (Federal prisons have an email system for the inmates to use) telling his cousin that: "I am positive that Abdul is working for the FBI as a Confidential Informant, and that Abdul had just attempted to set-me-up and entrap-me in a scheme in which to murder Tommy Moran". Mr. Bergrin wanted to send this email to his cousin because Mr. Bergrin knew that *FBI Special Agent Shawn Brokos* receives copies of all of Mr. Bergrin's cousin's *correspondence*, and Mr. Bergrin knew that if Ms. Brokos read Mr. Bergrin's email, that she would not permit one of her Confidential Informant's to travel with Mr. Bergrin to Philadelphia on Thursday, because the FBI agent would fear that Mr. Bergrin would cause injury to Abdul if Mr. Bergrin knew that Abdul was working for the FBI as a Confidential Informant. Mr. Bergrin also realized that if Abdul were to back-out of their plans for Mr. Bergrin to pick Abdul up on Thursday to travel with Mr. Bergrin to Philadelphia, it was because the FBI told Abdul that he could no longer meet with Mr. Bergrin. Mr. Bergrin then sent an email to his cousin, which stated the following:

26

**"Abdul J is working for the FBI as a Confidential Informant and he attempted to set-me-up and entrap-me in a crime by asking me if I wanted him to arrange for Tommy Moran to be murdered in prison.....Ron".**

By the end of the day on Tuesday Mr. Bergrin received an email response from his cousin that stated the following:

**"Ron.....Abdul would never work against me as a Confidential Informant. He loves me. I saved his life and the lives of several of his family members. I think you're just being overly cautious"**

57. However, the following day (Wednesday), Mr. Bergrin called Abdul's cell phone number numerous times throughout the day to confirm that Mr. Bergrin would be picking Abdul up on Thursday morning at 8:00 a.m. to travel to Philadelphia, but Abdul would not answer Mr. Bergrin's telephone calls, which had never happened before. Mr. Bergrin then called Abdul from a telephone number that Abdul was not familiar with, and Abdul then answered his telephone. Mr. Bergrin said "Hi Abdul, its Ron! I was just calling to confirm that I will be picking you up tomorrow morning at 8:00 a.m. to go to Philadelphia", but Abdul then responded: "No. Don't pick me up. I'll get a ride there myself". Mr. Bergrin then asked Abdul: "Why don't you want me to pick you up?" To which Abdul responded: "I got another ride" and he hung up the telephone.

58. The following morning, Mr. Bergrin arrived at the courthouse in Philadelphia at least an hour and a half before the hearing was to begin, because Mr. Bergrin wanted to see if Abdul was going to walk into the lobby by himself or with someone else. Approximately 30 minutes after Mr. Bergrin arrived at the courthouse, Abdul walked into the lobby of the courthouse with Special Agent Shawn Brokos and with several other FBI agents. The next time that Mr. Bergrin saw Abdul was at Mr. Bergrin's cousin's first trial, and Abdul was sitting directly next to Special Agent Shawn Brokos of the FBI in the courtroom, despite that side of the courtroom being reserved for people that were supportive of the prosecution. It was Shawn Brokos who attempted to set-up and entrap Mr. Bergrin in the murder-for-hire scheme, and Shawn Brokos was Abdul's handler.

59. Days after this incident, Mr. Bergrin arranged for an investigator to look into Abdul's background, and Mr. Bergrin's investigator learned that Abdul had gotten arrested by Shawn Brokos several months earlier, and he retained an attorney by the name of Robert Pierce, Esq. to represent him in his defense of the criminal charges. However, weeks after retaining Mr. Pierce to defend him, Abdul contacted Mr. Pierce and told him that the FBI had dropped the charges against him and that Mr. Pierce's services were no longer needed. However, Mr. Pierce did not believe Abdul, and Mr. Pierce was sure that Abdul had become a Confidential Informant for the FBI, and this was the reason that Abdul had attempted to set-up and entrap Mr. Bergrin in a murder-for-hire scheme. Mr. Bergrin will be subpoenaing Abdul and Mr. Pierce to testify in any upcoming trial.

**Entrapment Scheme**

60. **Sex with a Minor: Another scheme developed by the FBI to set-up and entrap Mr. Bergrin in a crime.**

Mr. Bergrin was working on his laptop computer, and for the first time ever, Mr. Bergrin received a "pop-up". It was a message from someone allegedly named Lisa. The following dialogue is what took place:

**Alleged Female:** Hi Ron. It's Lisa.

**Ron Bergrin:** Lisa who?

**Alleged Female:** You just met me a few days ago; did you already forget who I am?

**Ron Bergrin:** Where did I meet you?

**Alleged Female:** What are you doing tonight? Wanna come over?

**Ron Bergrin:** Where did I meet you?

**Alleged Female:** I don't know the name of the place. It was a bar/restaurant. So, do you want to come over tonight?

**Ron Bergrin:** Where do you live?

**Alleged Female:** Fort Lee, New Jersey. Just over the GW Bridge.

**Ron Bergrin:** Whom do you live with?

**Alleged Female:** Nobody's going to be home except me. Can you bring something to drink?

**Ron Bergrin:** Do you live alone?

**Alleged Female:** No. But nobody's going to be home except me. We have the house to ourselves. Can you bring with you some Vodka and some Red Bull?

**Ron Bergrin:** Whom do you live with?

**Alleged Female:** My parents, but they're away.

**Ron Bergrin:** How old are you?

**Alleged Female:** I'm old enough!

**Ron Bergrin:** I want to know how old you are!

**Alleged Female:** I told you I'm old enough.

**Ron Bergrin:** I want to know exactly how old you are!

**Alleged Female:** I'm 16 years old, but I have lots of experience.

**Ron Bergrin then logged off of the computer.**

61. Mr. Bergrin did not know it at the time, but after Mr. Bergrin told the investigators that Mr. Bergrin retained for his cousin about this experience, the investigators told Mr. Bergrin that the FBI often sets-up-men and entraps them in these types of schemes with allegedly underage girls.

62. Throughout a period of five (5) years, there were more than fifty (50) such attempts to set-up and entrap Mr. Bergrin in crimes.

63. The following is only one example of FBI's Severe, Persistent, and Pervasive *Harassment* and *Slandering* of Mr. Bergrin.

64. David Parks, Esq. of Mautner Glick Corp. is the Managing Agent of the building in which Mr. Bergrin resides at 218 West 72nd Street, New York, NY 10023 and Marc Wigder, Esq. is the Landlord/Owner of the building located at 218 West 72nd Street:

65. In early 2014, Mr. Bergrin stopped by the office of the Managing Agent of the residential building in which Mr. Bergrin resides on the Upper West Side in order to pay his monthly apartment rent, which Mr. Bergrin generally pays several months in advance for convenience purposes. Mr. Bergrin met with the managing agent, David Parks, Esq., of Mautner Glick Corp, and after paying his rent, Mr. Parks asked Mr. Bergrin to step into the conference room with him for a few minutes. Mr. Parks informed Mr. Bergrin that the FBI had contacted Mr. Bergrin's landlord, Marc Wigder. The FBI agents told Mr. Wigder that Mr. Bergrin committed numerous crimes with Mr. Bergrin's cousin, and that Mr. Bergrin also might have committed *income tax evasion, money laundering, and other crimes*, and the Managing Agent told Mr. Bergrin that the FBI told Mr. Wigder that: "It is illegal to accept *dirty money* once you know that the money is dirty". Mr. Parks also volunteered that the FBI asked Mr. Wigder numerous questions about Mr. Bergrin, and Mr. Parks also told Mr. Bergrin that Marc Wigder would like Mr. Bergrin to leave the building when his lease expires. However, Mr. Bergrin's apartment is Rent Stabilized and Mr. Bergrin has a legal right to renew his apartment lease. Mr. Bergrin then explained to Mr. Parks that Mr. Bergrin never committed a crime, but the FBI has been harassing Mr. Bergrin on a daily basis because Mr. Bergrin supported his cousin when his cousin had gotten arrested.

66.    A few weeks later, Mr. Bergrin received a bill from the Managing Agent of the residential building that Mr. Bergrin resides for approximately $1,800.00 for "legal fees". Mr. Bergrin then contacted Mr. Parks, and Mr. Bergrin asked Mr. Parks what the bill for legal fees was for? To which Mr. Parks responded: "You were late in paying your rent and we had to retain counsel". Mr. Bergrin then responded: "What are you talking about? I always pay my rent prior to it being due!" Mr. Bergrin did not pay the invoice for the legal fees, and months later Mr. Bergrin threatened to bring the landlord and the managing agent to court to settle the matter, but after threatening to sue the landlord and the managing agent, Mr. Parks removed the legal fees from Mr. Bergrin's monthly invoice.

67.    However, as you will learn later on in this complaint, this was not the end of the FBI's interference with Mr. Bergrin's relationship with his landlord and with Mr. Bergrin's apartment, because during the period of time that Mr. Bergrin was falsely arrested and incarcerated for a period of 22+ months for a crime that never occurred, the FBI instructed Mr. Bergrin's landlord to *clean-out* Mr. Bergrin's apartment and to remove all of Mr. Bergrin's personal belongings, including his furniture, clothing, and all of his *valuables* (which included highly valuable artwork and antiques), and after the bogus criminal case was dismissed, Mr. Bergrin returned home to an empty apartment. However, as you will also learn later on in this complaint, Judge R. Guy Cole, Chief Judge, United States Court of Appeals for the Sixth Circuit, then engaged in Intentional Interference and Obstruction of Justice, and Judge Cole prevented Mr. Bergrin from recovering the moneys that the landlord's insurance company was to pay to Mr. Bergrin for the loss of Mr. Bergrin's personal property. There is no end to the corruption that had been ongoing and is still being perpetrated by members of the United States Department of Justice and by the corrupt Judges in the Sixth Circuit.

68.    The investigators who Mr. Bergrin had retained to investigate the allegations against his cousin had uncovered the reason that FBI Special Agent Shawn Brokos had severely, persistently, and pervasively *harassed* Mr. Bergrin and attempted to set-up and entrap Mr. Bergrin in crimes. Several years prior to arresting Mr. Bergrin's cousin, FBI Special Agent Shawn Brokos had arrested a young man from Newark, New Jersey who was purchasing cocaine from a street gang in Newark, and the young man was then selling the cocaine on a street corner. After arresting the young man, Ms. Brokos was able to convince the young man to become a Confidential Informant for the FBI in an effort to set-up and entrap the members of the drug gang that had been supplying

the young man with his drugs. Ms. Brokos was in a vehicle with the young man, and she took a cell phone out of her pocketbook and she instructed the young man to contact his drug supplier at the street gang in order to purchase "One Kilo of Cocaine", which at the time cost $20,000.00.

69.     The young man made the telephone call and he agreed to meet the drug supplier in approximately 30 minutes. However, Ms. Brokos forgot to block-out the telephone number of her cell phone, and when the young man contacted his drug supplier, Ms. Brokos telephone number appeared on the drug supplier's caller ID. Several minutes later, the drug supplier realized that he could not meet the young man in 30 minutes, because the drug supplier needed additional time, because he had to travel to another location to pick-up the Kilo of Cocaine. The drug supplier then attempted to call back the young man at the telephone number that had lit-up on his Caller-ID, but the telephone call had gone into Ms. Brokos' voice-mail, and the voice-mail message stated: "This is Special Agent Brokos of the FBI. Please leave a message and I will get back to you shortly". Within 10 minutes of hearing that recording, approximately 120 gang-members on the street learned that the young man was working as a Confidential Informant for the FBI, and the gang then put a contract out on the young man's life. Ms. Brokos destroyed Mr. Bergrin's business and was attempting to set-up and entrap Mr. Bergrin in crimes in order to prevent the numerous investigators that Mr. Bergrin had retained for his cousin from finding-out the details of Ms. Brokos negligence, which led to the young man's death, but what happened next is an even more compelling reason that Ms. Brokos was frantic about concealing her negligence, which led to the death of her Confidential Informant.

70.     Minutes after the drug supplier had called Ms. Brokos' cell phone, Ms. Brokos and the young man realized that the telephone call had gone into *voice-mail*, and the young man begged Ms. Brokos to hide him in another state or in another city, because the young man knew that the street-gang was going to murder him, but in an effort to conceal her own negligence, Ms. Brokos refused to hide the young man who was then murdered by the street-gang. This was the reason that Ms. Brokos became *obsessed* with Plaintiff Ronald Bergrin and was attempting to prevent Mr. Bergrin from financing the defense team who were ultimately able to uncover Ms. Brokos' negligence, and this was the reason that the FBI repeatedly attempted to set-up and entrap Mr. Bergrin in crimes. Ms. Brokos is extremely angry that the cousin's defense team called Ms. Brokos to testify on the witness stand and made her confess that she was responsible for the death of her Confidential Informant.

71.   Ms. Brokos had alleged that Mr. Bergrin's cousin (who represented one of the members of the street gang that was charged in the conspiracy to murder the Confidential Informant), had suggested that the street-gang get rid of the Confidential Informant. Mr. Bergrin's cousin had gone to trial in late 2012, and the first trial ended with a "hung jury". Mr. Bergrin attended the first trial in which ten (10) jurors voted *not guilty* and two (2) jurors voted *guilty.*

72.   Attached hereto is a list of *exhibits*, which form a part of this complaint. Such exhibits include a *partial list* of the Confidential Informants who worked for the FBI in which to set-up and entrap Mr. Bergrin in crimes, and a list of the criminal schemes in which the FBI's Confidential Informants attempted to entrap Mr. Bergrin.

73.   In or about 2013, Special Agent Shawn Brokos was transferred from New Jersey to Pittsburgh, PA. However, despite Ms. Brokos' relocation, the *baton-of-harassment* was then passed from Ms. Brokos to other FBI agents who continued to harass Mr. Bergrin on a daily basis, and continued their attempts to set-up and entrap Mr. Bergrin in crimes. Mr. Bergrin did not want to sue the FBI as the Honorable William J. Martini and the Honorable Dennis Cavanaugh had suggested. However, in an attempt to get the FBI off of his back, Mr. Bergrin did the following:

74.   A). In or about 2013, Mr. Bergrin Googled Ms. Brokos' name and he found her *home address* on-line, and Mr. Bergrin then sent "Easter Cards" to Shawn Brokos' home. Mr. Bergrin simply added her name and address to the computerized list of the more than 200 people that Mr. Bergrin had been sending Easter Cards to each year. Mr. Bergrin's thinking at the time was that if Ms. Brokos was aware that Mr. Bergrin knew where she lived in Pennsylvania, that *she might put an end to the severe, persistent, and pervasive harassment* by pulling the other FBI agents off of Mr. Bergrin, and

75.   B). In early and mid 2014, Mr. Bergrin had written several letters to the FBI threatening to contact the television news media, the radio news media, the online news media, and the news print media, in order to expose the *harassment* and the *wrongdoing* by the members of the FBI, and

76. C). Mr. Bergrin was considering "stopping by the home of Shawn Brokos" in Pennsylvania to "say hello", in order to once again let Ms. Brokos know that Mr. Bergrin *knows where she lives*, in hopes of convincing her to pull the FBI agents off of him.

77. In mid November 2014, Mr. Bergrin had enough evidence of wrongdoing by the FBI, and numerous witnesses that would testify on Mr. Bergrin's behalf in order to initiate a lawsuit against the FBI for *harassment* and for the destruction of Mr. Bergrin's reputation and his business, which lawsuit Mr. Bergrin had repeatedly threatened to file against the FBI. In mid November 2014, Mr. Bergrin forwarded a letter to Aaron Ford of the FBI (with copies to James Comey), informing them that Mr. Bergrin would be serving Mr. Ford, Mr. Comey, Shawn Brokos, Paul Fishman, and others with a civil suit for *harassment* within the next sixty (60) days.

78. Days after sending that letter to the FBI, Mr. Bergrin received a telephone call from a friend of Mr. Bergrin's who had traveled from New York to Cleveland, Ohio with his wife. The friend's wife needed an outpatient medical procedure that she wanted to be administered at the Cleveland Clinic (similar to a colonoscopy). However, there was a *complication* in the surgical room, in that the woman's bowel was accidentally punctured by the doctor, and the woman's body went into Septic Shock, the woman's lungs collapsed, and the friend's wife was in *severely critical condition*. Mr. Bergrin's friend asked Mr. Bergrin if he would to come out to Cleveland to assist his friend and to support the family, and the following day, Mr. Bergrin traveled to Cleveland. Mr. Bergrin did not retain counsel to prepare the lawsuit against the FBI as he had written in his letter to the FBI, because he was attending to his friend's medical emergency in Cleveland.

79. On or about December 19, 2014, which was towards the end of the 30 day period that Mr. Bergrin had been in Cleveland, Mr. Bergrin was walking into the Hilton Garden Inn hotel, when he was arrested in the lobby of the hotel by the FBI. Mr. Bergrin was initially charged with 2 counts of "threatening an FBI agent via email", which Mr. Bergrin did *not* do.

34

80. The FBI agents who arrested Mr. Bergrin told Mr. Bergrin:

> **"The FBI agents in New York said that you sent an email to Special Agent Shawn Brokos of the FBI from the State of Minnesota, threatening to murder her".**

But Mr. Bergrin responded:

> **"I did not send Ms. Brokos an email. I don't know her email address, and I have never been in the State of Minnesota".**

81. Mr. Bergrin then asked the FBI agents if he could *see* the email, but the FBI agents told Mr. Bergrin that they did not have it, and that it was in New York or New Jersey. Mr. Bergrin knew instantly that he was being arrested by the FBI in retaliation for Mr. Bergrin threatening to sue the FBI for five (5) long-years of severe, persistent, and pervasive *harassment*, which caused the destruction of Mr. Bergrin's health, his reputation, his many relationships, and his business.

82. This was a "Retaliatory Arrest" as a result of Mr. Bergrin threatening to sue the FBI agents that were harassing him. There was no "probable cause" to arrest Mr. Bergrin, but probable cause doesn't matter because probable cause is always in the eye of the beholder.

83. The FBI agents then walked with Mr. Bergrin to his hotel room so that they could seize Mr. Bergrin's laptop computer, from which Mr. Bergrin *allegedly* communicated the threat to Ms. Brokos. When the FBI agents were in Mr. Bergrin's hotel room, Mr. Bergrin asked them to take along a bag that contained Mr. Bergrin's *prescription heart-related medications* and his *medical records*, so that Mr. Bergrin would be assured to receive his *prescription heart-related medications*. The FBI agents took with them the laptop computer and the plastic bag containing Mr. Bergrin's medical records and his prescription heart medications.

84. Unbeknownst to Mr. Bergrin, his laptop computer was forwarded overnight to the FBI's headquarters in Quantico, Virginia, and 3 days later, Mr. Bergrin was brought to the courthouse to be arraigned.

85. On or about December 22, 2014 (which was approximately 3 days after Mr. Bergrin was arrested in Cleveland), Mr. Bergrin was brought to the courthouse for an *arraignment*. An attorney from the Office of the Federal Public Defender, Charles Fleming, Esq., sat-in-on-the-arraignment on Mr. Bergrin's behalf. However, Mr. Fleming explained to Mr. Bergrin that he would not be representing Mr. Bergrin in the defense of the criminal charges, but that there were two other attorneys from the Office of the Federal Public Defender who would be representing Mr. Bergrin. Mr. Bergrin was not very concerned about being convicted of a crime because Mr. Bergrin hadn't committed a crime, and Mr. Bergrin knew that the FBI agents in New York were aware that Mr. Bergrin hadn't committed a crime.

86. Mr. Fleming then shared with Mr. Bergrin that he spoke with the Assistant U.S. Attorney, Brian McDonough, Esq., and Mr. McDonough offered Mr. Bergrin a "Plea Deal" in which Mr. McDonough offered to send the case down to the *state level* and Mr. McDonough would recommend a sentence of *time-served* (after arresting Mr. Bergrin only 3 days earlier), but only if Mr. Bergrin would agree to plead guilty to *one misdemeanor*. Mr. Fleming also told Mr. Bergrin that Mr. McDonough said that Mr. Bergrin could plead guilty to "any misdemeanor of Mr. Bergrin's choice". However, Mr. Bergrin *rejected* the Misdemeanor Plea-Deal because Mr. Bergrin did not want to plead guilty to a crime that he did not commit, and to a crime that never occurred.

87. After the arraignment, Mr. Bergrin was transferred from the Cuyahoga County Prison in Cleveland to the Northeast Ohio Correctional Center in Youngstown, Ohio. The Northeast Ohio Correctional Center is a private prison that is owned and managed by CoreCivic, Inc. (formerly known as "Corrections Corporation of America"). Pre-trial inmates at the Northeast Ohio Correctional Center are under the custody of the United States Marshals Service, and Peter Elliott is the United States Marshal in Cleveland, Ohio.

88. On or about December 30, 2014, which was approximately eleven (11) days after Mr. Bergrin's arrest, Mr. Bergrin was brought back to the courthouse for the indictment to be read and for a bail hearing. Prior to the hearing, Mr. Bergrin was brought to the attorney-client meeting room where Mr. Bergrin met with Carolyn Kucharski, Esq. of the Office of the Federal Public Defender. Carolyn Kucharski, Esq. told Mr. Bergrin that she and her colleague, Edward Bryan, Esq., were appointed to represent Mr. Bergrin. Ms. Kucharski told Mr. Bergrin the following: "The Office of

the U.S. Attorney offered you a *plea-deal* in which they would send the case down to the *state level* and to sentence you to *time-served*", but only if you would agree to plead guilty to *one misdemeanor*". However, Mr. Bergrin once again refused to accept the Misdemeanor Plea Deal, because Mr. Bergrin hadn't threatened anyone, nor had Mr. Bergrin committed a crime. At the time, Mr. Bergrin knew very little about the "criminal justice system", but subsequently, as a result of being incarcerated for a period of more than twenty-two (22) months for a crime that never occurred, Mr. Bergrin learned in retrospect that in a federal case, defendants are not offered to be sentenced to "time-served" after being arrested only three days earlier, unless the defendant either agreed to work as a Confidential Informant for the FBI or if the prosecutor is convinced that the Defendant did not commit a crime.

89.    Mr. Bergrin then told Ms. Kucharski that he wanted a meeting with the FBI agents that arrested Mr. Bergrin and with the Assistant U.S. Attorneys (Brian McDonough, Esq. and Matthew Shepherd, Esq.), and 30 minutes later, Mr. Bergrin found himself in a meeting with Ms. Kucharski and the 2 Assistant U.S. Attorneys and with the 2 FBI agents that arrested Mr. Bergrin. Mr. Bergrin requested the meeting because Mr. Bergrin wanted to be "released on bail", and Mr. Bergrin believed that he needed the support of the Office of the U.S. Attorney in order to be offered bail by the Magistrate Judge.

90.    However, during that meeting, Ms. Kucharski surprised Mr. Bergrin and betrayed Mr. Bergrin by arguing vociferously against Mr. Bergrin receiving bail. Mr. Bergrin could not believe that the attorney that was appointed to represent him was arguing against Mr. Bergrin receiving bail, because it didn't make any sense to Mr. Bergrin. Ms. Kucharski was saying that because Mr. Bergrin was arrested in Cleveland, and because he lives in New York City, he is therefore a *flight risk*. But Mr. Bergrin argued that the Assistant U.S. Attorneys repeatedly offered Mr. Bergrin a *Misdemeanor Plea Deal* with *Time-Served*, and that Mr. Bergrin has no reason to flee, because if he were to flee, he would then be charged with a *felony* for *fleeing*. The argument between Mr. Bergrin and Ms. Kucharski became heated, and the 2 FBI agents and the 2 Assistant U.S. Attorneys were laughing at Mr. Bergrin. The meeting ended shortly thereafter, without the result that Mr. Bergrin was hoping for. After the meeting ended, Mr. Bergrin was furious that Ms. Kucharski argued against Mr. Bergrin receiving bail, and Mr. Bergrin was planning to terminate Ms. Kucharski at Mr. Bergrin's earliest opportunity.

91. Approximately a half-hour later, Mr. Bergrin was brought into the attorney-client meeting room and Ms. Kucharski was sitting on the other side of the glass. As soon as the U.S. Marshal closed the door behind Mr. Bergrin, Ms. Kucharski started crying profusely, and with tears in her eyes, Ms. Kucharski apologized to Mr. Bergrin for betraying Mr. Bergrin in the meeting, and she explained to Mr. Bergrin that she betrayed Mr. Bergrin because she and her colleague, Edward Bryan, Esq. are *under FBI criminal investigation* and they are *about to be indicted*, and Ms. Kucharski explained that the FBI is destroying their careers, their marriages, and their lives.

92. Mr. Bergrin then asked Ms. Kucharski why she and her colleague were "under FBI criminal investigation" and why they were "about to be indicted", and Ms. Kucharski responded that a Judge in another case had issued a "No-Contact Order" against Ms. Kucharski and her colleague, Edward Bryan, Esq., contacting the witness in that case, but the two of them violated the Judges No-Contact-Order and they contacted the witness. The FBI found out about the illicit contact, and they were planning to charge Ms. Kucharski and Mr. Bryan "criminally", but a deal was reached in which Mr. Bryan and Ms. Kucharski would betray Mr. Bergrin in the herein case in order to prevent the Office of the U.S. Attorney from charging Mr. Bryan and Ms. Kucharski with a crime. Ms. Kucharski explained to Mr. Bergrin that the Assistant U.S. Attorney asked Ms. Kucharski and Mr. Bryan to keep Mr. Bergrin incarcerated until he pleads guilty to a misdemeanor, which the defense attorneys agreed to do.

93. Mr. Bergrin then told Ms. Kucharski that Mr. Bergrin wanted the Office of the Federal Public Defender off of Mr. Bergrin's case *immediately*, and Mr. Bergrin requested a meeting with the Magistrate Judge, the Honorable Nancy Vecchiarelli. An hour later, they entered the courtroom, and the 2 Assistant U.S. Attorneys, Ms. Kucharski, and Mr. Bergrin approached the bench, and Mr. Bergrin explained to Judge Vecchiarelli that Ms. Kucharski argued against Mr. Bergrin receiving bail in the meeting with the Assistant U.S. Attorneys and with the FBI agents, and then Mr. Bergrin told Judge Vecchiarelli what Ms. Kucharski subsequently told to Mr. Bergrin in the attorney-client meeting room, and Judge Vecchiarelli then turned to the court-reporter and stated: "Seal This!" Judge Vecchiarelli then asked Ms. Kucharski: "Is what Mr. Bergrin just stated truthful and accurate?" To which Ms. Kucharski responded "Yes Your Honor", and Judge Vecchiarelli then stated:

**"I am disqualifying the Office of the Federal Public Defender from the herein case. The Office of the Federal Public Defender has engaged in an Actual Conflict of Interest, and the Office of the Federal Public Defender has the Appearance of a Conflict of Interest and can no longer represent Mr. Bergrin in the herein case".**

94.    Ms. Kucharski later thanked Judge Vecchiarelli for removing such damaging testimony from the transcript.

95.    A CJA attorney, named Michael O'Shea was then appointed to represent Mr. Bergrin at his bail hearing, but throughout Mr. Bergrin's bail hearing, Assistant U.S. Attorney, Brian McDonough, attempted to convince Judge Vecchiarelli that Mr. Bergrin was *obsessed* with Special Agent Shawn Brokos of the FBI, and Mr. McDonough inferred that Mr. Bergrin had Googled her name "twenty-three-thousand-times" (23,000 times), which was not truthful. Mr. Bergrin did Google Ms. Brokos' name once or twice *annually* throughout the five (5) year period that Ms. Brokos and other FBI agents were harassing Mr. Bergrin, and the Google search might have registered approximately 23,000 hits or articles (including numerous articles about "the FBI", which had nothing to do with Shawn Brokos), but Mr. Bergrin only Googled Ms. Brokos' name once or twice annually, and the only reason that Mr. Bergrin Googled her name was to find out where she lived because Mr. Bergrin wanted to send her Easter Cards in an attempt to persuade Ms. Brokos to put an end to the harassment that had destroyed Mr. Bergrin's business and his life.

96.    Throughout Mr. Bergrin's bail hearing, Assistant U.S. Attorney, Brian McDonough, fabricated information about Mr. Bergrin by inferring that Mr. Bergrin was involved with his cousin's alleged crimes, and Mr. McDonough argued vociferously that Mr. Bergrin was both a *flight risk* and a *danger to society*, despite the fact that Mr. Bergrin had never committed a crime in his life, and despite the fact that Mr. Bergrin had no reason whatsoever to *flee*.

97.    In reality, it was Shawn Brokos who was obsessed with Mr. Bergrin, and Mr. Bergrin had learned in his cousin's first trial that the FBI had penalized Ms. Brokos several times in the past for disobeying the FBI's rules and for violating the FBI's own mandate, and Ms. Brokos testified under oath that she was penalized by the FBI for disobedience and for numerous other infractions. Mr. Bergrin does not need to fabricate nor exaggerate nor embellish anything in the herein

complaint because there is documentary evidence of every allegation, and witnesses will testify to any and all allegations in which the documentary evidence is not available.

98.    Despite knowing that Mr. Bergrin did not commit a crime, the Assistant U.S. Attorneys indicted Mr. Bergrin on:

COUNT I: Cyber-stalking; and

COUNT II: Threatening a Federal Law Enforcement Officer in Retaliation for Performing Official Duties; and

COUNT III: Threatening Interstate Communications.

99.    The "cyber-stalking" allegation was not in the original arrest warrant, but Assistant U.S. Attorney, Brian McDonough, threw the *cyber-stalking* charge into the mix in an attempt to force Mr. Bergrin to plead guilty to the lesser charge of a *Misdemeanor.*

100.    The FBI in Cleveland had *arrested* Mr. Bergrin in order to prevent Mr. Bergrin from filing a civil suit against the FBI agents in "New York" who had been harassing Mr. Bergrin for 5 long years (from September 2009 – November 2014), and the Assistant U.S. Attorneys *indicted* Mr. Bergrin under false pretenses in order to prevent Mr. Bergrin from suing the FBI agents in "Cleveland" who falsely arrested Mr. Bergrin.

101.    The Assistant U.S. Attorneys violated Mr. Bergrin's constitutional rights by indicting Mr. Bergrin based upon the same *fabricated hearsay information* and the same *blatant lies* that the Assistant U.S. Attorney, Brian McDonough, used to argue against Mr. Bergrin receiving bail, and despite Mr. Bergrin *not* having sent an email to Shawn Brokos (as the FBI agents in Cleveland wrongly alleged), and despite it being *impossible* for Mr. Bergrin to have "cyber-stalked" the FBI agent when Mr. Bergrin did *not* have the FBI agent's email address, Mr. Bergrin was wrongly indicted and he was denied bail. The former head of the Gambino Organized Crime Family, Paul Castellano, who murdered numerous people, was given bail, but Mr. Bergrin, who never committed a crime in his life, was denied bail. There is no end to the corruption that is so pervasive and systemic throughout the *cesspool* known as the Sixth Circuit.

102.	Mr. Bergrin repeatedly responded to Mr. McDonough's plea-deal by telling his attorneys that Mr. McDonough can either dismiss the bogus criminal case or Mr. McDonough can hold a jury trial. However, the Assistant U.S. Attorneys were unable to take Mr. Bergrin to trial because no crime had been committed. The Assistant U.S. Attorneys then produced an email that Mr. Bergrin had forwarded to his cousin's daughter, but even if Mr. Bergrin had forwarded that email directly to FBI Special Agent Shawn Brokos, it still would not have been a threat or a crime, because that email clearly falls under "First Amendment Free Speech".

103.	Had Mr. Bergrin actually committed a crime, Mr. Bergrin would have accepted the Assistant U.S. Attorney's Misdemeanor Plea-Deal in *light-speed*, but if Mr. Bergrin had committed a crime, the Assistant U.S. Attorneys would *not* have offered Mr. Bergrin the Misdemeanor Plea-Deal.

104.	As a result of the blatant lies that the Assistant U.S. Attorney, Brian McDonough, argued at the bail hearing, Mr. Bergrin was denied bail by the Honorable Nancy Vecchiarelli, despite the following:

a.	Mr. Bergrin was a 56-year-old man at the time of his arrest.

b.	Mr. Bergrin did not commit a crime.

c.	Mr. Bergrin had never been accused of a crime, prior to being falsely accused in the bogus criminal case.

d.	Mr. Bergrin never did anything violent to anyone in his life, and Mr. Bergrin never attempted to cause physical injury to anyone in his life.

e.	Mr. Bergrin maintained his residence in New York City, where he resided at that time for the prior 35 years.

f.	Prior to the bail hearing, there was overwhelming and incontrovertible evidence that Mr. Bergrin was innocent of the bogus criminal charges that were brought against him.

g.	The Assistant U.S. Attorney could not make a legitimate argument as to why Mr. Bergrin would *flee* or would not attend his hearings and/or his trial had Mr. Bergrin been offered bail.

h.	Mr. Bergrin rejected numerous *Misdemeanor* plea-deals on the *State Level* with a sentence of *Time Served*. Had Mr. Bergrin *fled*, then he would have been *legitimately* charged with a *felony* for *fleeing*, and therefore, it made absolutely no sense whatsoever when Mr. McDonough argued that Mr. Bergrin was a *flight risk*.

i. Mr. Bergrin traveled to Cleveland solely because his friend's wife was in *severely critical condition* at the Cleveland Clinic, and Mr. Bergrin had been staying at the Hilton Garden Inn hotel in Cleveland for the 30-day period prior to Mr. Bergrin being falsely arrested by the FBI and charged with crimes that never occurred.

j. Mr. Bergrin offered to wear an ankle bracelet and offered not to leave the State of Ohio until after the *speedy trial* is concluded.

k. Mr. Bergrin has memberships in two synagogues in New York City, and although Mr. Bergrin does not attend the synagogues, he supports the synagogues via his memberships.

l. Prior to Mr. Bergrin being arrested in the bogus criminal case, Mr. Bergrin was the primary fundraiser for an Evangelical Church in New York City.

m. Prior to being falsely arrested, Mr. Bergrin raised money each year in order to send tens of thousands of New Testament Bibles and Christmas CD's to United States service men and women operating overseas.

n. Mr. Bergrin was involved in numerous charitable organizations, raising funds and attending numerous charitable events annually on behalf of several Autism organizations and numerous other organizations that help people with intellectual and developmental disabilities, and numerous organizations that raise money for Mesothelioma Cancer Research (Mr. Bergrin's Mother died of Mesothelioma).

o. In his younger days, Mr. Bergrin joined a *volunteer ambulance corps* in New York and became certified in Standard and Advanced First Aid and he rode an ambulance for several years, without ever receiving compensation of any kind, and Mr. Bergrin raised funds for the ambulance corps to purchase new ambulances and equipment.

105. Mr. Bergrin then appeared before District Court Judge Dan Polster. Judge Polster is a former Assistant U.S. Attorney who worked for 20+ years in the same office as the Assistant U.S. Attorneys who were prosecuting the bogus criminal case against Mr. Bergrin.

106. During one of the first hearings, Judge Dan Polster told Mr. Bergrin that the CJA attorney, Michael O'Shea, Esq. (whom Mr. Bergrin only spoke with for 5 minutes) *allegedly* requested via telephone that Mr. Bergrin undergo a *psychological evaluation*, because Mr. Bergrin had insisted on representing himself *pro-se* at trial, and Judge Polster stated that he needed to confirm that Mr. Bergrin is *competent to represent himself at trial*. Mr. Bergrin insisted on representing himself *pro-

*se* at trial because the attorneys from the Office of the Federal Public Defender had thrown Mr. Bergrin under the proverbial bus by arguing against Mr. Bergrin receiving bail, and Mr. Bergrin's CJA attorney, Michael O'Shea, did not argue effectively that Mr. Bergrin should be given bail. At that time, Mr. Bergrin naively believed that it is common-place for a criminal defendant to undergo a "competency evaluation" if the defendant chooses to represent himself/herself *pro-se*, because this is what had been explained to Mr. Bergrin by Judge Dan Polster.

107. Judge Polster stated: "Mr. Bergrin, if you want to represent yourself, we need to insure that you're *Competent to Stand Trial*, because if you are convicted, your attorneys could later argue that you *weren't competent*". After the bogus criminal charges were dismissed 22 months later, Mr. Bergrin learned that Judge Polster had arranged for all of the hearing transcripts to be altered by the Court Reporters, and anything that could be later used against Judge Polster was removed from the transcripts. Judge Polster blatantly violated Mr. Bergrin's constitutional rights in every court hearing that took place throughout the criminal case, and there was not even one hearing in which Judge Polster did not *blatantly* violate Mr. Bergrin's constitutional rights.

108. In March 2015, Judge Dan Polster violated Mr. Bergrin's constitutional rights by refusing Mr. Bergrin a *speedy trial*, and instead, Judge Polster sent Mr. Bergrin to the Metropolitan Correctional Center in Chicago, Illinois for a period of three (3) months to undergo a *psychological (Forensic) evaluation* as part of an *illicit scheme* in which to fraudulently declare Mr. Bergrin *Incompetent to Stand Trial*, because the Assistant U.S. Attorneys could not take the frivolous criminal case against Mr. Bergrin to trial.

109. The Assistant U.S. Attorneys, who did not want to be sued by Mr. Bergrin for false indictment, prosecutorial misconduct, selective prosecution, and a host of other violations, colluded with Judge Dan Polster in an attempt to declare Mr. Bergrin *Incompetent to Stand Trial* because Mr. Bergrin hadn't committed a crime, and the Assistant U.S. Attorneys could therefore not take Mr. Bergrin to trial. Mr. Bergrin also wanted to represent himself *pro-se* at trial because the attorneys that were appointed to represent Mr. Bergrin were *under FBI criminal investigation* for crimes that they engaged in and the other attorneys were *clearly incompetent*.

110. During the period of time that Mr. Bergrin was incarcerated at the Metropolitan Correctional Center in Chicago, undergoing a 10 week psychological evaluation, Judge Dan Polster contacted the doctors at the Metropolitan Correctional Center whom are employed by the Federal Bureau of Prisons, and Judge Polster repeatedly attempted to pressure the doctors to declare Mr. Bergrin *Incompetent to Stand Trial*, which the government's own doctors refused to do. After undergoing a 10-week psychological evaluation at the Metropolitan Correctional Center in Chicago, the doctors determined that "Mr. Bergrin is Competent to Stand Trial", and they sent Mr. Bergrin back to Ohio to stand trial. The doctors in Chicago shared with Mr. Bergrin that Judge Polster contacted them and attempted to persuade them to declare Mr. Bergrin *incompetent*, which the doctors refused to do.

111. In June of 2015 Mr. Bergrin returned to Ohio from Chicago to stand trial, and Mr. Bergrin once again requested a *speedy trial*, but Judge Polster refused to set a trial date, and instead, Judge Polster forced Mr. Bergrin to suffer in prison cells for the following sixteen (16) months, but that was the least of Judge Polster's wrongdoing, and the false arrest and false imprisonment was the least of the wrongdoing by the Assistant U.S. Attorneys and by other law enforcement officers of the United States Department of Justice.

112. Upon Mr. Bergrin's return to the Northeast Ohio Correctional Center from Chicago, Judge Dan Polster disregarded Judge Nancy Vecchiarelli's Order in which Judge Vecchiarelli disqualified the Office of the Federal Public Defender from representing Mr. Bergrin, and Judge Polster then re-appointed Carolyn Kucharski, Edward Bryan, and Claire Curtis of the Office of the Federal Public Defender to represent Mr. Bergrin, and when Mr. Bergrin objected, Judge Polster responded: "I am not going to remove the Office of the Federal Public Defender from the case under any circumstances". For the following 16 months, the defense attorneys from the Office of the Federal Public Defender worked hand-in-hand with Judge Polster and with the Assistant U.S. Attorneys to keep Mr. Bergrin incarcerated until he pleads guilty or is murdered by members of the government, whichever were to occur first.

113. Judge Dan Polster made it his mission to prevent Mr. Bergrin from being able to sue the FBI in New York for the 5 years of severe, persistent, and pervasive *harassment*, and to prevent Mr. Bergrin from suing the FBI in Cleveland for falsely arresting Mr. Bergrin, and to prevent Mr.

Bergrin from suing the Assistant U.S. Attorneys who wrongly indicted Mr. Bergrin. Judge Polster blatantly violated Mr. Bergrin's constitutional rights during every single hearing that took place in the bogus criminal case throughout the 22 months that Mr. Bergrin was incarcerated for a crime that never occurred.

114.  Upon Mr. Bergrin's return to the Northeast Ohio Correctional Center from Chicago, the medical staff at the Northeast Ohio Correctional Center refused to administer to Mr. Bergrin one of Mr. Bergrin's *prescription heart-related medications*, which Mr. Bergrin needed to take every day. The withdrawal of that particular *prescription heart-related medication* was done in an effort to force Mr. Bergrin to plead guilty to a crime or to cause Mr. Bergrin's death, but Mr. Bergrin had decided that because he was the *victim*, and not the *perpetrator*, that he would not plead guilty to a misdemeanor or to any other charges, under any circumstances.

115.  The government did not simply *permit* the medical staff at the Northeast Ohio Correctional Center to withhold Mr. Bergrin's prescription medication, but rather, the Assistant U.S. Attorneys colluded with the United States Marshal, Peter Elliott, who then ***instructed*** the Warden (Laura Bedard) to instruct the medical staff at the Northeast Ohio Correctional Center to withhold one of Mr. Bergrin's *prescription heart-related medications* that Mr. Bergrin needed to take every day. The government was well aware that the withholding of that particular medication would cause Mr. Bergrin to become extremely ill within a short period of time, because the prison had possession Mr. Bergrin's medical records which clearly state that "Mr. Bergrin has an Aneurysm in the Aortic Root of his Heart", and the medical staff at the Northeast Ohio Correctional Center were well aware that the withdrawal of that particular medication could eventually cause Mr. Bergrin's death.

116.  Throughout a period of six (6) months, Mr. Bergrin had written in excess of 36 letters and filled-out other documents that were forwarded to the medical staff, with copies to the Warden, to the United States Marshal - Peter Elliott, to Judge Dan Polster, to the Inspector General in Washington, DC, to Mr. Bergrin's attorneys, and to the Senior Executives of Corrections Corporation of America (Damon Hininger and Steve Grooms), but the medical staff at the Northeast Ohio Correctional Center continued to withhold the *prescription heart-related medication*. Had the medical staff administered to Mr. Bergrin his *prescription heart-related medication*, the United States Marshal might have terminated the government's contract with Corrections Corporation of America, and therefore, the withholding of Mr. Bergrin's *prescription heart-related medication*

benefitted Corrections Corporation of America *financially*. Numerous employees of the medical staff (and several Senior Officials) at the Northeast Ohio Correctional Center told Mr. Bergrin that they did not want to withhold his *prescription heart-related medication*, but that the Warden and the United States Marshal had insisted it be withheld, and those members of the medical staff (and others) will be called to testify at trial.

117.    As a result of Mr. Bergrin not receiving his *prescription heart-related medication*, Mr. Bergrin's heart malfunctioned within days, and throughout the following six months, Mr. Bergrin suffered severe and permanent damage to his heart, which damage could have been foreseen, and it was in-fact foreseen, but Corrections Corporation of America and the Assistant U.S. Attorneys, and the United States Marshal, chose to violate Mr. Bergrin's constitutional rights in an effort to force Mr. Bergrin to plead guilty to a crime that never occurred.

118.    If the medical staff at the Northeast Ohio Correctional Center or if the Senior Executives of Corrections Corporation of America were to argue that such damage to Mr. Bergrin's heart was not "foreseen", then the medical staff at the Northeast Ohio Correctional Center and the Senior Executives of Corrections Corporation of America were certainly aware that Mr. Bergrin's heart was severely malfunctioning within only a few days after denying Mr. Bergrin his prescription heart medication, because Mr. Bergrin's body filled-up with fluid, which made Mr. Bergrin appear somewhat deformed, and Mr. Bergrin immediately sought medical treatment from the medical staff at the Northeast Ohio Correctional Center, but the medical staff refused Mr. Bergrin any meaningful medical treatment.

119.    As a result of the Northeast Ohio Correctional Center withholding Mr. Bergrin's *prescription heart-related medication*, Mr. Bergrin's heart malfunctioned, and his entire body filled-up with "fluid", and over a period of six (6) months, Mr. Bergrin's shoe size went from a size 13 to a size 15 to a size 17 to a size 19, and the corrections officers were unable to shackle Mr. Bergrin's ankles with standard leg irons when he was being transported. Mr. Bergrin was severely ill, and the medical staff at the Northeast Ohio Correctional Center refused to permit Mr. Bergrin to see a doctor, and they refused to send Mr. Bergrin to a hospital.

120. The medical staff and the above defendants ignored the numerous letters and documents that Mr. Bergrin had forwarded to all of those who were responsible for Mr. Bergrin's health, safety, and security, and they refused Mr. Bergrin any meaningful medical treatment. However, the icing on the proverbial cake by the medical staff of the Northeast Ohio Correctional Center was "the falsifying of Mr. Bergrin's medical records". The documentary evidence that members of the medical staff at the Northeast Ohio Correctional Center were instructed to falsify Mr. Bergrin's medical records is voluminous and undeniable.

121. The only reason that a doctor or a hospital or an institution falsifies a person's medical records is to "conceal something", which is exactly what the medical staff was attempting to do. The Assistant U.S. Attorney (Brian McDonough), conspired with the U.S. Marshal (Peter Elliott), who conspired with the Warden (Laura Bedard), who conspired with the Medical Staff at the Northeast Ohio Correctional Center and with the Senior Executives of Corrections Corporation of America (now known as "CoreCivic, Inc."), to withhold one of Mr. Bergrin's *prescription heart-related medications* until Mr. Bergrin either pleads guilty or dies, whichever were to occur first. This was done to Mr. Bergrin as Judge Polster and the Assistant U.S. Attorneys conspired with the Office of the Federal Public Defender to keep Mr. Bergrin incarcerated for a crime that all of the above parties were aware never occurred.

122. The withholding of Mr. Bergrin's *prescription heart-related medication* and the denial of any meaningful medical treatment was an Intentional Tort and falls under "Cruel and Unusual Punishment" and it was a violation of Mr. Bergrin's Eighth Amendment rights and Fourteenth Amendment rights.

123. The withholding of Mr. Bergrin's *prescription heart-related medication* and the denial of any meaningful medical treatment also falls under the Federal Tort Claims Act (August 2, 1946, ch.646, Title IV, 60 Stat. 812, "28 U.S.C. Pt.VI Ch.171" and 28 U.S.C. § 1346) ("FTCA"). A Federal Tort would cover Negligence, Fraud, Intentional Infliction of Emotional Distress, and numerous other violations of Mr. Bergrin's constitutional rights.

124. The withholding of Mr. Bergrin's *prescription heart-related medication* and the denial of any meaningful medical treatment also falls under Title 18, U.S.C., Section 241 - Conspiracy Against

Rights. This statute makes it unlawful for two or more persons to conspire to injure, oppress, threaten, or intimidate any person of any state, territory or district in the free exercise or enjoyment of any right or privilege secured to him/her by the Constitution or the laws of the United States, (or because of his/her having exercised the same).

125. The withholding of Mr. Bergrin's *prescription heart-related medication* and the denial of any meaningful medical treatment also falls under Title 18, U.S.C., Section 242 - Deprivation of Rights Under Color of Law. This statute makes it a crime for any person acting under color of law, statute, ordinance, regulation, or custom to willfully deprive or cause to be deprived from any person those rights, privileges, or immunities secured or protected by the Constitution and laws of the United States. The withholding of Mr. Bergrin's *prescription heart-related medication* is also a violation of Mr. Bergrin's Eighth and Fourteenth Amendment rights under the constitution of the United States.

126. In addition to his negligence claims, plaintiff also seeks to recover against CoreCivic and its officers under 42 U.S.C. § 1983 for alleged Eighth Amendment violations. Prison officials can be held liable for an Eighth Amendment violation when an inmate shows: (1) "that he is incarcerated under conditions posing a substantial risk of serious harm," and (2) that the prison official had "the state of mind ... of `deliberate indifference' to inmate health or safety." (*Farmer v. Brennan*, 511 U.S. 825, 842, 114 S.Ct. 1970, 1977, 128 L.Ed.2d 811 (1994)) (citations omitted). The Supreme Court has held that "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer*, 114 S.Ct. at 1981.

127. The U.S. Supreme Court has also held that subjecting individuals to a substantial risk of future harm can be cruel and unusual punishment if the conditions presenting the risk are "sure or very likely to cause serious illness and needless suffering" and give rise to "sufficiently imminent dangers." *Helling v. McKinney*, 509 U.S. 25, 33-35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993). Significantly, the Supreme Court has held that an isolated mishap alone does not violate the Eighth Amendment, *Louisiana ex rel. Francis v. Resweber*, 329 U.S. 459, 463-464, 67 S.Ct. 374, 91 L.Ed. 422, because such an event, while regrettable, does not suggest cruelty or a "substantial risk of serious harm."

128. For the following sixteen (16) months, the defense attorneys from the Office of the Federal Public Defender worked hand-in-hand with the Assistant U.S. Attorneys and with Judge Dan Polster to keep Mr. Bergrin incarcerated in exchange for the Office of the U.S. Attorney agreeing not to file criminal charges against the defense attorneys.

129. Throughout the 22+ months of Mr. Bergrin's incarceration for a crime that never occurred, Mr. Bergrin filed at least nine (9) *pro-se* motions for the Office of the Federal Public Defender to be removed from the case (Please see the attached Exhibits), but Judge Polster denied every motion and refused to issue *final orders* in violation of Mr. Bergrin's Due Process rights so that Mr. Bergrin was unable to appeal Judge Polster's wrongful and malicious decisions and orders. Mr. Bergrin did in-fact file numerous *pro-se* appeals of every silent denial of Mr. Bergrin's appeals, but the United States Court of Appeals for the Sixth Circuit was in bed with Judge Polster, and they either denied every appeal or they refused to rule on Mr. Bergrin's appeals.

130. In violation of Mr. Bergrin's constitutional rights, Judge Dan Polster contacted Judge R. Guy Cole, Chief Judge, United States Court of Appeals for the Sixth Circuit, and Judge Polster requested that Judge Cole arrange for *all* of Mr. Bergrin's, Motions, Appeals, and Petitions for Writs of Mandamus be *denied*, and sadly, Judge R. Guy Cole agreed to Judge Polster's illicit request. Judge R. Guy Cole joined in the *criminal conspiracy* that plagued the bogus criminal case against Mr. Bergrin, and Judge Cole then instructed his Associate Judges to enter into the criminal conspiracy as well. Judge Cole and his Associate Judges then violated Mr. Bergrin's constitutional rights by denying each and every Appeal, Motion, and Petition for Writ of Mandamus that Mr. Bergrin filed in the bogus criminal case, despite Mr. Bergrin having a constitutional right for every one of the Appeals, Motions, and Petitions for Writs of Mandamus to be granted, and despite Mr. Bergrin having a liberty interest at stake.

131. Mr. Bergrin also filed several motions for Judge Polster to be disqualified for violating Mr. Bergrin's constitutional right to *conflict-free counsel* (and for numerous other violations of Mr. Bergrin's Due Process rights), but Judge Polster refused to rule on Mr. Bergrin's motions, and because Judge Polster refused to issue any *final orders*, in violation of Mr. Bergrin's Due Process rights, Mr. Bergrin was *technically* unable to appeal Judge Polster's wrongful and malicious Decisions and Orders. However, Mr. Bergrin filed numerous appeals of Judge Polster's *silent*

denials of Mr. Bergrin's *pro-se* motions with the United States Court of Appeals for the Sixth Circuit, but the United States Court of Appeals for the Sixth Circuit repeatedly violated Mr. Bergrin's constitutional rights by refusing to rule on Mr. Bergrin's Appeals, Motions, and Petitions for Writs of Mandamus, and when the United States Court of Appeals for the Sixth Circuit did in-fact issue Decisions, they would either rubber-stamp such motions and appeals DENIED, or they would write something that was blatantly untruthful and did not make any sense, or they would state that Mr. Bergrin has counsel and can therefore not file any *pro-se* documents. The Judges at the United States Court of Appeals for the Sixth Circuit were well aware that Mr. Bergrin's counsel had refused to file any legal documents that could have benefitted Mr. Bergrin in any way, and the Judges were well aware the Mr. Bergrin's appointed counsel was *under FBI criminal investigation* and that they had previously been disqualified by the Honorable Nancy Vecchiarelli, but the Judges at the United States Court of Appeals for the Sixth Circuit refused to grant any of Mr. Bergrin's Appeals, Motions, and Petitions for Writs of Mandamus, because they had entered into the criminal conspiracy that Judge Dan Polster and Judge Cole had requested of them.

132.    Judge Dan Polster had entered into a "criminal conspiracy" with the Assistant U.S. Attorneys, with the Office of the Federal Public Defender and with Judge R. Guy Cole, in an effort to protect Judge Polster and the members of the United States Department of Justice, who repeatedly and blatantly violated Mr. Bergrin's constitutional rights.

133.    Mr. Bergrin filed a motion with the United States Court of Appeals for the Sixth Circuit to either move the venue of the criminal case to the Southern District of New York (which is where the case originated) or to disqualify Judge Polster for his repeated violations of Mr. Bergrin's constitutional rights. However, the United States Court of Appeals for the Sixth Circuit refused to issue a ruling, because they were in bed with Judge Polster. Mr. Bergrin sent a second Motion for the venue to be transferred to the Southern District of New York, but the corrupt Judges at the United States Court of Appeals for the Sixth Circuit accused Mr. Bergrin of "Judge Shopping", because that is what corrupt Judges do when they want to protect a fellow crony who's violating a litigant's constitutional rights.

134. In accordance with <u>Strickland v. Washington, 466 U.S. 668 (1984)</u>, in order for a case to remain in the same office as an attorney that was disqualified from representing a defendant, the "defendant" must *request* to keep the office of the disqualified attorney on the case, and only in very rare circumstances can a Judge permit an attorney to remain on the case if the attorney's colleague had been disqualified, and *only* if the lawyers are "walled off", and in those rare circumstances, "such a wall must be as imposing as the Great Wall of China", thus referred to as a "Chinese Wall". But not only was there not a Chinese Wall installed at the Office of the Federal Public Defender in order to preserve Mr. Bergrin's constitutional right to *conflict-free counsel*, but there wasn't even a flimsy partition installed in the Office of the Federal Public Defender, and there was ongoing communications regarding Mr. Bergrin's case between Carolyn Kucharski, Edward Bryan, and Claire Curtis, and those so-called "defense attorneys" had constant ongoing communications with their *handlers* from the Office of the U.S. Attorney (Brian McDonough, Esq. and Matthew Shepherd, Esq.), which was a *blatant* violation of Mr. Bergrin's constitutional rights.

135. In June of 2015, the Office of the U.S. Attorney produced numerous emails that Mr. Bergrin had sent to his cousin's daughter, which clearly were <u>not</u> a threat to anyone, but the Assistant U.S. Attorneys and Judge Dan Polster pretended that the emails were a threat. Had there been any question whatsoever as to whether or not Mr. Bergrin had communicated a threat to anyone, on June 1, 2015 (which was approximately six (6) months after Mr. Bergrin's arrest, and approximately sixteen (16) months prior to the dismissal of the bogus criminal case), the Supreme Court of the United States issued what is most likely the single most important Decision ever on the subject of "threats" in *Anthony Elonis v. United States*. The Supreme Court's Decision (which decision the United States Court of Appeals for the Sixth Circuit supported by overturning *United States v. Houston*) clearly confirmed that Mr. Bergrin could not possibly have committed a crime, and there were six (6) different reasons that each of the emails that Mr. Bergrin had sent to his cousin's daughter were not crimes, and the government was well-aware that any one (1) of those six (6) reasons meant that the government had to dismiss the bogus criminal charges, but the government refused to dismiss the bogus criminal case in June of 2015 because the government only arrested Mr. Bergrin for *retaliatory purposes* and in order to prevent Mr. Bergrin from suing the FBI agents in New York City, and the government was well aware that Mr. Bergrin had not committed a crime.

136.  On or about June 15, 2015, Mr. Bergrin's sent numerous copies of the Supreme Court's decision in *Anthony Elonis v. United States* to Judge Dan Polster, to the United States Court of Appeals for the Sixth Circuit, to the Office of the U.S. Attorney, and to the Office of the Federal Public Defender, but Judge Polster, the United States Court of Appeals for the Sixth Circuit, and the Office of the U.S. Attorney violated Mr. Bergrin's constitutional rights by refusing to dismiss the frivolous criminal charges that were brought against Mr. Bergrin, and they conspired together with the Assistant Federal Public Defenders to keep Mr. Bergrin incarcerated for another sixteen (16) months in an attempt to force Mr. Bergrin to plead guilty to a crime that never occurred.

137.  After Mr. Bergrin returned to the Northeast Ohio Correctional Center from Chicago in June of 2015, in addition to withholding one of Mr. Bergrin's prescription medications, the Government then attempted to force Mr. Bergrin to plead guilty by arranging for the United States Marshal in Cleveland, Peter Elliott, to arrange for Mr. Bergrin to be tortured on two (2) occasions during the following 6 month period, which almost cost Mr. Bergrin his life, but despite being tortured, Mr. Bergrin still refused to plead guilty to a crime.

138.  On or about July 21, 2015, Mr. Bergrin was taken out of his prison cell and brought to the courthouse in Cleveland. When Mr. Bergrin arrived at the courthouse, members of the United States Marshals Service brought Mr. Bergrin and another inmate named Kevin Slater (a healthy 61-year-old inmate) to the basement of the courthouse, and Mr. Bergrin and Mr. Slater were put into a *freezer* (an Ice-Cold Holding-Cell that had freezing-cold-air being pumped into the cell, which environment was designed to cause a person's death, because no man or woman could survive the frigid temperatures of that environment without having access to coats, hats, gloves, and blankets). The temperature in the freezer was Below Zero, and there was ice in the toilet bowl. Upon entering the freezer, Mr. Slater and Mr. Bergrin knew instantly that the U.S. Marshals Service was attempting to cause Mr. Bergrin's death, because a person with a severe heart-condition cannot withstand such freezing temperatures for an extended period of time without causing severe damage to one's heart.

139.  Within a couple of hours, Mr. Slater and Mr. Bergrin began to get Hypothermia. Their lips were purple and they were shivering, and it was difficult for them to breathe. No matter how much they yelled for the U.S. Marshals to lower the air-conditioning or to give them blankets, or begged the U.S. Marshals to take them out of the freezer, the U.S. Marshals ignored their pleas. After a couple

of hours, Mr. Bergrin looked at Mr. Slater and thought that Mr. Slater looked as if he would die. Mr. Bergrin then looked in the scratched mirror that was on the wall, and Mr. Bergrin also looked as if he were going to die as well. They were not able to sit on the stainless steel bench in the freezer because the stainless steel bench was freezing-cold and it was like sitting on a block of ice, and they had to keep moving around in order not to freeze to death, so they had to stand the entire time that they were in the freezer.

140.   Within approximately 3 hours, Kevin Slater's eyes rolled to the back of his head, and Mr. Slater blacked-out from Hypothermia, and Mr. Slater fell-face-first onto the concrete floor of the freezer. Mr. Slater was unable to brace his fall with his hands because Mr. Slater had lost consciousness prior to hitting the floor *face-first*. Mr. Bergrin immediately started kicking the freezer door and Mr. Bergrin was screaming for the U.S. Marshals to get a doctor, but the response was "laughter" and what sounded like "clapping". The U.S. Marshals seemed to be "celebrating", and minutes later, one of the U.S. Marshals peeked through the glass in the door and he went from having a smiley-face to a look of "devastation", and he yelled: "It's Not Bergrin. It's the Other Guy! Get a Gurney and a Medic!" The clapping that Mr. Bergrin had heard earlier was the U.S. Marshals high-fiving each other because they had thought that it was "Mr. Bergrin" who had lost consciousness and fell face-first onto the concrete floor. Mr. Slater was unconscious and he suffered severe head trauma. Minutes later, a couple of first-aid medics arrived with a gurney and they loaded Mr. Slater onto the gurney and removed him from the freezer.

141.   Mr. Bergrin later learned that after Mr. Slater was removed from the freezer, Mr. Slater was taken to a "normal temperature cell" for the remainder of the day. The U.S. Marshals made sure that Mr. Slater "thawed-out" prior to Mr. Slater attending his court hearing, but Mr. Slater had a severe face and head injury, which everyone in the courtroom wrongly assumed was the result of a severe beating that Mr. Slater had sustained at the prison. Mr. Slater suffered a severe concussion and was incoherent days after the incident. Mr. Slater will be testifying on Mr. Bergrin's behalf, and unlike the government's witnesses, Mr. Slater will not be paid in any way, shape, or form for his testimony.  Despite Mr. Bergrin having a severe heart condition, the U.S. Marshals Service kept Mr. Bergrin locked up in that torture chamber for approximately seven (7) hours, and Mr. Bergrin could not understand how he had survived the frigid temperatures of the freezer that was meant to cause his death.

142. Days later, Mr. Bergrin was physically able to contact his cardiologists in New York City to tell them that the Northeast Ohio Correctional Center had taken away his *prescription heart-related medication* ("Polyethylene Glycol 3350 Powder"), and Mr. Bergrin explained to his doctors that the United States Marshal and his henchmen had put Mr. Bergrin and Mr. Slater in a freezer for several hours, and Mr. Bergrin explained to his doctors that he was experiencing severe shortness of breath, weakness throughout his body, and severe chest pain, and a host of other symptoms that are related to what Mr. Bergrin later learned was "Heart-Related Hypothermia".

143. Mr. Bergrin's cardiologists then explained to Mr. Bergrin that had the Medical Staff at the Northeast Ohio Correctional Center not attempted to cause Mr. Bergrin's death by depriving Mr. Bergrin of his *prescription heart-related medication* ("Polyethylene Glycol 3350 Powder"), Mr. Bergrin would surely have died in that freezer. Mr. Bergrin's cardiologists further explained to Mr. Bergrin that as a result the U.S. Marshals Service instructing the Medical Staff at the Northeast Ohio Correctional Center to withhold that particular *prescription heart-related medication* from Mr. Bergrin, his body filled-up with fluid as a result of his heart malfunctioning, and the fluid actually insulated Mr. Bergrin's heart against the frigid temperatures of the freezer which temperatures were meant to cause Mr. Bergrin's death, and the fluid actually protected Mr. Bergrin from what otherwise would have been *certain death.*

144. The U.S. Marshal, Peter Elliott, engineered the attempt to cause Mr. Bergrin's death, which almost cost Kevin Slater and Mr. Bergrin their lives, but Mr. Bergrin and his cardiologists are still surprised that Mr. Bergrin survived that torturous experience. Mr. Bergrin's cardiologists will be testifying to the severe and permanent injuries that Mr. Bergrin sustained as a result of Mr. Bergrin being denied his *prescription heart-related medication* and getting *heart-related hypothermia* as a result of being put into a freezer for 7 hours.

145. Under the constitution, the withholding of Mr. Bergrin's *prescription heart-related medication* was a crime, and placing Mr. Bergrin in the freezer was a crime under 18 U.S. Code § 1117. "If two or more persons *conspire* to violate section 1111, 1114, 1116, or 1119 of this title, and one or more of such persons do any overt act to effect the object of the *conspiracy*, each shall be punished by imprisonment for any term of years or for life".

146.   The Eighth Amendment imposes a constitutional limitation on the power of the states to punish those convicted of crimes. Punishment may not be "barbarous," nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). The Amendment, therefore, prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes*, 452 U.S. at 346). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v.Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

147.   In order for a prisoner to prevail on an Eighth Amendment claim, he must show that he faced a sufficiently serious risk to his health or safety and that the defendant official acted with "'deliberate indifference' to [his] health or safety." *Mingus v. Butler*, 591 F.3d 474, 479-80 (6th Cir. 2010) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (applying deliberate indifference standard to medical claims); *see also Helling v. McKinney*, 509 U.S. 25, 35 (1993) (applying deliberate indifference standard to conditions of confinement claims)).

148.   One of Mr. Bergrin's doctors in New York City contacted the Northeast Ohio Correctional Center and spoke with a senior member of the medical staff, Renee Sferra, and Mr. Bergrin's doctor requested that the medical staff at the Northeast Ohio Correctional Center immediately administer to Mr. Bergrin his *prescription heart-related medication* ("Polyethylene Glycol 3350 Powder"), but Ms. Sferra refused the doctor's request, and that doctor will also be testifying at trial to his discussion with Ms. Sferra. Such deprivation of Mr. Bergrin's *prescription heart-related medication* and the refusal to provide any meaningful medical treatment to Mr. Bergrin were violations of Mr. Bergrin's Eighth and Fourteenth Amendment rights of the United States constitution.

149. During the time of Mr. Bergrin's incarceration, the FBI violated Mr. Bergrin's constitutional rights by engaging in *Witness Tampering* and *Obstruction of Justice* by contacting and coercing several of Mr. Bergrin's witnesses to work as a Confidential Informants for the FBI. These witnesses will be called to testify on behalf of Mr. Bergrin. Several of Mr. Bergrin's witnesses admitted to Mr. Bergrin their roles in working as Confidential Informants for the FBI, and several of them will testify that they were intimidated and threatened by members of the FBI.

150. For a period of six months (from June 2015 through early January 2016), Mr. Bergrin made numerous requests both verbally and in writing for Judge Polster to issue an Order instructing the Northeast Ohio Correctional Center to administer to Mr. Bergrin his *prescription heart-related medication*, but Judge Polster repeatedly violated Mr. Bergrin's constitutional rights by verbally denying Mr. Bergrin's numerous requests and motions, despite Judge Polster knowing that Mr. Bergrin had a prescription for the medication, and despite knowing that Mr. Bergrin had been receiving the medication at the Northeast Ohio Correctional Center prior to the government's doctors in Chicago opining that "Mr. Bergrin is Competent to Stand Trial", and despite Judge Polster knowing that Mr. Bergrin was prescribed that medication since his first heart attack in June of 2011. Judge Polster also arranged for Mr. Bergrin's numerous verbal requests to have his prescription medication administered to him - removed from the hearing transcripts by the Court Reporters, and Judge Polster also refused to issue *final orders* in an effort to prevent Mr. Bergrin from appealing Judge Polster's malicious and wrongful decisions.

151. Mr. Bergrin repeatedly requested that Edward Bryan and Claire Curtis file a *Motion for a Bill of Particulars* for the bogus criminal charges that were brought against Mr. Bergrin, because such Bill of Particulars would have forced the government to explain how Mr. Bergrin committed a crime, but the attorneys refused to file the motion. Mr. Bergrin then filed a *pro-se* Motion for a Bill of Particulars, but Judge Polster verbally denied the motion by saying "Mr. Bergrin has counsel and he is therefore not permitted to file any *pro-se* documents". Mr. Bergrin then threatened to file a complaint against the attorneys with the Bar Association, and after making that threat, Claire Curtis and Edward Bryan finally filed a Motion for a Bill of Particulars, but Judge Polster violated Mr. Bergrin's constitutional rights by *denying* the Motion, as he denied every motion that could have benefited Mr. Bergrin in any way.

152.   In October 2015, Mr. Bergrin filed a Motion for the Northeast Ohio Correctional Center to cease using *Jailhouse Informants* who had been harassing Mr. Bergrin, threatening Mr. Bergrin's life, and stealing Mr. Bergrin's legal file from his prison cell when Mr. Bergrin was at the cafeteria, but Judge Polster verbally denied the motion and he refused to issue a *final order*, which technically prevented Mr. Bergrin's from being able to appeal Judge Polster's wrongful and malicious denial of Mr. Bergrin's motion. Mr. Bergrin filed an appeal with the United States Court of Appeals for the Sixth Circuit, but they refused to rule on the appeal.

153.   Throughout Mr. Bergrin's incarceration, Mr. Bergrin wrote numerous letters to the Chief United States District Judge, Solomon Oliver, Jr., informing Judge Oliver that Mr. Bergrin's constitutional rights were being repeatedly and blatantly violated by Judge Dan Polster and by other members of the United States Department of Justice, but Judge Oliver violated Mr. Bergrin's constitutional rights by refusing to respond to Mr. Bergrin's numerous letters and Judge Oliver refused to intervene.

154.   In November 2015, Mr. Bergrin wrote a 5-page letter to the United States Attorney, Steven Dettlebach and to the Federal Public Defender, Dennis Terez, in order to share with them how Mr. Bergrin's constitutional rights were being repeatedly violated by Judge Polster, by the Assistant U.S. Attorneys, and by Carolyn Kucharski, Edward Bryan, and Claire Curtis of the Office of the Federal Public Defender, and by the United States Marshal, Peter Elliott. Mr. Bergrin asked Mr. Dettlebach and Mr. Terez to intervene, but Mr. Dettlebach and Mr. Terez chose to support their corrupt colleagues, and neither Mr. Dettlebach nor Mr. Terez would intervene nor respond to Mr. Bergrin's letter. Mr. Dettlebach and Mr. Terez violated Mr. Bergrin's constitutional rights because they had chosen to support their corrupt colleagues.

155.   On or about December 9, 2015, which was approximately six months after the government's own doctor in Chicago, Ron Nieberding, PhD, found Mr. Bergrin "Competent to Stand Trial", Mr. Bergrin was taken to the courthouse for what turned out to be a *"surprise competency hearing"*, in which Edward Bryan and Claire Curtis retained a man by the name of George Schmedlen, PhD (a Liar-for-Hire who is **NOT** a Government employed doctor), and George Schmedlen took the witness stand and committed perjury, fraud, and medical malpractice, by testifying falsely that in

his opinion "Mr. Bergrin is Incompetent to Stand Trial", but worse, Mr. Bergrin was not permitted to question Dr. Schmedlen, nor was Mr. Bergrin permitted to testify at the hearing, nor was Mr. Bergrin permitted to subpoena witnesses to testify at the hearing, nor was Mr. Bergrin permitted to subpoena or present evidence at the hearing, despite Mr. Bergrin having a constitutional right to do all of those things. The entire hearing was a "sham" and another *blatant* violation of Mr. Bergrin's constitutional rights.

156.    In accordance with "United States Federal Code", under 18 USCS 4241 ("The Competency Statute"), at a Competency Hearing, the Defendant has the constitutional right to be made aware there will be a Competency Hearing *prior* to the Competency Hearing date, and the defendant is entitled to subpoena witnesses and evidence, to question witnesses, to present evidence, and to testify at the hearing, but Judge Polster violated all of Mr. Bergrin's constitutional rights and would not permit Mr. Bergrin to participate at the hearing. Upon Mr. Bergrin's entry into the courtroom, Edward Bryan and Claire Curtis told Mr. Bergrin that Judge Polster told them: "If Mr. Bergrin were to say anything during the hearing, I will hold Mr. Bergrin in Contempt of Court and I will sentence Mr. Bergrin to six months in prison for each time he opens his mouth".

157.    At the end of the sham competency hearing, Judge Polster stated that there was evidence that Mr. Bergrin is *Incompetent to Stand Trial*, which was a total fabrication and a blatant lie, and Judge Polster stated that he is sending Mr. Bergrin to a prison hospital for "Competency Restoration". Mr. Bergrin then filed an Appeal of Judge Polster's Order with the United States Court of Appeals for the Sixth Circuit, but the corrupt Judges at the United States Court of Appeals for the Sixth Circuit also violated Mr. Bergrin's constitutional rights by refusing to rule on Mr. Bergrin's appeal, and Mr. Bergrin remained incarcerated, having committed no crime and having never been incompetent.

158.    On or about December 23, 2015, Mr. Bergrin filed one of many *pro-se* Motions For Discovery requesting twenty-one (21) specific items that Mr. Bergrin needed for trial, but Judge Polster violated Mr. Bergrin's constitutional rights by verbally denying his Motion for Discovery, and Judge Polster once again violated Mr. Bergrin's constitutional rights by refusing to issue a *final order* in an effort to prevent Mr. Bergrin from appealing such denial. The attorneys from the Office

of the Federal Public Defender shared Mr. Bergrin's "Defense Strategy" with the Office of the United States Attorney and the defense attorneys refused to subpoena the discovery items.

159. Judge Polster repeatedly violated Mr. Bergrin's *due process* rights to a trial and to a *speedy trial,* because Mr. Bergrin did not commit a crime, and because the Government could not take Mr. Bergrin to trail because they could not convict Mr. Bergrin of a crime that never occurred. Judge Polster assumed that Mr. Bergrin would eventually plead guilty to a misdemeanor or would be murdered in prison by members of the United States Department of Justice, and Judge Polster continued to violate Mr. Bergrin's constitutional rights.

160. Despite being found *Competent to Stand Trial* by the government's own doctors in June of 2015 (and again on December 9, 2015 during the sham competency hearing), Judge Polster violated Mr. Bergrin's constitutional rights by sending Mr. Bergrin to the Federal Medical Center in Butner, North Carolina (an institution that houses the *criminally insane) allegedly* for "Competency Restoration". Judge Polster sent Mr. Bergrin to the Federal Medical Center because the Federal Medical Center is a very difficult environment in which to survive, and Judge Polster was maliciously attempting to force Mr. Bergrin to plead guilty to a crime that never occurred by way of a *misdemeanor.*

161. On or about January 3, 2016, Mr. Bergrin was removed from his prison cell at the Northeast Ohio Correctional Center and Mr. Bergrin's wrists, ankles, and waist were shackled together, and Mr. Bergrin was put on an airplane and forced to endure three (3) days of sleep-deprivation and physical-abuse by members of the United States Air Marshals, prior to Mr. Bergrin arriving at the Federal Medical Center in Butner, North Carolina. When Mr. Bergrin attempted to *doze-off* in the airplane, the U.S. Air Marshal kicked Mr. Bergrin in his thigh hard enough for Mr. Bergrin's entire body to go into shock, and Mr. Bergrin had a hematoma on his leg for at least 4 weeks. The United States Marshals were instructed to deprive Mr. Bergrin of any sleep and to physically and verbally abuse Mr. Bergrin.

162. On the afternoon of January 6, 2016, Mr. Bergrin arrived at the Federal Medical Center in Butner, North Carolina. However, within two hours of Mr. Bergrin's arrival, Mr. Bergrin was once again placed into a *freezer* by himself for the following 24-hour period. The *freezer* was similar to the freezer that Mr. Bergrin and Mr. Slater had been forced to endure in July of 2015, but this freezer

was substantially worse. The filthy, freezing-cold cell had Ice-Cold Air being pumped into the small room, which had *bright blinding lights* that could have lit-up an entire city, which lights were causing severe pain and discomfort to Mr. Bergrin's eyes, and were causing Mr. Bergrin to have a severe headache. The bed in the freezer consisted of "a slab of concrete" with a "turquoise-colored one-inch-thick vinyl mattress that was covered with human feces". The temperature of the freezer felt like it was Below Zero degrees, and it was obvious that the government was once again attempting to murder Mr. Bergrin.

163.    Throughout the next 24-hours, Mr. Bergrin had gotten Hypothermia, and Mr. Bergrin did not believe that he was going to survive. Every few hours a Corrections Officer would come around and check to see if Mr. Bergrin was still alive. Mr. Bergrin begged the Correction Officers to raise the temperature or to provide him with a coat or a blanket, but they refused to help Mr. Bergrin. After 24-hours, Mr. Bergrin was semi-conscious and he was dragged out of the freezer and then picked up off of the floor by two correctional officers. It took Mr. Bergrin weeks to physically recover from that experience, but Mr. Bergrin still suffers from severe heart-related illness and numerous other medical issues as a result of being incarcerated for 24-hours in what can only be described as a "torture chamber". The United States Marshal, Peter Elliott, and members of the Federal Bureau of Prisons conspired together to cause Mr. Bergrin's death. Had Mr. Bergrin died in that torture chamber, Mr. Bergrin's Death Certificate would most likely have stated "Death by Natural Causes", but Mr. Bergrin's death would have been via *homicide.*

164.    Several weeks after Mr. Bergrin arrived at the Federal Medical Center in Butner, North Carolina, Judge Dan Polster committed numerous *crimes* in the herein case. Judge Polster contacted Tanya Cunic, Psy.D, who was Mr. Bergrin's primary doctor at the Federal Medical Center, and Judge Polster *instructed* Dr. Cunic to commit medical malpractice, fraud, and perjury, by instructing Dr. Cunic to fraudulently declare Mr. Bergrin *Incompetent to Stand Trial*, but Dr. Cunic *refused* to declare Mr. Bergrin *Incompetent to Stand trial*, and she told Mr. Bergrin that she documented Judge Polster's *criminal-behavior* in Mr. Bergrin's first Competency Report that was prepared by Dr. Cunic on or about March 6, 2016.

165.    When Judge Polster received his copy of Mr. Bergrin's first Competency Report, Judge Polster became *furious* with Dr. Cunic, and Judge Polster committed another *crime* by contacting Dr. Cunic a second time, and Dr. Cunic shared with Mr. Bergrin that Judge Polster threatened to have

Dr. Cunic "*terminated from the Federal Bureau of Prisons if she refuses to declare Mr. Bergrin Incompetent to Stand Trial in the second Competency Report*", which Competency Report was to be prepared 60 days after the first Competency Report (and the second Competency Report was supposed to be the *final* Competency Report, because the Order in which Judge Polster sent Mr. Bergrin to the Federal Medical Center stated that Mr. Bergrin is to be there for 120 days).

166.    After being threatened with termination from the Federal Bureau of Prisons, Dr. Cunic approached Mr. Bergrin and she told Mr. Bergrin that she was *devastated* about the possibility of losing her job with the Federal Bureau of Prisons, because she is married with children and she needed the income. Dr. Cunic initially sought permission from Mr. Bergrin to opine that Mr. Bergrin is Incompetent to Stand Trial, because Dr. Cunic was convinced that Judge Polster was going to have her terminated. At that time, Mr. Bergrin was extremely concerned that he would be fraudulently declared *Incompetent to Stand Trial*, and he wrote three (3) letters to Dr. Cunic expressing his concerns, and he explained to Dr. Cunic that if she were to declare Mr. Bergrin *Incompetent to Stand Trial* then she would be engaging in perjury, fraud, and medical malpractice. Mr. Bergrin also explained to Dr. Cunic that if she does *not* declare Mr. Bergrin *Incompetent to Stand Trial* that Judge Polster would most likely attempt to have her terminated from her position with the Federal Bureau of Prisons. Mr. Bergrin then advised Dr. Cunic that she needed to retain competent counsel immediately. Dr. Cunic took Mr. Bergrin's advice and she retained highly competent counsel. Approximately 30 days later, Cr. Cunic shared with Mr. Bergrin that after Dr. Cunic's attorney spoke with the "Director of the Federal Bureau of Prisons", Dr. Cunic received a promotion, a substantial increase in salary, and an offer to be relocated to any federal institution in the United States.

167.    In the second (and what was supposed to be the *final)* Competency Report in accordance with Judge Polster's Order dated December 9, 2015, Dr. Cunic once again found Mr. Bergrin *Competent to Stand Trial*, and Dr. Cunic told Mr. Bergrin that she once again documented in Mr. Bergrin's second Competency Report that "Judge Dan Polster threatened to have Dr. Cunic terminated from the Federal Bureau of Prisons if she did not erroneously declare Mr. Bergrin *Incompetent to Stand Trial*".

168.    Upon receiving the second Competency Report that Dr. Cunic had prepared, Judge Dan Polster immediately ordered the Federal Bureau of Prisons and the Freedom of Information Offices in

Washington, DC to SEAL Mr. Bergrin's first 2 Competency Reports, because those documents contain evidence of the *crimes* that were committed by Judge Dan Polster.

169. Judge Polster's erroneous actions were not only a violation of Mr. Bergrin's constitutional rights, but they were *actual crimes*, because it is a crime for a Judge to instruct a doctor to make a medical diagnosis, and Judge Polster was well aware that it was a crime, or Judge Polster and Judge R. Guy Cole would not have *sealed* Mr. Bergrin's first 2 Competency Reports, which contain evidence of Judge Polster's numerous crimes.

170. Mr. Bergrin made numerous attempts to receive copies of his first 2 Competency Reports by contacting numerous people at FMC-Butner and his attorneys from the Office of the Federal Public Defender, and the FOIA offices in Washington, DC and by filing a Petition for a Writ of Mandamus with the United States Court of Appeals for the Sixth Circuit, but because Judge R. Guy Cole had entered into the criminal conspiracy with Judge Polster, the United States Court of Appeals for the Sixth Circuit and all of the other entities denied Mr. Bergrin's numerous requests to receive his Competency Reports despite Mr. Bergrin having a constitutional right to receive his Competency Reports, which state that "Ronald Bergrin is Competent to Stand Trial".

171. After Dr. Cunic refused to declare Mr. Bergrin *Incompetent to Stand Trial* in her second (and what was supposed to be the *final)* Competency Examination/Report, Judge Polster then committed another *crime* by contacting Warden J.C. Holland at the Federal Medical Center, and contacting Dr. Cunic's supervisor at the Federal Medical Center, and Judge Polster instructed the Warden and the Supervisor to "keep Mr. Bergrin incarcerated at the Federal Medical Center for an additional period of ninety (90) days, and Judge Polster insisted that another Competency Evaluation be performed, and he once again insisted that Dr. Cunic declare Mr. Bergrin *Incompetent to Stand Trial"*. Dr. Cunic told Mr. Bergrin that she had no choice but to keep Mr. Bergrin incarcerated for an additional period of 90 days, but at the end of the 90-day period, Dr. Cunic once again found Mr. Bergrin *Competent to Stand Trial* in her third and final Competency Evaluation/Report. Mr. Bergrin has a copy of that Competency Report because it does not mention the numerous crimes that were committed by Judge Polster.

172. Mr. Bergrin will produce documentary evidence and several witnesses will testify that Judge Dan Polster, repeatedly attempted to coerce the government's own doctors who are employed by the

Federal Bureau of Prisons to declare Mr. Bergrin to be *Incompetent to Stand Trial*, but each and every one of the government's doctors at the Metropolitan Correctional Center in Chicago and at the Federal Medical Center in Butner, NC refused to commit fraud, medical malpractice, and perjury, and after undergoing numerous months of psychological evaluations "for no legitimate reason whatsoever", and despite Judge Polster threatening the careers of the doctors if they did not cooperate with his illicit demands, all of the government's doctors found Mr. Bergrin *Competent to Stand Trial.*

173.    As a result of the abuse that Mr. Bergrin was subject to at the Federal Medical Center by those who are employed by the United States Department of Justice and the Federal Bureau of Prisons, Mr. Bergrin was confident that he would not be leaving the Federal Medical Center alive, because he had too much dirt on those who are employed by the United States Department of Justice, and therefore, on March 15, 2016, Mr. Bergrin wrote a 4-page letter to President Obama, to Vice President Biden, to the Inspector General, to the nine Supreme Court Justices, and to numerous others in Washington, DC to let them know that Mr. Bergrin had not committed a crime and was being held without a trial and was being severely abused, and was most likely going to be murdered by members of the government. Mr. Bergrin wrote that letter, which he entitled: "The Government Has 60 Days To Murder Me". Mr. Bergrin gave the letter that *title* because he thought that it would cause the recipients of the document to read it.

174.    Mr. Bergrin was being verbally abused by the prison staff on a daily basis in an effort to provoke Mr. Bergrin into doing something that would allow the prison staff to charge Mr. Bergrin with a crime. But Mr. Bergrin would not respond to the abuse. However, approximately 10 days after sending that letter, the abuse at the Federal Medical Center ended. The letter that Mr. Bergrin had written actually saved Mr. Bergrin's life, because prior to forwarding that letter to the most powerful people in Washington, DC, there was no possible way the members of the government who violated Mr. Bergrin's constitutional rights were going to permit Mr. Bergrin to walk out of prison alive after everything that the government had done to him, and nobody from the United States Department of Justice wanted to be responsible for the civil suit that Mr. Bergrin had repeatedly threatened to file against those that violated his constitutional rights and committed numerous heinous crimes against Mr. Bergrin.

175.    On or about May 25, 2016, which was during the period of time that Mr. Bergrin was incarcerated at the Federal Medical Center in Butner, North Carolina, and *allegedly* "Undergoing Competency Restoration", the government attempted to set-up and entrap Mr. Bergrin in a crime. Mr. Bergrin's cellmate, RTB, was approached by members of the United States Department of Justice and RTB was asked to set-up and entrap Mr. Bergrin in a *murder-for-hire scheme* in which RTB offered to arrange for Judge Dan Polster to be murdered for a nominal amount of money. Mr. Bergrin immediately declined his cellmate's generous offer and Mr. Bergrin left his cell and wrote a letter to Judge Polster informing him of what Mr. Bergrin's cellmate had offered to do at Mr. Bergrin's behest. This attempt to set-up and entrap Mr. Bergrin in a crime, represents incontrovertible evidence that the Federal Bureau of Prisons and the United States Marshal - Peter Elliott, and the Assistant U.S. Attorneys (who pulled Peter Elliott into the criminal conspiracy) were well aware that Mr. Bergrin was *Competent to Stand Trial*, because the Government is not permitted to set-up and entrap a person that is mentally ill, nor do they have an incentive to set-up and entrap a person that is mentally ill, because "a person that is *mentally ill* or is *Incompetent to Stand Trial* cannot go to trial and cannot be convicted of a crime". This attempt to entrap Mr. Bergrin in a crime was an act of *desperation* by those members of the government who entered into the criminal conspiracy and repeatedly violated Mr. Bergrin's constitutional rights.

176.    In June of 2016, Judge Polster once again blatantly violated Mr. Bergrin's constitutional rights by issuing an Order to the Clerk of the Court preventing the Clerk of the Court from opening or filing any of Mr. Bergrin's *pro-se* legal documents, which Order prevented Mr. Bergrin from being able to defend him-self in the criminal case. Mr. Bergrin had little contact with his appointed counsel, because the attorneys from the Office of the Federal Public Defender were working hand-in-hand with the Assistant U.S. Attorneys and with Judge Polster to keep Mr. Bergrin incarcerated. Judge Polster maliciously issued this wrongful Order in violation of Mr. Bergrin's due process rights, despite knowing that *Mr. Bergrin had a liberty interest at stake*, and despite knowing that Mr. Bergrin's legal counsel from the Office of the Federal Public Defender had already been disqualified from the case by the Honorable Nancy Vecchiarelli and the attorneys were *under FBI criminal investigation*. Mr. Bergrin filed an Appeal of Judge Polster's flawed Order, but the United States Court of Appeals for the Sixth Circuit once again denied Mr. Bergrin's motion by stating that Mr. Bergrin cannot file *pro-se* documents because he is represented by counsel. The United States Court of Appeals for the Sixth Circuit denied Mr. Bergrin appeal despite Mr. Bergrin having filed nine (9) *pro-se* motions and appeals in which to remove such conflicted and ineffective

counsel who had previously been disqualified by the Honorable Nancy Vecchiarelli. The constitution of the United States means absolutely nothing to these people in the Sixth Circuit.

177.   Mr. Bergrin had also written numerous angry letters to Judge Polster and in one letter Mr. Bergrin compared Judge Polster to a Nazi War Criminal, but the letters had no effect on Judge Polster and when Mr. Bergrin appeared before Judge Polster, Judge Polster stated that he found Mr. Bergrin's letters to be "entertaining".

178.   On or about September 26, 2016, which was days after Mr. Bergrin returned to the Northeast Ohio Correctional Center from the Federal Medical Center in Butner, North Carolina, Edward Bryan, Esq. came to see Mr. Bergrin at the prison. Whenever Edward Bryan would come to see Mr. Bergrin, Mr. Bryan would always antagonize Mr. Bergrin in an effort to get Mr. Bergrin to physically assault Mr. Bryan so that Mr. Bergrin could then be sentenced to 20-years in prison for slugging a federal official. Mr. Bergrin knew about Mr. Bryan's motives and strategies, so when Mr. Bryan would come to see Mr. Bergrin at the prison, Mr. Bergrin would ask Mr. Bryan what he wanted, and Mr. Bergrin would spend no more than 2 minutes with Edward Bryan prior to walking out of the meeting and returning to his prison cell. But this time, Mr. Bryan behaved differently. Mr. Bryan pretended to be Mr. Bergrin's friend, and Mr. Bryan told Mr. Bergrin that he came to visit with him to ask how Mr. Bergrin was feeling. Mr. Bergrin did not answer Mr. Bryan's question, because Mr. Bergrin knew not to trust Mr. Bryan, and Mr. Bergrin was not going to be fooled by a man who repeatedly violated Mr. Bergrin's constitutional rights throughout the prior fourteen months, and who worked hand-in-hand with the Assistant U.S. Attorneys and with Judge Dan Polster to keep Mr. Bergrin incarcerated for crimes that never occurred.

179.   Then Mr. Bryan asked Mr. Bergrin: "Do you want to see something? Look at the photo of this beautiful lady that I'm representing". Mr. Bryan then opened a document to the third-page and he handed the document to Mr. Bergrin, which had a photo of a very attractive woman. The woman's name was Jonida Alicka, and the document was a Presentence Investigation Report. Mr. Bergrin looked at the photo of the highly attractive woman, and Mr. Bryan then asked Mr. Bergrin if Mr. Bergrin wanted to keep the document, and Mr. Bryan told Mr. Bergrin that he has additional copies at his office. Mr. Bergrin then responded that he would take the copy of the document, and he thanked Mr. Bryan. However, at that time, Mr. Bergrin knew that Mr. Bryan was violating the constitutional rights of Ms. Alicka when he gave Mr. Bergrin the inmate's Presentence

Investigation Report, and Mr. Bergrin also thought that it was possible that Mr. Bergrin was being set-up and entrapped by Mr. Bryan, because possession of another inmate's PSI report is considered "contraband", and it is a crime to possess contraband. The meeting ended within a few minutes, and Mr. Bergrin immediately made copies of the inmates PSI report, and Mr. Bergrin then arranged for two inmates at the Northeast Ohio Correctional Center who were not located in Mr. Bergrin's unit to send copies of Ms. Alicka's Presentence Investigation Reports to Mr. Bergrin's people in New York. The next morning, Mr. Bergrin was returning from breakfast, and there were two Corrections Officers shaking down Mr. Bergrin's cell. The Corrections Officers went through Mr. Bergrin's cell with a fine-tooth-comb looking for any kind of contraband that they could find, but there was none. Mr. Bergrin had been set-up by Edward Bryan and most likely by other members of the U.S.D.O.J. Mr. Bergrin had a telephone conversation with Ms. Alicka's attorney after Mr. Bergrin arrived home from prison, and was given permission to share this information with the Court. Attached hereto are a few pages of the Presentence Investigation Report of Jonida Alicka.

180.    On October 26, 2016, Judge Polster once again *blatantly* violated Mr. Bergrin's constitutional rights by wrongly and maliciously declaring Mr. Bergrin *Incompetent to Stand Trial* immediately prior to dismissing the bogus criminal case. Judge Polster stated that he is dismissing the criminal charges because *Mr. Bergrin is suffering from a mental disease or defect and is therefore Incompetent to Stand Trial*, which was a total fabrication and could not have been further from the truth, and despite Mr. Bergrin having never been to a psychiatrist, a psychologist, a mental institution, and had never been prescribed psychotropic medication, and despite each and every one of the government's own doctors opining that "Mr. Bergrin is *Competent to Stand Trial*", Judge Polster wrongly, maliciously, and sadistically declared Mr. Bergrin *Incompetent to Stand Trial*, in an effort to prevent Mr. Bergrin from being able to go to trial for the bogus criminal charges that were erroneously brought against Mr. Bergrin, and because Judge Polster was attempting to prevent Mr. Bergrin from suing the FBI in New York City and all of the government's employees from the United States Department of Justice and the numerous members of the Northeast Ohio Correctional Center who violated Mr. Bergrin's constitutional rights and committed numerous crimes in the herein case.

66

181. By declaring Mr. Bergrin *Incompetent to Stand Trial,* Judge Polster was in essence stating that "Mr. Bergrin had committed a crime, but because Mr. Bergrin is *Incompetent to Stand trial*, Mr. Bergrin could not be prosecuted", which could not have been further from reality.

182. Judge Dan Polster, Brian McDonough, Matthew Shepherd, the Judges at the United States Court of Appeals for the Sixth Circuit, and the attorneys from the Office of the Federal Public Defender kept Mr. Bergrin incarcerated for 22+ months, knowing that Mr. Bergrin did not commit a crime and knowing that Mr. Bergrin is extremely Competent, and such despicable behavior should not be condoned by this Court.

183. One might think that after Mr. Bergrin was released from prison that the government would no longer harass Mr. Bergrin and would no longer attempt to set-up and entrap Mr. Bergrin in crimes, but since returning home from prison on October 27, 2016, the FBI has continued to harass Mr. Bergrin on a daily basis and has continued its attempts to entrap Mr. Bergrin in crimes, because the FBI agents are angry that Mr. Bergrin is suing the FBI and the other members of the government who violated Mr. Bergrin's constitutional rights. The FBI agents have repeatedly violated Mr. Bergrin's constitutional rights by utilizing the FBI's technology and resources without an authorized warrant to find out which law firms and which attorneys are representing Mr. Bergrin, and the FBI agents then contact Mr. Bergrin's numerous attorneys.

184. The FBI agents have wrongfully gained access to all of Mr. Bergrin's emails, his email addresses, his computers, and his cell phones. The FBI agents then met Mr. Bergrin's attorneys at their offices, and they intimidated, pressured, coerced, and threatened the numerous attorneys that Mr. Bergrin repeatedly retained in order to overturn Judge Polster's wrongful Decision in which Judge Polster stated that "Mr. Bergrin is Incompetent to Stand Trial", and in order to prepare the voluminous lawsuit against the government, against CoreCivic, Inc., and against those that violated Mr. Bergrin's constitutional rights. The numerous attorneys that Mr. Bergrin had retained did exactly what the FBI agents instructed them to do, which was to "eat-up the Statute of Limitations clock and to then abandon Mr. Bergrin", despite Mr. Bergrin paying his attorneys legal fees, costs, and expenses.

185. The following is a partial list of the numerous crimes and the numerous violations of Mr. Bergrin's constitutional rights that were committed by members of the Federal Bureau of Investigation after Mr. Bergrin's release from prison on October 27, 2016, and many of these crimes and violations of Mr. Bergrin's constitutional rights occurred within the past six (6) months. Mostly all of these crimes and violations of Mr. Bergrin's constitutional rights were committed in New York City, and only 2 or 3 of the numerous crimes were committed in the State of Florida. As a result of the damage that the members of the U.S.D.O.J. and members of Corrections Corporation of America (now known as CoreCivic, Inc.), and members of the Northeast Ohio Correctional Center did to Mr. Bergrin's heart, Mr. Bergrin can no longer reside in cold temperatures in the wintertime, which is the reason that Mr. Bergrin is now spending the winter months in the State of Florida.

186. After Mr. Bergrin was released from prison on October 27, 2016, the United States Court of Appeals for the Sixth Circuit appointed CJA attorney, Steven Jaeger, Esq., to represent Mr. Bergrin to prepare the appeal brief. Mr. Bergrin needed to overturn Judge Polster's flawed and malicious Decision and Order in which Judge Polster declared Mr. Bergrin *Incompetent to Stand Trial* prior to dismissing the bogus criminal case. Mr. Bergrin was painfully aware that such a Decision and Order would destroy any chances that Mr. Bergrin would have to engage in any business ventures. However, Mr. Jaeger had been coerced by the United States Court of Appeals for the Sixth Circuit and by members of the United States Department of Justice to betray Mr. Bergrin and to file *an intentionally deficient appeal brief* on Mr. Bergrin's behalf. Mr. Bergrin knew *instantly* that Mr. Jaeger was planning to file an *intentionally deficient appeal*, because Mr. Jaeger refused to subpoena Mr. Bergrin's first 2 Competency Reports that were prepared by Tanya Cunic, Psy.D at the Federal Medical Center in Butner, North Carolina in accordance with Judge Polster's Order dated December 10, 2015, and those documents were of paramount importance to Mr. Bergrin having Judge Polster's malicious and wrongful Order overturned on appeal, because the Competency Reports represent undeniable evidence that Mr. Bergrin was, is, and always had been Competent to Stand Trial.

187. During a telephone call, Mr. Bergrin told Mr. Jaeger that there would be *severe consequences* (or words to that effect) for refusing to subpoena Mr. Bergrin's Competency Reports and for filing an *intentionally deficient appeal brief on Mr. Bergrin's behalf,* and Mr. Jaeger got scared, and Mr. Jaeger chose to exit the case. Mr. Jaeger then fabricated a story to the United States Court of Appeals for the Sixth Circuit so that he could be removed from the case. The Office of the U.S.

Attorney and Edward Bryan, Esq. coerced Mr. Jaeger to join in their *criminal conspiracy* and to file an *intentionally deficient appeal brief* on Mr. Bergrin's behalf, which were crimes and violations of Mr. Bergrin's constitutional rights. This agreement to violate Mr. Bergrin's constitutional rights was part of the *criminal conspiracy* that was initially developed by the FBI, by Judge Dan Polster, by the Assistant U.S. Attorneys (Brian McDonough and Matthew Shepherd), by the United States Marshals Service, by the Office of the Federal Public Defender, by the Judges at the United States Court of Appeals for the Sixth Circuit, by others that are employed by the U.S.D.O.J., and by those at the Northeast Ohio Correctional Center, and by those at CoreCivic, Inc. (formerly known as "Corrections Corporation of America"), and by numerous other above defendants.

188. After Mr. Jaeger was removed from the case, the United States Court of Appeals for the Sixth Circuit then appointed Gary W. Crim, Esq. to represent Mr. Bergrin in his appeal, but Edward Bryan, Esq. (who was working hand-in-hand with the Assistant U.S. Attorneys), "instructed Mr. Crim not to subpoena Mr. Bergrin's Competency Reports and he instructed Mr. Crim to file an intentionally deficient appeal brief on Mr. Bergrin's behalf". Mr. Crim communicated directly with Edward Bryan, who acted as an intermediary or conduit, and Edward Bryan communicated directly with his *handler*, Brian McDonough, Esq. Mr. Bergrin possesses incontrovertible evidence of the existence of this illicit relationship, because Mr. Crim inadvertently forwarded an email to Mr. Bergrin stating that he is talking with Edward Bryan, which was another violation of Mr. Bergrin's constitutional right to *conflict-free counsel*.

189. Mr. Bergrin was aware that Mr. Crim was also planning to file an *intentionally deficient appeal brief* on Mr. Bergrin's behalf, because Mr. Crim also refused to subpoena Mr. Bergrin's first 2 Competency Reports that were prepared by Tanya Cunic, Psy.D at the Federal Medical Center in Butner, North Carolina in accordance with Judge Polster's Order dated December 10, 2015, which documents were needed to be filed with the appeal, and which documents Mr. Bergrin had a constitutional right to receive, because the Competency Reports are "part of Mr. Bergrin's medical records".

190. Mr. Bergrin sent Mr. Crim more than fifteen (15) letters (including some via certified mail) instructing Mr. Crim to subpoena Mr. Bergrin's first 2 Competency Reports, which were prepared

at the Federal Medical Center, and to not file the appeal brief without including *all* four (4) of the Competency Reports which were prepared by the government's own doctors that are employed by the Federal Bureau of Prisons, but Mr. Crim violated Mr. Bergrin's constitutional rights and he filed the *intentionally deficient appeal brief* with the Court, and he did not include *any* of the four (4) Competency Reports with the appeal brief, and all four (4) of the Competency Reports state that *Mr. Bergrin is Competent to Stand Trial.* Mr. Crim became part of the criminal conspiracy to violate Mr. Bergrin's constitutional rights.

191.    On or about October 5, 2017, Mr. Bergrin sent a letter to the United States Court of Appeals for the Sixth Circuit in which Mr. Bergrin insisted that the *intentionally deficient document* that Mr. Crim filed be removed from the docket immediately, and Mr. Bergrin also requested that the venue be transferred to the Southern District of New York so that Mr. Bergrin can receive *justice* in the herein case. However, Mr. Bergrin's request for the venue to be transferred was denied, as was Mr. Bergrin's appeal, because Judge R. Guy Cole entered into the criminal conspiracy with Judge Polster. Throughout the 22+ months of Mr. Bergrin's incarceration, and after Mr. Bergrin's release from prison on October 27, 2016, Judge Cole denied *all* of Mr. Bergrin's Motions, Appeals, and Petitions for a Writ of Mandamus, despite knowing that Mr. Bergrin had a constitutional right for each and every legal brief to be *granted.*

192.    Judge R. Guy Cole and the Associate Judges of the United States Court of Appeals for the Sixth Circuit repeatedly violated Mr. Bergrin's Sixth Amendment constitutional rights in accordance with <u>Strickland v. Washington, 466 U.S. 668 (1984)</u> by denying Mr. Bergrin's numerous requests for such conflicted and ineffective CJA counsel to be removed from the herein case, but Judge R. Guy Cole appointed counsel that had agreed to take part in the *criminal conspiracy*, and Judge Cole refused to remove Gary Crim, Esq. from the case, and Mr. Crim then filed the *intentionally deficient appeal*, which was of course denied. How does an attorney file an appeal of a Decision and Order in which a highly competent person was erroneously declared incompetent by a corrupt Judge, and the attorney does not subpoena nor present the victim's Competency Reports, which clearly proves that the victim is competent?

193.    After Mr. Bergrin was released from prison and arrived in New York City on October 27, 2016, the criminal conspiracy continued within the ambit of the Fourteenth Amendment, and the above-named Defendants acted *under color of law,' and the conspiracy included numerous actions by* the

United States through its Judges in the District Court of Ohio, in the U.S. Court of Appeals for the Sixth Circuit, through the CJA attorneys whom were appointed to represent Mr. Bergrin, and through numerous members of the FBI in order to punish the victim in violation of the Fourteenth Amendment's direct admonition to the States."

194.    After Mr. Bergrin was released from prison on October 27, 2016, the FBI violated Mr. Bergrin's constitutional rights by committing *Witness Tampering* and *Obstruction of Justice*, by contacting and coercing *several* of Mr. Bergrin's trial-witnesses to work as Confidential Informants for the FBI. Jodi Gold was contacted by the FBI after the Assistant U.S. Attorneys learned that Mr. Bergrin was planning to call Ms. Gold as a witness in the herein case. Mr. Bergrin traveled to Ohio in November 2014 because Ms. Gold was in severely critical condition at the Cleveland Clinic. Tragically, Jodi Gold has since passed away, but prior to her death, Ms. Gold executed a notarized affidavit, and her husband, Dr. Gold, will testify that everything in the affidavit is truthful and accurate. Prior to her death, Jodi Gold shared with Mr. Bergrin that "a male and a female FBI agent came to Dr. and Ms. Gold's home in Roslyn, New York and attempted to coerce and intimidate Ms. Gold not to testify on behalf of Mr. Bergrin". Witness Tampering and Obstruction of Justice means absolutely nothing to members of the FBI, similar to the way in which the Constitution of the United States means absolutely nothing to Brian McDonough, Matthew Shepherd, Edward Bryan, Claire Curtis, Peter Elliott, Judge Dan Polster, and to Judge R. Guy Cole.

195.    After Mr. Bergrin was released from prison on October 27, 2016, one of Mr. Bergrin's Harvard educated attorneys who was intimidated and threatened by the FBI told Mr. Bergrin: "Between the Judges in Ohio and the FBI agents in New York, we're living in a third world country". Another Harvard educated attorney who Mr. Bergrin retained and who ultimately admitted to Mr. Bergrin that he was forced by the FBI agents to throw Mr. Bergrin under the proverbial bus prior to abandoning Mr. Bergrin's case, stated to Mr. Bergrin: "I've been a criminal defense attorney and a civil rights attorney for the past 42 years, and the worst people that I've come across are those employed by the government". Another Ivy League attorney that was retained to represent Mr. Bergrin told Mr. Bergrin: "I do not believe that there has ever been another case throughout the history of the United States in which a defendant's constitutional rights had been violated more times than your constitutional rights have been violated in the herein case". All three of these witnesses are highly reputable attorneys who will be called to testify in the herein case.

196.    After Mr. Bergrin was released from prison on October 27, 2016, the FBI agents also violated Mr. Bergrin's constitutional right to healthcare privacy under the HIPAA Act by contacting two (2) of Mr. Bergrin's doctors in New York City and by requesting that the doctors provide the FBI agents with *copies of Mr. Bergrin's medical records*. Mr. Bergrin will be calling both of these doctors to testify against the government in the herein case. The contacting of Mr. Bergrin's doctors by the FBI is defined as Witness Tampering, Obstruction of Justice, and Due Process violations, and the doctors will testify that they were *intimidated* by the members of the FBI. One of the doctors refused to cooperate with the FBI agents and the other doctor refused to say whether or not he cooperated with the FBI agents, but both of them will be called to testify against the government in the herein case.

197.    After Mr. Bergrin was released from prison on October 27, 2016, Mr. Bergrin received a letter from Mr. Bergrin's former cellmate at the Federal Medical Center in Butner, North Carolina, RTB. In his letter, RTB wrote that he had been "released from prison" (after serving less than two (2) years for being charged with selling methamphetamines, Guns, and Dynamite to an undercover ATF agent). Prior to being arrested for possessing and selling illegal drugs, guns, and dynamite, RTB had been arrested in the past for selling drugs, and RTB has a prior felony record. Under federal law, a person with a felony conviction is not permitted to possess or sell drugs, guns, or dynamite, and RTB is a convicted felon. The prison sentence for a convicted felon possessing only "a gun" is up to ten (10) years in prison, but RTB could have received a sentence of up to 24 years in prison. Mr. Bergrin knew instantly that this was another attempt by the U.S.D.O.J. to set-up and entrap Mr. Bergrin in a crime.

198.    In the letter that RTB had written to Mr. Bergrin, RTB asked Mr. Bergrin if Mr. Bergrin would finance a new business venture that RTB was starting. However, Mr. Bergrin knew that RTB was working as a Confidential Informant for the United States Department of Justice, and it's quite obvious that nobody from the United States Department of Justice informed RTB or RTB's handler, that after RTB offered to murder Judge Polster on Mr. Bergrin's behalf in May of 2016, that Mr. Bergrin then sent a letter to Judge Polster accusing the Government and RTB of attempting to set-up and entrap Mr. Bergrin in a crime. Had the Government told RTB that Mr. Bergrin is aware that RTB was working as an informant for the Government when RTB attempted to set-up and entrap Mr. Bergrin in a murder-for-hire scheme, RTB would not have sent Mr.