UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                    :

RONALD A. BERGRIN,             :
                                      :

                       Plaintiff,   :
                                      :                    19-CV-9681 (VSB)
          - against -        :
                                      :                **OPINION & ORDER**

UNITED STATES OF AMERICA, et al.,   :
                                      :

                     Defendants.  :
                                      :
-------------------------------------------------------X

<u>Appearances</u>:

Ronald A. Bergrin
New York, New York
*Pro Se Plaintiff*

Zachary Bannon
United States Attorney's Office
New York, New York

Timothy J. Bojanowski
Struck Love Bojanowski & Acedo, PLC
Chandler, Arizona

*Counsels for Defendants*

<u>VERNON S. BRODERICK, United States District Judge</u>:

       Before me are the motions to dismiss Plaintiff's amended complaint ("Amended

Complaint" or "Am. Compl."), (Doc. 7), from a group of defendants who are federal government

entities or federal employees (the "Moving Government Defendants"), (Doc. 74), and from

another group of defendants who are affiliated with CoreCivic, Inc. (the "CoreCivic

Defendants"), (Doc. 77).  Because I find that Plaintiff's claims are barred by (1) failure of

service, (2) lack of personal jurisdiction, (3) statute of limitations, and (4) immunity, Defendants

motions are GRANTED and Plaintiff's Amended Complaint is DISMISSED in its entirety.

## I.      Factual Background[1]

Plaintiff was born and grew up in New York.  (Am. Compl. ¶ 13.)  He moved to

Manhattan in 1981 where he worked as a real estate broker, (*id*. ¶ 14), and still maintained a

residence in New York City at the time the incidents that led to this case began, (*id*. ¶ 26).

In or about July 2009, Plaintiff's counsin Paul Bergrin, who was a criminal defense

attorney in Newark, New Jersey, was charged with drug-related crimes in connection with his

criminal clients in the drug business.  (*Id*. ¶ 17–18.)  In or about August 2009, while being

detained, Paul Bergrin sent a letter offer of a "54-month plea-deal" to the United States

Attorney's Office in New Jersey ("USAO NJ") through Plaintiff, his cousin.  (*Id*. ¶ 20.)  After

Plaintiff delivered the letter to USAO NJ, he received a call from "one of the Assistant U.S.

Attorneys" ("AUSAs"), who asked to meet with Plaintiff "to discuss the plea deal."  (*Id*. ¶ 21.)

The meeting took place at "the office of the Federal Bureau of Investigation" in Newark, and

Plaintiff met with Special Agents Shawn Brokos and Steven Cline from the Federal Bureau of

Investigation ("FBI").  (*Id*. ¶ 22.)  Although the two FBI agents appeared friendly at first, they

ultimately rejected the plea deal and made clear that they "would not consider anything less than

20 years."  (*Id*. ¶ 23.)

---

[1] The facts contained in this section are based upon the factual allegations set forth in Plaintiff's Amended Complaint.  Many of these allegations strain credulity and are implausible on their face.  Indeed, as will be discussed below, some of the allegations could be characterized as fanciful, fantastic, or delusional.  My reference to these allegations should not be construed as a finding as to their veracity, and I make no such findings.

A court may dismiss a complaint, even a "sufficiently well-pleaded" one, if it contains "fanciful, fantastic, or delusional" facts.  *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011) (quoting *Denton v. Hernandez*, 504 U.S. 25, 32–33 (1992)) (internal quotation marks omitted).  Here, I make no findings as to which of Plaintiff's allegations are "fanciful, fantastic, or delusional," for I find other grounds to dismiss the Amended Complaint.  The fanciful, fantastic, or delusional nature of these allegations did not effect my analysis or influence my decision except in my finding that any further attempt from Plaintiff to amend would be futile.  *See infra*.  With this understanding, I assume the allegations in the Amended Complaint to be true in considering the motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007).

A week after the meeting, Brokos reached out to Plaintiff to seek Plaintiff's cooperation in the prosecution against Paul Bergrin by working as an informant for the government.  (*Id.* ¶ 24.)  Plaintiff refused the request because he "did not want to be disloyal to his cousin."  (*Id.*)

Within a couple of weeks, the "retaliation" from the FBI began, which ultimately became five years of "severe, persistent, and pervasive harassment."  (*Id.* ¶¶ 26, 28.)  FBI agents would wait outside Plaintiff's residence and "say obnoxious things to [him] when he walked out," including "accus[ing] [him] of being 'A Traitor To [his] Country.'"  (*Id.* ¶ 26.)  FBI agents contacted "in excess of 200 people that [Plaintiff] had relationships with" and told them that Plaintiff was involved in crimes with his cousin.  (*Id.* ¶ 27.)  FBI agents "intimidated and threatened" these people in order to force them to become informants against Plaintiff.  (*Id.* ¶ 28.)  FBI agents and those people who agreed to become informants (60 out of the 200 people) attempted to "set-up and entrap" Plaintiff in crimes "every 45-60 days," for a total of over fifty entrapment attempts during the five years.  (*Id.* ¶¶ 28–29.)  Examples of these entrapment attempts and harassment include:

- Plaintiff's neighbor in Manhattan, after becoming a government informant, climbed onto the roof of the building they lived in and "spliced into [Plaintiff's] cable-wire [and then] download[ed] all of [Plaintiff's] personal files" from his personal computer.  (*Id.* ¶¶ 31–32.)

- An FBI agent attempted to murder Plaintiff by hitting him with a car as he was crossing the street.  (*Id.* ¶ 40.)

- Abdul J, a friend of Paul Bergrin's, cooperated with the FBI and attempted to entrap Plaintiff with the murder of a witness who would testify against Paul Bergrin.  Abdul J told Plaintiff, during their meeting at a pizza restaurant, that "I

could arrange to have [the witness] killed in prison if you give me the go ahead." Plaintiff refused, and later discovered that people who looked like FBI agents were waiting outside the pizza restaurant in a car, apparently recording the conversation.  (*Id*. ¶¶ 46–59.)

- Plaintiff received messages from an allegedly 16-year-old girl who invited him to her home where they would "have the house to [themselves]."  Plaintiff never knew this girl before, and he told the investigator he hired for his cousin's case about this incident.  The investigator told Plaintiff that the FBI "often sets-up men and entraps them" with sex with underage girls.  (*Id*. ¶¶ 60–61.)

- FBI agents told Plaintiff's landlord that Plaintiff had been involved in "income tax evasion, money laundering, and other crimes" and warned the landlord that "[i]t is illegal to accept dirty money once you know that the money is dirty."  As a result, Plaintiff's landlord asked Plaintiff to move out upon the expiration of the lease.

   (*Id*. ¶ 65.)

In addition, FBI agents put "near-lockstep surveillance" on Plaintiff such that he "could not leave his home without FBI agents following him."  (*Id*. ¶ 34.)  FBI agents even arranged with local police to "sit in police cars outside of his Mother's home 24/7" when Plaintiff visited his mother in Florida.  (*Id*.)  The harassment did not stop but continued after Paul Bergrin was convicted, during a second trial, in 2013.[2]  (*Id*. ¶ 41.)

Due to the stress caused by such "harassment," Plaintiff suffered a "severe heart attack"

---

[2] On September 23, 2012, Paul Bergrin was sentenced to multiple mandatory terms of lifetime imprisonment after a two-month jury trial before U.S. District Judge Dennis M. Cavanaugh.  *See Attorney Paul W. Bergrin Sentenced To Life In Prison For Murder Conspiracy And Racketeering Offenses*, United States Attorney's Office of the District of New Jersey, https://www.justice.gov/archive/usao/nj/Press/files/Bergrin,%20Paul%20Sentencing%20News%20Release.html (last accessed March 28, 2022).

in June 2011, and underwent several surgical procedures.  (*Id.* ¶ 35.)  Plaintiff was then

prescribed numerous heart-related medications which he was required to take on a daily basis.

(*Id.*)

Plaintiff attempted to contact (1) James Comey, then-director of the FBI; (2) Aaron Ford,

then-director of the FBI's field office in Newark; and (3) Paul Fishman, then-U.S. Attorney for

the District of New Jersey.  (*Id.* ¶¶ 30, 37.)  None of them accepted Plaintiff's calls, replied to his

letters, or otherwise did anything to stop the "harassment" from the FBI.  (*Id.*)  Plaintiff

contacted the Office of the Inspector General, which also refused to intervene but advised

Plaintiff that he could "file a complaint against the FBI with the FBI."  (*Id.* ¶ 37.)  Plaintiff did

not think this advice "make any sense."  (*Id.*)

Plaintiff learned that one of the crimes Paul Bergrin was charged with was "conspiracy to

cause the death of a drug dealer in Newark, New Jersey who had been working for the FBI as a

Confidential Informant."  (*Id.* ¶ 18.)  Subsequently, the investigators that Plaintiff hired for Paul

Bergrin's case told Plaintiff that they had "uncovered the reason that [the FBI agents, in

particular Agent Brokos]" kept harassing Plaintiff.  (*Id.* ¶ 68.)  Specifically, these investigators

found that Brokos negligently exposed the identity of the drug dealer as a government informant.

(*Id.* ¶ 68–70.)  One of the members of a street gang that conducted business with this drug dealer

happened to be Paul Bergrin's client; after learning that the drug dealer was an informant, Paul

Bergrin suggested to "get rid of" this drug dealer-informant, and the person was subsequently

murdered.  (*Id.* ¶ 71.)  The conclusion drawn from Plaintiff's investigation was that Brokos

destroyed Plaintiff's life and business in order to "prevent the numerous investigators that

[Plaintiff] had retained for his cousin from finding out the details of [her] negligence."  (*Id.* ¶ 70.)

In 2013, Brokos was transferred from New Jersey to Pittsburgh, Pennsylvania.  (*Id.* ¶ 73.)

Plaintiff obtained Broko's home address though Google, and sent her "Easter Cards," thinking that "if Ms. Brokos was aware that [Plaintiff] knew where she lived in Pennsylvania, that *she might put an end to the severe, persistent, and pervasive harassment* by pulling the other FBI agents off of [Plaintiff]." (*Id.* ¶ 74.) Plaintiff also considered "stopping by the home of [Brokos] . . . to say hello," just to let her know that "[Plaintiff] *knows where she lives.*" (*Id.* ¶ 76 (internal quotation marks omitted).)

In mid-November 2014, Plaintiff sent a letter to Aaron Ford and James Comey, informing them that Plaintiff would serve them, as well as several others including Brokos, with a civil lawsuit for harassment within the next sixty days. (*Id.* ¶ 77.) On December 19, 2014, Plaintiff was arrested at a hotel during his visit to a friend in Cleveland, Ohio. (*Id.* ¶ 79.) He was then charged with "threatening an FBI agent via email."[3] (*Id.*)

After Plaintiff was charged, Brian McDonough, the AUSA assigned to his case, offered him a plea deal to a one-count misdemeanor, which Plaintiff rejected. (*Id.* ¶ 86.) Subsequently, Plaintiff was transferred to the Northeast Ohio Correctional Center ("NOCC") in Youngstown, Ohio, which was a private prison owned and managed by CoreCivic, Inc. ("CoreCivic"). (*Id.* ¶ 87.) At NOCC, pre-trial inmates like Plaintiff were under the custody of the United States Marshals Service ("USMS"). (*Id.*)

On December 30, 2014, Plaintiff was brought before Magistrate Judge Nancy Vecchiarelli of the Northern District of Ohio for a bail hearing. (*Id.* ¶ 88.) There, Plaintiff met with Carolyn Kucharski from the Office of the Federal Public Defender ("FPDO"), who was

---

[3] Specifically, Plaintiff sent an email from the Northern District of Ohio in which he made comments about Agent Brokos that "She thinks she's living in a safe place. A place where nobody can find out where she lives and nobody could get her. I'm going to teach her that I could crush her like the bug she is . . . She will never sleep at night again. She will have nightmares." *New York Man Indicted for Cyberstalking FBI Agent*, United States Attorney's Office of the Northern District of Ohio, https://www.justice.gov/usao-ndoh/pr/new-york-man-indicted-cyberstalking-fbi-agent (last accessed March 28, 2022).

assigned as his counsel.  (*Id.*)  During their meeting with AUSAs Brian McDonough, Matthew

Shepherd, and the two FBI agents who arrested Plaintiff, Kucharski "betrayed [Plaintiff] by

arguing vociferously against [him] receiving bail."  (*Id.* ¶¶ 89–90.)  Plaintiff started to argue with

his own attorney, meanwhile the two AUSAs and the two FBI agents were "laughing at

[Plaintiff]."  (*Id.* ¶ 90.)  After the meeting, when Kucharski and Plaintiff were alone in the

attorney-client meeting room, Kucharski "started crying profusely," saying that she and her

colleague Edward Bryan were under FBI criminal investigation, and that the FBI pressured them

into "betraying" Plaintiff by arguing against his bail, so that she and Bryan could avoid being

charged by the government.  (*Id.* ¶¶ 91–92.)  After learning this information, Plaintiff

immediately requested a meeting to inform Judge Vecchiarelli of what Kucharski told him.

Kucharski confirmed Plaintiff's statements with Judge Vecchiarelli.  (*Id.* ¶ 93.)  Judge

Vecchiarelli then disqualified the FPDO from the case.  (*Id.*)

Nevertheless, Plaintiff was denied bail by Judge Vecchiarelli.  (*Id.* ¶ 104.)  Plaintiff then

appeared before District Judge Dan A. Polster of the Northern District of Ohio with his newly-

appointed Criminal Justice Act attorney Michael O'Shea.  (*Id.* ¶¶ 95, 105.)  Judge Polster told

Plaintiff that O'Shea had requested that Plaintiff undergo a psychological evaluation to ensure

that he was competent to stand trial.  (*Id.* ¶ 106.)  Judge Polster then ordered Plaintiff to undergo

a psychological evaluation.  (*Id.* ¶ 108.)

Plaintiff was sent to the Metropolitan Correctional Center ("MCC") in Chicago for a 10-

week psychological evaluation, at the conclusion of which the doctors determined that Plaintiff

was competent to stand trial.  (*Id.* ¶ 110.)  The doctors told Plaintiff that Judge Polster contacted

them and "repeatedly attempted to pressure the doctors to declare [Plaintiff] *incompetent to stand*

*trial*."  (*Id.*)  After Plaintiff returned to Ohio from Chicago, Judge Polster denied Planitiff's

motion for a speedy trial and refused to set a trial date, such that Plaintiff would stay detained for the following sixteen months. (*Id*. ¶ 112.) Judge Polster also reappointed Carolyn Kucharski, Edward Bryan, and Claire Curtis from the FPDO to represent Plaintiff, despite Judge Vecchiarelli's previous order that disqualified these attorneys. (*Id*.)

After Plaintiff returned to NOCC from Chicago, the medical staff refused to give Plaintiff his prescribed heart-related medications that he needed to take every day. (*Id*. ¶ 114.) Peter Elliott, a United States Marshal in Cleveland, instructed Warden Laura Bedard to order the medical staff to withhold Plaintiff's medication, despite knowing, based on Plaintiff's medical records, that even a short period without the medication could lead to severe illness. (*Id*. ¶ 115.) Plaintiff quickly began experiencing heart problems, and his entire body "filled-up with fluid," which led to severe and permanent damage to his heart in the ensuing six months. (*Id*. ¶¶ 117, 119.)

On July 21, 2015, Plaintiff was taken out of his prison cell and brought to the courthouse in Cleveland. (*Id*. ¶ 138.) When he arrived, the U.S. Marshals brought him and another inmate to the basement of the courthouse. (*Id*.) The two were then locked inside a "freezer" for hours where "[t]he temperature . . . was Below Zero." (*Id*. ¶¶ 138–139.) The U.S Marshals "ignored their pleas" to get out and were "laugh[ing]" and "celebrating" when the other inmate passed out from "hypothermia." (*Id*. ¶¶ 139–140.) Plaintiff afterwards told his cardiologist in New York about this incident. (*Id*. ¶ 142.) His cardiologist told him that as a result of not taking his prescribed medicine, his body was "filled up with fluids [which] insulated [his] heart" against the temperature in the freezer and that, but for the fluid, he "would surely have died in that freezer." (*Id*. ¶ 143.)

Plaintiff's doctors in New York City called NOCC and asked a senior member of the

medical staff, Renee Sferra, to give Plaintiff his medication immediately.  (*Id.* ¶ 148.)  Sferra rejected this request.  (*Id.*)  Plaintiff also filed numerous motions and letters with Judge Polster, requesting that his medication be administered, all of which Judge Polster denied.  (*Id.* ¶ 150.)  Plaintiff wrote letters to Chief Judge Solomon Oliver, Jr. of the Northern District of Ohio, but did not receive a response.  (*Id.* ¶ 153.)  Plaintiff also wrote letters to Steven Dettelbach, then-U.S. Attorney for the Northern District of Ohio, and Dennis Terez from FPDO; again, neither of them responded.  (*Id.* ¶ 154.)

In December 2015, Plaintiff was taken to the courthouse for a competency hearing.  (*Id.* ¶ 155.)  Despite the MCC doctors' finding that Plaintiff was competent to stand trial, Plaintiff's counsel, Edward Bryan and Claire Curtis, retained another doctor named George Schemedlen to testify that Plaintiff was incompetent to stand trial.  (*Id.*)  Plaintiff was not permitted to question Schemedlen or to present witnesses himself.  (*Id.*)  Bryan and Curtis later told Plaintiff that Judge Polster told them:  "If [Plaintiff] were to say anything during the hearing, I will hold [him] in Contempt of Court and I will sentence [Plaintiff] to six months of prison for each time he opens his mouth."  (*Id.* ¶ 156.)

On January 3, 2016, Plaintiff was removed from NOCC to the Federal Medical Center ("FMC") in Butner, North Carolina for "Competency Restoration."  (*Id.* ¶ 160.)  When he arrived, he was again "placed into a *freezer* by himself for the following 24-hour period."  (*Id.* ¶ 162.)  During Plaintiff's time at FMC, Judge Polster contacted Tanya Cunic, Plaintiff's primary doctor at FMC, and asked her to "fraudulently declare [Plaintiff] incompetent to stand trial" and threatened to have her job terminated if she refused.  (*Id.* ¶¶ 164–66.)  Cunic told Plaintiff that she documented Judge Polster's "criminal behavior" in Plaintiff's two Competency Reports.  (*Id.* ¶¶ 164, 167.)  Upon learning of the two reports, Judge Polster ordered them to be sealed and

contacted Warden J.C. Holland at FMC "to keep [Plaintiff] incarcerated" for an additional 90

days.  (*Id*. ¶¶ 168, 171.)

During this time, the government continued its attempt to entrap Plaintiff.  For example,

Plaintiff's cellmate at FMC, RTB, who was a government informant, attempted to entrap

Plaintiff by offering to murder Judge Polster for Plaintiff for a nominal amount of money.  (*Id*. ¶

175.)  In addition, the government worked with Bryan, Plaintiff's lawyer, to entrap Plaintiff by

giving him the Presentence Investigation Report of another defendant who was a "highly

attractive woman," who Bryan identified as one of his clients.  (*Id*. ¶¶ 178–79.)

On October 26, 2016, Judge Polster dismissed Plaintiff's case after declaring again that

Plaintiff was incompetent to stand trial.  (*Id*. ¶ 180.)  Plaintiff was released from prison the next

day, but was not satisfied with the result.  (*Id*. ¶¶ 182–83.)  Instead, he appealed the dismissal of

his case with the assistance of CJA attorney Steven Jaeger.  (*Id*. ¶ 186.)  Jaeger, however, refused

to subpoena Plaintiff's first two Competency Reports, which documented Judge Polster's

"criminal behavior."  (*Id*.)  Plaintiff called Jaeger and told him that "there would be *severe*

*consequences* (or words to that effect) for refusing to subpoena the Competency Reports and for

filing an *intentionally deficient appeal brief*."  (*Id*. ¶ 187.)  Jaeger then "got scared" and

"fabricated a story to the . . . [Sixth Circuit] so that he could be removed from this case."  (*Id*.)

After Jaeger's withdrawal, another CJA counsel, Gary Crim, was appointed as Plaintiff's

counsel.  (*Id*. ¶ 188.)  However, Crim also refused to subpoena Plaintiff's two Competency

Reports.  (*Id*. ¶¶ 188–89.)  Subsequently, Judge R. Guy Cole from the Sixth Circuit denied all

Plaintiff's "Appeals, Motions, and Petitions for a Writ of Mandamus."  (*Id*. ¶ 191.)

Meanwhile, the FBI agents continued to harass Plaintiff's friends and lawyers to prevent

him from proceeding with his case.  The FBI harassed Plaintiff by:  (1) coercing and intimidating

Plaintiff's friend, Jodi Gold, to prevent her from testifing on behalf of Plaintiff in his case against the FBI, (*id*. ¶ 194); (2) forcing and intimidating the "Ivy League" attorneys that Plaintiff retained into "throw[ing] [Plaintiff] under the proverbial bus prior to abandoning [his] case," (*id*. ¶ 195); (3) threatening Richard K., another lawyer Plaintiff retained, to destroy Plaintiff's case by "staying on the case and eating up as much time as possible," (*id*. ¶¶ 200–03); (4) instructing the Comenity Bank to terminate Plaintiff's credit card, (*id*. ¶ 204); (5) coercing Plaintiff's former girlfriend, Ana P., and his former clients, Vito R. and Kenneth Kelner, to entrap him in various crimes, (*id*. ¶¶ 205, 208, 212); (6) pretending to be "young beautiful women" from dating apps trying to contact Plaintiff, (*id*. ¶ 209); and (7) harassing  acquaintances of Plaintiff, (*see id*. ¶ 206).

Kenneth Kelner, Plaintiff's former business client, was misled by the FBI into believing that Plaintiff had committed crimes, and therefore refused to pay Plaintiff substantial fees to which Plaintiff was entitled as part of their contract.  (*Id*. ¶ 212.)  Plaintiff sued Kelner in the Supreme Court of the State of New York, where the case was pending before Judge Robert R. Reed.  (*Id*. ¶ 214.)  At the suggestion of Judge Cole, Judge Reed intended to declare Plaintiff incompetent to bring a civil suit.  (*Id*. ¶ 216.)  Upon learning this information, Plaintiff's attorney immediately withdrew the lawsuit.  (*Id*.)

After Plaintiff returned home from prison, he found that "in excess of Three Million Dollars in valuables" were taken from his apartment by his landlord because the FBI told his landlord that Plaintiff "[was not] coming home."  (*Id*. ¶¶ 218–20.)  Plaintiff sued his landlord, and the case was also assigned to Judge Reed.  (*Id*. ¶ 221.)  However, "the Judges in Ohio interfered" by calling Judge Reed and asking him to ensure that "[Plaintiff did] not receive any money."  (*Id*. ¶¶ 218, 221.)  Shortly thereafter, Judge Reed fined Plaintiff $250 for "no legitimate

reason whatsoever." (*Id*. ¶ 222.)  FBI agents also contacted Plaintiff's counsel in that case and attempted to pressure the attorney to enter into a stipulation to "withdraw the civil suit . . . because [Plaintiff] was declared Incompetent to Bring a Civil Suit." (*Id*. ¶ 225.)  The attorney later stipulated to withdraw the case, but did not put that language into the stipulation. (*Id*.)

Plaintiff subsequently brought this case, with a 135-page Amended Complaint consisting of 542 paragraphs, alleging 32 causes of action against 53 defendants (including 42 individual defendants).  The claims include malicious prosecution, harassment, battery, and false imprisonment, all arising under 42 U.S.C. § 1983.  The dendants appear below in groups of affiliation based on the allegations in the Amended Complaint:

- United States of America, United States Department of Justice ("USDOJ"), FBI, USAO,[4] USMS, Federal Bureau of Prisons ("FBP"), Office of the Inspector General, Office of the Attorney General, (together, the "Government Entity Defendants");

- Judge Dan Polster, Judge R. Guy Cole, Judge Eric L. Clay, Judge Damon J. Keith, Judge Deborah H. Cook, Judge Benice B. Donald, Judge Ronald Kee Gilman, Judge Karen Nelson Moore, Judge Richard Allen Griffin, Judge Richard F. Suhrhenrich, Judge Jane Branstetter Stranch, Judge Solomon Oliver, Jr. (together, the "Sixth Circuit Defendants");

- Peter Elliot and John Doe of USMS in Cleveland, Ohio;

- John Doe of USMS in Butner, North Carolina;

- J.C. Holland, Warden at FMC-Butner;

- James Comey, Aaron Ford, Shawn Brokos, Steven Cline, Paul Fishman,

---

[4] Plaintiff appears to be suing the USAO located in both New Jersey and Ohio.

(together, the "NJ Investigation Defendants");

- John/Jane Doe FBI agents;

- Steven Dettlebach, Brian McDonough, Matthew Shepard (together, the "USAO Ohio Defendants");

- FPDO, Denni Terez, Clarie Curtis, Carolyn Kucharski, Steven Jaeger, Gary Crim (together, the "Defense Attorney Defendants");

- George W. Schmedlen, PhD, a court-appointed expert;

- NOCC, CoreCivic, Damons Hininger, Steven Grooms, Laura Bedard, Dana Hivner, Jason Rupeka, Renee Sferra, Steven Senich, Kurt Kampfer, Deborah Johnson, Arlene Glass (i.e. the "CoreCivic Defendants"); and

- Judge Robert R. Reed from the New York Supreme Court.

(*Id.* ¶¶ 253–541.)  Plaintiff also brings a Bivens action against "certain members and former members of the FBI and of the United States Department of Justice[,] the DOJ."  (*Id.* ¶ 237.)

## II.   **Procedural History**

Plaintiff filed his complaint on October 21, 2019.  (Doc. 1.)  On December 5, 2019, Plaintiff filed his Amended Complaint.  (Doc. 7.)  Affidavits of Service were filed with respect to USDOJ, (Doc. 11); CoreCivic, (Doc. 20); USAO, (Doc. 22); FBI, (Doc. 42); FBP, (Doc. 43); Juge Robert R. Reed, (Doc. 46); J.C. Holland, (Doc. 49); and the Office of the Attorney General, (Doc. 51).  Summonses were returned executed with respect to NOCC, (Doc. 14); Brian McDonough, (Doc. 15); Damons Hininger (Doc. 17); Steven Grooms, (Doc. 18); FPDO, (Doc. 28); Claire Curtis, (Doc. 29); Steven Senich, (Doc. 30); Dana Hivner, (Doc. 31); Judge Dan Polster, (Doc. 32); Judge R. Guy Cole, (Doc. 33); Renee Sferra, (Doc. 34); USMS, (Doc. 35); Matthew Shepherd, (Doc. 36); and Shawn Brokos, (Doc. 56).

On June 15, 2020, the USAO for the Southern District of New York, which represents the

Government Entity Defendants, the NJ Investigation Defendants, the USAO Ohio Defendants,

Peter Elliot, J.C. Holland, and all the Sixth Circuit Defendants except Judge Polster, Judge

Griffin, and Judge Oliver, (*i.e.* the "Government Moving Defendants") filed a motion to dismiss

Plaintiff's Amended Complaint.  (Doc. 74.)  On the same day, the CoreCivic Defendants filed

their motion to dismiss Plaintiff's Amended Complaint.  (Doc. 77).  On August 4, 2020, Plaintiff

filed his opposition to Defendants' motions to dismiss.  (Doc. 87.)  On December 18, 2020, the

Government Moving Defendants filed their reply to Plaintiff's opposition.  (Doc. 91.)  The

CoreCivic Defendants did not file a reply.

## III.   <u>Legal Standards</u>

### A.   *Rule 12(b)(1)*

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1)

when the district court lacks the statutory or constitutional power to adjudicate it," *Makarova v.

United States*, 201 F.3d 110, 113 (2d Cir. 2000), and a court can raise such an issue to dismiss a

case sua sponte, *see Fountain v. Karim*, 838 F.3d 129, 133 n.5 (2d Cir. 2016).  While a district

court resolving a motion to dismiss under Rule 12(b)(1) "must take all uncontroverted facts in

the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting

jurisdiction," "where jurisdictional facts are placed in dispute, the court has the power and

obligation to decide issues of fact by reference to evidence outside the pleadings, such as

affidavits," in which case "the party asserting subject matter jurisdiction has the burden of

proving by a preponderance of the evidence that it exists."  *Tandon v. Captain's Cove Marina of

Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (alteration, internal quotation marks, and

citation omitted).  Finally, "[a] court must liberally construe a pro se litigant's papers when

considering a motion to dismiss under Rule 12(b)(1)." *Jones v. Nat'l Commun. & Surveillance Networks*, 409 F. Supp. 2d 456, 465-66 (S.D.N.Y. 2006) (*Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995)).  "Notwithstanding the liberal pleading standard afforded *pro se* litigants, federal courts are courts of limited jurisdiction and may not preside over cases if subject matter jurisdiction is lacking." *Chestnut v. Wells Fargo Bank, N.A.*, No. 11 Civ. 5369, 2012 WL 1657362, at *3 (E.D.N.Y. May 7, 2012) (citing *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700–01 (2d Cir. 2000).

### B.    *Rule 12(b)(2)*

A court may "turn[] directly to personal jurisdiction" to dismiss an action where it faces "a straightforward personal jurisdiction issue" that "present[s] no complex question of state law." *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 588 (1999).  A plaintiff opposing a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) "bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010) (citing *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 206 (2d Cir. 2003) (per curiam)).  To survive such a motion, a plaintiff must make a prima facie showing that jurisdiction exists." *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 167–68 (2d Cir. 2015) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013).  This showing may be made through materials outside the pleadings, such as affidavits submitted by parties, *see DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001), and it "must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)).

Plaintiff's averments "must be taken as true to the extent they are uncontroverted by the defendant's" submissions. *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) (internal quotation marks omitted). The court, however, "will not draw argumentative inferences in the plaintiff's favor, nor must [a court] accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks*, 714 F.3d at 673 (internal citations and quotation marks omitted).

### C.    *Rule 12(b)(5)*

Rule 12(b)(5) authorizes a court to dismiss a complaint for insufficient service of process prior to a defendant filing an answer. *See* Fed. R. Civ. P. 12(b)(5). "In deciding a Rule 12(b)(5) motion, a Court must look to Rule 4, which governs the content, issuance, and service of a summons." *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 64 (S.D.N.Y. 2010). Under Rule 4(m), "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). If the plaintiff is able to demonstrate good cause, the court must grant the plaintiff an extension of time for service. *See id.* Even where a plaintiff does not show good cause, "district courts have disrection to grant extensions" to effect adequate service. *Zapata v. City of New York*, 502 F.3d 192, 196 (2d Cir. 2007); *see also George v. Prof'l Disposables Int'l, Inc.*, 221 F. Supp. 3d 428, 433 (S.D.N.Y. 2016) ("In certain circumstances, a court may grant an extension under Rule 4(m) even absent a showing of good cause, but this power is discretionary[.]").

When a defendant moves for dismissal for inadequate service of process, the plaintiff "bears the burden of proving inadequate service." *George*, 221 F. Supp. 3d at 442. In

considering the motion, the court "must look to matters outside the complaint," including affidavits and supporting materials, to determine whether service was proper. *Mende v. Milestone Tech., Inc.*, 269 F. Supp. 2d 246, 251 (S.D.N.Y. 2003).

      **D.**     ***Rule 12(b)(6)***

      To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully."

      In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner*, 496 F.3d at 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). Finally, although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.* A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers*, 282 F.3d at 152.

      Even after *Twombly* and *Iqbal*, a "document filed *pro se* is to be liberally construed," *Boykin v. KeyCorp*, 521 F.3d 202, 214 (2d Cir. 2008) (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)), and pro se pleadings should be read "to raise the strongest arguments that they

suggest."  *Brownell v. Krom*, 446 F.3d 305, 310 (2d Cir. 2006) (quoting *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003)); *see also Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (stating that the submissions of *pro se* litigants are "held to less stringent standards than formal pleadings drafted by lawyers" (internal quotation marks omitted)); *Ruotolo v. I.R.S.*, 28 F.3d 6, 8 (2d Cir. 1994) (recognizing that pro se litigants should be accorded "special solicitude").  However, *pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (internal quotation marks omitted).  Lastly, a court may dismiss a pro se complaint sua sponte for failure to state a claim, as long as the plaintiff has been given an opportunity to be heard. *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 313 (S.D.N.Y. 2001) (citing *Thomas v. Scully*, 943 F.2d 259, 260 (2d Cir. 1991)).

IV.   **Discussion**

A.   *Failure of Service*

All Defendants should have been served by January 19, 2020.  As of the filing of this Opinion & Order, Plaintiff provides no evidence of service for 30 out of the 53 Defendants.  In a letter dated January 22, 2020, Plaintiff claims that he served "approximately 33 of the more than 50 Defendants" named in this case, but admitted that "there will not be any additional service of any additional Defendants."  (Doc. 50, at 1–2.)

"[P]laintiff's pro se status is no excuse for failure to serve[.]"  *See Harper v. N.Y.C. Admin. for Children's Servs.*, No. 09 Civ. 2468(JGK), 2010 WL 23328 at *4 (S.D.N.Y. Jan. 4, 2010).  Although a court can exercise its discretion to afford pro se plaintiffs "a certain amount of latitude," pro se litigants are still required to at least "attempt to comply with procedural rules." *Yadav v. Brookhaven Nat'l. Lab.*, 487 F. App'x 671, 672 (2d Cir. 2012).  Here, I need

not exercise discretion to afford Plaintiff any leniency because Plaintiff has made clear that he would not even attempt to serve the remaining Defendants.  The only explanation Plaintiff provides for the failure to serve was that "the FBI [was] instructing [the Defendants] to 'refuse service.'" (Doc. 50, at 2.)  Plaintiff provides no support whatsoever for this conclusory, bare-bones allegation; nor has he asked for any extension to complete service or sought any injunction from me against the alleged "FBI interference."  I find no good cause that can excuse Plaintiff's failure to serve.

Accordingly, I must dismiss the claims against the following unserved Defendants upon the motion from the Government Moving Defendants:  James Comey, Aaron Ford, Steven Cline, Paul Fishman, the Office of the Inspector General, Peter Elliott, Steven Dettlebach, Judge Eric Clay, Judge Deborah Cook, Judge Bernice Donald, Judge Ronald Lee Gilman, Judge Karen Nelson Moore, Judge Richard Suhrhenrich, and Judge Jane Stranch.  (Gov. MTD, at 24.)[5] Similarly, I must dismiss the claims against the following unserved Defendants upon the motion from the CoreCivic Defendants:  Laura Bedard, Jason Rupeka, Kurt Kampfer, Deborah Johnson, and Arlene Glass.  (CoreCivic MTD, at 13.)[6]

I further dismiss the claims against the unserved Defendants under Rule 4(m) sua sponte, as they have not appeared in this case:  Dr. Schmedlen, Judge Oliver, Judge Griffin, Denni Terez, Carolyn Kucharski, Steven Jaeger, Gary Crim, the two John Doe defendants of USMS

---

[5] "Gov. MTD" refers to the memorandum of law in support of the Government Moving Defendants' motion to dismiss.  (Doc. 75.)

There is no evidence from the docket that Judge Damon J. Keith was served, but the Government does not move on behalf on Judge Keith to dismiss the case for insufficient service.  Nevertheless, as will be explained later, the claims against Judge Keith should be dismissed for lack of personal jurisdiction, or, alternatively, on the basis of judicial immunity.

[6] "CoreCivic MTD" refers to the memorandum of law in support of CoreCivic Defendants' motion to dismiss.  (Doc. 78.)

and one John/Jane Doe Defendant from FBI.[7]

        **B.**    *Personal Jurisdiction*

        **1. Applicable Law**

Whether a foreign defendant can be sued in a federal court "is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996) (quoting *Arrowsmith v. United Press Int'l*, 320 F.2d 219, 223 (2d Cir. 1963) (en banc)).  In assessing whether personal jurisdiction exists, courts "engage in a two-part analysis, first determining whether there is a statutory basis for exercising personal jurisdiction, and second deciding whether the exercise of jurisdiction comports with due process." *BWP Media USA Inc. v. Hollywood Fan Sites, LLC*, 69 F. Supp. 3d 342, 349 (S.D.N.Y. 2014) (citing *NAF Holdings, LLC v. Li & Fung (Trading) Ltd.*, No. 10 CIV. 5762 PAE, 2013 WL 489020, at *7 (S.D.N.Y. Feb. 8, 2013), *vacated and remanded on other grounds*, 801 F.3d 92 (2d Cir. 2015)).

Therefore, I will apply New York law in considering the statutory basis of personal jurisdiction.  *See Metro. Life Ins. Co.*, 84 F.3d at 567.  In New York, personal jurisdiction can be based on "general jurisdiction" under N.Y. C.P.L.R. § 301 or "long-arm jurisdiction," also known as specific jurisdiction, under N.Y. C.P.L.R. § 302.  *See Noval Williams Films LLC v. Branca*, 128 F. Supp. 3d 781, 786 (S.D.N.Y. 2015).  A court may exercise general jurisdiction over an out-of-state defendant if the defendant engages "in 'continuous, permanent, and substantial activity in New York.'"  *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 (2d

---

[7] Because (1) the government does not indicate that it represents these unnamed Defendants or moves on their behalf, and (2) Plaintiff has never attempted to identify these Defendants or asked for my assistance to identify these Defendants, I take these unnamed Defendants as having not appeared in this case.

Cir. 2000) (quoting *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990)); *see* N.Y. C.P.L.R. § 301.  If there is no general jurisdiction, a court may exercise specific jurisdiction over an out-of-state defendant, in a matter that "arises out of" the defendant's activities in New York, if the defendant :

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
>
> 2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act; or
>
> 3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he
>
>> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>>
>> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce;[8]

N.Y. C.P.L.R. § 302.  If the court finds a statutory basis for personal jurisdiction, it will proceed to the due process analysis, which requires that defendants have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'"  *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

"Minimum contacts must have a basis in 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits

---

[8] N.Y. C.P.L.R. § 302(a)(4) also extends jurisdiction to a defendant who "owns, uses or possesses any real property situated within the state."  For this provision to apply, the plaintiff's "cause of action [must] arise[] out of the fact of ownership, use or possession of New York realty."  *Elsevier, Inc. v. Grossman*, 77 F. Supp. 3d 331, 346 (S.D.N.Y. 2015).  Although Plaintiff claims that his "valuables" in his apartment were taken away and seeks damages, (Am. Compl. ¶¶ 218–20), these "valuables" are not real property, and, in any case, his causes of action do not arise out of the ownership, use, or possession of these "valuables."  *See id*. ("[I]t is not enough for the property to be related in some way to the parties' dispute.").  Therefore, I do not consider jurisdiction under § 302(a)(4).

and protections of its laws.'" *Asahi Metal Indus. Co.*, 480 U.S. at 109 (quoting *Burger King Corp.*, 471 U.S. at 475). However, "[i]f jurisdiction is statutorily impermissible, then the Court need not reach the [constitutional analysis]," and must dismiss the lawsuit. *Best Van Lines, Inc.*, 490 F.3d at 244.

### 2.  Application

Here, Plaintiff has not met his burden to establish a prima facie showing of personal jurisdiction over the USAO Ohio Defendants, the Sixth Circuit Defendants, the CoreCivic Defendants, the Defense Attorney Defendants, the John Doe Defendants from USMA, and J.C. Holland.

Plaintiff alleges that:  the USAO Ohio Defendants maliciously prosecuted him and conspired to deprive him of his civil and constitutional rights, (Am. Compl. ¶¶ 100–04, 109); Judge Polster and Judge Cole joined in this conspiracy by forcing him to undergo psychological evaluation, fraudulently declaring him incompetent to stand trial, keeping him detained by refusing to rule on his motions, and interfering with his lawsuit even after he was released from prison, (*id.* ¶¶ 108–09, 113, 116, 130, 180, 191, 226–228); J.C. Holland, the John Doe U.S. Marshals, and the CoreCivic Defendants joined in this conspiracy by depriving him of his medical prescriptions and locking him in "freezers" in an attempt to murder him, (*id.* ¶¶ 114–119, 138–143); and the Defense Attorney Defendants were all coerced or intimidated by the FBI agents into betraying him or abandoning his case, (*id.* ¶¶ 88–93, 186–89).  Despite all of these allegations, Plaintiff has made no allegation that any of these Defendants were residents of New York or engaged in any "continuous, permanent, and substantial activity in New York," *Wiwa*, 226 F.3d at 95; *see* N.Y. C.P.L.R. § 301.  Nor does he allege that any of these Defendants' improper acts took place in New York, *see* § 302(a)(2), or arose out of business transacted in

New York, *see* § 302(a)(1), or that any of the Defendants regularly engaged in a persistent course

of conduct in New York, *see* § 302(a)(3)(i), or derived substantial revenue from interstate

commerce, *see* § 302(a)(3)(ii).

Moreover, except for Judge Polster, Judge Oliver, and Judge Cole, Plaintiff has not

alleged any conduct by the other Sixth Circuit Defendants, not to mention any tie between them

and New York.  Plaintiff does allege that Judge Cole made phone calls to Judge Reed in an

attempt to interfere with Plaintiff's New York State court case.  Plaintiff recounts what he

imagines was a telephone conversation between the two judges.  (*See* Am. Compl. ¶ 227 ("When

Judge R. Guy Cole contacted Judge Robert Reed, the conversation was extremely similar to the

following. . .").)  Plaintiff does not describe the source of his recitation of this conversation.  I

need not speculate what source, if any, Plaintiff had for his detailed description of the

conversation, nor need I examine whether these allegations should be dismissed as "fanciful,

fantastic, or delusional," *Gallop*, 642 F.3d at 368, because even taking them as true, these

allegations are not sufficient to establish specific jurisdiction over Judge Cole.  It is well

established in New York that "telephone calls originating outside the state may not constitute

tortious acts 'commit[ted] within the state'" under N.Y. C.P.L.R. § 302(a)(2).  *Bank v. Green*

*Bullion Fin. Servs., LLC*, 922 N.Y.S.2d 733, 735 (2nd Dep't 2011) (collecting cases); *see also*

*Lantau Holdings, Ltd. v. Orient Equal Int'l Grp.*, 2017 NY Slip Op 30464(U), at 11–12 (Sup.

Ct.) ("Most of the New York courts have refused to apply [N.Y. C.P.L.R. § 302(a)(2)] to claims

based on tortious statements that made their way to New York only by mail or telephone.").

Because no other provisions under N.Y. C.P.L.R. § 302 apply here, I do not have personal

jurisdiction over Judge Cole.

Because Plaintiff has not established personal jurisdiction under New York law over

these Defendants, I need not engage in the constitutional analysis, *Best Van Lines, Inc.*, 490 F.3d at 24, and must dismiss all claims against the following Defendants for lack of personal jurisdiction:  the USAO Ohio Defendants, the Sixth Circuit Defendants (except Judge Polster, Judge Griffin, and Judge Oliver), the Defense Attorney Defendants, and J.C. Holland.[9]

### C.     *Statute of Limitations*

"Section 1983 does not provide a specific statute of limitations.  Thus, courts apply the statute of limitations for personal injury actions under state law."  *Hogan v. Fischer*, 738 F.3d 509, 517 (2d Cir. 2013).  Accordingly, "Section 1983 actions in New York are subject to a three-year statute of limitations," *Milan v. Wertheimer*, 808 F.3d 961, 963 (2d Cir. 2015), which is triggered when a "plaintiff knows or has reason to know of the injury which is the basis of his action," *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994)) (quoting *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980)).

Plaintiff filed this action on October 21, 2019.  (Doc. 1.)  His last encounter with any NJ Investigation Defendants alleged in the Amended Complaint occurred in November 2014, when he sent a letter to Aaron Ford and James Comey informing them of the civil suit against the FBI that Plaintiff was about to file.  (Am. Compl. ¶ 77.)  That letter was dated nearly five years before the commencement of this action.  All of the alleged conducts of the NJ Investigation Defendants that might give rise to any causes of action took place more than three years before the filing of this lawsuit or, in other words, outside the statute of limitations period.

Plaintiff fails to provide any basis to justify tolling the statute of limitations.  Indeed, he admitted that he has not, and would not, read "even one word of either of the Motions to

---

[9] Even for those Defendants who have not appeared or moved to dismiss under Rule 12(b)(2), Plaintiff's allegations can hardly establish personal jurisdiction over any of them.  However, I do not reach this issue sua sponte, as the claims against those Defendants can be dismissed on other grounds.

Disimiss," much less respond to Defendants' statute of limitations defense.  (MTD. Opp., at 2.)[10]
Therefore, I must dismiss all claims against the NJ Investigation Defendants.

        **D.**     *Immunity*

          **1. Sovereign Immunity**

           a.  <u>The Claims against the Government Entity Defendants</u>

      It is well settled that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued[.]"  *AmBase Corp. v. United States*, 731 F.3d 109, 118 (2d Cir. 2013) (citation omitted).  "[A]n action against a federal agency or federal officers in their official capacities is essentially a suit against the United States[.]"  *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994).  Therefore, "in the context of a private party suit against a Federal agency or officer — absent a waiver of sovereign immunity — subject matter jurisdiction does not exist."  *SEC v. Comm. on Ways & Means of the United States H.R.*, 161 F. Supp. 3d 199, 216 (S.D.N.Y. 2015).

      Here, Plaintiff brings § 1983 claims against the Government Entity Defendants and a Bivens action against the DOJ.[11]  None of these claims can prevail.  "Actions of the Federal Government or its officers are exempt from the proscriptions of § 1983," *John's Insulation, Inc. v. Siska Const. Co., Inc.*, 774 F. Supp. 156, 161 (S.D.N.Y. 1991), and "Bivens actions . . . do not lie against federal agencies," *Caraveo v. United States EEOC*, 96 F. App'x 738, 740 (2d Cir. 2004); *see also Robinson*, 21 F.3d at 510(dismissing the pro se plaintiff's Bivens action against the federal agency under the doctrine of sovereign immunity).  Therefore, these claims are

---

[10] "MTD Opp." refers to Plaintiff's opposition to Defendants' motions to dismiss.  (Doc. 87.)

[11] Plaintiff's Bivens action against the FBI agents has been dismissed for lack of personal jurisdiction and for statute of limitations.  *See infra.*

dismissed.[12]

b.  <u>The Claim against Judge Reed</u>

"The Eleventh Amendment bars federal jurisdiction over suits against nonconsenting

States, and so whether or not sovereign immunity bars a claim is properly decided under . . . Rule

12(b)(1)." *Goonewardena v. New York*, 475 F. Supp. 2d 310, 321 (S.D.N.Y. 2007) (internal

quotation marks omitted).  "[A]s a general rule, state governments may not be sued in federal

court unless they have waived their Eleventh Amendment immunity, or unless Congress has

abrogated the states' Eleventh Amendment immunity when acting pursuant to its authority under

Section 5 of the Fourteenth Amendment." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009)

(internal quotation marks omitted).  "[T]he immunity recognized by the Eleventh Amendment

extends beyond the states themselves to state agents and state instrumentalities that are,

effectively, arms of a state."  *Id.* (citation omitted).

"[T]he New York State Unified Court System is unquestionably an arm of the State" and

therefore entitled to sovereign immunity under the Eleventh Amendment.  *Id.* at 368.  State

officials sued in their official capacity are likewise entitled to Eleventh Amendment sovereign

immunity because "the real party in interest in an official-capacity suit is the governmental entity

and not the named official."  *Zahl v. Kosovsky*, No. 08 Civ. 8308 LTS THK, 2011 WL 779784 at

*9 (S.D.N.Y. Mar. 3, 2011) (quoting *Hafer v. Melo*, 502 U.S. 21, 25 (1991)).

Judge Reed, sitting in the New York Supreme Court, is an officer of the New York State

Unified Court System.  There is no indication, and Plaintiff does not argue, that the New York

---

[12] To the extent that I construe Plaintiff's claims against the Government Entity Defendants as arising under the
Federal Tort Claims Act ("FTCA"), Plaintiff fails to allege that he has met the procedural requirements under 28
U.S.C. 2675, which requires that such a claim be first presented to the agency.  *See Collins v. United States*, 996
F.3d 102, 109 (2d Cir. 2021) ("The FTCA requires that a claimant exhaust all administrative remedies before filing a
complaint in federal district court.  This requirement is jurisdictional and cannot be waived." (quoting *Celestine v.
Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005).)

Supreme Court has waived its sovereign immunity or that Congress has abrogated such immunity.  Therefore, Plaintiff's claim against Judge Reed in his official capacity, to the extent that he does not seek purely prospective relief, is barred by the Eleventh Amendment.  *See e.g. id.* at *9 (dismissing claims against state court judges under the Eleventh Amendment).

## 2. Judicial Immunity

"It is well settled that judges generally have absolute immunity from suits for money damages for their judicial actions."  *Butcher v. Wendt*, 975 F.3d 236, 241 (2d Cir. 2020).  The purpose of this immunity is to ensure that the judicial offers can be free to act upon their own convictions "without apprehension of personal consequences."  *Bliven v. Hunt*, 579 F.3d 204, 209 (2d Cir. 2009) (citing *Bradley v. Fisher*, 80 U.S. 335, 347 (1871)).  Even allegations of bad faith or malice cannot overcome judicial immunity.  *Id.*  A judge will have absolute immunity from claims brought against them in their individual capacity if the actions were taken in their judicial capacity and not "in the complete absence of all jurisdiction."  *See Zahl*, 2011 WL 779784 at *9 (quoting *Mireles v. Waco*, 502 U.S. 9, 11–12 (1991)).

Judges, however, are not immune from liability for non-judicial actions or, in other words, actions not taken in the judge's judicial capacity.  *Id.* (citing *Mireles*, 502 U.S. at 11.)  In determining whether an act by a judge is a "judicial" one, the courts take a "functional approach" and look at the nature of the act itself.  *Id.* at 209–210.  Factors include "whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity."  *Id.* (quoting *Stump v. Sparkman*, 435 U.S. 349, 362 (1978)).  In determining whether a state judge's act is judicial or extrajudicial, courts look at state law.  *See Huminski v. Corsones*, 396 F.3d 53, 76 (2d Cir. 2005) (looking to state law to determine whether the state judges acted in their judicial capacities); *Shtrauch v. Dowd*, 651 F.

App'x 72, 73–74 (2d Cir. 2016) (same).  In New York, the "erroneous manner in which [the court's] jurisdiction was exercised," or the improper motive of the judges, "d[oes] not make the act any less a judicial act," although it may have affected the validity of the act.  *Tarter v. State*, 503 N.E.2d 84, 86 (1986) (quoting *Stump*, 435 U.S. at 359).

Plaintiff alleges that the Sixth Circuit Defendants "entered into a conspiracy to prevent [him] from being brought to trial."  However, the alleged "conspiracy" mainly involved Judge Polster's decisions to keep him incarcerated, to declare him "incompetent to stand trial" before dismissing the case and, presumably, the appellate judges' orders affirming this decision.  (Am. Compl. ¶¶ 180, 191.)  Such decisions are "function[s] normally performed by a judge," *Zahl*, 2011 WL 779784 at *9.  Plaintiff also alleges "judicial misconduct" which includes the Sixth Circuit Defendants' failure to grant his various requests and motions, including his requests for medication and to disqualify his attorneys.  (*Id*. ¶¶ 170, 176, 182.)  Ruling on such motions are also clearly within the judicial function.  Therefore, the Sixth Circuit Defendants are immune from suit in their individual capacity "however erroneous the act and however evil the motive" might have been, *Bobrowsky v. Yonkers Courthouse*, 777 F. Supp. 2d 692, 713 (S.D.N.Y. 2011) (internal quotation marks omitted).  Consequently, I dismiss the claims against the Six Circuit Defendants who are among the Moving Government Defendants.  Further, I sua sponte dismiss the claims against Judge Polster, Judge Griffin and Judge Oliver, who are not among the Moving Government Defendants, but who are otherwise clearly entitled to judicial immunity.  *See Deem v. Dimella-Deem*, 941 F.3d 618, 621 (2d Cir. 2019) (affirming the district court's sua sponte dismissal of claims against a judge, who was "clearly entitled to judicial immunity"); *see also DeJesus-Vasquez v. Bethencourt*, No. 19-CV-967 (KMK), 2020 WL 1047909, at *7 (S.D.N.Y. Mar. 4, 2020) (noting that a district court has "inherent authority to sua sponte dismiss frivolous

claims, even in pro se cases.").

Plaintiff alleges that Judge Reed "threaten[ed] to declare him incompetent to bring a civil suit," and fined him $250 "for no legitimate reason whatsoever." (Am. Comp. ¶¶ 221–22.) Plaintiff does not allege that judges from the New York Supreme Court lack the authority to declare someone "incompetent to bring a civil suit" or to impose sanctions on litigants, nor do I find that such acts are beyond the scope of Judge Reed's judicial function. Consequently, Judge Reed is also immune from suit in his individual capacity, regardless of whether he exercised his jurisdiction in an erroneous manner or with improper motives. *See Tarter*, 503 N.E.2d at 86. For the same reason above, I sua sponte dismiss the claims against Judge Reed.

## V. <u>Dismissal without Leave to Amend</u>

While leave to amend the complaint should be freely given when dismissing a pro se complaint sua sponte, the dismissal can be without leave to amend "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 98 (2d Cir. 2019) (citation omitted); *see also Peterec-Tolino v. New York*, 364 F. App'x 708, 711 (2d Cir. 2010) (affirming district court's sua sponte dismissal under Rule 12(b)(6) of the pro se plaintiff's claim because amendment would be futile). Courts have denied leave to amend as futile where the claims are barred by applicable statute of limitations or immunity. *See Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 634 (S.D.N.Y. 2014) (denying leave to amend as futile because the claim was barred by statue of limitations); *In re IndyMac Mortg.-Backed Sec. Litig.*, 793 F. Supp. 2d 637, 650–51 (S.D.N.Y. 2011) (same); *Johnson v. N.Y.C. Police Dep't*, 651 F. App'x 58, 61 (2d Cir. 2016) (dismissing the pro se plaintiff's complaint without leave to amend where the dismissal was based on absolute immunity, among other reasons); *Ying Li v. City of N.Y.*, 246 F. Supp. 3d 578, 646 (E.D.N.Y.

2017) (denying leave to amend where the dismissal was based on absolute immunity and statute of limitations).  Further, courts have found leave to amend futile when they "lack personal jurisdiction to litigate the matter."  *Kommer v. Ford Motor Co.*, No. 17-CV-296 (LEK/DJS), 2019 WL 2895384, at *1 (N.D.N.Y. June 19, 2019); *see also Shenzhen OKT Lighting Co. v. JLC-Tech LLC*, 2021 WL 4443637, at *12 (S.D.N.Y. Sep. 28, 2021) (denying leave to amend as futile after finding that the plaintiff failed to sufficiently allege personal jurisdiction over the defendant); *Taormina v. Thrifty Car Rental*, No. 16-CV-3255 (VEC), 2016 WL 7392214, at *8 (S.D.N.Y. Dec. 21, 2016) (same).

Here, Plaintiff already had an opportunity to amend his complaint.  Any further amendment would be futile because (1) Plaintiff has failed to timely serve or establish personal jurisdiction over many of the Defendants, and (2) Plaintiff would not be able to present sufficient allegations to make out any claim against the rest of the Defendants given the fanciful, fantastic, and delusional nature of his allegations.  Therefore, I decline to sua sponte grant leave to amend. *See Rodriguez v. Lahar*, No. 15-CV-3446 (CS), 2016 WL 5376217, at *4 (S.D.N.Y. Sep. 26, 2016) (declining to sua sponte grant leave to amend where the pro se plaintiff had already had an opportunity to amend and "better pleading will not fix" the problem with the claim).

### VI.  <u>Conclusion</u>

For the reasons above, Defendants' motions to dismiss are hereby GRANTED and Plaintiff's Amended Complaint is dismissed in its entirety.  The Clerk of Court is respectfully directed to mail a copy of this order to the pro se Plaintiff and terminate the case.

SO ORDERED.

Dated: March 28, 2022
        New York, New York

Vernon S. Broderick
United States District Judge